**SCHMOYER REINHARD LLP**
Richard L. Clifton (*Pro Hac Vice* granted)
Texas Bar No. 24103565
8000 IH 10 West, Suite 1600
San Antonio, TX 78230
(210) 447-8033

Tyler D. Williams [ISB No. 8512]
NAYLOR & HALES, P.C.
Attorneys at Law
950 W. Bannock Street, Ste. 610
Boise, ID 83702
Telephone No. (208) 383-9511
Facsimile No. (208) 383-9516
Email: tdw@naylorhales.com

**ATTORNEYS FOR DEFENDANT**
**UNITED PARCEL SERVICE, INC. (OHIO)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| HEIDI H. PECK; an individual;<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED PARCEL SERVICE, INC. an Ohio Corporation,<br><br>*Defendant.* | **CASE NO. 4:22-CV-00381-CWD**<br><br>**DEFENDANT'S MEMORADUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT** |

Defendant United Parcel Service, Inc. ("UPS") files this Memorandum in Support of Defendant's Motion for Summary Judgment and would respectfully show as follows:

## I. INTRODUCTION

This case is about a manager who was letting her employees lie about failing to deliver customers' packages and was fired for it. Plaintiff Heidi Peck, a former business manager at

UPS, was terminated December 13, 2021 for dishonesty, and now sues her former employer UPS for sex discrimination, unpaid wages in the form of a bonus she did not receive, and a collection of breach of contract claims.

But her claims are unsupported by the evidence. First, there was no contract between Peck and UPS, and her claim that an employee manual created a contract is contradicted by basic contract law. Second, the 2021 bonus she claims she was denied is for model employees; she had been investigated twice for dishonesty in 2021 and ultimately terminated. Moreover, the bonus—given in March of the following calendar year—is only available to employees who are still employed by UPS on December 31 of a calendar year. Because Peck was terminated for dishonesty on December 13, she cannot claim the bonus was "then due" as required to support a claim under the Idaho Wage Claims Act.

Finally, Peck cannot support her claim that her termination for dishonesty was actually sex discrimination. Her initial problem is that she cannot support the second or fourth elements of even a prima facie case of Title VII sex discrimination. The second element—that she performed her job satisfactorily up to her termination—is contradicted by the record showing two separate, substantiated investigations into misconduct at the centers under her control for covering up failed deliveries by attributing them to the customer or acts of nature. She was coached after the first investigation and, when a second investigation months later revealed the coverups continued, and witness interviews tied her directly to the practice, she was terminated. So, she cannot show satisfactory job performance. The fourth element—that other similarly situated employees were treated better under similar circumstances—is also contradicted by the record, showing a male manager was terminated around the same time after just a single investigation revealed the same type of hiding missed deliveries was occurring at his center. Thus, her case fails at the prima facie stage.

But even if it did not, UPS has provided a legitimate, nondiscriminatory reason for her termination and the burden is on Peck to demonstrate UPS's reason is merely pretext for unlawful sex discrimination. And she has no evidence of this. There is nothing in the record

showing either a sex-based decision or even a sex-based comment by anyone, let alone her supervisor who terminated her. Nothing else in the record contradicts that UPS terminated Peck after two separate investigations revealed her centers were actively hiding failed deliveries and that she had failed to correct the misreporting after agreeing to do so. Because Peck is unable to support a prima facie case or to demonstrate pretext, UPS is entitled to summary judgment on her sex discrimination claim.

## II. Undisputed Material Facts

Pursuant to Local Rule 7.1, please see UPS's Statement of Material Facts in Support of Defendant's Motion for Summary Judgment, filed contemporaneously with this Memorandum in Support.

## III. Arguments and Authorities

### A. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Wilcox v. Bibin*, No. 215CV00261EJLREB, 2017 WL 3749431, at *2 (D. Idaho Aug. 30, 2017).

The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," and instead "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

**B. Peck's claim of sex discrimination fails because she cannot establish the second or fourth elements of a prima facie case, and even if she could, she has no evidence of pretext.**

*a. The McDonnell Douglas burden-shifting analysis governs claims of sex discrimination under Title VII.*

The well-known *McDonnell Douglas* framework governs claims of discrimination under Title VII.[1] *Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1123 (9th Cir. 2000). To establish a *prima facie* case under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). A person suffers differential treatment in her employment "when he or she is singled out and treated less favorably than others similarly situated on account of [sex]." *See McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1121 (9th Cir. 2004) (internal quotation marks omitted).

*b. Peck's sex discrimination claim fails because she cannot establish the second element of a prima facie case: that she performed her job satisfactorily. The May 2021 investigation revealed a practice of hiding failed deliveries at her Rexburg facility. She was directed to stop the practice, which she promised to do. The subsequent July 2021 investigation revealed the practice was ongoing. Thus, she cannot support the critical performance element of her prima facie case.*

As an initial matter, Peck cannot even support a prima facie case of sex discrimination. The undisputed material facts demonstrate that she was investigated twice for dishonesty in

---

[1] Peck brings her claim under Title VII of the Civil Rights Act of 1964. *See* Dkt. Entry 1 (Pl's. Complaint) at 5-6. Peck's Complaint, however, under "Jurisdiction and Venue," mentions the Idaho Human Rights Act ("IHRA"). To the extent she purports to bring her sex discrimination claim under the IHRA, the analysis is the same. *See Colo v. NS Support, LLC*, No. 1:20-CV-00437-DKG, 2022 WL 2528266, at *4 (D. Idaho July 7, 2022) ("Claims under the IHRA are analyzed under the same standards applicable to Title VII claims.").

the year leading up to her termination. She was given an opportunity to stop the practice, confirmed that she would, and then UPS discovered the practice was still ongoing months later. Unable to show she performed her job satisfactorily—an essential element of a prima facie case of discrimination—her claim is ripe for summary judgment.

Where an employee fails to demonstrate satisfactory job performance according to an employer's legitimate expectations, the inquiry ends. *See Ochs. v. Eugene Emeralds Baseball Club, Inc.*, 774 Fed. App'x 1026, 1029 (9th Cir. 2019) (affirming summary judgment on female employee's Title VII claim where, although employee had "good sales numbers," she had also been warned about prior misbehavior); *Martin v. City of Reno*, 168 Fed. App'x 802, 803 fn.1 (9th Cir. 2006) (affirming summary judgment where performance concerns were raised and, on that basis, holding the Court "need not address the other steps of the burden-shifting framework for discrimination claims . . . .").

Evidence from two investigations into Peck's management at her Rexburg and Idaho Falls Centers establishes that she was not performing her job satisfactorily. In May 2021, UPS security launched an investigation following allegations reported through a helpline complaint that drivers' failures to deliver packages were being hidden by misreporting them as non-service failures. *See* Ex. 1 (Statement of Material facts) at ¶ 20. This investigation was substantiated, revealing a practice of hiding service failures. *Id*. Moreover, during the investigation, Peck admitted to being aware of a problem with service failures at the Rexburg Center despite the center reporting almost no service failures, and further admitted that she had been signing compliance documents without reading them, a clear neglect of duty. *Id*. at ¶¶ 23-24.

During a May 28, 2021 interview, Idaho Division Manager Steve Johns counseled Peck on proper reporting of service failures and directed her to rectify these practices at her centers. *See* Ex. 1 (Statement of Material facts) at ¶¶ 23-25. In addition, Peck's manager Troy Emerson sent an email to all business managers under his supervision, including Peck, alerting them that the practice was unacceptable and "must cease immediately." *Id*. at ¶ 26. Peck responded

to this email, stating "[g]ot it." *Id*. Despite these directives and Peck's promise to put a stop to this deceptive practice, a subsequent investigation started in July 2021 and concluded in September 2021 revealed the continuation of the practice of hiding service failures by misrepresenting them as nonservice failures under her supervision, and witness interviews tied her directly to the practice. *See* Ex.1 (Statement of Material facts) at ¶¶ 27, 30.

The continuation of these deceptive practices despite clear instructions and retraining highlights a deliberate disregard for company policies and a failure to perform her managerial duties adequately. Additionally, Peck's admission of signing off on certifications without reading them further underscores her neglect of responsibilities critical to her role. Given the clear evidence of Peck's unsatisfactory job performance, she cannot establish the second element of a prima facie case under Title VII. *Cornwell*, 439 F.3d at 1028; *Ochs*, 774 Fed. App'x at 1029. Consequently, summary judgment should be granted to UPS on this ground alone.

*c. Peck's sex discrimination claim also fails because she cannot establish the fourth element of a prima facie case: that similarly situated individuals outside of her protected class were treated more favorably.*

Peck also cannot demonstrate the fourth element of her prima facie case of sex discrimination: that she was treated less favorably than others under similar circumstances. Peck claims that "UPS discriminated against [her] on the basis of her sex when it terminated her without warning for alleged conduct that UPS did not terminate other male Business Managers for engaging in." Dkt. Entry 1 (Pl's. Complaint) at 5-6, ¶ 39. But the record shows UPS terminated a male manager for less severe conduct, and the comparators Peck relies on in her complaint were in different situations and investigated fewer times than Peck.

To establish similarity under the *McDonnell Douglas* framework, the individuals being compared "need not be identical; they must only be similar 'in all material respects.'" *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)) (applying *McDonnell Douglas* to a Title VII claim). Generally, "individuals are similarly situated when they have similar jobs and display similar conduct."

*Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

Critically, when attempting to compare discipline, the misconduct must be the same; more severe misconduct, prior instances of misconduct versus no prior instances, or other differentiating circumstances, make a comparator invalid. *Scott v. Mabus*, 618 F. App'x 897, 899 (9th Cir. 2015) (plaintiff terminated while on probation could not use non-probationary employees who engaged in same misconduct as comparators); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (different type of misconduct negates showing employees were similarly situated); *Wall v. Nat'l R.R. Passenger Corp.,* 718 F.2d 906, 909 (9th Cir.1983) (affirming summary judgment where plaintiff did not show that he was treated less favorably than similarly situated employees because other employees had no prior misconduct, unlike plaintiff, and were thus not similarly situated); *see also Ankeny v. Napolitano*, No. C09-1379-JCC, 2010 WL 5094687, at *3 (W.D. Wash. Dec. 7, 2010) ("Different misconduct mandates different responses."). Likewise, a showing that similarly situated individuals to a plaintiff were treated similarly prevents a showing of disparate treatment. *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1094 (9th Cir. 2001) (holding that a showing that similarly situated employees were treated in a like manner to plaintiff "negat[ed] any showing of pretext").

Here, the difference between Peck and the male comparators she proffers is clear: Peck engaged in the misconduct twice; the male comparators only once, along with other dissimilarities. The record demonstrates that male employees in comparable positions who engaged in similar conduct were subject to the same disciplinary actions as Peck the first time they were investigated, and despite her assertion, Peck has no evidence to demonstrate that anyone was treated more favorably than her.

Indeed, the evidence shows the opposite is true. The record shows that Josh Bowman, a white male supervisor out of Butte, Montana, was terminated after just a single security investigation in July 2021 revealed that misreporting was occurring at his center. *See* Ex. 1 (Statement of Material facts) at ¶ 38. The investigation into Bowman was part of the company-

wide effort of eliminating this type of fraudulent reporting, which further emphasizes that managers were being investigated regardless of their gender. *Id*. at ¶ 16. Like Peck, employees under Bowman's supervision were falsifying delivery records to hide packages that were not delivered on the intended day. *Id*. at ¶ 39. Like Peck, security conducted an investigation into the practice and found it was substantiated. *Id*. Like Peck, Bowman was terminated for dishonesty. *Id*. But unlike Peck, Bowman was terminated after only a single substantiated investigation, whereas Peck was not terminated until a second substantiated investigation. *Id*. Moreover, UPS offered Peck a demotion to an on-road supervisor, while Bowman was given no such offer. *Id*. *Wall*, 718 F.2d at 909

Additionally, Peck's supervisor Troy Emerson demoted two male business managers to on road supervisor for the same misconduct *after only their first offense*. Emerson testified that he previously terminated two male business managers for dishonesty in 2018, each after only a single security investigation revealed that there was a practice of manipulating records ongoing at their facilities. Peck was also offered a demotion (after the second security investigation) but ultimately refused it. *See* Ex. 1 (Statement of Material facts) at ¶ 37. Thus, if anything, the record evidence suggests that Peck was given more leniency than her male counterparts. This precludes Peck from making a showing of disparate treatment. *See Cornwell*, 439 F.3d at 1028l; *Snead*, 237 F.3d 1080.

Peck attempts to rely on two other male business managers to support her claim: Floyd Reinhardt and Brian Livdahl. But these individuals cannot serve as comparators as a matter of law. First, the most glaring difference between the two is that Reinhardt was only investigated *once* for the practice occurring at his facility. Ex. 1 (Statement of Material facts) at ¶¶ 40-41. Peck, as shown, had been given a chance after the first investigation and was only terminated after a *second* investigation months later revealed she had not stopped the misreporting despite promising to do so. *Id*. Second, Reinhardt was forthcoming in the investigation and admitted the practice was occurring at his facility, while Peck was evasive and claimed she had not even read the reporting policy reviews, merely signed and returned them. *Id*. at ¶ 40. Third, none of

Reinhardt's subordinates suggested he was responsible for the deceptive practice, while witness interviews in Peck's case tied her directly to the practice. *Id.* Fourth, Reinhardt went on FMLA leave while his investigation was pending and never returned, preventing UPS's from taking any disciplinary action against him. *Id*. at ¶ 41. Indeed, Emerson—who was Peck's supervisor as well—testified that would have terminated Reinhardt but could not because he was on FMLA leave.[2] *Id*.. So from any viewpoint, Peck cannot show that Reinhardt received more favorable treatment.

Livdahl is even more unfit as a comparator because he was disciplined in 2003—18 years before Peck's case even arose. Ex. 1 (Statement of Material facts) at ¶ 42. Moreover, he was demoted for a different reason: poor service numbers. *Id*. That is, his center was accurately reporting service failures and he was disciplined because the numbers were unacceptable. *Id*. Peck was disciplined because her centers were *hiding* service failures from management, thus making their circumstances dissimilar as a matter of law. *Id*. at ¶¶ 33-34.

Peck has failed to demonstrate that similarly situated individuals outside her protected class were treated more favorably. The evidence shows that disciplinary actions were consistently applied across employees regardless of sex and, accordingly, Peck cannot establish the fourth element of her prima facie case of sex discrimination.

c. *Even if Peck had evidence to support a prima facie case—which she does not—she cannot demonstrate that UPS's reason for terminating her was unworthy of belief and thus pretext for discrimination.*

Even if Peck had evidence supporting a prima facie case of sex discrimination, she has no evidence that UPS's reason for terminating her is unworthy of belief. UPS terminated Peck based on credible, substantiated findings of dishonest practices at two facilities she managed. The initial May 2021 investigation into her Rexburg facility and a subsequent July 2021

---

[2] As discussed in the statement of facts, FMLA leave is not approved by UPS; leave is approved through the Hartford and UPS has no control or input on the decision to approve FMLA leave. Ex. 1 (Statement of Material facts) at ¶ 41. And UPS typically will not issue any discipline, including termination, to an employee that is out on approved FMLA leave. *Id*.

investigation into her Idaho Falls Center both concluded that Peck failed to rectify dishonest reporting practices, despite clear directives and retraining after the first investigation. UPS has therefore provided a legitimate, nondiscriminatory reason for Peck's termination, and it is Peck's burden to show the reason is actually pretext for sex discrimination.

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003). "Although the burden of production shifts to the defendant at this point, the burden of proof remains with the plaintiff at all times." *Id*. (citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)). If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is actually pretext for discrimination in order to survive summary judgment. *Id*. (citing *McDonnell Douglas,* 411 U.S. at 804).

Here, UPS met its burden by providing a legitimate reason for terminating Peck: dishonest practices continued at her facility after being warned a first time, and witness interviews tied her directly to the practice the second time. *See* Ex. 1 (Statement of Material facts) at ¶¶ 31, 33. At this point in the analysis, the "presumption of unlawful discrimination simply drops out of the picture." *McGinest,* 26 F.3d at 889. To survive summary judgment, Peck must show that UPS's reason for terminating her is pretext for discrimination "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Summers v. City of McCall*, 84 F. Supp. 3d 1126, 1140 (D. Idaho 2015) (internal marks omitted) (quoting *Dawson v. Entek Intern.,* 630 F.3d 928, 935 (9th Cir. 2011)). Where the evidence is circumstantial, the employee must provide enough evidence to create a genuine issue of material fact. *Dawson,* 630 F.3d at 936. To show UPS's reason for terminating Peck is "unworthy of credence," Peck must produce some evidence that UPS's reason "was due in part or whole to discriminatory intent, and so must counter [UPS]'s explanation." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1123 (9th Cir. 2004).

Peck has no evidence of pretext here. First, there is no direct evidence of sex discrimination as there is no testimony that anyone made a statement linking the decision to terminate Peck to her protected class. Indeed, Alecia Todd and Troy Emerson testified her termination was based exclusively on investigation outcomes and that no consideration of her gender or any other irrelevant personal characteristics was made. Ex. 1 (Statement of Material facts) at ¶ 33. The thorough investigations, conducted by the security group and reviewed for accuracy, focused solely on Peck's professional conduct and adherence to company policies. *Id*. Peck was given opportunities to correct her behavior following the first investigation, and the continued policy violations after being given that chance justified her termination. *Id*. at ¶¶ 26-27.

Against this evidence, Peck has only the assertion that, even if the concealment was happening, she was not responsible for the practice or UPS should not have disciplined her for it. But this argument is a red herring. It is an assertion that UPS made the wrong business decision in terminating her. Peck's burden, however, is to show that UPS's reason was false, and the real reason was discriminatory intent. *Summers*, 84 F. Supp. 3d at 1140.

Courts are not super-human-resources departments, second guessing whether a business made the best or even right decision in terminating an employee. *See Hutchins v. DirecTV Customer Serv., Inc.,* No. 1:11-CV-422-REB, 2013 WL 12149687, at *3 (D. Idaho Oct. 2, 2013) ("[T]he Court is not to act as a 'super personnel department' and 'second-guess the wisdom of an employer's business decision' absent some evidence of discriminatory intent.) (emphasis original); *cf. Hoyt v. Dole Packaged Foods Co.,* 119 F.3d 6 (9th Cir. 1997) ("The purpose of the ADEA is to prevent discrimination in the workplace, not act as a general regulation of employers hiring, promoting, and terminating decisions."); *Stevenson v. Potlatch Corp.*, 674 F. Supp. 1410, 1417 (D. Idaho 1987), *aff'd*, 874 F.2d 816 (9th Cir. 1989) ("It is not this court's function, in the context of a federal age discrimination claim, to second-guess the business decisions of a defendant."). Peck can only argue that *some* of the witnesses interviewed in the May and July 2021 investigations did not state, one way or the other, that

she was involved in the practice of hiding service failures, and that a question therefore exists as to whether she was in fact responsible for the practice. This is not evidence of pretext as to the reasons UPS cited for her termination; it is merely an argument for UPS not making the *right* decision in terminating her employment.

To survive summary judgment, Peck must show more than that she *might* not have been personally responsible for the practice at her facility of hiding service failures; she must show that UPS is lying about the reasons it gave for her termination and that the real reason is sex discrimination. *Mihailescu v. Maryville Nursing Home,* 339 F. App'x 717, 719 (9th Cir. 2009) ("An employer is required only to offer its honest reasons for its action, even if the reason is foolish, trivial, or baseless.") (citing *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1063 (9th Cir. 2002)). Even a mistake that the employee engaged in misconduct may be a legitimate and nondiscriminatory reason for an employer's conduct. *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011) (stating that an employee cannot establish pretext by "simply show[ing] the employer's decision was wrong, mistaken, or unwise") (citation omitted).

Peck cannot offer any evidence to even suggest UPS did not have a good faith belief regarding the policy violations cited for her termination, let alone that her sex was a factor in deciding to terminate her employment. Indeed, the two investigations conducted by separate investigators concluded the misconduct was occurring at her Rexburg and Idaho Falls centers, witnesses tied her to the practice, and the decision makers testified that she was terminated for that ongoing misconduct. Ex. 1 (Statement of Material facts) at ¶¶ 33-34. And while Peck asserts that investigator Holloway was subsequently disciplined himself, that has no bearing on her termination because: (1) he was disciplined for misconduct in July 2022, so his discipline could not have influenced the decision to terminate Peck seven months earlier, and (2) the security director conducted a second review of Holloway's investigation of Peck in July 2022 and found no impropriety into Peck's investigation. *Id.* at ¶ 42. And there is no record evidence that Holloway had any discriminatory animus toward Peck. Peck is thus left only

with the assertion in her complaint that "UPS discriminated against Ms. Peck on the basis of her sex," which is insufficient to survive summary judgment. Dkt. Entry 1 (Pl's. Complaint) at 5-6, ¶ 39; *see Ting v. Adams & Assocs., Inc.*, 823 F. App'x 519, 523 (9th Cir. 2020) (holding that a conclusory allegation that employer's conduct was on account of employee's protected characteristics was insufficient to state a claim). Accordingly, Peck cannot demonstrate pretext and her sex discrimination claim must be dismissed for this additional reason as well.

**C. Peck's contract claims (Counts III-V) fail outright because she has no evidence there was a contract of employment between her and UPS, and an "employee manual" does not constitute a contract under Idaho law, especially where the manual expressly states it is not a contract and there is no other "manifestation of intent" to contract. Because there is no contract, her claims for breach of contract and breach of the duty of good faith and fair dealing fail.**

Peck's breach of contract and breach of duty of good faith claims are frivolous, resting entirely on the assertion that certain employee manuals constituted an employment contract between her and UPS. Idaho law clearly establishes that for an employment contract to be binding, it must exhibit a mutual intent to contract, which is absent here. And both the UPS employee manual and dispute resolution manual that Peck relies on state on page one that they are not contracts. Peck's contract claims (Counts III-V) therefore fail as a matter of law.

"In order for a contract to be formed there must be a meeting of the minds. A meeting of the minds is evidenced by a manifestation of intent to contract which takes the form of an offer and acceptance." *Unifund CCR, LLC v. Lowe*, 367 P.3d 145, 149 (2016) (quoting *Barry v. Pac. W. Constr., Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004)). "The meeting of the minds must occur on all material terms to the contract." *Tricore Invs., LLC v. Est. of Warren through Warren*, 485 P.3d 92, 111 (2021) (quoting *Barry*, 103 P.3d at 444) (internal quotations omitted). "The material terms . . . include the parties to the contract, [and] the subject matter of the contract, . . . ." *Bear Island Water Ass'n, Inc. v. Brown*, 874 P.2d 528, 533 (1994).

"Whether there was a meeting of the minds is an objective inquiry that does not focus on the subjective beliefs or intentions of [the parties]." *Brunobuilt, Inc. v. Strata, Inc.*, 457 P.3d 860, 869 (2020).

The express terms of the manuals Peck relies on here demonstrate by their terms that they are not contracts between UPS and Peck. Peck relies on two documents: The Employee Dispute Resolution ("EDR") manual, and the UPS Policy Book. Dkt. Entry 1 (Pl's. Complaint) at 7-8[3]. The EDR manual, which outlines a voluntary dispute resolution process, states on its first page that it is not a contract:

> Note: The UPS Employee Dispute Resolution (EDR) Program establishes a procedure for resolving workplace disputes, but does not establish any of the terms of your employment. The UPS EDR Program creates a mechanism for the investigation and resolution of employment related concerns. Although that mechanism may change from time to time to improve its efficiency, it is intended to be a process upon which you and the company will rely. At the same time, however, nothing in the EDR process or this program booklet creates a contract of employment, express or implied, for any period of time. The UPS EDR Program does not alter UPS's at-will employment policy.

Ex. 1 (Statement of Material facts) at Ex. N, pg. 10. Further removing any pretense of contract, the manual goes on to state that the recommendations of the EDR Peer Review Panel are non-binding. The Peer Review Panel consists of three UPS employees, two members chosen by the employee and one member chosen by the company, who review evidence and listen to informal testimony from the employee, company representative, and witnesses, and make a recommendation on whether to uphold discipline or modify it. *Id.* at 9. In a bold typeface page entitled "Non-Binding Nature of the Peer Review Recommendation," it further clarifies that neither UPS nor the employee are bound to follow the recommendations of the EDR panel,

[3] There is no "Employee Manual," at UPS, as Peck states in her complaint.

underscoring the non-binding nature of the document. *See id*. ("After listening to the information presented during the Peer Review Conference, the three Panel members will deliberate and provide a non-binding recommendation. This is not a decision, instructions, or an order. . . . You and the company will have 10 business days to either accept or reject the recommendation from the Peer Review Conference.").

It is the same for the UPS Policy Book. On the first page, even before the table of contents, it states, "[t]he Policy Book is not a contract of employment and does not guarantee employment for any particular period of time, or otherwise create any rights as an employee of UPS." Ex. 1 (Statement of Material facts) Ex B (Policy Book Excerpts) at 2.

Such explicit disclaimers show neither Peck nor UPS manifested an intent to enter into a contractual relationship through the EDR manual or Policy Book. Courts in the 9th Circuit routinely refuse to entertain such claims. *Rouse v. Wal-Mart Stores, Inc.*, 297 F. App'x 608, 609 (9th Cir. 2008) (holding employee handbook, standing alone, is not sufficient to demonstrate existence of a contract); *Almada v. Allstate Ins. Co.*, 153 F. Supp. 2d 1108, 1112 (D. Ariz. 2000), *aff'd sub nom. Almada v. Allstate Ins. Co.*, 285 F.3d 798 (9th Cir. 2002) ("Clear and conspicuous disclaimers instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.") (cleaned up); *Bianco v. H.F. Ahmanson & Co.*, 897 F. Supp. 433, 440 (C.D. Cal. 1995) (holding that "when the employee handbook states on its face that it is not intended to constitute or create, . . . an employment contract," it cannot be evidence of an employment contract). And, without a contract, Peck's claims for breach of contract or breach of duty of good faith and fair dealing are baseless. *See Rouse*, 297 F. App'x at 609 fn.1 ("Plaintiff also contends that Wal–Mart breached the covenant of good faith and fair dealing. Even assuming that plaintiff pleaded such

a claim, it also requires the existence of a contract.”).

Given the explicit language in the EDR manual stating that it is not a contract and the absence of any intent by UPS to enter into a binding contractual relationship through such a document, Peck’s contract claims (Counts III-V) cannot survive summary judgment. This Court should grant UPS’s Motion on these claims as well.

**D. Peck’s claim for unpaid wages related to an annual merit bonus also fails. To be eligible for a Manager Incentive Program (“MIP”) bonus, an employee must be a model employee, and be employed from January 1 to December 31 of a calendar year. Because Peck was terminated for dishonesty on December 13 after two separate investigations in 2021, she did not meet the eligibility qualifications, and therefore could not have “fully earned” the bonus by the time of her termination, as required to state a claim for unpaid wages under Idaho law.**

Peck’s claim for unpaid wages relating to a denied annual bonus under the Manager Incentive Program (“MIP”) is unfounded. To be eligible for an MIP bonus, the employee must not only exhibit model behavior but also be actively employed from January 1 through December 31 of the applicable year. Peck’s two substantiated investigations for misconduct in 2021, and her termination on December 13 for that misconduct, disqualifies her from meeting these criteria. The bonus therefore was not due and payable under Idaho law, and her claim for unpaid wages must be dismissed.

The Idaho Wage Claims Act (Idaho Code §§ 45-601, *et seq.*) defines “wages” as compensation for labor or services rendered by an employee, irrespective of the basis of calculation. And Idaho Code § 45-606 specifies that upon termination, an employer is obligated to pay all wages *then due* by the next scheduled payday or within ten days, excluding weekends and holidays. Wages are interpreted as compensation earned and payable at the time of termination. *Huber v. Lightforce USA, Inc.*, 367 P.3d 228, 237 (Idaho 2016).

As stated, the MIP bonus is an incentive program for high performance. To qualify for an MIP bonus, an employee must be recommended for a bonus by his or her manager for exceptional performance throughout the entire calendar year. Ex 1 (Statement of Facts) at ¶

44. More importantly here, the employee must also still be employed by UPS as of December 31 of the calendar year. *Id*. Once the criteria have been met, the bonuses are evaluated and paid out in March of the following calendar year. *Id*.

But Peck was terminated on December 13, 2021, prior to the year-end cutoff for bonus eligibility. That alone demonstrates her MIP bonus had not been "earned" at the time of her termination, because she was terminated before she met the basic criteria to qualify for the bonus. Ex 1 (Statement of Facts) at ¶ 45. Even if that were not enough, the MIP bonus is reserved for employees who consistently demonstrate exemplary performance and receive a recommendation from their manager for the bonus. Peck's involvement in two substantiated investigations—one in May and one in July of 2021—for dishonest reporting practices disqualifies her from being considered a model employee. *Id*. Indeed, her manager stated unequivocally that he would not have recommended her for the bonus based on these investigations and did not in fact recommend her. *Id*. Without your manager's recommendation, you cannot be eligible for an MIP bonus. *Id*. Given the requirements to be eligible for the MIP bonus and Peck's failure to meet these terms due to her termination for misconduct prior to December 31, she was not entitled to the bonus, and it was therefore under Idaho law not "wages" due at the time of her termination. *Huber*, 367 P.3d at 237.

Consequently, Peck's claim for unpaid wages related to the MIP bonus is without merit and should be dismissed. This Court should grant summary judgment in favor of UPS on this claim as well.

**E. Even if Peck's claims survived summary judgment, UPS would be entitled to judgment on her damages because she has failed to mitigate her damages.**

Even if any of Peck's claims survived dismissal, the fact remains that Peck has failed to mitigate her damages and UPS is entitled to summary judgment on its affirmative defense. To support this affirmative defense, a defendant must establish "(1) that the damages suffered by plaintiff could have been avoided, *i.e.*, that there were suitable positions available which plaintiff could have discovered and for which [she] was qualified; and (2) that the plaintiff

failed to use reasonable care and diligence in seeking such a position." *Colo v. NS Support, LLC*, No. 1:20-CV-00437-DKG, 2023 WL 4034208, at *21 (D. Idaho June 15, 2023) (quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir. 1978)).

Peck claims damages related to her termination, including back pay up to the present and front pay going forward for the time she would have continued working for UPS. *See* Dkt. Entry 1 at 6. But it is undisputed that Peck did not mitigate her damages because she refused UPS's offer of a demotion to on-road supervisor. Ex 1 (Statement of Facts) at ¶ 36. A demotion is a common for of discipline at UPS, and she would have remained open for future promotions. *Id*. Peck refused this offer. But, had she taken it, she would have gone from making $104,100 annually to $84,900 annually. Accordingly, Peck cannot show she mitigated her damages and cannot show she is entitled to back or front pay that she allegedly would have been receiving from UPS but for her refusal to take UPS's offer of reinstatement. *See High Speed Enter., Inc.*, 833 F. Supp. 2d at 1161–62. UPS is accordingly entitled to summary judgment on its affirmative defense of failure to mitigate. *Id*.

## IV. CONCLUSION

In conclusion, the Court should grant summary judgment on all claims in favor of UPS. The material facts show Peck failed to perform her job duties satisfactorily and engaged in dishonest practices, crucially failing to establish the necessary elements of a prima facie case for sex discrimination. Further, no evidence supports her claims of disparate treatment or pretext for discrimination. Moreover, Peck's contract and unpaid wages claims fall flat as she cannot demonstrate the existence of an employment contract, nor does she meet the criteria for the disputed bonus. Additionally, Peck's failure to mitigate damages solidifies UPS's affirmative defense. For these reasons, this Court should grant UPS's Motion for Summary Judgment in its entirety.

DATED: May 17, 2024

*/s/ Richard L. Clifton*
Richard L. Clifton (*Pro Hac Vice* Granted)
Texas State Bar No. 24103565
rclifton@sr-llp.com
SCHMOYER REINHARD LLP
8000 IH 10 West, Suite 1600
San Antonio, TX 78230
(210) 447-8033

and

Jacob H. Naylor
Taylor D. Williams
Naylor & Hales, P.C.
950 W. Bannock Street, Suite 610
Boise, ID 83702
Phone: (208) 383-9511
Fax: (208) 383-9516
jake@naylorhales.com
tdw@naylorhales.com

**ATTORNEYS FOR UNITED PARCEL SERVICE, INC. (OHIO)**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served *via email* to:

Cory R. Stegelmeier
Blake G. Hall
Sam L. Angell
Cory R. Stegelmeier
Hall Angell & Associates, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Telephone: (208) 522-3003
Fax: (208) 621-3008
bgh@hasattorneys.com
sla@hasattorneys.com
crs@hasattorneys.com

**ATTORNEYS FOR PLAINTIFF**

on this 17th_day of May, 2024.

*/s/ Richard L. Clifton*
Richard L. Clifton