**SCHMOYER REINHARD LLP**
Richard L. Clifton (*Pro Hac Vice* granted)
Texas Bar No. 24103565
8000 IH 10 West, Suite 1600
San Antonio, TX 78230
(210) 447-8033

Tyler D. Williams [ISB No. 8512]
NAYLOR & HALES, P.C.
Attorneys at Law
950 W. Bannock Street, Ste. 610
Boise, ID 83702
Telephone No. (208) 383-9511
Facsimile No. (208) 383-9516
Email: tdw@naylorhales.com

**ATTORNEYS FOR DEFENDANT**
**UNITED PARCEL SERVICE, INC. (OHIO)**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| HEIDI H. PECK; an individual;<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC. an Ohio Corporation,<br><br>*Defendant.* | **CASE NO. 4:22-CV-00381-CWD**<br><br>**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT** |

Defendant United Parcel Service, Inc. ("UPS") submits this its Statement of Material Facts in Support of Motion for Summary Judgment and respectfully shows as follows:

## STATEMENT OF MATERIAL FACTS

1. United Parcel Service, Inc. ("UPS") is the world's largest package delivery and logistics company, employing more than 400,000 employees in the United States and transporting more than five billion packages annually to more than 220 countries and territories. Ex. A (Decl. of A. Todd) ¶ 1.[1]

2. UPS provides managers and supervisors with a Policy Book and Code of Business Conduct, which restate UPS's commitment to providing a work environment free of unlawful discrimination. *See* Ex. B (Policy Book); Ex. C (Code of Business Conduct) at 24-25.

3. To ensure and encourage reporting of any unlawful discrimination without the need of involving local management, UPS also maintains an independently monitored 1-800 number (Helpline) that employees can call to report any workplace concerns. *See* Ex. C (Code of Business Conduct) at 6; Ex. D (Anti-Harassment Policy) at 1.

4. UPS hired Plaintiff Heidi Peck in 2004 as a preloader. Ex. E (Peck Deposition Excerpts) at 16:12-21. In 2007, she briefly served as a cover driver and then was promoted to a full-time on road supervisor. *Id*. at 24:8-11. In 2019, she was promoted to business manager over the eastern Idaho area, including UPS's Rexburg and Idaho Falls centers. *Id* at 27:4-8.

[1] Regarding exhibits, UPS cites to specific paragraphs of declarations and pages and lines of depositions. For exhibits comprised of aggregated documents, UPS cites to the exhibit's ordinal pagination, which should correspond to the auto-stamped ECF pagination.

5. As business manager, she was responsible for all business aspects at the facilities under her care and supervised all on-road supervisors at those centers. Ex. E (Peck Deposition Excerpts) at 29:4-17.

**Reporting of Service Failures and Exceptions**

6. A key statistic reviewed by corporate management at UPS is the number of service failures in a given service region. Ex. F (C. Fitzmaurice Deposition) at 46:16-21. The Service Exceptions and Analysis ("SEAS") database allows UPS to see how packages are flowing through network, including service failures in a particular area. *Id*. at 48:8-13.

7. A "service failure" is the term used to describe when a driver does not make a scheduled delivery due to a failure on UPS's part. *Id*. at 64:3-15; 46:12-15. Knowing the number of service failures is important to UPS. If a center is struggling with service failures, it indicates to leadership that something is not running well in that center. *Id*. at 46:16-21.

8. If these failures are not reported, it does not give appropriate visibility to leadership to ensure customers are being serviced properly. *Id*. at 46:21-25. Service failures damage UPS reputation among shippers who rely on UPS to deliver packages to their customers, as well as members of the public relying on their service. Ex. G (Declaration of C. Fitzmaurice) at ¶ 10.

9. A secondary issue is that if there is a service failure, that is, if it is UPS's fault a package was not delivered on time, the customer can get a Guaranteed Service Refund ("GSR"). If, however, the customer's error or an act of nature is the reason a delivery could not be made, the customer is not eligible for a GSR. Ex. F (C. Fitzmaurice Depo) at 47:1-11.

10. An example of a service failure would be when a loader places a package on the wrong UPS delivery truck and the intended recipient does not timely get the package. That is

a service failure because the loader made a mistake and put the package on wrong car; thus, it is UPS's error that caused the delivery failure. *Id* at 29:4-17, 44:17-20. Another example would be when a truck breaks down and the driver is unable to make his or her deliveries because of the breakdown. *Id*. at 44:1-11, 17-20.

11. Drivers report the delivery or failure to deliver every package that is loaded onto their vehicle through the use of a handheld computer system called a Delivery Information Acquisition Device, known as a DIAD. Ex G (Declaration of C. Fitzmaurice) at 9. The system automatically notifies the customer of the delay and delivery failure. Ex. F (C. Fitzmaurice Depo) at 19:24-25, 20:1-3.

12. If there are acts of God or weather conditions or something not under UPS's control that prevents delivery, that's an exception, not a service failure. *Id*. at 64:3-15. "Exceptions" are what the driver puts into the system to explain why they could not make a scheduled delivery. *Id*. at 18:11-14.

13. Reporting such nonservice failure exceptions when a service failure actually occurred is hiding service failures, both from management and the customers themselves. *Id*. at 29:1-3.

14. Employees are trained on proper reporting and the difference between service failures and nonservice failures via a course that teaches them how and what to report regarding packages that are not delivered. *Id*. at 64:16-25. After that initial training when an employee begins his or her position, there are also annual certification trainings that remind and retrain employees on proper reporting procedures. *Id*. at 64:16-25.

15. A business manager who has a significant number of service failures at one of his or her centers will have to answer to leadership for why service failures are happening at

those centers. *Id*. at 75:22-25, 76:1. If service failures are consistently happening, the business manager will be held accountable, put on action plans, and potentially terminated. *Id*. at 76:12-21.

16. In 2021, UPS Security was engaged in a company-wide effort of investigating and eliminating this type of falsifying of delivery records. Ex. A (Decl. of A. Todd) ¶ 23.

**Security Investigations at UPS.**

17. Security investigations can begin for a number of reasons. *Id*. at 11:10-15. It is common for the security team to receive a complaint of policy violations that will cause them to begin an investigation. *Id.* at 11:15-21. Once an investigation is opened, it is assigned to an investigator based on the investigator's region/geographic location and area of responsibility. *Id*. at 14:11-21.

18. After an investigation is complete, if the investigation substantiates that there was a policy violation, it is referred to Human Resources and appropriate management for next steps. *Id*. at 25:4-11. Security investigators do not make recommendations on discipline; they only conclude whether a policy violation has in fact occurred. *Id*. at 24:17-19.

**First Investigation into Misreporting at Peck's Rexburg Center in May 2021.**

19. In May 2021, UPS security initiated an internal investigation due to reports of misreporting at the Rexburg Center. Ex. F (C. Fitzmaurice Deposition)[2] at 12:12-18; Ex H (May 2021 Joiner Investigation) at 1.

---

[2] Clyde Fitzmaurice, district security director, was deposed as UPS's corporate representative speaking on behalf of the corporation pursuant to Federal Rule of Civil Procedure 30(b)(6). Ex. F (C. Fitzmaurice Deposition) at 1.

20. The investigation began when an anonymous report was made through the 1-800 reporting Helpline, alleging that drivers' failures to deliver packages were being hidden at the Rexburg Center. Ex. F (C. Fitzmaurice Deposition) at 12:12-18; Ex. I (Helpline Complaint) at 1. The misconduct was ultimately substantiated by the investigation. Ex. H (May 2021 Joiner Investigation) at 1-2.

21. Security Investigator William Joiner conducted the investigation because the Rexburg facility was his area of responsibility. Ex. F (C. Fitzmaurice Deposition) at 11:22-25, 12:1-2, 14:11-21.

22. Through analysis of the SEAS database, Joiner was able to determine that a rare "misflow," exception, which is almost never used, was in frequent use by Rexburg employees. Ex. F (C. Fitzmaurice Deposition) at 21:23-25; 22:1-6. Through subsequent witness interviews of personnel at the facility, Joiner determined that drivers and on-road supervisors claimed they had been trained to use exceptions instead of marking a missed-on-road delivery as a service failure. Ex H (May 2021 Joiner Investigation) at 2, 4, 7, 9.

23. Joiner interviewed Peck on May 28, 2021. *Id.* at 15:9-19. Included in the interview were Maegan Ferguson (security supervisor), Rebekah Mulloy (security manager), Lori Atkinson (HR representative), and Steve Johns (Idaho Division Manager). Ex H (May 2021 Joiner Investigation) at 7. Peck admitted to knowing there was a big issue with service failures in Rexburg, and that on road supervisor Dustin Wagner told her there was a big misloads issue. Ex. F (C. Fitzmaurice Deposition) at 18:5-10; Ex. H (May 2021 Joiner Investigation) at 7. When asked how many service failures Rexburg had, she stated she "wasn't sure." Ex. H (C. Fitzmaurice Deposition) at 20:7-13. Johns noted that as of May 2021, there were only "2" identified as missed for the entire year.

24. Johns noted the system automatically notifies customers of the delay when a package cannot be delivered and asked Peck why she did not question the misreporting in light of her training and the integrity policies. Ex. H (May 2021 Joiner Investigation) at 7; Ex. F (C. Fitzmaurice Deposition) at 19:24-25, 20:1-3. Peck claimed she had not read the last "few things" she was sent, just signed them and sent back. Ex. H (May 2021 Joiner Investigation) at 7; Ex. F (C. Fiztmaurice Depo) at 20:3-8. Peck was referencing the annual certification for proper reporting of service and nonservice failures when she claimed she had looked at several things and signed them without reading them. Ex. F (C. Fitzmaurice Deposition) at 64:23-25, 65:1-5; Ex H (May 2021 Joiner Investigation) at 7-8.

25. Johns explained the proper process for reporting and directed Peck to put a stop to the practice. Ex. F (C. Fitzmaurice Deposition) at 19:11-18; Ex H (May 2021 Joiner Investigation) at 7. Peck was not disciplined. Instead, Peck was directed to put a stop to the practice. Ex. F (C. Fitzmaurice Deposition) at 17:18-25, 18:1. Ex. H (May 2021 Joiner Investigation) at 7.

26. In addition, on June 4, 2021, Peck's manager Troy Emerson, sent an email to all business managers under his authority, including Peck, alerting them that misrepresenting service failures as exceptions was unacceptable and "must cease immediately." Ex. J (Emerson Email) at 1-2. Peck responded to this email the same day, stating "[g]ot it." *Id.*

**Second Investigation into Misreporting at Peck's Idaho Falls Center in July 2021.**

27. A subsequent investigation at Peck's Idaho Falls center, however, found that the incorrect practices had continued. Ex. K (July 2021 Investigation) at 1.

28. This investigation was initiated when in July 2021, a part-time supervisor at the Idaho Falls center approached Security Supervisor Clay Holloway and advised him that service

failures were being hidden in the same fashion as at the Rexburg center. Ex. K (July 2021 Investigation) at 1; Ex. F (C. Fitzmaurice Deposition) at 35:9-13.

29. Once again through analysis of the SEAS database, Holloway was able to determine that the center had reported thousands of exceptions based on emergency conditions (weather) and almost no service failures. Ex. K (July 2021 Investigation) at 1.

30. Holloway interviewed multiple supervisors and obtained witness statements from them that they were actively scanning service failures as exceptions and had trained employees to do the same. Ex. K (July 2021 Investigation) at 2; Ex. F (C. Fitzmaurice Deposition) at 28:6-25. Employee, Mason Woolf, stated that Peck had directed the practice. Ex. K (July 2021 Investigation) at 2, 5-6. Local supervisor Scott Richardson also state that Peck had instructed him to use weather exceptions instead of reporting service failures. *Id*. at 4. This is hiding service failures as nonservice failures. Ex. F (C. Fitzmaurice Deposition) at 29:1-3.

31. Security was aware Peck had recently had an investigation conducted into her Rexburg Center. Ex. F (C. Fitzmaurice Deposition) at 27:8-13. Holloway, along with security supervisor Nicholas Luper, interviewed Peck on September 28, 2021. *Id*. at 32:13-15; Ex. K (July 2021 Investigation) at 6. Peck denied knowledge of the practice of misreporting service failures as exceptions. Ex. F (C. Fitzmaurice Deposition) at 32:13-15; Ex. K (July 2021 Investigation) at 6.

**Termination**.

32. Based on the findings of two separate investigations indicating a pattern of dishonest reporting at Peck's centers, Troy Emerson, Package Operations Manager, made the decision to terminate Peck's employment for dishonesty. Ex. L (Emerson Declaration) at ¶ 9.

This decision was made in consultation with HR, focusing solely on the investigation findings without consideration of Peck's sex or any other irrelevant characteristic. *Id.*; Ex. M (A. Todd Deposition) at 25:7-13, 53:6-8.

33. Emerson, along with HR Business Partner Alecia Todd, met with Peck on December 13, 2021. Ex. M (A. Todd Deposition) at 19:12-24. Emerson told Peck she was being terminated for dishonesty based on the two investigations into misreporting at her centers. *Id.*

**Employee Dispute Resolution.**

34. Peck then applied for the voluntary Employee Dispute Resolution ("EDR") process to review her termination. The EDR process is a non-binding dispute resolution process. Ex. N (EDR Manual) at 10, Neither UPS nor the employee are bound to follow the recommendations of the EDR panel or even participate in any portion of the program. *See id* at 9.

35. The EDR Peer Review Panel, which reviews the dispute, consists of three UPS employees, two members chosen by the employee and one member chosen by the company. *Id.* at 9. The panel, after reviewing documents and listening to both the employee and the company representative during an informal hearing, makes a recommendation. *Id.* The recommendation "is not a decision, instructions, or an order. . . . [the employee] and the company . . . have 10 business days to either accept or reject the recommendation from the Peer Review Conference." *Id.*

36. In Peck's case, the EDR panel recommended Peck be reinstated at a different location. Ex. A (Decl. of A. Todd) at ¶ 18. UPS offered Peck reinstatement with a demotion to on-road supervisor. *Id.* at ¶ 19. Peck declined this offer, and proceeded to litigation. *Id.*

**Comparators**.

37. In 2021, the security group was engaged in a company-wide effort of investigating and eliminating this type of falsifying of delivery records. *Id*. at ¶ 23.

38. In July 2021, Josh Bowman, a white male supervisor out of Butte, Montana, was terminated after just a single security investigation revealed that misreporting was occurring at his center. *See* Ex. A (Declaration of A. Todd) at ¶ 24. Like Peck, employees under Bowman's supervision were falsifying delivery records to hide packages that were not delivered on the intended day. Ex O (Bowman 2021 Investigation) at 1. Security conducted an investigation into the misreporting at his center and substantiated it. *Id*. Bowman was then terminated for dishonesty after this first and only investigation. Ex. A (Declaration of A. Todd) at ¶ 24-25. UPS did not offer to reinstate Bowman during the EDR process. *Id*. at 26.

39. Also in July 2021, Floyd Reinhardt, a white male business manager out of Cheyenne, Wyoming, was investigated for similar misreporting at his center. Ex. P (Reinhardt Investigation) at 1. Security Investigator Holloway investigated. *Id*. A SEAS analysis showed multiple exceptions and no service failures. *Id*. Holloway interviewed multiple supervisors, who admitted to occasional use of the practice but none stated that Reinhardt was responsible for the practice. *Id*. at 1-2. Holloway interviewed Reinhardt, who was cooperative and admitted the practice was occurring, stating he was not attempting to hide it. *Id*, at 3.

40. After his interview but while this first investigation into Reinhardt was still being processed, Reinhardt applied for FMLA leave for knee surgery through the Hartford, UPS' third-party administrator. Ex. A (Declaration of A. Todd) at ¶ 30. The Hartford approves all FMLA leave, and UPS has no input in this process. *Id*. The Hartford approved Reinhardt's FMLA leave, and he remained out on leave for the remainder of 2021. *Id*. In January 2022, his

available leave automatically renewed, and he reapplied and was approved for leave; Reinhardt never returned to work. *Id*. at ¶ 31. While still out on leave, Reinhardt utilized UPS's computer system to process an approve his retirement, and it was automatically effective June 30, 2022. *Id*. at ¶ 32. Emerson testified that had Reinhardt returned to work, Emerson would have terminated him. Ex. Q (Emerson Depo) at 69:5-14, 113:12-20.

41. Brian Livdahl, who Peck names as a comparator in her Complaint, was a former business manager, was demoted in 2003 for poor service numbers after his center accurately reported higher than average service failures. Ex. A (Declaration of A. Todd) at ¶ 34.

42. Holloway was subsequently disciplined himself in July 2022 for misconduct unrelated to Peck's investigation. The security director conducted a second review of Holloway's investigation of Peck in July 2022 and found no impropriety into Peck's investigation. Ex. G (Declaration of C. Fitzmaurice) at ¶¶ 7-8.

**Manager Incentive Program ("MIP") Bonus**.

43. After being terminated on December 13, 2021, Peck did not receive a Manager Incentive Program ("MIP") bonus when those bonuses were processed in March 2022. Ex. A (Decl. of A. Todd) at ¶ 11.

44. To qualify for an MIP bonus, an employee must be recommended for a bonus by his or her manager for exceptional performance throughout the entire calendar year. *Id*. at ¶ 13-14. The employee must also still be employed by UPS as of December 31 of the calendar year. *Id*. An employee who engaged in misconduct, or who retired, voluntarily resigned, or was terminated before December 31 of a calendar year would not be eligible for that year's MIP bonus (paid out in March of the following year). *Id*.

45. Because of the two substantiated instances of misconduct at her centers, Peck would not have been recommended by her manager for the MIP bonus, and was not in fact recommended. Ex. L (Decl. of T. Emerson) at ¶ 11. Because of her termination prior to the end of the year, Peck would not have been eligible for this additional reason as well. Ex. A (Decl. of A. Todd) at ¶ 15. Peck was accordingly neither recommended nor eligible to receive an MIP bonus. *Id.*

DATED: May 17, 2024

*/s/ Richard L. Clifton*
Richard L. Clifton (*Pro Hac Vice* Granted)
Texas State Bar No. 24103565
rclifton@sr-llp.com
SCHMOYER REINHARD LLP
8000 IH 10 West, Suite 1600
San Antonio, TX 78230
(210) 447-8033

and

Jacob H. Naylor
Taylor D. Williams
Naylor & Hales, P.C.
950 W. Bannock Street, Suite 610
Boise, ID 83702
Phone: (208) 383-9511
Fax: (208) 383-9516
jake@naylorhales.com
tdw@naylorhales.com

**ATTORNEYS FOR UNITED PARCEL SERVICE, INC. (OHIO)**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served *via email* to:

Cory R. Stegelmeier
Blake G. Hall
Sam L. Angell
Cory R. Stegelmeier
Hall Angell & Associates, LLP
1075 S Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
Telephone: (208) 522-3003
Fax: (208) 621-3008
bgh@hasattorneys.com
sla@hasattorneys.com
crs@hasattorneys.com

**ATTORNEYS FOR PLAINTIFF**

on this 17th day of May, 2024.

*/s/ Richard L. Clifton*
Richard L. Clifton