# EXHIBIT A

**SCHMOYER REINHARD LLP**
Richard L. Clifton (*Pro Hac Vice* granted)
Texas Bar No. 24103565
8000 IH 10 West, Suite 1600
San Antonio, TX 78230
(210) 447-8033

Tyler D. Williams [ISB No. 8512]
NAYLOR & HALES, P.C.
Attorneys at Law
950 W. Bannock Street, Ste. 610
Boise, ID 83702
Telephone No. (208) 383-9511
Facsimile No. (208) 383-9516
Email: tdw@naylorhales.com

**ATTORNEYS FOR DEFENDANT**
**UNITED PARCEL SERVICE, INC. (OHIO)**

**UNITED STATES DISTRICT COURT**
**IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| HEIDI H. PECK; an individual;<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED PARCEL SERVICE, INC. an Ohio Corporation,<br><br>*Defendant.* | **CASE NO. 4:22-CV-00381-CWD**<br><br>**DECLARATION OF ALECIA TODD** |

My name is **Alecia Todd.** I am of sound mind, capable of making this declaration, and personally acquainted with the facts stated herein.

1. United Parcel Service, Inc. ("UPS") is the world's largest package delivery company, employing more than 400,000 employees in the United States and

transporting more than five billion packages annually to more than 220 countries and territories.

2. I am a current employee of United Parcel Service, Inc. ("UPS"). In my position as [Human Resources Business Partner], I am a custodian of records for UPS, and I am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities.

3. I have reviewed UPS's Motion for Summary Judgment in the lawsuit of *Heidi Peck v. United Parcel Service, Inc.*. Attached as exhibits to that motion are UPS's business records. These are the original records or exact duplicates of the original records.

4. These records are kept by UPS in the regular course of business, and it is the regular practice of UPS to make this type of record at or near the time of each act, event, condition, opinion, or diagnosis set forth in these records.

5. In accordance with this regular practice, these records were made by, or from information transmitted by, persons with knowledge of the matters set forth in them.

6. Included in these records are UPS's Policy Book and Code of Business Conduct, UPS's Anti-Harassment Policy, UPS's EDR Policy Manual, a May 2021 security investigation into Heidi Peck, an August 2021 security investigation into Peck, a July 2021 security investigation into Floyd Reinhardt, a July 2021 investigation into Josh Bowman, a July 2022 investigation into Clay Holloway, and other UPS policies and business records. UPS periodically trains employees on these and similar policies, which are posted in all facilities and are available to employees on UPS's intranet, UPSers.com.

7. In addition, I have reviewed Peck's personnel records and was present during her termination.

8. Peck, like all UPS management, was an at-will employee.

9. Peck was terminated December 13, 2021 for dishonesty after two investigations—one conducted in May 2021 and the other conducted in July 2021—revealed a practice at her centers of hiding service failures by attributing them to exceptions. This is dishonesty and a violation of UPS policy.

10. I was present during the meeting on December 13, 2021 in which Troy Emerson terminated Peck. I provided Peck with a copy of the Employee Dispute Resolution manual during that meeting. I never advised Peck she could not speak during the meeting, nor would I have, as that is not a UPS policy.

11. After being terminated on December 13, 2021, Peck did not receive a Manager Incentive Program ("MIP") bonus when those bonuses were processed in March 2022.

12. The MIP is a program to incentivize high performance amongst management. No manager is automatically entitled to an MIP bonus. They must be earned and is for model employees. MIP bonuses are calculated in February of the following calendar year and distributed in March of that year. It is based on the performance of the entire company during the prior calendar year as well as the individual employee's performance.

13. To qualify for an MIP bonus, an employee must be recommended for a bonus by his or her manager for exceptional performance throughout the entire calendar year.

14. The employee must also still be employed by UPS as of December 31 of the calendar year. *Id.* An employee who retired, voluntarily resigned, or was terminated before December 31 of a calendar year would not be eligible for that year's MIP bonus (paid out in March of the following year).

15. Because of the two substantiated instances of misconduct at her centers, Peck would not have been recommended by her manager for the MIP bonus, and was not in fact recommended. Peck, having been terminated during the calendar year of 2021, would not have been eligible for the 2022 MIP bonus distributed in March 2022.

16. The Employee Dispute Resolution process is a voluntary process to resolve disputes, including discipline and termination, between the company and employees. It is voluntary for both the employee and UPS. It is a non-binding dispute resolution process, and neither UPS nor the employee are bound to follow the recommendations of the EDR Peer Review Panel that reviews the disputes. The EDR process is not a contract.

17. Managers are not trained on the EDR process. It is a function of Employee Services, a branch of Human Resources.

18. I was involved in the EDR process for Peck. The Peer Review Panel, consisting of two employees chosen by Peck and one by UPS, recommended she be reinstated to her former position but at a different location. The Panel's recommendation was not based on the absence of policy violations but on the belief that she should be given an opportunity at another location. As stated above, UPS is not obligated to follow the recommendation of the Peer Review Panel.

19. On or about March 22, 2022, I contacted Peck after the Peer Review Panel recommendation, and offered her a demotion to on-road supervisor but at the same rate of pay as her prior position as business manager. The on-road supervisor position is one step below a business manager. Keeping Peck at her same pay rate was possible because of experience based pay scales. Peck had only been a business manager for a short time and was on the low scale of pay for that position. But she had previously served as an on-road supervisor for 12 years, so was entitled to the highest experience pay for that position.

20. As a Business Manager, Peck was making $104,100.00 annually. The position I offered her would provide her $84,900.00 annually had she accepted the offer.

21. Peck said she would consider it. Within 24 hours, she informed UPS that she declined the offer and had obtained legal counsel.

22. It is common practice for UPS to use demotion as a form of discipline for management employees. Once a manager or supervisor is demoted, they remain eligible to be re-promoted during their career, which often occurs. If Peck had accepted the demotion to on-road supervisor, she would have remained eligible to be promoted back to business manager later in her career.

23. In 2021, security was engaged in a company-wide effort of investigating and eliminating this type of falsifying of delivery records.

24. In July 2021, Josh Bowman, a white male full time supervisor out of Butte, Montana, was terminated after just a single security investigation revealed that misreporting was occurring at his center.

25. Bowman was investigated for the same misconduct as Peck. Employees under Bowman's supervision were falsifying delivery records to hide packages that were not delivered on the intended day as exceptions. Security conducted an investigation into the misreporting at his center and substantiated it.

26. UPS terminated Bowman for dishonesty after this first and only investigation. Bowman applied for and was enrolled in the EDR process. UPS did not offer reinstatement to Bowman or offer him any other position with UPS. Instead, UPS offered him a one-month salary as severance pay. Bowman refused this offer.

27. In July 2021, Floyd Reinhardt, a white male business manager out of Cheyenne, Wyoming, was investigated for similar misreporting at his center.

28. Service Exceptions and Analysis ("SEAS") reports showed multiple exceptions and no service failures at Reinhardt's Cheyenne center. Security interviewed multiple supervisors, who admitted to occasional use of the misrepresenting of service failures as exceptions but none stated that Reinhardt was responsible for the practice. We could not substantiate that Reinhardt was involved in the practice

or directed it based on witness interviews. Security interviewed Reinhardt, who was cooperative and admitted the practice was occurring, stating he was not attempting to hide it. He was forthcoming and did not try to cover up the practice.

29. Reinhardt's situation was different than Peck's in that it was the first time this type of misconduct had been attributed to him. For Peck, it was the second time and was occurring after she had been given a directive to stop the practice.

30. After his interview but while this first investigation into Reinhardt was still being completed, Reinhardt applied for FMLA leave for knee surgery through the Hartford, UPS's third-party administrator. The Hartford approves all FMLA leave, and UPS has no input in this process. An employee can apply for leave and receive approval without talking to their supervisor or anyone in management. Hartford then sends UPS notification that leave has been approved and the employee need provide nothing further to UPS to begin his or her leave.

31. The Hartford approved Reinhardt's FMLA leave, and he remained out on leave for the remainder of 2021. On January 1, 2022, his available leave automatically renewed, and he reapplied through the Hartford and was approved for leave. At no point did Reinhardt ever return to work or even enter the building.

32. While still out on leave, Reinhardt utilized UPS's computer system to process his retirement, and it was automatically effective June 30, 2022. UPS never had an opportunity to issue any discipline to Reinhardt.

33. UPS does not typically issue discipline to an employee while that employee is out on approved FMLA leave. UPS policy when an employee is under investigation but is out on FMLA leave is to wait until the employee returns to duty to issue discipline. Reinhardt was given no special consideration.

34. Brian Livdahl was a business manager in 2003. In 2003, Livdahl was demoted to on-road supervisor based on poor performance. His center had reported consistent service failures. Records do not reflect that there was any hiding of service failures or fraudulent reporting at his center. The opposite was true: his center was reporting significantly higher service failures than comparable centers. This was unacceptable, and he was offered and accepted a demotion to on-road supervisor. His situation was not comparable to Peck's.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on May 17, 2024.

Alecia Todd