# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HEIDI H. PECK, an individual, Plaintiff, | )( | Case No: 4:22-CV-00381-CWD |
| VS. | )( | DEFENDANT UNITED PARCEL SERVICE, INC. (OHIO)'S NOTICE TO THE ORAL DEPOSITION OF HEIDI H. PECK |
| UNITED PARCEL SERVICE, INC. An Ohio Corporation, Defendant. | )( | |

******************************************************

ORAL DEPOSITION OF

HEIDI H. PECK

December 1, 2023

(Reported Remotely)

******************************************************

ORAL DEPOSITION OF HEIDI H. PECK, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 1st day of December 2023, from 10:04 a.m. to 3:07 p.m., via videoconference, before AMANDA K. SAILSBURY, CSR, in and for the State of Texas, reported by oral stenography, at HALL ANGELL & ASSOCIATES, LLP, 1075 South Utah Avenue, Suite 150, Idaho Falls, Idaho, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HEIDI H. PECK, an individual, Plaintiff, | )( | Case No: 4:22-CV-00381-CWD |
| VS. | )( | DEFENDANT UNITED PARCEL SERVICE, INC. (OHIO)'S NOTICE TO THE ORAL DEPOSITION OF HEIDI H. PECK |
| UNITED PARCEL SERVICE, INC. An Ohio Corporation, Defendant. | )( | |

*******************************************************

ORAL DEPOSITION OF

HEIDI H. PECK

December 1, 2023

(Reported Remotely)

*******************************************************

ORAL DEPOSITION OF HEIDI H. PECK, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 1st day of December 2023, from 10:04 a.m. to 3:07 p.m., via videoconference, before AMANDA K. SAILSBURY, CSR, in and for the State of Texas, reported by oral stenography, at HALL ANGELL & ASSOCIATES, LLP, 1075 South Utah Avenue, Suite 150, Idaho Falls, Idaho, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.



APPEARANCES

FOR THE PLAINTIFF:
CORY R. STEGELMEIER (Via Videoconference)
HALL ANGELL & ASSOCIATES, LLP
1075 South Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
crs@hasattorney.com
(208) 522-3003

FOR THE DEFENDANT:
RICHARD L. CLIFTON (Via Videoconference)
SCHMOYER REINHARD, LLP
8000 Interstae Highway 10 West Suite 1600
San Antonio, Texas 78230
rclifton@sr-llp.com
(210) 447-8033



INDEX


| | PAGE |
|---|---|
| Appearances.................................... | 2 |
| HEIDI H. PECK | |
| Examination By MR. CLIFTON..................... | 4 |
| Changes and Signature.......................... | 162 |
| Reporter's Certification....................... | 163 |


EXHIBITS


| NUMBER | DESCRIPTION | IDEN. |
|---|---|---|
| 1 | Charge of Discrimination............. | 91 |
| 2 | EDR Request Form..................... | 94 |
| 3 | Plaintiff's Initial Disclosures....... | 125 |




THE COURT REPORTER: Counsel, would you prefer to have me read the script for the Federal Deposition and then you introduce yourselves, or would you prefer to waive this.
MR. CLIFTON: Sure. Go ahead.
THE COURT REPORTER: Yes, sir.
At this time the deposition of Heidi H. Peck, produced at the request of the Defendant is being taken in the Case No. 422-CV-00391-CWD, Styled Heidi H. Peck, an individual versus United Parcel Services, Inc. an Ohio Corporation, commencing at Hall Angell & Associates, LLP on December 1st, 2023 via Zoom teleconference.
My name is Amanda Sailsbury, certified court reporter number 11923, representing Hill and Romero Certified Court Reporters.
Will counsel please state their appearances for the record.
MR. STEGELMEIER: Yes. This is Cory Stegelmeir with Hall Angell & Associates for the Plaintiff.
MR. CLIFTON: And this is Richard Clifton for Defendant.
Heidi H. Peck,
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. CLIFTON:

Q. Good morning Ms. Peck, how are you doing today?
A. Good. How are you?
Q. Good. Good. First, I want to say I hope you had a happy Thanksgiving. I know we're just coming off of that. If you would please give me your full name for the record.
A. Heidi Hulet Peck.
Q. All right. And have you ever gone by any other names in your lifetime?
A. No.
Q. I want to go over a few deposition ground rules before we get started. And my first question is, are you aware that you're under oath?
A. Yes.
Q. And that oath is just as binding as if you were in front of a jury?
A. Yes.
Q. And I want you to understand you need to answer my questions audibly for the court reporter because she needs to be able to hear to be able to produce a proper transcript and if we're not speaking clearly she will have to ask us to stop and repeat ourselves. So if you would just try to speak up and speak clearly and I'll



try to do the same. Does that sound good?
A. It does.
Q. Okay. I also want you to know you can take a break at any time. I may ask you to finish answering my last question but we will take the breaks.
A. Okay.
Q. Have you ever been deposed before?
A. I have not.
Q. And are you currently on any medications?
A. I'm not.
Q. Okay. Is there anything that would prevent you from answering truthfully and accurately today?
A. No.
Q. Okay. Did you bring any documents with you today?
A. I did not.
Q. Okay. Did you review any documents in preparing for today?
A. I did not have any documents to review.
Q. Okay. But you didn't review any documents in anticipation of this deposition?
A. I did not.
Q. Nothing to jog your memory about the claims you're making?
A. I did not. I did not have any documents to



review other than the peer review documents that are -- well, they were old -- so and I remember that so I didn't need to review those.
Q. Okay. So you did not review those?
A. No.
Q. Okay. And you mentioned the peer review documents; to the best of your knowledge have those been produced in this lawsuit?
A. Yes, I provided them to my attorney.
Q. Okay. All right. I'm going to ask you a few questions about your personal background to get started with. The first thing, what is your current residence?
A. 442 Tryall Circle, Idaho Falls, Idaho 83401.
Q. And that was Idaho Falls?
A. Correct.
Q. Okay. And what county is that?
A. Bonneville.
Q. And do you own or rent?
A. I'm owning.
Q. Okay. And how long have you owned your home?
A. Since 2015.
Q. Okay. Does anyone live with you?
A. Yes, my husband.
Q. Anyone else?
A. No.



Q. And are you current on your mortgage?
A. I am.
Q. Current on bills?
A. Yes.
Q. And you said you're married, is that correct?
A. Correct.
Q. How many times have you been married?
A. Once.
Q. Okay. Do you have any children?
A. I do not.
Q. Okay. Do you have any relatives in Idaho Falls?
A. I do.
Q. Okay. Could you tell me who they are please?
A. My mother, my father and many of my siblings.
Q. Okay. Well, if you wouldn't mind please give me their names starting with your mother and father.
MR. STEGELMEIER: I was going to object to relevance on this just so it's noted for the record. Go ahead and answer it.
MR. CLIFTON: That's fine, Cory, but it might be relevant in the case of a jury trial who the family members are. So please go ahead and answer, Ms. Peck.
MR. STEGELMEIER: I just wanted to note it

for the record.
BY MR. CLIFTON:
A. My father is Walter John Hulet, my mother is Rebecca Hulet, my oldest sibling living in Idaho Falls is -- I don't remember (inaudible). Well, Matthew Hulet, Seth Hulet, Michael Hulet and Natalie Hulet. All live in Idaho Falls.
Q. Okay. Anyone else; cousins, something like that?
A. I do have many cousins (inaudible).
Q. I'm sorry, Ms. Peck, your voice sounded scrambled there. I think there may be an audio issue.
MR. STEGELMEIER: Okay. We'll have her answer again. Okay. Just --
BY MR. CLIFTON:
A. So I do have cousins in the area but they live outside of Idaho Falls.
Q. Okay. And I'm going to ask you a few questions about your educational history starting with the schools you've attended most recent and walking backwards.
A. So most recent was Waldorf College, I did that online, and then I attended ISU prior to that and then I attended Skyline High School, Lincoln High School, Bonneville High School and Hillcrest High School.
Q. Okay. And you said most recently it was



Waldorf, right?
A. Correct.
Q. And then before that it was ISU; what does that acronym stand for?
A. Idaho State University.
Q. Idaho State University. Okay. And what dates did you attend Waldorf?
A. Oh I -- I do not remember the exact dates.
Q. Okay. Did you obtain a degree from that school?
A. I did not.
Q. Okay. Were you seeking a particular degree?
A. I was seeking a Bachelor's of Arts.
Q. Any particular concentration?
A. No, just general studies.
Q. Okay. And what about Idaho State University; do you recall what dates you attended that school?
A. It was around 2006.
Q. Do you recall how long you attended that school?
A. I think I only attended two semesters.
Q. Okay. Did you obtain a degree from that university?
A. I did not.
Q. And what degree were you seeking to obtain from



that university?
A. I changed my degree many times so there was really not a definitive one for that school.
Q. Okay. And what was your reason for leaving that school?
A. I was working two jobs at the time, one of which was for UPS and I was falling asleep in class. So I chose work over school?
Q. And you said prior to that you attended high school, is that right?
A. Correct.
Q. Okay. Did you serve in the military?
A. I did not.
Q. Have you ever been a party to a lawsuit before?
A. Yes.
Q. Okay. And which suit would that be?
A. I was in an auto accident.
Q. Okay. And do you recall when that was?
A. It was in my early 20s I don't have dates.
Q. Sometime in your early 20s? And what was the nature of the lawsuit?
A. The nature of the lawsuit was I was injured during that lawsuit and was able to come to an agreement on medical bills for that accident.
Q. Okay. And you weren't deposed in that lawsuit



I take it?
A. I was not but I can remember.
Q. Okay. Any other lawsuits?
A. No.
Q. Okay. You said that was in your early 20s; how old are you, Ms. Peck?
A. I'm 40 years old.
Q. So the lawsuit was maybe over 20 years ago possibly?
A. Correct.
Q. Have you ever filed shots with the EELC or the Idaho Human Rights Commission before the one with UPS obviously?
A. I have not.
Q. Okay. Ever filed a discrimination complaint against any other person or entity?
A. No. I've never had a reason to.
Q. Okay. Ever been accused of a -- or convicted of a crime?
A. No.
Q. Okay. Ever declared bankruptcy?
A. Yes.
Q. Okay. And when was that?
A. Well, it's over seven years because it's no longer on my credit report. I don't have a date.

Q. Okay. Could you take an estimate of when you might have declared bankruptcy?
A. I think it was around 2006 in that timeframe because I was trying to do college and work.
Q. So around 2006. Okay. All right. And now I just have a few questions about your employment history before UPS which we may have touched on a little bit but I just want to ask so that we get everything clear. What job did you have before you began with UPS, if any?
A. I had a supervisor job at Home Depot.
Q. Okay.
A. And then I was working at Home Depot while working at UPS. And then prior to that I was working at a farm and ranch store called Carlton Ranch. And then before that I was working at a pizza parlor named Cubbies Pizza and before that it was Steak Escape and TCB (inaudible).
Q. Cubbies Pizza; would you recommend that I go eat there when I go up to Idaho Falls?
A. No, they are out of business.
Q. All right. And so it was Home Depot; do you recall what dates you were employed? And you can ballpark it, it's fine.
A. I believe it was around 2002 to 2007.
Q. And there do you recall what your job title was



by chance?
A. When I left Home Depot I was the department head over the receiving department.
Q. Okay. And what responsibilities did you have as the department head?
A. Making sure that the trucks were scheduled, trucks got unloaded timely and managing the freight flow onto the floor in order for the freight crew to put it away overnight.
Q. Okay. Was that -- I guess that's a managerial position; you supervise the number of employees?
A. Yeah, I think I had about four at one time.
Q. Okay. Did you receive any promotions while you were working for Home Depot?
A. I started out as a receiving employee and was promoted to the department head.
Q. Okay. And do you recall about what your salary was back then? And again you can ballpark it.
A. Roughly $12 an hour.
Q. Okay. And what was your reason for leaving Home Depot?
A. I went to full-time at UPS.
Q. Okay. And you said prior to that you worked at Carlton Ranch, is that right?
A. Yes.



Q. And about how long did you work with them?
A. I believe it was five years.
Q. Five years. Okay. What was your position with Carlton Ranch?
A. I was in the receiving department so I would receive freight and then I was a backup cashier.
Q. Okay. You said you would receive freight; what does that mean?
A. When UPS, FedEx or delivery trucks would show up, I would help them unload and then I would have to go through each and every box and make sure that what the shipper sent and what was on the invoice matched what we actually received.
Q. Okay. And your -- sorry. What was -- what did you say the title of that position was?
A. At Carlton Ranch?
Q. Yes.
A. Receiving Clerk.
Q. Receiving Clerk. Okay. And you said you worked there five years; did you receive any promotions while you were there?
A. I did not.
Q. Okay. Do you remember about what you were making at Carlton Ranch?
A. I do not.



Q. Okay. And your reason for leaving?
A. I got a job at Home Depot.
Q. Okay. Have you ever been terminated from employment for any reason?
A. No.
Q. Okay.
A. Other than UPS.
Q. Other than UPS. Now let's move into your UPS employment. You held multiple positions at UPS, is that right?
A. That is correct.
Q. Okay. And which positions did you hold in -- let's just start with the most recent and going back to when you first started.
A. The most recent was Business Manager over Eastern Idaho. Prior to that I was an on-road supervisor. Prior to that I was a part-time supervisor over the preload. Prior to that I was a part-time supervisor in the data acquisition and then prior to that I drove for UPS. And then prior to that I was on the preload and that was where I started.
Q. You said you started at preload; how did you learn about your UPS job?
A. The UPS guy that was delivering to Carlton Ranch told me that they were hiring and hooked me up

with HR and I got hired on.
Q. And so what was that application process like; was it pretty straightforward?
A. It was.
Q. Okay. And did you submit a resume or anything like that?
A. I do not remember if I submitted a resume. I do think I just had to apply online and then they called me.
Q. Okay. And do you remember when about that was?
A. It was in 2004.
Q. 2004. Okay. Did you get interviewed before you were hired?
A. I did.
Q. Okay. And do you remember who interviewed you by chance?
A. I can see his face; I do not know his name.
Q. Okay. And that's okay. Do you remember what the substance of the interview was?
A. Just general interview questions and they said they would get back to me.
Q. Okay. And then when you say general interview questions, you mean -- could you be -- do you remember anything specific?
A. I do not.



Q. Okay. That's fine. Do you remember once you were hired who your supervisor for that position was?
A. Back then the preload supervisor's name was Travis. I do not recall his last name.
Q. Travis. Okay. Did you have a good working relationship with Travis?
A. I did, yes.
Q. And when you were hired did you sign an employment agreement?
A. I do not recall signing an employment agreement.
Q. Okay. Did you go through an orientation or anything like that?
A. I remember sitting in the break room upstairs and I believe I was the only one there and I don't know if that was considered orientation or not.
Q. Okay. Do you remember receiving any documents during orientation?
A. I do remember going over some footwear paperwork, conveyor safety paperwork, like an alcohol and drugs policy paperwork. So there was some, yes, that I do remember going over and signing.
Q. Okay. Great. And so that was in 2004 and you were a preloader; when did you become a driver for UPS?
A. I believe it was three years after so 2007 was



when I was a driver.
Q. Okay. And how did you find out about the driver position opening up?
A. With UPS being union that's one of the reasons I got hired on was because I wanted to become a driver and I was told when I got hired on it was going to be about seven years before I could become a driver because of the six on-one off with the union. And I was able to get hired on as a driver -- it was more of a backup driver position which they called the utility driving position and I just filled in for sick colleagues and vacations.
Q. Okay. Was that kind of like being a cover driver I guess?
A. Yes.
Q. Okay. So you got that three years after they told you it would be probably seven. Was there any particular reason that they gave you the early promotion?
A. It wasn't an early promotion. The contract stated that every sixth driver had to be hired off the street and I was an internal hire but it just got -- they were in that rotation where they had to take people from the inside versus going off the street for the sixth person.



Q. Okay. I mean, I'm just curious if there was some particular reason that they thought it was initially going to take seven years and they only took three.
A. It is all based off of seniority and it is off your hire date.
Q. Okay. So it was just some kind of straightforward process there was nothing in particular about it?
A. No.
Q. And you did your seniority. So you started as a cover driver; did you ever get promoted to active driver?
A. I did not.
Q. Okay. So your next position was part-time supervisor, is that right?
A. That is correct.
Q. Okay. And how did you learn about that position?
A. They posted those and it was more word of mouth. They just said, Hey, we've got somebody leaving. Is anybody interested? And then you just went and talked to management if you were interested and then you had to interview for those positions with the manager.
Q. Okay. And was there any particular reason you

thought you would switch to management side instead of staying under the union truck?
A. Yes. So I was told that I was going to be the next full-time driver and then UPS hired somebody off the street which I was upset about and I decided I didn't want to drive anymore and so that's why I decided to go into management. So I didn't want to drive anymore.
Q. Okay. Did you ever make a complaint with the union; filed a grievance or anything like that?
A. No because they were following the contract. It was the sixth person which is per their contract. So no, I did not.
Q. Okay. And when about did you apply for the part-time supervisor position?
A. I can't remember exactly but I believe it was about three months after I stopped driving in November that year -- excuse me, October. Right around -- I can't remember (inaudible) and then three months later I got promoted to part-time supervisor.
MR. STEGELMEIER: Yeah. Just say it again. I'm sorry.
BY MR. CLIFTON:
A. I remember stopping driving as the cover driver, went back to the preload and then roughly three



months after that I went part-time supervisor.
Q. Okay. So you went back to preload; that was the part that was cut. Do you remember or recall what year that was?
A. It was -- it was probably -- I don't recall what year, I just remember it was prior to 2007 because that's when I went full-time at UPS.
Q. Prior to 2007. I thought that you said that 2007 is when you became a driver?
A. Yes. That was actually I did say that but that was when I went full-time because I was able to quit working at the Home Depot in 2007. Because I went full-time, yes. Yeah.
Q. Okay. So you went back to the -- you went back to the preload and then about three months later you heard that there was a part-time management position open which is part-time supervisor, is that right?
A. Yes.
Q. Okay. And who interviewed you for that position?
A. I do not remember who interviewed me for the part-time supervisor position.
Q. Okay. Do you recall what the substance of the interview was?
A. No.



Q. You don't remember any particular questions about management or it was just kind of straightforward?
A. Yes, straightforward.
Q. Okay. Do you recall who your supervisor was; your full-time supervisor when you became a part-time supervisor?
A. At that time I believe it was Rod Elson.
Q. Sorry, what was that?
A. Rod Elson.
Q. Rod Elson. Okay. And how would you describe your working relationship with Rod Elson?
A. I had a good working relationship with Rod. When I was a driver he was my driver supervisor.
Q. Okay. So y'all knew each other before?
A. Yes.
Q. Okay. And then as a part-time supervisor you had a good working relationship with him?
A. I did.
Q. Okay. And then next you moved into a full-time supervisor position, is that right?
A. Correct.
Q. And what was that; on-road supervisor?
A. Yes.
Q. Okay. And how did you learn about the opening for an on-road supervisor position?



A. I was approached by management and they asked me if I wanted to be an on-road supervisor.
Q. Okay. Do you remember when about that was?
A. It was in 2007 because I took the promotion.
Q. Okay. So right after -- very shortly after you became a part-time supervisor you became a full-time on-road supervisor?
A. No, I think I got my dates mixed up for part-time sup -- because I believe I was a part-time supervisor for three years and then went full-time which was in 2007. That should be a part on my resume.
Q. So it was about 2007 when you became a full-time supervisor, is that right?
A. Correct.
Q. Okay. And when you became a full-time sup who was your manager at that point?
A. Tom Yanks was the manager at that time.
Q. Okay. And did Tom interview you for that position?
A. He was part of the interview. They had -- there was HR on the phone and Tom in the office and I believe there was one more person in the room but I don't remember who it was.
Q. Okay. Do you recall what the substance of the interview was?

A. General interview questions. They wanted to make sure that I had driven for UPS because that was one of the requirements. They wanted to make sure I had managed people before and knew how to read reports and understand the metric that UPS had meet their numbers with.
Q. Okay. And so how many interviews were there; was it just the one or did you have any subsequent?
A. Just one.
Q. Just one interview. Okay. And then you became a full-time on-road supervisor and about how long were you in that position?
A. Seven years.
Q. Seven years? Okay. So were your job duties roughly the same throughout those seven years?
A. They changed throughout the years. So when I first got hired on they had different metric that I had to meet and as the years went on the company changed and so the things that they required were different over that span of time.
Q. Okay. And if you could just briefly describe what your job duties were?
A. My job duties were to train drivers, that was my main role. So as new drivers came in I had to put them through a 30-day driver training packet. I had to



make sure that they memorized the Smith system for driving because they did not have to have a CDL; there was a very strict driving system that they had to learn and they should be able to speak the Smith system while driving. And deliver packages on time to the customers so it was always safety first so we had to make sure that drivers worked safe. And then it was service to the customer and then we had to teach production and it was the last thing because UPS is in the business of making money. So my job was to do those three things in that order; safety, service and production with my driver group over that timeframe.
Q. Okay. So you were keeping the drivers accountable essentially?
A. Yes.
Q. Okay. And your previous driver experience kind of helped with that in a significant way?
A. It did.
Q. Okay. And so you said you were in that position for seven years and then your next position was business manager?
A. Yes.
Q. And how did you learn about the business manager position?
A. My manager at the time, James Strickland, was



transferring to Florida and he was grooming me because UPS teaches if you want to move up you need to always have a replacement so I was James' replacement and so as he was on his way out I got interviewed for the business manager position and got the job.
Q. Okay. And about what year was that?
A. 2000 -- 2019 I believe.
Q. Okay. Around 2019?
A. Yes.
Q. Do you remember what month by chance?
A. September.
Q. September?
A. Yes.
Q. Okay. And how did you -- how was the interview process for this position?
A. This one was a little different. I talked to the division manager at the time his name -- it just flipped my mind. I can't remember his name but it might come to me. But I was interviewed by him over the phone and then the Northwest District Op's Manager was coming out to Idaho and I had a one on one meeting with him and I took him around the Idaho Falls facility, we went to the Silver Springs facility and we went to the Rexburg facility. And then he was the one that ultimately made the decision and I was promoted after that.



Q. Okay. And you filled the vacancy left by your former business manager, is that right?
A. Correct.
Q. Okay. And do you remember who your supervisor was as the business manager?
A. I can see his face but I cannot remember his name, I'm drawing a blank.
Q. Okay. Would you have a lot of interaction with him?
A. I remember his name now it's Phil Taylor. I don't know how I forgot.
Q. Phil Taylor. Okay.
A. Phil Taylor.
Q. Okay. Did you have a lot of interaction with Mr. Taylor?
A. Phil only came to Idaho probably a handful of times. And all the rest of the interaction that I had with him he was based out of Boise, Idaho, was over the phone or through Zoom.
Q. So he was based out of Boise by the time --
A. Correct.
Q. And he would come visit occasionally is what is sounds like.
A. On occasion, correct. He was division manager over Idaho and Wyoming.

Q. Okay. Did you have a good working relationship with him?
A. I did.
Q. Okay. Can you describe your primary responsibilities as the business manager?
A. What I would have to do is make sure that the packages that came in that day, brought out that day, every package had an attempt on it. And then my responsibilities were also to make sure that the drivers worked safe. If there was an up-rise in accidents or injuries we had to do thorough investigations as to why. And then I was also supposed to make sure that the people that directly reported to me which was the on-road supervisors were also doing what I was doing as an on-road supervisor. And then keeping up with the changes with the company with the changing of the metric and what the company needed from us at that time.
Q. Okay. And you said the on-road supervisors are reporting to you; about how many on-road supervisors reported to you?
A. When I first took over the position I had one in Rexburg, two in Idaho Falls and two in Pocatello. When I left the position I had three in Idaho Falls and two in Rexburg and they had pulled Pocatello off of me and gave it to another manager so I did not have



Pocatello according to me at the time of my termination.
Q. Okay. And so the on-road supervisors were according to you they were managing the drivers at the centers and you were making sure that metric was being followed. Is that about right?
A. Not all the supervisors would report to me on how the day was going. If we were going to have any packages that were not going to get delivered and I would report on that to my boss every night over the telephone.
Q. And that was Mr. Taylor?
A. No, at that time it was Doug Barry. Phil Taylor retired.
Q. Oh, okay. About what time did Mr. Taylor retire?
A. I don't remember the date when Phil retired. But Doug Barry took his place.
Q. Okay. Do you remember maybe a ballpark around what time, what year, something like that?
A. It would be maybe 2020 or early 2021. It might have been January of 2021 but I do not remember exactly.
Q. Okay. And so Mr. Taylor retired and then Doug Barry came and took over his position?
A. Yes.
Q. Okay. Did you have a good working relationship



with Mr. Barry?
A. I did.
Q. Okay. And was he your supervisor up until the point of your termination?
A. Yes.
Q. Okay. Now as a business manager how were your performance goals set? You mentioned some of the metric earlier but kind of walk me through that.
A. This process changed throughout my career at UPS. They had what they called the Star program but then eventually that phased out. They had a program before that, I don't remember what it was called, that one got phased out. At the end of my career they had one I don't -- they just fixed it again (inaudible).
MR. STEGELMEIER: The joy of Zoom depositions. Okay. So the metric system at the end of her career I guess that's where we'll have her pick up.
BY MR. CLIFTON:
A. So the metric system (inaudible) for our performance had changed again and everything is based off of the company goals. I can't remember what any others are.
Q. That's okay. You mentioned the Star system was the one in place before the metric system, is that right?



A. Yeah, I remember a Star program.
Q. Okay. Do you kind of recall what the Star program was? I mean what --
A. No, because -- when I was out in Idaho and my manager being in Boise and I only was able to mostly communicate via Zoom and telephone, I didn't get annual reviews so I didn't really pay attention to any of those. If something went wrong I would get a phone call or I would call my boss. There was really no review system, Hey, this is how you're doing. This is what I need you to improve on. That did not happen at UPS.
Q. During the Star program?
A. During any of the programs.
Q. Okay. So what were the programs -- I mean what was their function?
A. Good question.
Q. All right. You recall the programs though. Do you recall why you recall the programs?
A. Because they changed and so I would have to ask my supervisor to get with the part-time supervisors and do their reviews.
Q. Okay. So this was a -- this was a process that the on-road supervisors would be involved in not necessarily you?
A. It should have been everybody but whether it

happened or not was up in the air.
Q. Okay. So it's supposed to be something that everyone including yourself I guess was doing?
A. Yes.
Q. So it wasn't just like, this is for on-road supervisors and this is for drivers, something like that?
A. Correct.
Q. Okay. And what was the metric system like; can you explain that one?
A. I don't understand what you're asking; what metric system?
Q. So you said that the last change that was made as far as how your goals and criteria and everything was set was called the metric system for lack of a better word. You said it was called metric something. Could you tell me what that was please?
MR. STEGELMEIER: I'm going to object because it misstates prior testimony.
MR. CLIFTON: I'll stop you right there. Cory, let's not do any speaking objections. If you have an objection to form you can state under the directive under the rules but we won't have any clarifying speaking objections.
MR. STEGELMEIER: I don't think it was



clarifying speaking objection. I stated that you misstated her prior testimony.
MR. CLIFTON: I was asking her a question but we'll just -- we'll just stop --
MR. STEGELMEIER: Well you asked her -- you said this when you --
MR. CLIFTON: Cory, okay. Thank you. Now please.
BY MR. CLIFTON:
Q. We were talking about the systems that were in place and you mentioned a number of systems. Could you tell me what those systems were?
A. In regards to which? Because I talked about safety, service and production.
Q. Right. So we were talking about performance goals and the way things were set and you said they had changed a few times while you were a business manager, is that right?
A. I did say that, yes.
Q. Okay. And can you tell me -- you named the system changes; could you tell me what those were as far as you recall?
A. I don't recall exactly what the systems changes were because every -- you know, sometimes it changed monthly on what goals or what UPS was trying to get us



to hit as far as numbers and so everything would change constantly.
Q. Okay. So how were your performances -- how was your performance measured; how would you know whether you were hitting your targets or not?
A. So they had one program called PPG, I don't remember what it stands for, but that was the daily matrix and how we had done the daily for week over week, year over year.
Q. Okay. So it was like a measurement of production, things like that?
A. Correct.
Q. Okay. And did you ever talk about this with Doug Barry?
A. Every morning.
Q. Every morning.
A. With all the other managers.
Q. Okay. So it was reviewed periodically?
A. Yes.
Q. Okay. And it was the same thing with Mr. Terry?
A. With Mr. Taylor?
Q. Taylor, that's right. Phillip.
A. Yes, every morning there was a morning manager call and all managers would get on that call.



Q. Okay. Were you ever told you weren't meeting your expectations?
A. Yes, I was told that, You're missing an element that's what we need you to focus on. I was told that throughout my career.
Q. Okay. And who told you that?
A. Depending on what element or what metric was being missed, it would have either been my direct supervisor whether it was Phil Taylor or Doug Barry.
Q. Okay. So this happened periodically?
A. If one of my buildings was missing a number we would review all numbers on the morning call.
Q. Okay. So they would say, This number is down, something like that that's what you mean by missing an element?
A. Yes.
Q. Yeah, I'm just trying to get a feel for what we're talking about here. Were you ever subject to any disciplinary actions during your career?
A. I was not ever disciplined for anything as a manager at UPS.
Q. Okay. Ever subject to a performance review?
A. I do not remember having a performance review at UPS with my manager.
Q. Okay. With your manager do you remember having

any performance reviews at UPS?
A. If you're saying exact performance review, yes, I did not have a performance review that I can recall at UPS.
Q. Okay. Could you tell me about that please?
A. I did not have a performance review.
Q. Okay. So you did not have a performance review?
A. As a manager, no.
Q. Okay.
MR. CLIFTON: You know what, we've been going for about an hour. Why don't we take a short four-minute break?
MR. STEGELMEIER: That works for us.
MR. CLIFTON: Okay.
(Brief recess of the record.)
MR. STEGELMEIER: All righty. Are we all ready to go back?
THE COURT REPORTER: Back on the record.
BY MR. CLIFTON:
Q. All right. Ms. Peck, we're back after a short break. Is there anything you want to change about your prior testimony?
A. I was thinking back on the dates from when I went preload driving and back to part-time soup and I



think I was off by a year or two. But like I said I don't know the dates exactly.
Q. And that's okay. You can always give estimates just as best as you recall. Yeah. Anything else about your testimony you want to change?
A. No.
Q. Okay. I'm going to ask you a few questions about some of the incidents that led up to your termination. Your first being were you aware that there was a companywide investigation into a reporting of misdeliveries starting in 2021?
A. I had heard that there was an investigation that UPS was being investigated for something that had to do with packages and how packages were being recorded. That's what I remember.
Q. Okay. And who told you about the investigation?
A. I don't remember exactly.
Q. Do you recall if it was a higher up manager or just someone else?
A. No, I don't remember.
Q. Okay. But what did you hear about the investigation?
A. I just heard that UPS was being investigated based off of how the drivers were putting packages into



their delivery board which is called the dyad and/or how the clerks were putting packages and saying whether they were or were not being delivered and that sometimes the reasoning was incorrect.
Q. Okay. And you said, UPS was being investigated. Being investigated by an outside body?
A. I have no idea who that investigating party was.
Q. Okay. And do you recall when about you heard about this investigation for the first time?
A. No. Throughout my career I had heard rumors that UPS was getting investigated over many different things. I honestly would just ignore the rumors because to me that's what they were.
Q. Okay. And so you mean companywide investigations?
A. Correct. The last one that I was just telling you about the packages I was told that the entire company was being investigated on how packages were being reported whether they were being delivered or not delivered. I was told that was companywide, I do not know who told me that.
Q. Okay. Do you remember how you were told; were you told on the phone or via e-mail or something like that?



A. No.
Q. No. So no documents reflecting that was what my question is?
A. No.
Q. Okay. Were you aware of the May 2021 investigation that began at the Rexburg facility that you were overseeing?
A. No, I was not aware that an investigation was taking place in Rexburg.
Q. Okay. Were you ever made aware that there was an investigation taking place at the Rexburg facility?
A. Yes.
Q. Okay. And when was that?
A. I don't have an exact date. I was traveling between Rexburg and Idaho Falls when a person from security I do believe it was Clay Holloway and somebody named Eric was with him in the car and they were traveling back to Montana where they resided and they let me know that an investigation had taken place in Rexburg and told me over the phone that they had completed an investigation. So it was just me on my car speakers and them in their vehicle traveling.
Q. Okay. And do you remember when about this was?
A. No, I don't remember when it was.
Q. Okay. And it was for the Rexburg facility,

right?
A. Correct.
Q. Are you sure that Clay Holloway was the investigator you spoke with?
A. Yes.
Q. Okay. Did you ever speak with William Joyner?
A. William Joyner was a part-time security officer I guess you can call him and I remember talking to William but not about Rexburg.
Q. Okay. What did you talk to William about?
A. Well, will and I had a good working relationship and so we would talk about anything and everything. It was never anything to do with discipline.
Q. Okay. So these conversations were work-related?
A. With William?
Q. Yes.
A. Some were, some were not.
Q. Okay. So he was a friend, is that what you're saying?
A. No, Will was not a friend unless you consider him a work friend. I never did anything with Will. He lived in Boise and on occasion he would come to the Idaho Falls facility but it was rare.



Q. Okay. I just ask that question because you said some conversations were work-related and some weren't.
A. Well, some didn't pertain to work.
Q. Okay.
A. He would talk to me about his wife.
Q. Okay. And if I were to tell you that William was the one who conducted the May 2021 investigation in Rexburg, would you have any reason to doubt that?
A. Since I had no knowledge of the investigation I would not be able to dispute.
Q. You said you were told about the investigation over the phone at some point but you can't recall when, is that correct?
A. I just know that I was traveling between Rexburg and Idaho Falls and I got a call from Clay Holloway and Eric who was training with Clay.
Q. Because I believe this was in 2021, is that right?
A. Yes.
Q. Do you remember if it was spring, summer, fall?
A. It was either summer or fall, any time in that timeframe.
Q. Okay. Were you ever told prior to speaking with Clay that there were concerns about misreporting at



your facility?
A. You cut out a little bit. Can you repeat that?
Q. Yes, sure. Were you ever told prior to this conversation with Clay that there were concerns about misreporting at your facility in Rexburg?
A. In Rexburg, no.
Q. Okay. Any other facilities?
A. Idaho Falls there was an investigation and I was on a Zoom call with HR and security and they were telling about an investigation that was -- had taken place in Idaho Falls. But other than that, no.
Q. And this was before your call with Clay Holloway?
A. Yes.
Q. Okay. Do you remember when about that call was?
A. I don't remember exactly. It was either June or July of 2021.
Q. Okay. June or July of 2021. And you said there were a few people on that call; could you tell me as best as you recall who was on the phone call?
A. I just remember it was HR and security and myself. So it was three people that I can remember being on that call. I don't know their names.
Q. Okay. And what was said on the call?



A. They were letting me know that an investigation had taken place in Idaho Falls and that there were some findings. I was not given any information from that investigation, I was not told the outcome of that investigation. And so that call ended because I was not given any information about how that investigation had went. They just let me know that they had some findings but I was unaware of those findings and so they got off the call.
Q. Did you ask what the reason they were calling was for? They said, We're telling you there's an investigation. What did you say?
A. So they -- when they called me and from what I gathered with the questions that they were asking me, it was more an investigatory questions on how the process was in Idaho Falls for package delivery.
Q. Okay. So it just sounds like you thought it was more of an investigation of you; they were asking you questions, is that right?
A. They were asking me questions about the processes for the building.
Q. Okay.
A. And how -- go ahead.
Q. I'm sorry, go ahead.
A. Asking me questions about the processes for the

building, how if something came up how do I tell my people that work for me to do certain things and so that I would share this is what I do and that my employees do whatever and then they report back to me with whatever I'm asking.
Q. Okay. Did they ask anything else?
A. Not that I can recall.
Q. Okay. So they were asking you about processes and scenarios but they never told you what the nature of investigation was?
A. They told me that there was -- if I can remember correctly there was -- it was about packages being reported one way but they were never attempted or something along those lines.
Q. Okay. Were you surprised by that information?
A. Yes.
Q. Okay. And did you tell -- what did you tell them?
A. I told them that I was unaware of that happening in my building.
Q. Okay. Did you tell them that you would attempt to address that practice?
A. I don't know if the conversation ever got to that point before the call ended. I do not recall.
Q. Okay. And so was there anything else on that



particular phone call that was discussed related to this investigation?
A. Not that I can remember.
Q. Okay. So after that call did you ever hear any follow-up about this investigation into your Idaho Falls facility?
A. No.
Q. Nothing else?
A. I never heard anything from anyone that I can recall about the Idaho Falls investigation that had taken place after that phone call.
Q. Okay. And again that was around in June or July of 2021, is that right?
A. Yes.
Q. Okay. Did you receive any documents related to that investigation?
A. No.
Q. Any e-mails, texts?
A. Nothing.
Q. Okay. And so you said the next you heard about an investigation was that Clay Holloway and another individual called you on the phone sometime in either July or August, is that correct?
A. I don't remember when Clay called me. I cannot tell you a date or a month. I just know it was after



the Idaho Falls investigation.
Q. Okay. And so you said that you were driving between Rexburg and Idaho Falls at the time of that call, is that right?
A. Correct. And I was being questioned without HR on the phone.
Q. Okay. And what were they questioning you about?
A. I can't remember the questions that they were asking I just knew that HR should have been on the phone for those questions.
Q. And why -- why do you say that HR should have been on the phone?
A. Because of the nature of the questions. I had been with UPS long enough to know when security is trying to bait somebody to say something.
Q. Okay. And what was the nature of the questions?
A. I don't remember the questions; it was just what they were asking and I did not feel comfortable answering those questions without HR on the phone.
Q. Okay. Did you tell them you didn't feel comfortable answering the questions without HR on the phone?
A. I did not; I just got off the phone and said,



Hey, I'm driving I'll just have to talk to you about this later. And then I never heard anything from them again.
Q. Okay. So you got off the call did you ask them what the call was about before you did?
A. They told me that they had just completed an investigation in Rexburg and that they had findings. But I never received any documentation from that investigation either.
Q. And you never heard back from Clay Holloway or this other individual?
A. I did not.
Q. Did you ever follow up with anyone else about this phone call?
A. No.
Q. You never spoke to your manager and say, I had security call me?
A. No. Because I was under the understanding that if my boss needed to talk to me he would call me and if I was going to be reprimanded or have any issues with my performance, I would get a phone call from my direct supervisor.
Q. Okay. So you just -- you never followed up with anything regarding this phone call with Clay Holloway?

A. I did not call Clay and I don't recall calling Doug Barry. I may have, I don't recall.
Q. And that's okay. Just as best as you recall. Could you describe the practices at the Rexburg facility as regards coding for misdeliveries?
A. What I told all my supervisors whether they worked at Idaho Falls or in Rexburg, if a package could not be delivered that day, it was to be fitted as missed. And if my supervisors chose to do something other than that, I'm not aware of it.
Q. Okay. You said that was the same thing you told them at both facilities?
A. Correct. If I had a driver call me and they told me, Hey, I have a package that's on my vehicle it does not belong to me. What would you like me to ship it as? I told them to ship it as missed.
Q. Now you said earlier there's a difference between what is dictated my management and what actually takes place. Were you aware of any miscoding at either of your facilities?
A. I was not aware of any miscoding.
Q. Okay.
A. Every night my supervisors would text me how many missed that they had for that day which was how many couldn't get delivered, how many next day packages



were delivered late and then I would compile all of those text messages and send those off to my manager.
Q. Okay. And if they were ever -- if the missed or late were ever higher than average, would you trigger any kind of investigation or would you, you know, start asking questions?
A. I would normally know prior to that ever happening whether it was a later trailer or a driver got stuck, if there was an accident. It just depended on how the day went and if I knew ahead of time then it was easy. I would stay in constant contact with Doug Barry if something was to come up I would just share it right then and there so that way there was no surprises from the PM side.
Q. Okay. So usually you're saying for lack of a better word they kind of stayed with an average?
A. Yes. There was a few times where we did have an accident or a breakdown and those ones if we couldn't get them onto another driver like go rescue that driver and have them get some help to try and still make an attempt for those packages then I knew that those were going to be higher. If the roads were bad then the drivers or management I would instruct my employees to treat the packages as emergency conditions or weather. But the roads had to be bad, impassable, they couldn't



get down and it was a safety issue.
Q. So it sounds like there was always a good reason; there was never any point where you were concerned that you thought maybe something fishy was going on with the reporting?
A. No, I did not ever get suspicious. I trusted my supervisors to do what I asked.
Q. Okay. And you said no one ever followed up with you after either of these investigations, is that right?
A. That is correct.
Q. Okay. So you were never given a directive to change any practices or anything like that?
A. I had -- I'm remembering a call -- they would put me on a conference call for best practices for managers that were missing certain elements. So if the morning stock which was the preload was missing its production we would get on a conference call and talk about best practices. There was a conference call for discrepancy packages that I believe I was on once but that's about it.
Q. Okay. And the discrepancy packages call do you recall if that was in 2021?
A. I don't recall when it was.
Q. Do you remember what the call was about?



A. Best practices on how to make sure that everything is giving -- no, I don't recall. I just remember being on the call but I can't give you specifics because I don't want to misspeak.
Q. That's okay. It sounds like it was the best practices for making sure certain things get done properly.
A. Yes.
Q. But other than that you were never given any directives to change particular practices at either of your centers?
A. We tried multiple different things for different scenarios depending on what was happening. I don't remember specifics.
Q. And you were never told that there was an issue with any kind of dishonest reporting that needed to be addressed at either of your facilities, is that right?
A. Only from the call that a restart that I received for the Idaho Falls facility and then the phone call I received from our Rexburg facility from Clay. Those were the ones I was notified that I was being investigated or my buildings were.
Q. And so they mentioned that in particular?
A. When -- yeah, the Idaho Falls one when I was on the call with HR and security they mentioned that there

53

was some questions about how packages were being treated and then when I got the phone call from Clay Holloway and let me know that there was an investigation. But everything was kept away from me I had no knowledge of that happening.

Q. Okay. And how did you train your on-road sups to train the drivers to sheet packages?

A. So the on-road supervisors in order to become an on-road supervisor you have to be a driver. So I didn't have to train them; they already knew from previous work experience.

Q. Okay. So you didn't train them. This was something that they would do in particular?

A. Correct.

Q. Right. And you knew that from your time as an on-road supervisor?

A. Yes, I knew that from my time as an on-road supervisor.

Q. So when you were an on-road supervisor you were trained on how to sheet packages that were missed or had any other issues?

A. So the driver would call and say, Hey, I have this package how do you want me to put it in the system? And then as an on-road supervisor you tell them how to enter it into their dyad.

54

Q. Okay. Was that -- was that part of the training here in their training packet period or was this just like we call -- when they call them when they've got an issue and I can tell them what to do?

A. All of it. They learnt it when they were training because it was day to day process. Every day they had to put some type of scan and either mark it as delivered, mark it as missed, mark it as emergency condition, mark it as customers not home, no signature. It's something they do every day that's their job.

Q. Okay. And so if they had to question the driver they could call the on-road supervisor and say, Hey, I'm not sure exactly how to close this what should I do?

A. Correct. And they could call me as well.

Q. They could call you directly the drivers?

A. The drivers had my cellphone they could call me directly and some of them did.

Q. Okay. Do you ever recall -- could you give me an instance of why they would call you directly instead of the on-road supervisor?

A. Because sometimes the on-road supervisor was delivering and they're not allowed to answer their phone or they were training somebody, again, not allowed to answer their phone. Sometimes the on-road supervisor

55

was driving. You can't operate a vehicle -- a commercial vehicle and be on your phone at the same time. Sometimes they were just unavailable and they would call me if they couldn't get somebody right away.

Q. Okay. Would this be like a peak season practice when the on-road sups are out driving and they may need to call you more frequently?

A. No, there was only two drivers that had no problems calling me all the time. I think they preferred talking to me instead of the on-road supervisor.

Q. Okay. Do you remember which two drivers those were?

A. Yes; Trevor Larson and Brandon Halverson.

Q. Okay. And so they would call you directly typically?

A. If they didn't call me they would text me directly.

Q. Would they text from the dyad or text you from their cellphones?

A. From their cellphones.

Q. Okay. So they could reach out to you if they had an issue?

A. Correct.

Q. Okay. Did you take any particular steps to

56

make sure that the drivers weren't misreporting packages other than telling them what to do when they called in with a question?

A. So I would get with my on-road supervisors. One of the steps that we did in Idaho Falls was one of my on-road supervisors would block off the entrances. There was two entrances -- or three entrances into the parking lot in Idaho Falls.

And we would do vehicle checks to make sure that drivers that may have had a package that belonged to another driver they weren't trying to like hide it in their outbound packages so they didn't have to go deliver it. Because they knew that if they called or messaged the office that said, Hey, I have a package that does not belong to me, they were going to be told if it was within so many miles that they were going to have to go deliver it.

Most drivers didn't like to do that so they would hide those packages in their outbound volume that they had picked up from other customers. So we would block off the entrances and then we would check the drivers' cars and if we found any of those, those drivers had to go back out and attempt those packages.

I was -- did not have any issues with Rexburg and I was never told of any issues with Rexburg.

And I only went to Rexburg about once a week so I just thought Rexburg was my golden child so I didn't have to do anything in Rexburg. And Rexburg from what I can recall never pit any of my reports; it was mostly Idaho Falls.

Q. Okay. So Idaho Falls had more concerns and you had to have a more hands-on approach with that facility?

A. Correct.

Q. Okay. And would trigger these -- what did you call them; checks?

A. What would trigger those was if we had a high number of what they called send-agains where packages did not get delivered the prior day and we would have send-agains going out the next day. And so if we had a high percentage of that, that would trigger those checks.

Q. Okay. And how would you get an alert that was -- that there was a higher percentage than normal?

A. It was a daily report.

Q. And so if you saw this is a little above average you would say we need to do a check and talk to one of the on-road supervisors about it?

A. Yes.

Q. Okay. And then when the drivers came back and they had packages, what action would y'all take other



than telling them, Get back out there and deliver this package that should have been delivered?

A. We put a stop to it very quick because once they realized that we were doing those checks you would see a driver coming down the road they would see that we were standing outside and we later would turn around in the gas station parking lot and come back a little bit later.

Q. Okay. So you could tell that in those circumstances it solved the problem?

A. It solved most of the problems. Some of them still didn't want to go back out. You just had to discipline them that you have a verbal warning or whatever. But yeah, for the most part it solved that problem.

Q. Okay. And you said that was mostly at the Idaho Falls facility; the Rexburg not so much?

A. Yeah, I did not have any concerns about the Rexburg facility.

Q. Okay. When did you first become aware that some sort of investigation might lead to disciplinary action against you in particular?

A. When I got the phone call for the Idaho Falls facility and I was being interviewed by security and HR, I -- there was like a light bulb came on that told me I



had to look into this a little bit more. But no discipline came out of that call, I was never told anything after that and so I was not concerned and I figured no news was good news.

Q. Do you recall any phone calls or interviews that you gave in September of 2021?

A. No, not that I can recall.

Q. So when was the first time that you heard that you would be receiving discipline as a result of these investigations?

A. I never was given discipline as a result of either investigation.

Q. When were you told that you were going to be terminated?

A. In December of 2021.

Q. And that would be December 13th or thereabouts?

A. Yes.

Q. Okay. And how were you informed about this decision?

A. So I was sent a calendar invite from Troy Emerson and Alisha Todd saying that I had a conference call. And so I got on the Zoom call and they let me know that I was going to be terminated. I tried to speak and I was told by HR I was not allowed to speak. And they let me know that my employment had been



terminated and that I needed to leave my cellphone -- my work cellphone and my laptop and leave the building.

Q. Okay. And then you said they didn't give you an opportunity to speak to them about it?

A. No, Alisha Todd would not let me speak.

Q. And Alisha Todd is the HR representative?

A. Correct.

Q. Okay. And did Troy say anything?

A. Troy was the one that let me know that I was terminated based off of the investigations that I was never disciplined for. I was 100% shocked and -- yeah.

Q. Okay. So he just said, We've done some investigations and you're being terminated as a result of that?

A. Yes.

Q. Did he say anything else?

A. He told me that it was based off of proven dishonesty in reporting which I was also confused with because when I reported any numbers it was directly to my manager, Doug Barry, and those were all in text messages based off of the information I was getting from my on-road supervisors.

Q. Okay. And so that was the first time you've heard anything about it other than those two investigations -- phone calls investigations?

A. From what I can recall, yes.
Q. Okay. And so you tried to interject and you were told by Alisha Todd that you couldn't speak; what did she mean by that?
A. I tried to ask a question and before I could get the question out she told me I was not allowed to speak. That this was a termination and I just had to sit there and listen.
Q. Okay. And then did Troy say anything else?
A. No, other than I was terminated for proven dishonesty in reporting and to leave my equipment.
Q. Okay. And then --
MR. STEGELMEIER: Are you okay if we take a little break, Richie?
MR. CLIFTON: Yeah, we can take a little break, sure.
MR. STEGELMEIER: We have five minutes.
MR. CLIFTON: However long you need. What time?
MR. STEGELMEIER: We need about five I think. We'll turn the camera back on when we're ready.
MR. CLIFTON: Okay. That sounds good. Take your time.
(Brief recess of the record.)
BY MR. CLIFTON:



Q. All right. Ms. Peck, we just took a short break. Is there anything you want to change about your prior testimony?
A. No.
Q. Before the break we were just discussing your termination. You were told to go home and turn in your equipment, is that right?
A. I was told to leave my laptop and my cellphone and exit the premises.
Q. And what did you do next?
A. I did exactly that.
Q. How did you feel at the time of this?
A. I was completely in shock because I did not see it coming. The last I had heard anything was from Clay Holloway when he had called me on the phone in August sometime. And then they waited -- Troy and Alisha waited until December two weeks before Christmas to terminate my employment that I had worked with UPS for over 17 years.
Q. I'm sorry, Ms. Peck.
A. Thank you.
Q. Did you file an internal complaint at any point after this had happened?
A. Yes. Alisha Todd let me know that UPS has a peer review program and that I would -- she was going to



e-mail me the documents and that I could file an appeal on my termination which I did. And the end result of that peer review was my peers felt that I should not have been terminated and that I should be given a manager position somewhere else in the company even if it wasn't in Idaho Falls or Rexburg. And UPS decided to not go with the peer review and Alisha Todd did let me know that only about 5 to 10% of all peer reviews ever go in the favor of the person that was terminated. So when I was told that I could have my job back, I was offered from UPS an on-road supervisor position in Rexburg, Idaho or I could be a full-time preload supervisor in Pocatello, Idaho. So I was then demoted with less pay and I let them know that I did not feel like I should have been terminated and that I did not accept their offer because I didn't want a pay cut either.
Q. I'm just going to ask you a few questions about that in particular. But before I do, did you file any internal complaint like the UPS helpline or anything like that beforehand?
A. No, I'm old school and I -- if I have a problem I go to the source. I'm not one of those people that uses those resources.
Q. Okay. So you said you were told by Alisha Todd



about the EDR program, the Employee Dispute Resolution program, is that right?
A. Yes.
Q. Did she tell you that on the phone call?
A. She said she would e-mail me the information during the termination call and she did and that's when I started that process.
Q. Did you start it the same day?
A. No, I had to take a minute to process what had happened. I think I started it -- I don't remember exactly but I think it was a week later I think. I would have to go back to old e-mails.
Q. That's okay. Could you maybe kind of describe the process of starting EDR; what were you required to do to initiate that process?
A. The first one that I can recall from the EDR process was I had to send an e-mail to HR and HR was like the liaison between me and the company. And she got back with me and said the company was not interested in reinstating my position. And then it moved to the next step and I can't remember what the next step is. And then it went on to the peer review and the peer review went in my favor and then UPS just said that they were not interested in following their own EDR process.
Q. You said you spoke to a HR representative that

was the go-between between you and UPS; was that Alisha Todd?
A. No. I believe her name -- her last name is Cude, C-U-D-E, if I remember correctly and I think it was either June or Jill or Jude, J-U-D-E. I would have to go back through the e-mail.
Q. That's okay. Do you remember about when they started corresponding with you; was it immediately?
A. It was a couple of days after I had started it but it was a back and forth kind of thing. And then once it got to the peer review they had to schedule that because they had to get peers from all over the district so it would be available. And then we held that peer review with HR and I can't remember if it was Jill or Alisha on the phone with the peers but yeah, it went in my favor.
Q. But the initial step of the process was simply these two HR individuals go into the company on your behalf and saying she thinks that this termination was improper and she wants the job back and they come back to you. How did they inform you about what the company thought?
A. It was -- if I remember correctly it was all e-mails back and forth and if I need to find those e-mails I'm sure I could find those e-mails.



Q. Yes, if you can please try. I don't think that they're produced yet in this lawsuit but I believe you're going to find them. You said after that you initiated the peer review process, is that correct?
A. Yeah, I think that's step three in the EDR process.
Q. What was step two?
A. I don't remember what step two was. I would have to -- I would have to get the papers and I left them at home, I apologize.
Q. No, that's okay. But I guess step two was not the e-mailing back and forth, is that right?
A. It may have been because I think once she e-mailed me back and said UPS did not feel like my termination was wrong, that I needed to go to the peer review process. It may have been the e-mail back and forth.
Q. Okay. Step three is the peer review process.
A. Yes.
Q. And how did you initiate that process?
A. So they let me know -- UPS let me know what date and they sent me a Zoom link and then I got on the Zoom and the first part was everybody on the call asking me questions and then the second part was any question that I had I could ask back.



And one of the questions that I had asked was, Can I please get a copy of a piece of paper that you guys claim that I signed? I don't remember this form. And they said no, I could not have a copy of a piece of paper that I had signed that they were using in part of my termination.
Q. Do you recall what this piece of paper was about; what the document was, what did they say it was?
A. I don't remember even what it was. It was -- I know it was more than one page and I had asked for a copy of that and they said, No, you can't have a copy of that. And even the peers on the call were taken aback that I was not going to be a given a piece of paper that I had signed. They said it was UPS property.
Q. Was that your -- was the piece of paper your request for the EDR process by chance?
A. It was something that they had used. They said I had signed a form that they had e-mailed out. They said, You would sign this form on such and such date, I don't remember the date. Do you remember signing that? And I said yes, I remember signing that but no, I did not read it because UPS sends stuff out all the time they just need your signature on it you send it back. And so when I asked them, Hey, can I get a copy of this? Because they were using it against me, they said no I



could not have a copy of it.
Q. Do you remember what the nature of the document was; why was it important to the EDR process?
A. It was part of the investigation that they used to terminate me according to what they were telling me. It was something along the lines of this is a -- this is the item, this is what you're supposed to do for this process in regards to this problem or whatever. And I cannot remember the name of the document -- I cannot. But yeah, they knew what it was during the peer review but they would not produce it or they had it and they wouldn't give it to me.
Q. So it sounds like maybe it was some kind of like, I promise to do X, Y, Z, or something like that that you signed?
A. I think it was something along the lines of, These are the processes, this is how it should be done, sign it. But you may or may not have read it I don't know because I didn't read it. And then I e-mailed it back to Doug Barry and Troy Emerson and they used that in my termination.
Q. And then do you happen to recall what the date was of this documents or any other identifying characteristics of it?
A. It would have been between that summer and that

December when they terminated me. It would have been within a six months' period so it's probably going to be hard to find.

Q. You said that the panel review I guess took place around January?

A. The peer review I don't remember the date. I just know that it would have been between January and March when the peer review happened. Because I remember it taking a lot longer than I think it should have based off of the guidelines in the EDR process. There was like a timeframe each step was supposed to take and the peer review happened long after it should have taken place.

Q. So sometime between January and March of 2022, is that right?

A. Yes.

Q. Okay. You said there were several individuals which were your peers at this panel and they reviewed the evidence presented. Do you remember who these individuals were by chance?

A. I do have their names. I don't have them with me but I do have who attended the peer review and I can produce those if you need it.

Q. Okay. Were you allowed to select any of these individuals as panel members?



A. So I was given a list of -- I think I was able to choose one person and then UPS chose one person or maybe it was two and two. But I had to give them five names if I remember and then they chose from the names that I gave.

Q. Okay. And so there was an even make up, I guess, of panel members?

A. Yeah. I think there was -- I think there was six people on the call including myself and HR.

Q. Okay. This was done on Zoom, is that right?

A. Yes.

Q. Okay. And were you given -- how did the process work exactly; was it like a presentation of cases kind of thing or what exactly took place at this panel review hearing?

A. From what I could remember they let me tell my side of the story of how the events rolled out up to my termination and then after I got them speaking the peers then asked me questions. They got to review -- from what I could remember they got to review the information that UPS provided and I don't know what UPS gave them, and then they also let me know that after my interview Clay Holloway was going to be interviewed and I can't remember if they were going to interview somebody else as well. But I know I was not privy to any of the



outcomes of the other interviews other than UPS went in my favor -- the peer review went in my favor.

Q. Okay. And before the -- before the panel hearing, were you told what the company's position was so that you could prepare for presenting your side of the story?

A. No, they just said, Tell us from your point of view everything that happened up to your termination. And then if anybody had questions they could pick a part of whatever I had said or if they had clarifying questions they could ask me anything because I had to answer them.

Q. Okay. And I guess what exactly did you tell them; did you just begin speaking telling -- I mean, how did it work? I'm just trying to get a feel for what --

A. I just gave them kind of like a timeline I let them know that I had the call for the Idaho Falls facility and that I was not disciplined at all. And then I let them know about the call that I had received from Clay Holloway and that HR was not present during that phone call while we were both driving. And then I was -- I had radio silence after that; nobody said anything to me about any issues in either of my buildings.

And then all of a sudden in December I was



terminated. I was never told, Hey, you're going to be disciplined, you're going to be -- you're going to lose your bonus if you continue doing this. I was not told anything and then I was surprised by my termination in December and then they were able to ask me questions after that.

Q. Do you happen to recall any of the questions that the panel members may have asked you?

A. I remember one question that somebody had asked me about how the reporting and they said, What system do you use to locate your packages in this? There was an issue and I told them that there was PKG which we talked about earlier. And then I told them about iGate which was the other reporting system that UPS uses.

And then based off of those two that's where I would get my information on whether or not I needed to some further digging and/or fix anything.

Q. Did they ask you any other questions?

A. They did ask me questions but I don't remember what they asked me.

Q. That's okay. Do you remember maybe what the nature of the questions were?

A. They revolved around (inaudible) and I said that was accurate and I was never disciplined and I was never informed that I would either A, lose my bonus

which was the MIP, Management Incentive Program. They never once said, Hey, if you continue down this path, they did ask me about that stuff and I said no, none of that happened. So, yeah, that's what I remember.
Q. And then once they finished asking you the questions, what happened next?
A. After they finished asking me questions I had to drop off because they were going to start interviewing Clay Holloway for my peer review.
Q. And you said the other individuals; were there other ones that you had mentioned earlier that (inaudible)?
A. I don't remember if they were going to interview anybody other than Clay Holloway. I just know that Clay was one of the ones that was going to get interviewed since he was the one that had allegedly done the investigations.
Q. And was that the end of the call that day for you or were you brought back on the call?
A. That was the end of the call for me that day.
Q. Okay. And so when were you first notified of the results; were you told anything in between?
A. I was not notified of the results until after I had gotten an attorney and with my attorney's help we were able to get the results from the peer review and



that is how I found out that the peer review went in my favor.
Q. You didn't hear from UPS at any time before you obtained counsel and then --
A. At one point I remember I got a phone call from Doug Barry and I don't remember where it fell in the timeline but I had received a phone call from Doug Barry and that was when I was offered the motion to go back to on-road supervisor or be a full-time preload supervisor with less pay. That's the only time I heard back from UPS.
Q. So it was Doug -- Doug Barry called you at some point after the EDR panel and he didn't mention the EDR panel or anything or did he?
A. No, he did not. He did not tell me the outcome, he just said, UPS would like to have you come back to work on Monday with either one of these positions. And I declined.
Q. On Monday? He called you --
A. That following Monday from the day he called me.
Q. Okay.
A. I was then reinstated had I chose to do one of those lesser positions.
Q. And those positions were on-road supervisor and



full-time supervisor?
A. So they were both the same level because they were both full-time positions. One was the full-time position for an on-road supervisor in Rexburg or I could have been a full-time supervisor over the preload in Pocatello.
Q. In Pocatello?
A. In Pocatello.
Q. Okay. Were there any significant differences between these positions?
A. Yes. On-road supervisor is a driver trainer and then the preload position is making sure that you're managing the morning sort for the trailers that come in, unloading the trailers, getting all the packages onto the drivers' vehicles before they come in and leave for the day.
Q. Okay. So that would have been preload --
A. Uh-huh.
Q. Okay. So Doug offered you these positions and how was your response to this offer?
A. At the time I believe I told them that I would think about it and -- but I don't remember, I may have just turned them down right then and there. I don't remember. I may have e-mailed -- I would have to look. I don't remember exactly when that happened I just know



that I turned them both down.
Q. Okay. Did you ask him -- when you turned it down did you ask about the EDR process at all?
A. I did and he said he didn't have any information for that. He just said, UPS is willing to give you a job back. That's all he said.
Q. He didn't -- I guess he didn't necessarily link that offer to the results of the EDR process?
A. Not that I'm aware of. I don't know how much Doug Barry was told though either.
Q. Okay. And that's fine. You said you didn't hear anything back after that -- I mean about the EDR process. Once you turned Doug's offer down, did you hear anything else?
A. All correspondence after that was through my attorney and UPS after that.
Q. Okay. So you said you subsequently got the results of the EDR process -- of the EDR panel and you said that they were -- they had resolved in a recommendation that you get your old position back, is that right, the panel?
A. If I remember correctly it said I should be given back a manager position in a different UPS facility. So just not in the same buildings that I was in. And so when I asked them in an e-mail -- I think it

was an e-mail -- that said I'm interested in another manager position, where is there an available management position, I do believe there was an e-mail that came back that said UPS is not interested in giving you a manager position, that's off the table. So and then it was to go to the next step in the EDR process which was mediation because arbitration was the last one I think. Yeah.
Q. Yes.
A. And then UPS said that they're not interested in mediation and nothing happened with arbitration.
Q. Okay. So these communications you had with the back and forth about the manager position and everything, that was after you said you had retained counsel. Was it you e-mailing back and forth with them or was it --
A. Yeah, I do believe I have some e-mails. I would have to look.
Q. That's okay. Okay. So but you got the results of the panel and you saw that that was the recommendation. Did you initiate the communication with them -- with UPS?
A. When I found out the results I sent an e-mail that said what available management positions are there and that's when I got told that UPS is not interested in



giving you a manager position elsewhere.
Q. Okay. And who sent you the results of the EDR panel?
A. I received those via e-mail because of what my attorney was able to get back from UPS because UPS was not wanting to provide the results for the EDR process.
Q. Did somebody from UPS e-mailed you directly and said here is the results or (inaudible)?
A. No, they e-mailed the attorney with the results.
Q. Okay. Did you ever initially agree to Doug Barry's offer of one of those two demotions?
A. No because I didn't want to get demoted. I didn't feel like I deserved to get terminated and I didn't want to take a lesser position with less money. And so I was never interested in either one.
Q. So you said you had obtained counsel before you got the EDR process results. At what point I guess did you feel like the EDR process was not being followed properly?
A. When the first three steps were not happening in a timely manner based off of what it says in the EDR process how long each one should take. And then once I didn't get the results from the EDR process from peer review and I felt like it was a struggle to get anything



from UPS and it just wasn't going well at that point.
Q. Okay. And so you mentioned the EDR mediation process was the next step in the process, is that right?
A. If I remember correctly it was mediation and then arbitration was step five and that was the end of it.
Q. Okay.
A. And we never got through either one of those steps. UPS informed my attorney the day before mediation was supposed to happen that they were not interested in mediation at all.
Q. Okay. And did you see this e-mail?
A. I did see the e-mail.
Q. Okay. Is it possible that the e-mail said that they needed to reschedule mediation?
A. If I remember correctly it says UPS is not interested in mediation.
Q. Okay. I'm going back to the EDR panel review. Were you told at all what the results of either these investigations were at the time of the panel hearing?
A. During which process?
Q. During the peer review hearing?
A. No, not that I can recall. They just told me that I could tell my side of the story at the beginning of the peer review and then I was to be asked questions



after that. There was no review of documents other than the one that I was telling you about that they would not produce to me.
Q. Okay. And that was the one you said that they confronted you with that document; who was it that was using that document?
A. When Troy Emerson fired me or terminated my employment on December 13th, he brought up that document during the termination and he said he signed this document on this day and that's what they were using as part of my termination.
Q. Did he say anything else that we didn't discuss earlier?
A. Not that I can remember.
Q. Okay. And so was that document brought up in the EDR process?
A. Yes, that was brought up during the peer review and that is when I asked for a copy of that document because I had let my peers know that I had not read it, I had just signed and that I would like a copy of it since I did sign it, shame on me for not reading it first. And that's when HR told me, No, you can't have a copy of it, which also surprised my peers that they wouldn't even produce the document at all.
Q. Okay. And that was Alisha Todd?

A. I can't remember if it was Alisha or Jill Cude. I can't remember which HR it was that was on with the peers.
Q. Okay. And were there any other -- I'm sorry. What was that?
A. I have it written down on who was at the peer review I just don't have it with me.
Q. Okay. And if you would just be sure to produce a copy of that to your attorney. Were there any other documents that were brought up in the peer review process?
A. Not that I can recall.
Q. Did you submit any documents during that process?
A. I did not have any documents to produce because I lacked my laptop and my cellphone that had everything. So I had nothing to produce.
Q. Okay. And so other than that one document that was referenced were any other documents referenced?
A. Other than the investigations which I was not privy to, those were brought up but I've never seen them. I don't know the outcomes of those other than what they've told me.
Q. Okay. What was your response when you were told about the investigations?



A. I was shocked because the first time that I had heard about either one of them was when I was being interviewed with HR and security. And well, on the first one obviously no HR and on the second one. So I was blindsided by both of them.
Q. And were you told what the investigations had found?
A. So based off of the phone call that I can remember with Clay for the Rexburg one, he was informing me that they had found that packages were being sheeted incorrectly and that it looked like we were trying to hide packages that weren't getting delivered and I had no knowledge of that. And then for the Idaho Falls one was the more of the investigation that they -- when I was on the phone with them, they were just asking me process questions; What do you do if this happens, were you aware that this was going on in your building? No, I was not aware. This is what I do when this situation arises if a driver calls me I have them put the correct coding on. Because it didn't matter to me if the package got sheeted as missed or delivered or whatever as long as it had some type of recording on it that was accurate. I always told my employees if it's missed it's missed, if it's emergency condition because the roads are bad, then put it as emergency condition. I



had no problem putting it accurate. It didn't matter to me; the numbers were the numbers and that's what they were.
Q. And so when you were confronted with the results of the investigation it was shocking to you that the conclusion was that you were somehow involved in the process and knew about it?
A. So when they brought it up they never said that I was doing anything and they never said that my employees were doing anything; they just said this is happening. They didn't really say who was doing it that I can recall. And so it was a complete shock to me when I found out that I was getting investigated for Idaho Falls. And then it coincided when I got the phone call while I was driving for the Rexburg investigation.
Q. Okay. And did Troy when he was on the call with you during your termination call, did he ever link your termination to those investigations?
A. Yes. He said that there was two investigations; one in Idaho Falls, one in Rexburg and that I was being terminated for proving dishonesty in reporting. And then they terminated me. But my reporting was the reporting that I did every night to my boss and I never reported anything incorrectly to Doug Barry based off of what was coming to me from my on-road



supervisors. Whatever they sent me I took it, compiled it in a text and sent it off. I never changed how many missed or late or anything there. I gave them exactly what I was getting from my supervisors.
Q. Were you ever told at any point about any of the witness statements that were included in either of these investigations?
A. No. And I would have loved to have known and even if names were left out of them I would have been fine with that but no information from either investigation was ever shared with me other than the investigation phone call for Idaho Falls building and then the phone call from Clay Holloway. That's all I ever heard from either one of those investigations. No outcomes, no information which was why I was completely blindsided by my termination.
Q. Would it surprise you to learn that some of the witnesses interviewed said that at least you were somewhat aware of the practice of miscoding misdeliveries?
MR. STEGELMEIER: I want to object to the form. But go ahead and answer.
BY MR. CLIFTON:
A. Can you -- I didn't understand.
Q. That's okay. Would it surprise you to learn

that some of the witnesses interviewed as part of these interviews suggested that you were at least somewhat aware of misrecording misdeliveries?
A. That would surprise me, yes. I would not direct them to do anything that they should not be doing.
Q. Okay. Were you ever informed that that was the case that those witnesses had made such comments?
A. No, I was never informed that anybody had said that I was a part or party to anything being put in incorrectly.
Q. Do you think there would be any reason they would do so incorrectly?
A. The driver or who?
Q. Okay. That was an unclear question let me clarify it. Do you think that anyone would have any reason to misrepresent your knowledge about the sheeting practices?
A. I'm sure there are times where my employees wanted to either A, feel like they needed to protect me or not, I'm not sure. To me it didn't matter like I said if something was missed put as missed. There was no reason, no benefit, no gain for me to have them put something that was inaccurate. There was no gain in it. So no, I don't have any -- I don't know why somebody



would put something incorrect unless they thought that they were going to get in trouble.
Q. And you mentioned there was an important point; would the drivers have any kind of incentive to misreport misdeliveries?
A. Only if they didn't want to have go back out and reattempt a package that should not have been on their route or if they had found a package that they were missing earlier in the day and they didn't want to go back to that area and deliver it. It would have been personal for them.
Q. Okay. Would the on-road supervisors have any reason and any incentive to encourage the drivers not to report failed deliveries?
A. Only if they didn't want to have to report back to me. That would be the only thing that I can think of that would cause them to not report something accurately.
Q. As far as you're aware those practices were not occurring at either facility?
A. Correct. I had conversations with my employees, I had morning meetings with them every morning we would go over the day's prior results. And then as the day went on if they had a breakdown, drivers couldn't pass down a road, they would let me know, Hey,



I have this many missed packages, this many late next day or because of the roads or the plane was late. Or, We had a breakdown and these are the ones that we couldn't get delivered. That was a daily conversation. There was no discipline to my on-road supervisors so there was no gain for them reporting something that was actually happening.
Q. What would happen if say there were consistently higher misdeliveries at a particular facility than perhaps the area or district average?
A. In any building that is missing an element if they're having issues they would put the manager on a conference call like I spoke before and they would cover the best practices and review the results and, Are you getting any better in this element or not? And let's try something else if it's not working. There was just a conference call.
Q. Okay. And what if there was a consistent failure or there had been several conference calls; what would be the next step?
A. I never had that happen to me. There was never a mix up for me after a conference call so I cannot answer that question.
Q. Have you ever heard of that happening at all while you were at UPS?



A. Based off of -- you know, if it's a manager was put on conference calls if anybody -- no, I don't know what would happen. I've heard about people getting terminated, but it wasn't because they were on a conference call.
Q. Not because they had consistent failures in I guess deliveries, anything like that?
A. No, I don't know the end result for those.
MR. CLIFTON: It's 12:23. Why don't we take a short lunch break? I don't think I'll have too much after this I hope we can get this wrapped up shortly. But let's take about -- what do y'all need.
MR. STEGELMEIER: I don't know, I believe 40 minutes does that work?
MR. CLIFTON: Yeah, that works. Let's take --
THE COURT REPORTER: What time do we need to come back?
MR. STEGELMEIER: I like round numbers so let's plan on coming back at noon mountain time, 1:00 wherever you guys are.
MR. CLIFTON: Okay. Right. So 1:00 central time, noon mountain time. Okay.
MR. STEGELMEIER: That works?
MR. CLIFTON: That works.

MR. STEGELMEIER: All right. We'll see you then.
(A break was taken.)
BY MR. CLIFTON:
Q. Ms. Peck, we're back from our lunch break. Is there anything you would like to change about your prior testimony?
A. No.
Q. Before the break we were discussing the EDR (phonetic) process and your answer to that was that you and UPS were scheduled to attend the next step forward which is mediation, right?
A. Yes.
Q. Okay. And you said that someone from UPS contacted your attorneys and said that they're withdrawing from the mediation; is that right?
A. The correspondence with my and attorneys and UPS's attorneys -- the correspondence between them, that's when they said they're not interested in mediation.
Q. Okay. Just asking, did you review any documents during the lunch break?
A. No.
Q. So you were informed secondhand that UPS was withdrawing from mediation. Do you recall when?



MR. STEGELMEIER: Objection; form.
A. I do not recall.
Q. You can take your best guess. Would you say the panel reviews were sometime between January and March?
A. I do not recall.
Q. When do you think the mediation was taking place?
A. It probably would have been prior to March. I do not recall.
Q. But sometime after the panel review, right?
A. Yes. It would have been after.
Q. Was it very shortly thereafter or was it quite a bit of time after?
A. I think it was quite a bit of time, just because this process has been drawn out, but I just can't answer.
Q. Okay. I'm just trying to get a feel of the timeframe. So you're not sure if it a significant amount of time, but it certainly wasn't the next day or anything like that, right?
A. No.
Q. Okay. Do you recall filing a charge of sex discrimination with the Idaho Human Rights Commission?
A. Yes.



Q. Do you recall what you said in that charge?
A. Yeah. I put forward that Floyd Reinhardt was investigated and was told that he was going to be terminated for the same thing I was investigated for, Floyd kept his job and was able to retire and I was terminated.
Q. Would it refresh your memory to take a look at the charge?
A. Yes, it would refresh my memory to have it in front of me.
Q. Okay. Can you see this document?
A. It's small, but I think can read it.
Q. Okay. This is Exhibit No. 1.
(Exhibit No. 1 was marked.)
MR. STEGELMEIER: Can you make it a little larger so she can see it better?
MR. CLIFTON: Sure.
BY MR. CLIFTON:
Q. Okay. This is Exhibit 1. Is this your Charge of Discrimination?
A. Yes.
Q. This is your signature there at the bottom; is that right?
A. Yes.
Q. Okay. And under that are the particulars.



Could you read for me those -- those sort of series of paragraphs?
A. Yes. I allege that I was discharged because of my sex (female). In support of the statement, I offer the following facts:
A. I began working for Respondent around August 2004, as a pre-loader. My position at the time of discharge was business manager. My supervisor was Douglas Berry.
B. Respondent discharge me on December 13, 2021, for dishonesty in reporting. Respondent informed me that it had conducted two separate investigations; the last investigation was completed in August 2021.
C. I had not received any prior discipline or warnings leading up to my discharge.
D. Respondent demoted rather than discharged a similarly situated male employee, Brian Livdahl.
E. I allege Respondent treated me differently than Livdahl because of my sex.
F. Respondent employs more than 500 employees.
I allege the practices of the above-named Respondent are in violation of:
Title 67, Chapter 50 of the Idaho Code.

Title VII of the Civil Rights Act of 1964, as amended.
Q. Thank you, Ms. Peck. And can you state the date of this charge, please?
A. February 1st, 2022.
Q. Thank you. Did your charge mention Floyd Reinhardt?
A. When I limited it to the EEOC I believe I had put Floyd Reinhardt in this.
Q. Okay. But the original charge only included Brian Livdahl, Right?
A. Correct.
Q. And the EEOC changed it?
A. I'm not sure. I remember having both males mentioned because Brian Livdahl was demoted and Floyd Reinhardt was not terminated.
Q. Okay. Can you please describe for me the first incident in which you think you were discriminated against base of your sex?
A. When I was terminated in December and Floyd Reinhardt got to keep his job and I did not.
Q. Did you inform anyone at the company that you thought sex was the reason that you were being discriminated against?
A. I wasn't able to say anything to anyone at UPS



is not even. I was later told there's a chance to get my job back, but I was told not to talk to anyone at UPS.
Q. Were you told that after you were already discharged?
A. Yes, when I was terminated in December Alicia told me not to talk.
Q. So you said that Alicia told you not to contact anyone about your termination; is that right?
A. Yes.
Q. You didn't mention to Alisha that you thought there was an issue of discrimination?
A. No. I didn't talk to anybody at UPS.
Q. Not to Alicia specifically either right?
A. Only about the EDR process.
Q. Are you aware of the company's anti-discrimination policy?
A. I am aware that they have a policy.
Q. And you're aware that you can report things to a helpline?
A. I did not use the helpline.
Q. Okay. I am pulling up what will be marked as Exhibit 2. Can you see this?
(Exhibit No. 2 was marked.)
A. Yes.



Q. What does this appear to be?
A. This is the EDR Request Form.
Q. Okay. Is this your signature at the bottom of the document?
A. It is.
Q. And what is the date of this document?
A. 12/22/2021.
Q. Under, "Please describe your work-related issue," what did you write there?
A. Terminated for reasons I do not agree with.
Q. And this it says, "What efforts have you made to resolve this issue prior to EDR?" What did you write there?
A. I was not given any other avenue.
Q. And lastly, "Please describe the relief you are seeking:" What did you write there?
A. Reinstated with my position in this area with no loss of wages.
Q. Okay. Is there any reason you did not include sex discrimination and just put that you were terminated?
A. There's not a reason. I was hoping to get my job back.
Q. Did you think at that time that you had been discriminated against based on your sex?



A. Yes.
Q. Okay. Can you tell me why you thought that at the time you were filling that out on December 22nd, 2021 that you had been discriminated against based on your sex?
A. Because Brian Livdahl, I worked with him back in 2015 and when Brian Livdahl was being investigated for the same issues, he was manager, got demoted and then got promoted to manager later in his career. Then Floyd Reinhardt, I heard through the rumor line that he had an investigation similar to mine, he was able to keep his job and retire. I did not, I was terminated.
Q. You said they heard about Floyd through the rumor line, do you recall who told you about Floyd Reinhardt's issues with the company?
A. I do not recall who told me, it was 2021-22. I don't remember.
Q. Okay. The conversation would have been of interest to you?
A. Yes.
Q. Do you recall what they told you about Floyd Reinhardt?
A. I was told Floyd had an investigation similar to mine and that he was able to keep his position.
Q. You said that you were told this before

December of 2021?
A. I do not recall when I heard about Floyd Reinhardt being able to keep his position.
Q. Okay. So it may have been after the EDR document that we just reviewed?
A. Yes. It could have been after.
Q. Okay. Can you tell me or -- scratch that.
Can you describe any instances in which you feel like male business managers were treated differently than you while under similar circumstances?
A. Yes. Phil Taylor would sometimes break me on conference calls for other managers. Once another manager got praised for something similar to what I had just said, and when I said it he just said okay and moved on. That's just one instance I can of.
Q. So this was Phil Taylor?
A. Yes.
Q. And that was your former manager prior to Douglas Berry taking over?
A. Correct.
Q. And why do you think that Phil's treatment of you had anything to do with sex discrimination?
A. Because I was not getting high ratings after saying something that a male said and just put it into different words.



Q. Earlier You said that you had a good working relationship with Phil; is that right?
A. I did. Phil was good at keeping work and personal stuff separate. So sometimes he was one person at work and a completely different person outside of work.
Q. Now, can you tell me provide any instances of male business managers who had been treated differently who were under investigations similar to you and Floyd Reinhardt? Are there any others?
A. I'm not aware of any right off the top of my head other than Floyd and Brian Livdahl.
Q. Are there any other male employees that you're aware of who were disciplined for dishonesty in reporting?
A. No.
Q. Okay. Ms. Peck, these are called interrogatories which are just written questions that we sent for you to fill out along with your attorney. In Interrogatory No. 2 we asked you to identify each individual that you claim discriminated against yu and how they did so, and your response listed individuals. I want to go over that list of individuals if we might.
So the first individual you listed was Steve Redding. Who is Steve Redding?



A. He was the Northwest District HR Manager and he would have approved my termination. He would have had to review all documents so that everything was aboveboard so that we -- that UPS would not be liable for a lawsuit.
Q. Okay. So you think what he did was discriminatory against you?
A. Steve did not do a thorough investigation. Had he done a thorough investigation he probably would have came to the same conclusion as the peer-review did.
Q. Okay. And when was it that you think Steve did this poor investigation of the circumstances of your terminations?
A. I'm not sure. I'm not even sure he went over my case.
Q. So is it fair to say that Steve is -- you're not sure of what he did?
A. Yes.
Q. And he told you that he was the final decision from HR for any termination?
A. I heard that from either Doug Berry, Phil Taylor throughout my career when we talk about other terminations. Steve Redding had to be sure that there's no chance of a lawsuit.
Q. Okay. Is that the entire basis for Steve's



involvement in this case?
A. Yes.
Q. The next person that you listed was Doug Berry. Doug Berry was one of your managers; is that right?
A. Yes.
Q. Do you recall what his position title was?
A. Idaho Wyoming Division Manager.
Q. Okay. Division manager. And what do you think he did that was discriminatory against you?
A. Everyday I had to report to Doug on my service whether is was the next-day air, late-delivery. Any issues that would show up when I report for the next day based on what I was reporting to Doug. My information to Doug did not coincide with my dishonesty in reporting because I didn't report anything to Doug that was inaccurate.
I believe that since Doug Berry was my direct supervisor or manager, it is my belief that he would have been made aware that I was being investigated and would have known any or some of the commission or security or whoever was doing the investigation would be aware. He could have talked to me, he could have said something. He could have worked with me. None of that happened and so I feel like I was discriminated against because he had no desire to help me.

Q. So you think he knew about the investigation leading up to your termination?
A. Yes.
Q. Did he do anything else discrimination against your sex?
A. Not that I can recall right now.
Q. Is there any kind of document that might refresh you memory?
A. No.
Q. You said Troy was on there when it was communicated to you about your termination?
A. Yes.
Q. Do you know what Troy Emerson's title was?
A. He is the transportation manager.
Q. Did you interact with him on a regular basis?
A. I did call Troy regularly about an accident or injury, I also had to report to Doug Berry. So I had to report to both of them and then my interaction with him also when he terminated me.
Q. So it was infrequent interaction, just only when there was an accident?
A. There were times he would call me directly if he had questions about numbers, which I don't know why he wouldn't just go through Doug at that point, but there's times that he would call me directly.



Q. Your numbers you said?
A. Yes.
Q. Okay. Do you know when he called you?
A. Anytime he had a question.
Q. So was it a frequent occurrence?
A. Not really, no.
Q. Okay. About how many times did that happen?
A. When Doug Berry would go on vacation on occasion, I would cover for Doug. Other times, he'd call me out of nowhere when he wanted to know more about something.
Q. And that was the majority of your interactions with Troy then?
A. Yes, mostly.
Q. Okay. So what do you think Troy did that was discriminatory?
A. I was told that Troy Emerson was on the phone cal with Floyd Reinhardt and Steve Redding, when I couldn't ask questions, but I did not get to keep my job.
Q. Okay. So you're saying that you were told about this on December 21st when you had lost your job?
A. Yes.
Q. Who told you that he was on the call?
A. I do not recall who told me, it was about two



years ago.
Q. All right. The last person you listed was Clay Holloway. Who is Mr. Holloway?
A. Clay Holloway was the person I was told had conducted the investigation in Idaho Falls and Rexburg. So he worked for the security department and based on his reports I was terminated.
Q. So what are you claiming that Clay did to you that was discriminatory?
A. I believe that he falsified the investigation and clearly I feel that way because of Floyd and his investigation. He discriminated against me and I was terminated because of his investigation.
Q. So what exactly do you think your sex had to do with the way he conducted his investigation?
A. Because what he put in his report caused me to be terminated, while Floyd got to keep his position.
Q. And you have never seen the documents in the investigation report?
A. Correct, I have not seen them.
Q. Have you see any documents related to Clay Holloway?
A. I don't have any documents. My phone and my laptop were turned in.
Q. Okay. Now, going back to the interrogatories,



on Interrogatory No. 4 we asked you to identify the male business manager that was treated better than you and you stated that it was Floyd Reinhardt. How do you think Floyd was treated better than you?
A. Floyd got to keep his job.
Q. Okay. Do you know how many investigations were conducted into Floyd's misconduct?
A. I did not ask for it that.
Q. Okay. Was the basis of your believe based on your conversation with Floyd?
A. Based off the conversation with Floyd and the fact that Floyd got to keep his job and retire. That's where my basis is.
Q. And what did Floyd tell you about the investigation into him?
A. From what I can recall Floyd told me that Steve Reading and Troy Emerson had gotten on call with him and they were telling him that he was going to be terminated and whatever Floyd said back to them, because I do not recall exactly because I do not want to quote Floyd, but based off of the investigation that Clay Holloway did, Floyd let them know that that was not what happened when Clay was in his building doing the investigation and it was a false investigation with what was reported.
Q. Okay. So it sounds like they were talking

about the investigation conducted by Clay when they were trying to terminate him and he pointed out that Clay was not doing his job or not doing what he said he was doing while he was at the facility?

A. I'm not entirely sure because it was a while ago that I had talked to Floyd; I haven't talked to him in quite some time, and it was a very brief conversation with Floyd. I can talk to Floyd again to get more details but based off of what Floyd did tell me at that time, that is what I'm basing it off of.

Q. Okay. And so that's -- as far as you know that's what happened on the call?

A. From Floyd's point of view, yes.

Q. What else did Floyd tell you about the investigation to him?

A. I just know that Floyd told me that whatever Clay reported was not what had happened and Floyd got keep his job. I don't have specifics. I didn't take notes during my call with Floyd; it was just, Hey Floyd, do you have a second to talk?

Q. Did y'all discuss anything else?

A. Other than his termination and mine, not that I can recall.

Q. Okay. Did you discuss your termination of him?

A. I did.



Q. Okay. And what did you tell him exactly?

A. I let him know that I was terminated for proven dishonesty in reporting and that I had no recollection of reporting incorrectly. And then he told me about his investigation that he was aware of and then what had happened during the call with Troy and Steve Reading.

Q. Did he tell you what happened after that phone call?

A. No, he did not. He just said he got to keep his job and he later retired.

Q. Did y'all send any text messages to each other about this?

A. Not that I can recall because I just picked up the phone and called him.

Q. Okay. Did you have any other conversations Floyd after that?

A. I had two conversations with Floyd; the first one was the conversation that he told me about and then the second conversation I had was, Would it be okay if me or my attorneys contact you again? And he said yes.

Q. Okay. And was that via text message or?

A. No, I called him.

Q. Okay. Did you say nothing else on the call other than, Would it be okay if we got in touch with you?



A. Not that I can call.

Q. Okay. Did you ever reach out to him after that on your own?

A. No.

Q. You also stated that when you were terminated your position as business manager was filled by a male employee. Do you know who this male employee is?

A. His name is Rob Wood and Rob had come from Wyoming to help at Christmas time because we got really busy so he came to help train drivers.

Q. Okay. And was he an on-road supervisor when you were business manager?

A. He was.

Q. Okay. And he was working at the Idaho Falls facility?

A. He was working out the Idaho Falls and Rexburg facility both wherever he was instructed to go. He was on what they called a ready team so he could have been sent anywhere but he was sent to Idaho Falls and Rexburg.

Q. Was he the third individual you said was a third on-road supervisor that was under you when you said earlier you had two at one center and three at the other?

A. No, Rob Wood has only ever reported to me when



he came to help; he never was my direct employee.

Q. Okay. So he was just there to help during peak season?

A. Correct.

Q. Okay. And how do you know that he filled your position?

A. Because I get deliveries at my current position and I have a UPS driver that likes to share information.

Q. Okay. So you asked this UPS driver and he's the one who told you that Rob was in your former position?

A. I don't know how came up because I hear rumors from him all the time. Most of them I try to ignore. But somehow it got brought up that Rob Wood was my replacement.

Q. And you said you worked with Rob for a brief period of time before your termination, is that right?

A. Yes.

Q. Okay. What kind of employee was Rob?

A. From the interactions that I had with Rob he was good at what he did. He was an on-road supervisor and he did all the on-road supervisor jobs. But there wasn't anything for me to be upset about with Rob.

Q. Did this UPS employee who makes deliveries to you tell you by chance when Rob took over your position?

A. I know Rob started covering for me but he didn't accept the actual official position for a while afterwards. I don't have dates on when he would've accepted the position but he did tell me that Rob covered for me in my stead because I obviously wasn't there until he took promotion.
Q. A little while ago we were discussing Brian Livdahl and he was listed in your charge and in your complaint as a male businessman that you feel like was treated better than you were. Can you explain to me why you think his situation is similar to yours in any way?
A. When I worked with Brian Livdahl he was an on-road supervisor and I had been told that he was a business manager prior to him being an on-road supervisor and that he had been demoted because he had been investigated for packages that were not getting sheeted did correctly. And instead of being terminated Brian Livdahl was demoted and he did his time as an on-road supervisor and now last I knew Brian Livdahl had been promoted once again to business manager.
Q. Okay. And you said somebody told you this; do you recall who told you this?
A. It was another on-road supervisor that worked in that building where Brian and I were working but I don't remember which on-road supervisor it was.



Q. So this was prior to your termination that you heard this about Brian?
A. Yes.
Q. Okay. Do you remember when about you were told this?
A. No.
Q. Okay. And you said another on-road supervisor had told you about it; do you know how he knew about it?
A. I think he was working with Brian at the time but I don't know for sure.
Q. Are you aware that Brian's demotion occurred in 2003?
A. I was not aware that, no.
Q. Okay. You also mentioned Josh Bowman as a business manager who you think was treated better than you. Who is Josh Bowman?
A. I don't know a business manager named Josh Bowman.
Q. Do you know anyone named Josh Bowman?
A. The name sounds familiar but I don't know a business manager named Josh Bowman. I don't know any business manager named Josh Bowman.
Q. Is there any reason that he was listed as somebody who is treated differently than you were?
A. I cannot recall.



Q. Okay. Going back to Floyd, was there any other reason you though that he was treated differently than you other than this alleged phone call that he was on where he pushed back about the Clay Holloway investigation and wasn't terminated?
A. No, that is it.
Q. Okay. What you think that these individuals, Brian and Floyd, were treated differently than you because they're male and you're female?
A. Exactly that; because I'm female and they're male they've got to keep their jobs, I did not.
Q. Okay. As if their situations are different than yours would that change your opinion at all?
A. I believe our situations are very similar so, no.
Q. Now we had discussed Clay Holloway a little while ago and it's been your position during this lawsuit that Clay Holloway who is a security investigator and who conducted the second investigation that you discussed with the phone call had botched your investigation, is that right?
A. I'm not sure if he botched or not. I never got to see the investigation so don't know what was put in it.
Q. Okay. But from what you understand it was that



he put incorrect information in your investigation, is that right?
A. Since I don't know what he put in the investigation, yes I just don't know what he put in there so I don't know whether I can agree or disagree with what he put because I never saw the investigation.
Q. Okay. How about this; what is it that you think Clay Holloway did that was discriminatory against you?
A. Based off of whatever he did put in that investigation factored into Troy Emerson using that investigation to terminate me in December.
Q. Okay. Is there else; did you ever have a conversation with Clay where you felt like it was discriminatory in nature?
A. Not that I can recall right now.
Q. Okay. Did Clay ever say anything to you that was discriminatory?
A. I cannot recall.
Q. Okay. And we may have touched on this earlier but when did you first hear about Clay possibly being inaccurate in his report about the investigation into your facility?
A. I heard a rumor that Clay Holloway had been terminated for putting incorrect information into an

113

investigation that he had done and was terminated for that.
Q. Okay. And when did you hear this?
A. It was -- I don't have a date. It was prior to me -- it was right around the time I was seeking Counsel for this because I had heard that Floyd got to keep his job and that Clay Holloway had been investigated for reporting inaccurate information into an investigation and was terminated for that investigation. So it was around that time.
Q. Do you know who told you this?
A. I don't. I do not remember who told me.
Q. Okay. So you're saying -- are you saying that UPS was aware of this alleged wrongdoing by Clay Holloway at a time certain?
A. So I was terminated and then Clay Holloway was terminated sometime after I was for falsifying documentation for his investigation that he did. And from what I had heard he had admitted to putting in false information in the investigation and was let go from UPS for that.
Q. And that wasn't your investigation, right; that was another investigation?
A. It was another investigation which led me to question anything that Clay Holloway produced.

114

Q. And why do you think that this other investigation that he had botched or put inaccurate information in is relevant to your claims of gender discrimination?
A. From my point of view is somebody's going to lie into investigation and then later admit after they were caught, that that person is probably not an honest person and if they had done it then, then they had probably done it in other investigations. Credibility is dead and gone at that point.
Q. Okay. Did you hear about any other investigations that Clay had conducted that were allegedly inaccurate?
A. Other than the one that Floyd had told me about for him and then the one that Clay was terminated for, so that in my book is two, two starts a trend. So those -- that's just not great numbers for Clay.
Q. Do you remember the nature of this investigation that he was terminated for that you were told about?
A. I don't have any details; I just know that Clay was asked, Hey, did you do this? And he did admit it and that's why he was terminated that he had falsified an investigation.
Q. Okay. Does it change your mind at all that

115

discrimination had any role in your termination that Clay himself was terminated when it was discovered he was putting inaccurate information in reports?
A. No, I think that I was still discriminated against by UPS because Floyd did get to keep his position and I did not.
Q. Okay. So how do you think Clay's investigation plays into your discrimination claim?
A. Because whatever he reported led to my termination based off of his investigation. Because that's -- his investigation was used against me for my termination.
Q. So because his investigation may have been inaccurate and that investigation was subsequently going to be used against you, that's how his -- that's how his investigation plays into this charge of discrimination?
A. Yes.
Q. Okay. But if UPS wasn't aware at the time that he used this investigation and they weren't aware that he was being dishonest or untrue in his investigations, how is it that UPS is responsible for discrimination in relying on that report?
MR. STEGELMEIER: I'm going to object that it calls for speculation and legal conclusion. You can answer.

116

A. It goes back to how I feel like if they would've done their homework and did a thorough investigation prior to terminating me, I would not have been terminated.
BY MR. CLIFTON:
Q. Okay. Would it change your mind at all if I told you that UPS wasn't aware of the issues with Holloway until July of 2022?
A. No.
Q. Okay. And why is that?
A. Because it goes right back to Floyd; he had to keep his job and I did not.
Q. But those were both after, is that right?
A. What was after?
Q. To the -- I'm sorry, let me rephrase that. If UPS wasn't unaware until July of 2022 that was significantly after you were terminated, is that right?
A. It was after I was terminated but based off of what Clay reported, that caused my termination based off of his report.
Q. So your position is that UPS should have done a more thorough investigation into his report at that time if they were going to rely on it, is that right?
A. I think UPS should have done a better job doing an investigation on the entire scenario having known

that I was not disciplined; I was talked to by Clay Holloway without HR present which is a violation UPS' policy. If they had done a thorough investigation to know that they hadn't even told me that I was going be disciplined let alone terminated and why would they have done an investigation in Idaho Falls and then in August do another investigation in Rexburg but then do nothing; no discipline, no conversation and wait until December to terminate my employment.

Q. Would it make any difference to you in your mind if UPS had reinvestigated Clay Holloway's investigation; that is they did it over and talked to the same witnesses and kind of did a do over of your investigation; would that have changed your mind?

A. No.

Q. So if they had reinvestigated and everything turned out the same it wouldn't make a difference to you?

A. If Floyd was able to keep his position and I was let go, no that would not change my mind.

Q. Okay.

MR. STEGELMEIER: We've gone about an hour Richie, do you want to take a quick break, five minutes or so?

MR. CLIFTON: If we can please just go for



another ten I think we may be able to wrap it up here shortly.

MR. STEGELMEIER: All right. Let's do that. (Inaudible) through.

BY MR. CLIFTON:

Q. Earlier, Ms. Peck, we had discussed the Manager Incentive Program. Do you recall that?

A. I do.

Q. Yes. Can you explain to me what the terms of the Manager Incentive Program were as you understood it?

A. From my understanding as long as you (inaudible).

Q. I'm sorry. I'm sorry, stop. It was -- it started doing the static again. I'll just need you to repeat your answer.

A. (Inaudible).

MR. STEGELMEIER: Can you hear us now?

MR. CLIFTON: Yes.

MR. STEGELMEIER: Let's start again.

MR. CLIFTON: Okay. All right.

BY MR. CLIFTON:

Q. Can you explain the terms of the Manager Incentive Program as you understood it?

A. Yes. The Manager Incentive Program was an incentive for any employee that was full-time as long as



they excelled in their job, they weren't under any disciplinary action. They had to be told that they were or were not going to be getting the management incentive bonus. Then every person that was eligible for that bonus was going to get that bonus the following year as long as the company did well. There was one year in my history of UPS that there was no MIP but that was the year that I was promoted to on-road supervisor so that one did not affect me. And then the rest of those were anywhere between 60 and 150% bonus. But as long as you were doing your job and you were not told by management above you or HR because you were under any type of disciplinary action, you were going to get your MIP. And I was never informed by any parties that I was not going to get my MIP bonus and I worked hard for it every year.

Q. And what was the basis of your understanding of how the MIP worked; was it from talking to someone that -- was it explained to you at some point or how did you know how it worked?

A. Every year from the time I promoted to on-road supervisor I received an MIP bonus. I've never not received it.

Q. All right. So it's just something that would continually happen?



A. Correct.

Q. And that's as far as your understanding goes. And you said it was 60 to 150% of what exactly?

A. Of your -- it's based off of how many stock you owned plus your monthly salary. They had a form that they used to put in what the stock price was going to be, how much your monthly salary was and what the percentage of how well or not well the company did and all of that factored into what the MIP bonus was for each individual. So if somebody had more stock than somebody else, their bonus is going to be different.

Q. Okay. So part of it is based on your monthly salary. So whatever you make in a month times say 150, am I understanding that correctly?

A. It's something similar to that. Like I said it's a formula; I don't know what the formula is.

Q. You just heard -- you just heard what the formula was from someone?

A. UPS has a MIP factor calculator that was at the employee's disposal so if they could guess, Hey, this is what the factor might be. This is what we think the stock price is going to be when they run it, and then obviously you would know what your monthly salary is. And then you could plug those numbers in and then it would give you an idea of you might get.

Q. Okay. So it was like plug your salary in, plug in how much UPS stock you have at the time and then take a guess as to how the company might be doing or a rough estimate of how much the MIP might be would be given to any employee who requested it, is that right?
A. Yes. That form was available to anybody.
Q. Okay. Were you informed at any point in 2020 when your MIP bonus might be in jeopardy?
A. No.
Q. Okay. Was it discussed at your termination?
A. No.
Q. Are there any other factors besides the ones we've mentioned that are used as far as you know to assess whether an employee is eligible or not?
A. Not that I'm aware of.
Q. Okay. Again going back to the interrogatories, in Interrogatory No. 5 we asked you to describe the basis for your contention that your MIP bonus had adjusted, that is you earned it already before you were terminated December 13th of 2021. And you stated that you had consistently received favorable reviews and recruit completed all required tasks for the 2021 year. Are those the reasons you believe that you had earned your MIP bonus in 2021?
A. Yes, I was never disciplined for anything



during the 2021 timeframe, I never had any write ups that I can recall, nobody ever told me that I wasn't going to get my MIP bonus. And so is under my assumption that yes, I had worked all year for it, it was now December 13th and I'm getting terminated and I obviously did not get my MIP bonus.
Q. When you say you had completed all tasks, what you mean by that?
A. Just completing my job day to day, anything that they changed I had adopt to that change. So just all tasks.
Q. Okay. So there wasn't like a checklist that you're talking about or anything related to the MIP bonus?
A. No.
Q. Okay. But UPS is in peak season during the month of December, is that right?
A. That is correct.
Q. Okay. And is part of the bonus determined by how you perform during that particular critical season?
A. It is for the entire year and I was let go on the 13th which was, what, 17 days or 18 days prior to the end of the year.
Q. And you said that the December -- your December 13th, 2021 termination was an attempt to deprive you of



your MIP bonus. What did you mean by that?
A. With the last investigation taking place in August if there was something that I was doing so wrong, why did they not terminate me anytime between August and December 13th? They could have terminated me anytime during that timeframe but they waited two weeks roughly right before I would have receive my bonus. Because I had heard that you have to be on UPS's employment roll on December 31st of every year and as long as you are employed active in the system on the 31st of December, you qualify for the MIP bonus. And I was let go prior to that date but why didn't they terminate if it was something so wrong why would they -- why would UPS let those bad behaviors or whatever they felt was so wrong continue for that many more months before saying, Oops, we probably should let her go.
Q. Okay. So do think -- you think that they left you on so that you can work through most of peak season and then try to terminate you to deny you your bonus?
A. Yes.
Q. And now because you don't get the bonus if you're not employed on the rolls or whatever it was you said by December 31st, 2021?
A. Correct. December 31st of whatever year. Yes, you have to show that you were active and employed. And



then if you are, for example there was an employee that had quit in January of 20 something I don't remember. But because he had quit in January he still received his MIP bonus check when it came out months later but he had been employed with UPS for two or three months.
Q. Okay. So it's some kind of trigger date you just have to be on the roll?
A. Correct.
Q. As far as you understand?
A. Correct. And you had been told that you were not going to receive it and they would've had documentation that that conversation had taken place but I never received that conversation. Since I didn't receive it, I feel that they let me go in December so that I was not eligible for that bonus 17, 18 days later.
Q. I'm going to mark this as Exhibit 3 to Plaintiff's deposition.
Ms. Peck, I'm going to represent to you that this is a document you filed in this lawsuit called initial disclosures. It's basically a set of requirements that the Court requires us to go through. And in this document I'm going to ask you about some of the individuals you listed that you say have knowledge about your lawsuit. Does that make sense?

(Exhibit No. 3 was marked.)
A. Yes.
Q. Okay. Now the first individual listed besides yourself is Douglas Barry. Can you tell me if there's anything else that Douglas Barry knows about your claims that we haven't already discussed?
A. I'm not aware of anything that Doug might know.
Q. Okay. Have you reached out to Doug at all about your claims?
A. I have not.
Q. Okay. The next person listed is Brian Livdahl. What does he know about your claims?
A. I have not spoken to Brian Livdahl.
Q. Okay. So his involvement is simply on the basis of what you heard about what had happened to him, is that right?
A. Correct.
Q. Okay. And then Floyd Reinhart is listed next. What does Floyd know about your lawsuit other than what we've discussed so far today?
A. Just what I had talked to him in that brief conversation with him when I had called him after he had retired.
Q. And the next person is Mimi Lewis. Who is Mimi Lewis?



A. Mimi Lewis was an on-road supervisor that worked for me in the Idaho Falls facility. She would have been allegedly interviewed during the Idaho Falls investigation but I don't know what that result was. So Mimi worked for me and Mimi was -- after I was terminated Mimi was also let go from UPS.
Q. Mimi was also let go from UPS?
A. Yes.
Q. Shortly after you were terminated?
A. Correct.
Q. And how did you know Mimi was let go?
A. Mimi now works with me at one of my jobs.
Q. Okay. So that's the first time you learned about it; you saw her at work one day?
A. Mimi called me the day she got terminated.
Q. Okay.
A. And was escorted off UPS property.
Q. And what did she say to you that day?
A. That she had just been terminated and -- yeah, that it. I don't exactly remember what she said. I just know she was pretty upset and distraught and she wanted somebody to talk to and she had called me.
Q. Okay. And you don't remember any particulars about the conversation; did you discuss your termination?



A. No.
Q. Okay. Have you spoken to Mimi since then?
A. I see Mimi every week.
Q. Okay. Have you spoken to Mimi about your lawsuit since then?
A. No.
Q. Okay. You noted under Mimi's name that she has knowledge regarding the hostility that was exhibited towards women by UPS employees and UPS' refusal to investigate complaints made by female employees. What do you mean by that?
A. So Mimi had or had time with a lot of male employees and Mimi did call the hotline and nothing was ever done to rectify any of Mimi's complaints. And their behavior towards Mimi continued to escalate to the point where Mimi eventually got terminated. Because nothing was ever resolved when she complained about how she was getting treated.
Q. And this is what Mimi told you?
A. Yes.
Q. Okay. Does Mimi know anything about your lawsuit?
A. I have not talked to Mimi about my lawsuit but she did tell -- I did ask her if she would be willing to speak to it and she said yes. When she had called me



that day when had gotten terminated I told her anything that you need from me I'll help you and she said same for you.
Q. And you meant in the legal capacity when you said that?
A. Anything. Anything she needed, it didn't matter. Whatever she needed I told her I would help her.
Q. Okay. But did you mention specifically, Would you be a witness for me? Is that what you meant by that?
A. I did ask her if the need arose if she would be willing to talk to my lawyers and she said yes.
Q. Okay. And you said you would do the same for her?
A. I would do the same for her.
Q. Okay. But other than that she has no knowledge about the claims you're making in this case?
A. I've not spoken to Mimi about. I'm a private person and I try to keep to myself. So I don't share unnecessarily.
Q. The next person or persons you listed or persons listed were members of the peer review board. The members of the peer review board what is it that they know about your lawsuit?

A. I don't have any idea if they know anything about the lawsuit. I've not spoken to anybody from that peer review since my peer review.
Q. Okay. So you would be limited to what happened during the peer review process?
A. Correct.
Q. Right. You haven't reached out to any of them, contacted them, anything like that?
A. No.
Q. Okay. And the last person was an unknown UPS employee who conducted investigation which led to the termination of Plaintiff's employment. Who is it you're referring to there?
A. That one it could have been (inaudible) but I don't remember, it could have been Clay and then I had totally forgot about Bill Joyner because Bill Joyner had also been terminated prior to my termination.
Q. You mean William Joyner?
A. Yes, William. He goes by Bill.
Q. Okay. So whoever it was that conducted the other investigation?
A. Correct.
Q. Okay. Ms. Peck, as far as you recall what specific legal claims are you bringing against UPS in this lawsuit?



THE WITNESS: (Inaudible).
MR. STEGELMEIER: Yeah, those were the claims you're bringing.
THE WITNESS: Yeah. I don't remember what the paper said.
BY MR. CLIFTON:
A. It's in what my attorneys filled out that was sent to you. I don't recall what it says.
Q. Okay. On that list one of the claims is discrimination in the title seven based on sex. Have we discussed everything you believe occurred to you that was sex discrimination in this case?
A. From what I can recall right now, yes.
Q. And you're also bringing the claim of unpaid wages related to the MIP bonus, is that right?
A. Yes.
Q. And that's based on what we've just discussed about the MIP bonus?
A. Correct.
Q. Okay. And you are also bringing a claim of breach of contract for unpaid wages for the MIP bonus, is that right?
A. My attorneys wrote that, so yes.
Q. Okay. But that's based on the MIP bonus as well. My question is just if we've discussed everything



related to your claims about the MIP bonus?
A. Yes.
Q. Okay. You also brought a claim -- it's breach of contract but based on the failure of UPS to follow the EDR process. Is that based on their withdrawal from mediation?
A. It's based off of the untimely manner of how each step did not take place when it should have and then yes the last correspondence for the EDR process when the attorneys back and forth said were not interested in doing a mediation and then that stops for the EDR process. And that's UPS' policy so they weren't following their own policy.
Q. And lastly you're bringing the claim also breach of contract for violating what we attorneys call the duty of good faith and fair dealing. Can you tell me what that is based on; is it based on the EDR process as far as you know?
A. I don't know that one because my lawyer filled that out, sorry.
Q. That's okay, Ms. Peck. Can you tell me what amount of money you're seeking in this lawsuit for UPS' alleged wrongdoing against you?
A. I don't have a number.
Q. You don't have a number. Okay. Did you -- one



second.
MR. STEGELMEIER: It's the next report.
MR. CLIFTON: Yeah, it's not on the roll; it's not on the initial disclosures either.
BY MR. CLIFTON:
Q. You haven't discussed or you haven't thought of a number that might compensate you or make you whole or anything like that?
A. I have not given it a thought like this is exactly what I'd like to get out of that. I've not done that.
MR. CLIFTON: Why don't we take a five-minute break or if y'all need longer let me know. I think we should be able to wrap up pretty quickly after this but I assume y'all want to take a break as well.
MR. STEGELMEIER: Yeah, sounds good.
MR. CLIFTON: Okay.
(A break was taken.)
MR. CLIFTON: All right everyone. Are we ready to proceed?
MR. STEGELMEIER: We're ready.
THE COURT REPORTER: On the record.
BY MR. CLIFTON:
Q. All right. Ms. Peck, we're back after a short

break. Is there anything you want to change about your prior testimony?
A. No.
Q. Okay. Let's talk about what happened after your termination in December of 2021. Did you engage in a search for alternate employment?
A. I did.
Q. Okay. Can you please describe your job search for me?
A. I went to the Idaho Department of Labor here in town and was looking for jobs there. I also utilized the internet and was applying for many jobs online and I even had a couple of interviews with a couple of different people and companies. And eventually I was hired on for the hospital. During this time in order to pay for my bills which I'm currently current on because I'm stickler for that, I was using all of my UPS stock. So I was selling that off in order to live and eventually that run out and so I had to get a second job which I'm currently still working. I've been working two jobs since March of this year and there's two full-time jobs. So I have very little time to myself or for my husband. We -- I don't have any days off, I work seven days a week, week after week.
Q. Okay. And was very thorough and I appreciate



that answer. When did your job search begin?
A. I started looking for jobs right out of the gate because I needed to have employment. UPS did for the month of December they did pay me on the 26th of that month for the month of December. So that got me through January because I paid -- I got paid once a month and that check paid my bills for January so that gave me the January to try and find other employment. I was not able to get hired on with the hospital until March of 2022 and then I discontinued to sell stock to make up for the difference in what I was not bringing in from my job to pay my monthly bills.
Q. Okay. You said the first job you got was the hospital but were you applying for jobs before that or was that the first job you applied for and got it?
A. I was applying for other jobs. Like I said I did have interviews but they did not select me as their candidate and so I continued to look. But I did not stop looking until I was hired on somewhere which was the hospital.
Q. Okay. And did you keep records of these job searches?
A. I did. And I think I included them in the form I had to return back to my attorney. I listed a lot of the ones that I had applied for and had been interviewed



for.
Q. And you said you began in December. Was your first stop the Idaho Workforce Commission?
A. I did go there first, yes. That was my first place and then I just started submitting things online. I got an Indeed account and was just anything online popping up it would notify me, Hey, this looks like it's in your interest do you want to apply? I would say yes because my resume was already in the Indeed profile and I would just apply for jobs anytime if anything new popped up that fit my position and my knowledge.
Q. Okay. And you said those were documented. Those were the ones that y'all provided in your responses, correct?
A. Yes.
Q. Okay. After working for UPS was there any period of time when you were unavailable for any reason?
A. No.
Q. Okay. And since you left UPS have you gone on any vacations at any time?
A. I took five days off from the hospital and stayed home but other than that I have worked every single day.
Q. I'm going to ask you a few questions about some of the positions you held and some of the income you



earned after you were let go in December of 2021. In response to our interrogatories again Interrogatory No. 9 specifically we asked about the income you had received. You stated that you had received unemployment insurance payments of $4,630. Does that sound right to you?
A. It does.
Q. Okay. Are those the only unemployment benefits you received?
A. Yes. I was told by the Idaho Department of Labor because I had such a high income that that is all I qualified for and they spread that $4,000 over 16 weeks which isn't very much.
Q. So they didn't pay you that as a lump sum for the month of January or something like that; it was all the way until you received a position with the hospital?
A. No. Once I -- because I believe if I remember correctly it was like $268 a week I would get deposited into my account and like those payments stopped once they hit that number, that 4,000 whatever number it was. And then I received nothing after that, no income.
Q. Okay. And they said that was based on the Idaho rules?
A. It was based off of the income that I had received over a period of time. Because I had

received -- the prior year I had received an MIP bonus that dropped what I was eligible for down to that 4,000 whatever it was.
Q. Okay. So they gave you less than the maximum because you previously earned more money. Am I understanding that right?
A. They just said that because of the amount that I had made over the last I believe it was four quarters, they took the last four quarters and said, You made this much money you're only eligible for 4,000, whatever that is, and that's all you're going to get.
Q. Okay. And you said they spread that out about 16 weeks. Do you recall when it cut off?
A. I would have to go back through previous bank statements to find out when it cut off. It just -- it wasn't very much; it was like $268 a week which is not -- nothing when you had been bringing home what I was bringing home.
Q. And when did you -- when did you start receiving these payments?
A. I would have to look back but it would've been sometime in the end of January I do believe is when I started receiving those payments.
Q. Okay. And it went through the point or to the point where you got the job the hospital?



A. The payments from the Idaho Department of Labor stopped before I got my job at the hospital.
Q. Okay. Do you recall about how long before you got your job at the hospital that they stopped?
A. I don't recall. No, I don't recall.
Q. Okay. Maybe like a week, two weeks, three weeks, something?
A. I don't recall I just remember I needed to accept any job it didn't matter what it was so that there would be some form of income coming in.
Q. So you requested the maximum amount of unemployment benefit you could get, is that right?
A. I had requested anything that I could get. I don't know whether or not that was the maximum; I was just told, This is all you're eligible for, this is all you're going to get. And that's what -- and it did, it stopped after that $4,000.
Q. Okay. Do you have any documents related to your claim for unemployment benefits?
A. I would have to go back and look and see if I can find anything but that was from my taxes and that's -- yeah, that's all they gave me.
Q. Okay. And please do take a look. Do you recall if the Idaho Workforce Commission required you to show a certain number of job weeks and kind of turn in a



certain report, if you will, your attempts to find work while you were receiving unemployment benefits?
A. Yes. I had to at least do two -- apply two different positions every week with different companies until I found employment. And I did that because if you don't do that you don't get your check.
Q. Okay. And you're not sure if you have those documents or not but you're going to take a look?
A. I will look for those.
Q. Okay. You also stated in your response to Interrogatory No. 9 that you had sold UPS stock from January through May of 2023, is that right?
A. Yes.
Q. Okay. And you said that the total amount was about $106,702.51, does that sound correct?
A. It sounds correct.
Q. Okay. And I guess my question would by why such a substantial amount to cover the months of January until May?
A. Because in order for me to continue living based off of my salary if I remember correctly I was making roughly $9,800 a month and I got a job working for $15 an hour which is about $1,500 every two weeks. So I had to compensate for that and I sold some stock to try and pay off some of my pills so that my monthly



outgoing was going -- I needed to lower my monthly outgoing. So I paid off what I could; whether it was a credit card or whatever bill I had I just was trying to lower my monthly outgoing.
Q. Okay. Did you -- I guess did you use that entire amount during that time period?
A. During that time period with the bills that I had at the time, yes, I used those stocks in order to not hurt my credit and get behind on any of my bills.
Q. Okay. And then you were hired by Mountain View Hospital did you say in March of 2022, is that right?
A. That sounds right, yes.
Q. Do you remember was it early March, mid-March?
A. I think it was mid-March.
Q. Okay. You reported that you were making $31,200 a year with Mountain View Hospital, is that right?
A. I was making $15 an hour. They wanted to start me out at 13 and I was able to negotiate them up to $15 an hour. So if that's $31,000 a year then that's what I was making.
Q. Okay. Tell me about this position with Mountain View Hospital?
A. So this was an entry-level position because I was told if you get your foot on the door you can move

around. And so I became an admission clerk checking in patients as they came in for procedures, labs, whatever it may be. And it was the first job that offered me anything so I took it.
Q. Okay. And what was your job title at that initial position?
A. I was an admissions clerk.
Q. Admissions clerk. Okay. And so what was the interview process for that like?
A. I went in for an interview for a mailroom clerk that was a position that they were just opening up. They thought that I was too experienced for that and thought that my expertise would be used better elsewhere and they introduced me to the manager over the admissions department and she hired me and then I started the onboarding process and eventually started working there.
Q. Okay. And how did you learn about that position again?
A. I actually got on the Mountain View Hospital website and looked to see what they had available and I applied directly on the hospital's website. I applied for multiple positions but the mailroom clerk was the one that called me back but then I was introduced to the admissions manager and she's the one that decided to



hire me.
Q. And what made you think of the hospital as a potential employer?
A. Because I had just been terminated and I had been in the package industry whether it was receiving packages or getting them delivered to customers. I had had enough at the time and wanted to try something different just because I was still hurting. So I got hired up at the hospital for something different and I'm still there.
Q. Have you received any promotions at the hospital since working there?
A. I have changed departments and did get a promotion as far as pay goes and I have -- I share one office with one other person and they do allow me to work from home on occasion. So to me that's a promotion.
Q. And what position are you in in that promotion?
A. So I'm a Patient Financial Counselor.
Q. Okay. And I didn't ask about this but as the admissions clerk was your position full-time or part-time.
A. Full-time.
Q. 40 hours a week?
A. Correct.



Q. Okay. And what about as a Patient Financial Counselor?
A. Same; full-time, 40 hours a week.
Q. Okay. And you mentioned that there was a pay increase when you became a Patient Financial Counselor; what was the pay increase?
A. I got a dollar more an hour; I'm at 16.
Q. Okay. So it's up from 15 to 16?
A. Correct.
Q. Okay. You also stated that in March of 2023, which would be this year, you were hired by Amazon, is that right?
A. It is.
Q. And you stated that you were hired by Amazon at a rate of $52,000 a year, is that correct?
A. Yes.
Q. Okay. Tell me about this position with Amazon.
A. So I hired on as an ASM and my position covered the people that would deliver packages out of their personal vehicle. I had to make sure that as they rolled up there was a card next to their vehicle, they scanned the card, they load the packages and then they had to leave within a 15-minute timeframe for the next wave to come in because there was roughly four waves a day, 15 minutes a piece as people come in one of them



pull out. I had to make sure that everybody was safe, people couldn't get out of their cars unless their engines were off and no vehicles were moving. It's just varying -- managing the launch pad is what it's called. It's the Launchpad, three managing the launch pad so it's called launch pad. And then after all of those drivers get dispatched my job then turns into as the delivery drivers come back, the van drivers, those guys get dispatched before the people that deliver out of their personal vehicles. So as the van drivers come back I have to check them back in if they were bringing back any packages I had to find out, Hey, how come this one wasn't delivered? And usually it was just because the business was closed and they could not deliver it. Sometimes there was a dog; they couldn't deliver it because there was a dog and it was unsafe (inaudible) so they're not supposed to get out of their vehicle if there's even a dog present because of how many dog bites there are. And then after all the drivers are in I have to run or had to run nightly reports and then send those reports off to (inaudible) so they would know, Hey, how many packages are going to be reattempted the next day. And then I would arm the building and then I was able to leave for the day.
Q. Okay. So this is a very managerial position

that's what it sounds like?
A. Yes, I was hired on as an assistant site manager.
Q. Okay. And your experience at UPS as an on-road supervisor and as a business manager was helpful in this position?
A. Absolutely.
Q. Okay. And how were you -- what was the interview process like for this position exactly?
A. So when you apply for Amazon they have somebody that is the manager in another location so I was interviewed from somebody out of Texas. And then somebody else in HR also has to do an interview. So you get interviewed by two different people in two different locations; one person is in HR and one person is the next level above whatever position you're applying for. But you do not get interviewed at by the person that you will be reporting to. And then if you pass both HR and whoever does the other interview, they'll send in recommendations, they get reviewed and then whoever reviews those determines whether or not you get hired and then you can move forward if they decide to go with you as their candidate.
Q. Okay. And how did you learn about this position?



A. I heard that Amazon was coming to the area. It's the first Amazon building in this part of the State. And so I got online and there was an assistant manager position it was the only one that was on the website and applied. And I honestly didn't think I gotten the job because I had applied for it and I didn't hear anything for probably three or four months. And so I just totally forgot about it and then all of a sudden out of the blue one day they called me up and said, Hey, we want you to continue with this process. Can you have a Zoom interview? And I said yeah. And everything went forward and I started on March 26th of 2023.
Q. Okay. So it sounds like you applied maybe November or December of 2022, is that right?
A. No, I did not.
Q. Oh, okay. Because you said you had applied and then three months later you got the job -- three or four months later you got the job and you got the job in March of 2023 so.
A. So I know it was winter when I applied. Maybe it was November or December of 2022. That sounds right, yeah. And then it took a while but I eventually did get hired on. But I had forgotten that I had even put it in because I never heard anything.
Q. And you're still currently employed by Amazon?



A. I am.
Q. And still currently employed by Mountain View Hospital?
A. I am.
Q. How many hours a week are you working for Amazon?
A. For Amazon it is a minimum of 40 hours a week.
Q. Okay. And are you still working 40 hours a week for Mountain View Hospital?
A. I'm working a minimum of 40 hours a week for Mountain View Hospital.
Q. Okay. And so with both positions what is your combined -- both positions' combined salary?
A. My combined salary?
Q. Yeah.
A. Is this before taxes or after taxes?
Q. Whatever you can recall is fine just let me know which.
A. Well, I did the math just a little bit ago and I'm looking at making roughly $40,000 for Mountain View this year and roughly 43 to 45,000 with Amazon this year.
Q. Okay. So in the interrogatory responses you had said you were making 52,000 (inaudible). Is that number not correct?



A. It is but I didn't start until March. So I'm not going to get all 52,000.
Q. Oh, okay. Okay. So right, I understand. It's an hourly rate at Amazon?
A. That is correct; I'm an hourly employee at both jobs.
Q. Okay. Do you receive any overtime at either position?
A. Yes, unfortunately. It cuts into the time that's very limited.
Q. And that would be time-and-a-half pay, is that correct?
A. Correct.
Q. Okay. And were those -- excuse me. Was overtime included in your estimate of what you've earned this year?
A. Was that estimate the 43 to 45,000 for Amazon, yes. Overtime is -- any overtime that I've already worked this year is in that number.
Q. Okay. Thanks. Now when you started for Mountain View Hospital back in March of 2022, were you still searching for jobs while working for them?
A. I was. Because making $15 an hour was not cutting the monthly bills which is why had continued to apply and then eventually I got hired on at Amazon.

Q. Okay. And so do you have records of those applications?
A. They should be in what I had submitted to the attorneys. It should be all listed in there.
Q. Okay. And you just continued doing the same thing looking no Indeed, looking online, that sort of thing?
A. Yes, I had notifications turned on for any jobs that fit my expertise.
Q. Have you received any performance evaluations in either of your new jobs starting with Mountain View Hospital?
A. I have received one performance review from Mountain View Hospital and I had raise reviews and they let me know that when raise came out that I was going to get the highest percentage of what Mountain View offers. They could not tell me at the time if it was going to be four or 5% but I did receive the highest percentage of whatever the raise was for Mountain View.
Q. Was that the 15 to 16?
A. They put me up to 17 -- I think 17.10 is now what I'm making.
Q. And when was that?
A. I think it was within the last two months.
Q. Okay.



A. I would have to look. I think maybe July. I would have to look. I just work a lot so whatever.
Q. And have you received any performance evaluations at Amazon yet?
A. I have.
Q. Okay. And how did those go?
A. Fantastic. I've even change positions already. Same pay but I have better hours.
Q. Okay. So that was a promotion?
A. For me it was; better hours is a promotion.
Q. Okay. And that's different than the job you just described; the launch pad supervisor I think?
A. Correct. It's very similar to what I was doing but it's for the van drivers instead of the people that deliver out of their personal vehicles. So I just have to get the drivers that deliver out of the vans on the launch pad, get them loaded up and gone within 15 minutes. So I can do that over six times and then as the day goes on I'm talking back and forth with the dispatchers. And if they have an accident or injury I have to follow up on those and then just make sure packages are going to get delivered.
Q. Okay. Have you received any oral or written reprimands with Mountain View Hospital?
A. I have not.



Q. What about with Amazon?
A. I have not.
Q. Okay. Other than the income we've already discussed including the sales of stocks, did you earn any additional income outside of the pay you received from Mountain View Hospital or Amazon?
A. I was a ski instructor for Kelly Canyon but I don't go there for the income but if you do private lesson they will pay you as a ski instructor. I think that one year I made like 200 and something dollars. But I'm there because they, whatever, give you ski free ski lift ticket to go skiing if you help teach ski school.
Q. Nice. Where is that?
A. Kelly Canyon, Idaho in (inaudible).
Q. Very nice. I guess this is obvious; you haven't been terminated from any position that you obtained after UPS?
A. I have not.
Q. Okay. And are you still searching for employment right now?
A. I am. I'm trying to find a job that will compensate me enough that I only have to work one.
Q. And can you tell me what the job search process is like at present?



A. It's the same thing that I have been doing; I have the Indeed notifications turned on so anything that fits my knowledge base or whatever pings on my resume for Indeed it will send me notification, Hey, it looks like you would be a good fit for this job. Do you want to apply? So simple click of a button yes and then it sends off my resume because the form is already filled out with all of my information that they would need. And then if the company is interested they get back with me. I've had a couple of people get back with me but the jobs are less than what I'm currently making at Amazon so I'm not interested in anything less than what I'm currently making.
Q. And you said earlier your husband's work schedule -- what position does he have?
A. My husband is a general contractor and so he is his own boss.
Q. Okay. And about what is his annual income?
A. Right now it's not much because it's winter and he doesn't have anything coming in. I can't remember off the top of my head what his annual is because it's different every year; sometimes it's feast, sometimes it's famine.
Q. Okay. What was it last year?
A. Last year I don't even know off the top of my

head.
Q. If you had to guess a ballpark range?
A. If I had to guess it was probably 40,000 take-home after all expenses.
Q. Okay. And no other income -- source of income, is that right?
A. No.
Q. Okay. Ms. Peck, I'm sorry to have to ask you this but can you please describe the emotional impact being terminated from UPS and how that's been for you?
A. You want me to cry again, don't you?
Q. Absolutely not. I just have to ask.
A. Obviously (inaudible) I've never been terminated from any job other than UPS. I felt -- I don't even know if I can put into words how bad it destroyed me mentally. I did not seek help, I probably should because you can see what happens when I think about it. I had feelings of, You're not good enough. I was trying to figure out what I did wrong because I didn't know why everything that happened for me to lose my job. I would never wish that on my worst enemy. I take pride in my work. Every review I've ever had up until UPS has always been a good review. I started out at the bottom of UPS and I made it all the way to being a manager. And it hurt really bad I had every intention



of retiring from UPS. But my self-worth went down when I was applying for jobs I think some of the jobs I applied for were less than what I think I should've been playing for because I didn't feel like I was good enough to apply to some of the positions that I was applying for. And I still feel that this day. It still obviously upsets me greatly thinking or even talking about getting terminated and I never want to do it again and I will do everything that I will have to at both the jobs that I have to never get terminated ever again.
Q. I'm sorry to have to bring that up, Ms. Peck.
A. Thanks.
Q. I think you might have mentioned it but have you sought any medical or psychological healthcare treatment as a result of --
A. I have not. I'm a very private person and you can see what happens I talk about it but I probably should seek help but I have not.
Q. And I'm sorry. Again I just have to ask.
A. Thank you.
Q. Ms. Peck, do you have any other documents that we haven't discussed or that you haven't produced that are related to this lawsuit?
A. The only documents that I had was a copy of the employee policy handbook, the employee handbook, which I



did provide to my attorneys. But I think you already knew that. But I don't have anything else. UPS kept my work cellphone and my laptop which had everything on it. I have nothing.
Q. I think you mentioned notes maybe you were taking earlier?
A. Some notes from the peer review. I do have some of those that I have already provided to my attorney so he can get you a copy if you need it. And then if there was any e-mails that I can find from the EDR process prior to getting counsel, I'll see if I can find those as well.
Q. Any other journal or typed notes that are reflecting on the allegations specifically in the lawsuit?
A. I don't have anything.
Q. Besides the individuals we've already discussed, who else knows about this case?
A. I would have told my -- I talked to father-in-law because he's really great giving advice. But other than that I don't talk to anybody.
Q. I guess have you taken any statements from any of the witnesses we mentioned earlier?
A. I have not taken any statements, no.
Q. Okay. And besides meeting Lewis have you asked



anyone else to be a witness for you in this lawsuit?
A. No. Well, I think I asked Floyd but -- yeah, him and Floyd.
Q. Okay. Anyone else who worked at UPS or does work for UPS?
A. No.
Q. Okay. Anyone else that you think might support your case?
A. Any of my supervisors? Because I would have directly told them how to make sure packages were reported.
Q. Your on-road supervisors, is that right?
A. Correct. And whether or not they would tell the truth, the Trevor Lawson or Brandon Emerson are the drivers that would directly contact me and ask me, Hey, I have this package on my car how do you want me to sheet it? And if I had my work cellphone I could show you proof that I would type, Sheet it as missed, because that's what it was supposed to be, that's my proof but I don't have that phone.
Q. But no reason to think that they would be dishonest if they were called as witnesses?
A. I didn't have very many friends that were drivers because it was union against management. So there's rumors still going around about me and I haven't

been there for over two years. So who knows what they would or would not say, I don't know.
Q. You've mentioned rumors going on; what rumors are you referring to?
A. So the UPS driver that comes to Amazon to deliver he would let me know that there's a new rumor and it's about once every two or three weeks there's a new rumor. And the latest rumor was that I had been fired from Amazon which I thought was kind of funny because I still work there. And they even asked him, Hey, do you see Heidi there? And he says, Yeah. And he's like, Well do you talk to her? And he goes, Yeah. But the rumor goes around the UPS facility in Idaho Falls about different things that are derogatory towards me that I still hear about two years later.
Q. And I'm sorry to hear that, Ms. Peck. Is there anything else besides that you were fired from Amazon that is --
A. Yes. There was rumors as to why I had to work two jobs and then there was rumors that a driver helper in Rexburg had been killed and I had tried to cover it up. There was rumors that I was sleeping with drivers. You name it. That rumor was started about me.
Q. And do you think that was because you were a business manager you were at the top of the food chain



so to speak?
A. I had to terminate people and I didn't like it but we have to do our homework and when it came down to that I did; I had to terminate some people. And I didn't have a lot of friends because I was doing my job. I was doing what UPS asked me to do and this is the things that I get was to be let go. But yes, I -- because of the position that I held and I had to make hard decisions and I was the one that had to carry out whatever I was directed to do, there was a lot of people that didn't like me and they still don't like me and I don't work with them anymore.
Q. And the on-road supervisors do you think that they would be dishonest because they don't like you?
A. No. My on-road supervisors liked me. They were the ones that would maintain that I did get to pick. I interviewed my on-road supervisors and I selected them so they're not the ones that are spreading the rumors.
Q. Anyone else at UPS that might support your claims?
A. There are drivers that will support my claim. I could give you a list of drivers that would probably stand up. I've heard through the grapevine that they miss me but I don't know if that's relevant or not



whether or not you would need their names.
Q. I (inaudible) if they knew anything specific about the claims that you're raising in this lawsuit so.
A. Yeah. Kev Buck or Dave Taylor. A lot of the other drivers have retired but those two are still working there.
Q. And those were drivers at your facility, is that right?
A. Correct.
Q. And they were under your direct chain of command?
A. They were under the on-road supervisors but yes, you know, same command goes they worked for the on-road supervisors who then worked for me.
Q. Ms. Peck, what do you think that UPS' actions in terminating you were because of discrimination?
A. Because Floyd got to keep his job and I got terminated.
Q. If other business managers that were males were also terminated for the same reason you were terminated, would that change your opinion about discrimination?
A. I don't think so just because while I was under the Idaho Wyoming division I worked for Doug Barry and so did Floyd. Because our situation was darn near similar from what I can gather; we have the exact same



manager, the same male Troy Emerson called and spoke to both of us and in the end Floyd got to keep his job and I didn't. Floyd got to talk during his termination; I couldn't. I just -- to me it's not fair any way you look at it I feel like I was discriminate against.
Q. Okay. Have you told me everything you claim UPS has done wrong to you in this lawsuit?
A. From what I can recall right now, yes.
Q. Is there anything you remember that you want to add?
A. Not at this time.
Q. Anything you want to change about your testimony?
A. No.
Q. Do you plan to (inaudible)?
A. I do.
Q. Do you understand that if you (inaudible) in front of a judge or jury you might have to pay their costs?
A. I understand.
Q. Have you understood all of my questions today?
A. Yes.
Q. You're not claiming that I have harassed you at all?
A. No.

MR. CLIFTON: I'll pass the witness. Thank you.

MR. STEGELMEIER: I don't have any questions for her.

MR. CLIFTON: Reserve all questions for the time of trial then.

Amanda, are you there?

(Off the record discussion was held.)

(Technical difficulties were experienced.)

THE COURT REPORTER: I apologize, I heard everything, but I could not un mute myself or turn my camera on, I've never had that happen before.

MR. STEGELMEIER: That's okay. We would like --

MR. CLIFTON: It's all right.

MR. STEGELMEIER: We would like a paper copy and an electronic copy. We'd also like to read and sign as well.

MR. CLIFTON: Electronic is fine for us.

THE COURT REPORTER: Okay. You got it. We are now off the record.

(Proceedings concluded at 3:07 p.m.)



CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| HEIDI H. PECK, an individual, Plaintiff, | )( | Case No. 4:22-CV-00381-CWD |
| VS. | )( | DEFENDANTS UNITED PARCEL SERVICES, INC. (OHIO)'S NOTICE TO TAKE THE ORAL DEPOSITION OF HEIDI H. PECK |
| UNITED PARCEL SERVICE, INC. An Ohio Corporation, Defendant. | )( | |

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF HEIDI H. PECK
December 1, 2023

I, AMANDA K. SAILSBURY, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, HEIDI H. PECK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f) (1) that the signature of the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

___ was not requested by the deponent or a party before the completion of the deposition

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 TRCP will be certified to after they have occurred.



Sworn to by me this 15th day of December, 2023.

AMANDA K. SAILSBURY, CSR 11923
Expiration Date: 03-31-24
Hill & Romero
Firm Registration No. 313
7000 N. 10th Street, Suite C-2B
McAllen, Texas 78504
(956) 287-8898