# EXHIBIT F

**In The Matter Of:**

*PECK vs.*

*UNITED PARCEL SERVICE, INC.*

---

*30(b)(6) MATTHEW CLYDE FITZMAURICE*

*February 28, 2024*

---

*T&T Reporting, LLC*

*477 Shoup Avenue, Suite 105*

*Idaho Falls, Idaho 83402*

*(208) 529-5491*

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

HEIDI PECK, an individual, )
) 
Plaintiff, ) Case No.
vs. ) F:22-cv-00381-AKB
)
)
UNITED PARCEL SERVICE, INC., an )
Ohio corporation, )
)
Defendant. )

30(b)(6) DEPOSITION OF UNITED PARCEL SERVICE, INC.,

(MATTHEW CLYDE FITZMAURICE)

Wednesday, February 28, 2024, 12:30 p.m.

BE IT REMEMBERED that the 30(b)(6) deposition of United Parcel Service, Inc., (Matthew Clyde Fitzmaurice) was taken by the attorney for the plaintiff by Zoom before Sandra D. Terrill, Court Reporter and Notary Public, in and for the State of Idaho, in the above-entitled matter.



A P P E A R A N C E S

For the Plaintiff:
HALL ANGELL & ASSOCIATES, LLP
BY: CORY R. STEGELMEIER
1075 Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
(208) 522-3003
crs@hasattorneys.com

For the Defendant:
SCHMOYER REINHARD, LLP
BY: RICHARD L. CLIFTON, JR.
8000 IH 10 West, Suite 1600
San Antonio, Texas 78230
(210) 447-8033
rclifton@sr-llp.com



E X A M I N A T I O N


| MATTHEW CLYDE FITZMAURICE | Page |
|---|---|
| BY MR. STEGELMEIER | 4 |
| BY MR. CLIFTON | 81 |


E X H I B I T S


| No. | | Page |
|---|---|---|
| Exhibit 10. | Third Amended Notice of Rule 30(b)(6) Deposition of United Parcel Service, Inc. | 5 |
| Exhibit 11. | Investigative Summary | 53 |
| Exhibit 12. | C. Holloway Investigative Summary 22-PLN-1963 | 58 |
| Exhibit 13. | Defendant's Objections and Answers to Plaintiff's First Request for Admission | 66 |




(The deposition proceeded at 12:30 p.m. as follows:)

Matthew Clyde Fitzmaurice, produced as a witness at the instance of the plaintiff, having been first duly sworn, was examined and testified as follows:

**EXAMINATION**

**BY MR. STEGELMEIER:**

**Q. All right. Can we have you state your full name and spell your last name for the record?**

A. Matthew Clyde Fitzmaurice. Spelling of last name is F-i-t-z-m-a-u-r-i-c-e.

**Q. All right. So it's Fitzmaurice?**

A. Correct.

**Q. Okay. If I mess that up, I apologize in advance. I'll try.**

**My name is Cory Stegelmeier. I am the attorney for Heidi Peck in this case. We're here pursuant to a Rule 30(b)(6) depo. I'm sure you've spoken with people about that.**

**What's your understanding of what you're here for today?**

A. I am a corporate representative for several of the topics in a depo notice with

(inaudible).
MR. CLIFTON: I'm sorry. Are you all hearing a echo?
(A discussion was held off the record.)
**Q. BY MR. STEGELMEIER: So, Mr. Fitzmaurice, before we took a break there to address some stuff, you mentioned that you were the corporate representative for UPS to discuss several different topics; is that correct?**
A. That is correct.
MR. STEGELMEIER: All right. I'm going to show you what we'll mark as Exhibit 10. And this is the third amended notice of a Rule 30(b)(6) deposition of UPS.
(Exhibit 10 marked.)
**Q. BY MR. STEGELMEIER: Can you see that on your screen there?**
A. I do.
**Q. Okay. So this is the date and time that's noticed on here. We'll scroll down here to the areas of examination, and I just wanted to get your understanding of which areas you are going to be discussing.**
A. Would you like me to point out the ones that are my knowledge that I'll be speaking to?



**Q. Yes, please.**
A. All right. I'm looking at No. 2, "Information related to your decision to terminate Heidi Peck."
**Q. Okay.**
A. I'm looking at No. 4, "Information related to investigation conducted by you or your agents leading to the termination of Heidi Peck."
**Q. Okay.**
A. Number -- I want to make sure I'm saying the right ones here.
No. 5, "All communications between Heidi Peck and your employees regarding reporting requirements."
**Q. Okay.**
A. No. 6, "Information related to your investigations of Floyd Reinhardt regarding reporting requirements."
**Q. Okay.**
A. No. 9, "Information related to all investigations performed by Clay Holloway regarding Floyd Reinhardt and Heidi Peck."
**Q. Okay.**
A. No. 11, "Information related to your reporting requirements in 2022."



**Q. Okay.**
A. And then the last being, "Information related to your employment of Clay Holloway between 2021 and 2023 and your decision to terminate him."
**Q. All right. What kind of records have you reviewed or what kind of steps have you taken to prepare for this deposition?**
**I'm going to stop sharing for now.**
A. I have reviewed nine documents that Ricky forwarded over to me.
**Q. What documents are those?**
A. They are, Clay -- the first one is titled Clay investigation into Floyd, dash, July 2021.
**Q. Okay.**
A. At the bottom right it's marked D, dash, P -- well, it's that one, it's titled that one. It's titled Clay investigation, so on and so forth.
**Q. Okay.**
A. The second one, Clay -- sorry -- Floyd and Derrit's (phonetic) concern, RE scanning packages, 10, dot, 10, dot, 2019.
**Q. Okay. Does that one have -- sorry. Let's go back to 2 for a second. Does that one have a number at the bottom of it?**



A. Yeah, D, dash, HP, dash, 001441.
**Q. Okay. And then the third document?**
A. Healthline complaint report, 5, dot, 4, dot, 21.
**Q. Okay.**
A. Idaho Falls, dash, Holloway summary, parenthesis, 002.
**Q. Okay.**
A. Idaho Falls investigation, dash, Clay Holloway, July 2021.
**Q. Okay.**
A. Investigation summary into Holloway, dash, July 2022.
**Q. Okay.**
A. January 2021, dash, EthicsPoint report, parenthesis, driver about coding as weather.
**Q. Is there a number at the bottom of that one?**
A. Yes.
**Q. What's the number on that one?**
A. D, dash, HP, dash, 001923.
**Q. Okay. What's the next document you looked at?**
A. Joe Chavez' interview of Clay Holloway, dash, July 2022.

Page 9

**Q. What's the date on that one -- or the number on that one, sorry?**
A. D, dash, HP, dash, 002486.
**Q. Okay. And what was the last document you looked at?**
A. That one will be titled Rexburg, dash, May 2021, dash, investigator William Joiner.
**Q. Okay. Besides those documents, did you review anything else?**
A. I may have looked at the same documents before they were consolidated into, you know, these ones that are marked confidential with the D, dash, HP numbers at the bottom here.
**Q. All right. Did you speak with anyone in preparation for your deposition today besides your counsel?**
A. Negative. No.
**Q. Okay. Did you review any e-mails or text messages in preparation for this?**
A. E-mails or text messages? As they relate to the various documents that we just spoke about, yes.
**Q. But outside of that?**
A. No.
**Q. Okay. What's your position at UPS?**

Page 10

A. I am a district security director. You could say on the job profile itself it says U.S. security director, but colloquially district security director.
**Q. Okay. What district are you over?**
A. I oversee, in the security nomenclature, what we call the mountain security territory. As far as the operational areas to UPS nomenclature, it would be the UPS northwest districts, as well as the desert mountain district.
**Q. Okay. How long have you been the security director?**
A. Two years this month.
**Q. Okay. Were you the security director when Clay Holloway was employed at UPS?**
A. Yes.
**Q. Is Mr. Holloway still employed at UPS?**
A. No.
**Q. We'll get to that a little later. Maybe we'll go in order then just to keep it easy. Were you the security -- district security director in 2021?**
A. In 2021?
**Q. Yes.**
A. No.

Page 11

**Q. What was your job in 2021?**
A. I was a security manager.
**Q. Okay. What area were you over at that time?**
A. I oversaw part of Colorado, Wyoming, Montana, and part of Idaho.
**Q. Okay. So you were familiar with the investigations into Heidi Peck?**
A. Yes.
**Q. Okay. What makes the determination -- how does security decide to do an investigation?**
A. How does security decide to do an investigation? In essence, there's a myriad of different ways that security can initiate an investigation. We could be directed to do so by our security leadership. We could receive a complaint through various different avenues, I suppose, a complaint or an allegation. Or we could come upon something that we discern that needs investigation. Those would probably be the three most common ways that my function would initiate an investigation.
**Q. Okay. Are you familiar with the investigation of Heidi Peck in May of 2021?**
A. That would be the one that William Joiner was related to, correct?

Page 12

**Q. Yes.**
A. I am through reviewing the file.
**Q. Were you Mr. Joiner's supervisor at the time?**
A. I was not.
**Q. Did you review this file outside of preparing for this -- preparing for this deposition?**
A. I may have been aware of the investigation at the time. I don't remember specifically being -- reviewing it or being involved with it.
**Q. Okay. What's your understanding of the investigation having gone back and looked at it now?**
A. That an allegation or a complaint was made through our 1-800 reporting site, administered by a third-party company called Navex, that alleged that service failures were being hidden in the Rexburg, Idaho, center.
**Q. Okay. Are those third-party complaints recorded through the 1-800 number?**
A. I do not believe so.
**Q. So you just have people answering phones and answering -- or making those -- taking notes of those?**
A. Yes. My understanding of what Navex

does is it is a third-party ethics point hotline, if you will. And folks that have reasons to be concerned on any number of topics can either call a number or go to their website and provide details to what their concern is.

**Q. Okay. How does that get from Navex to UPS?**

A. Navex will initiate a report and then send that over to the UPS corporate compliance department. From there UPS corporate compliance professionals will triage, if you will, the concern or the allegations and then send said allegations to the appropriate investigative body within UPS.

**Q. How is that sent?**

A. The appropriate investigative body will receive a notification from the system that they have been assigned a new concern and then the investigative body will have to log in and take a look at what the matter is.

**Q. Is there a paper record of that or an online footprint? How do you -- is there a way to go back and look at that?**

A. I'm sure there is.

**Q. So there's data showing that there was a complaint that came across?**



A. Yeah -- well, the online footprint would be related to if I, Matthew Clyde Fitzmaurice, went in and looked at a concern and then I typed into it and all that kind of stuff, there would be a footprint to it. I'm not sure I understood the question.

**Q. That's fine. I just wanted to know if there's a way to, like, I don't know, reverse engineer this? To see -- kind of go back and follow how this process started and how it continued.**

**So after that gets started, how do you assign an investigator?**

A. Well, I can only speak to the -- my intimate familiarity to the security function itself. But in this case specifically because the concern involved Rexburg, Idaho, Mr. Joiner was the security supervisor domiciled in Boise, Idaho, at the time and he covered the -- I think what they refer to as the panhandle of Idaho. So if there were concerns that were to arise in his area of operation, they would be his to investigate.

**Q. Okay. Do you recall what the outcome of that investigation was?**

A. My understanding is that they found that service failures were indeed being hidden within the



Rexburg center and the management parties that were charged with the center were retrained.

**Q. Okay. I'm going to show you -- I believe this has previously been marked as Exhibit 5. This is -- I'll start at the top so you can see. Is this the investigation you're talking about, the Rexburg one?**

A. That looks like it.

**Q. Okay. We'll go down a few pages. I had a question. I had some confusion earlier on. So we have this summary and there's a list of people. What does that list mean?**

A. Those would be -- if I'm reading this correctly, you have Heidi Peck, Bill Joiner, Maegan Ferguson, Rebekah Mulloy, Lori Atkinson, Steve Johns, and then you have an interview start. I would surmise that those parties that are listed there were all parties in the interview that was conducted at 12:00 p.m. on 5-28-2021.

**Q. Okay. Is it normal to have an HR person present during an interview of this sort?**

A. Yes.

**Q. If someone -- does an employee have the right to request an HR person be present at an interview?**



A. What type of employee?

**Q. Manager.**

A. A manager in this -- in the time frame of 2021 when this interview was conducted, could they have requested one, yes, but it would be based on availability.

**Q. Okay. The security person conducting the investigation could decide that they didn't want to involve a manager though? Would they have that discretion?**

A. You don't necessarily need an HR representative in an interview with a manager.

**Q. Okay. But if they ask for one, how would you -- how would your -- how would security respond to that?**

A. I don't know that there's a hard and fast rule to that.

**Q. Okay. So it's basically their discretion if they want to let HR be involved or not?**

A. Certainly.

**Q. Okay. It mentions on here at one point that Bill shared his screen. Do you guys do meetings by Teams or Zoom for investigations sometimes?**

A. Sometimes, yes.

**Q. Are those ever recorded?**

A. No.
**Q. Are telephone calls ever recorded?**
A. It's against the UPS policy.
**Q. Does UPS issue cell phones to security investigators?**
A. UPS does.
**Q. So they don't have their own cell phones -- or I guess they can have their own cell phones, but they're given a cell phone for work purposes?**
A. Yes.
**Q. Okay. Do you know what happened as a result -- or, I guess, I think you already answered that. You say that she was retrained -- the manager was retrained as a result of this?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Can you -- can you restate that question?
**Q. BY MR. STEGELMEIER: Do you know what happened as a result of this investigation?**
A. As a result of this investigation, you'll see in the commentary towards the end of this exhibit that it indicates that Heidi Peck was retrained. And to add to that -- let's see here, okay, so I take that back. At the end of this document here it says, "HR is providing documentation



for retraining, as this is a district-wide issue."
But to add to that, if you scroll back up to the page that we were just looking at, this text/interview notes there, you'll see that about halfway down through this document it states, "Bill showed Heidi the on-road package exception guidelines. Heidi said she had probably seen it. Bill asked Heidi if she knew about the misload issue in Rexburg. Heidi said yes, that ORS Dustin came to her and said there was a big issue with misloads."
That package exception guideline is, in essence, a template of showing the rules of engagement of how to appropriately scan packages that are not serviced.
**Q. Okay. What does that look like?**
A. I know that there was an e-mail that Heidi responded to a gentleman named Troy Emerson. At the bottom of that e-mail it had kind of an Excel format sheet, I suppose. And it, in essence, looks like that. It's an Excel template.
Additionally you'll see there was a gentlemen called Steve --
**Q. Sorry. Let me interrupt here right quick. Is this the e-mail you're talking about? This was previously marked as Exhibit 2.**



A. Maybe the image is not -- do you see where it says IMG831?
**Q. If we scroll down here --**
A. Yes, there it is. There it is. So GSS exception code guidelines, that's what that matrix looks like.
**Q. Okay. So the retraining included sending out this e-mail with a description of future packages; is that --**
A. That is my understanding.
**Q. Was there any other retraining done?**
A. You'll see that in that same document that we were just looking at, Steve Johns was a part of that interview. He was the Idaho division industrial engineering supervisor and manager at the same time. Mr. Johns, I think, is mentioned here at the bottom and gives some guidance to Ms. Peck as well.
**Q. Can you show me where that is? I'm having trouble finding it.**
A. Yeah. Bear with me momentarily. So you'll see here about three-quarters of the way down on the very left hand of this margin of this paragraph, "Steve explains that the system automatically notifies the customer of the delay.



Steve asked Heidi why she didn't question the process with all of the training she has had, as well as the integrity of reporting. Heidi said that she hasn't read the last few things that have been sent to her to sign." That would imply that those were these documents.
"She said that she just signed them and sent them back. Steve asked how many misseds Rexburg has had this year. Heidi said she wasn't sure. Steve said year to date it is two for the year. Heidi said she looks at month to date and the previous day mostly so she can let her supervisors know."
So Steve speaks to this training that it seems that he had shared with the managers in Heidi's division, so it includes Heidi.
**Q. Okay. So there would be a sheet then with every exception guideline --**
A. Yes.
**Q. -- that would have been sent out?**
A. Yes.
**Q. I don't think I've seen that so you're going to have to walk me through it. How many exceptions are there?**
A. I believe a GSS scanner has hundreds of

exceptions in it.
**Q. Hundreds of exceptions. And all these are on the sheet --**
A. More than -- I couldn't speak that intimately to it.
**Q. Okay. So the reporting process is that the drivers be familiar with hundreds of exception codes?**
A. No, I said specifically to a GSS scanner.
**Q. What's a GSS scanner?**
A. That is a portable scanner that we use inside of our facilities.
**Q. Who is in charge of scanning packages with the GSS scanner?**
A. Typically management personnel that work inside of our facilities.
**Q. Okay. And they have hundreds of exceptions that they need to memorize for different packages?**
A. No. Many of those exceptions are very nuanced and hardly, if ever, used.
**Q. Okay. Can you give me an example of that?**
A. So one of them would be this,



quote-unquote, misflow exception scan that the management team was using in Rexburg, Idaho.
**Q. Okay.**
A. Even when I was reviewing this document, I had never heard of a misflow exception. It's just not one that is frequently used.
**Q. Okay. So you're not familiar with that exception though, right?**
A. No.
**Q. Okay. So it's not just missed or delivered; there's all sorts of nuance different things that could be going on, correct?**
A. Correct.
**Q. So if Heidi got a copy of this, though, would there be a record showing that she signed this sheet with all the exceptions on it?**
A. As I read through this document, it seems that Heidi had signed -- received and signed documents which showed the appropriate use of the exception guidelines.
**Q. Okay. Where would that document be stored?**
A. Well, if I read through this here, it seems like Mr. Johns was the ID special engineering supervisor of the division at the time. Perhaps the



manager. I would anticipate that either Heidi's boss or Mr. Johns would retain those.
**Q. Is there a file that's kept for employees when they sign stuff to put it in so you know what they've signed and what they've seen?**
A. Not to my knowledge.
**Q. You don't keep files on your employees?**
A. I do not.
**Q. Okay. Let me go back to this e-mail for a second. So if we scroll up to who it was delivered to -- so this was a district-wide issue you said?**
A. That is what the investigative document stated.
**Q. Okay. So this wasn't just sent to Heidi?**
A. As can be seen on the screen, correct.
**Q. So Floyd Reinhardt had also received a copy of this?**
A. Let's see, is he in the distribution list?
**Q. I believe so. I believe that's him right there.**
A. That looks like him.
**Q. Okay. So he would have had a copy of this one as well?**



A. He received the e-mail, it seems.
**Q. Okay. So I'm going to stop sharing, in case you hadn't noticed.**
**So after investigation's complete, what is the next step?**
A. If the allegation involves management personnel?
**Q. Yes.**
A. In essence, if there is a substantiated policy violation resulting from the investigation, it is referred to the HR department.
**Q. So is the HR department the one who makes the final determination regarding discipline?**
A. It would be between the person's staff manager, as we call them, a division level manager, their input in conjunction with human resources.
**Q. Okay. So security doesn't make recommendations regarding discipline?**
A. We do not.
**Q. Okay. That's left to the staff manager and HR?**
A. Correct.
**Q. Okay. Are you aware were the allegations of this deemed substantiated?**
A. "This" being?

Page 25

**Q. The Rexburg investigation.**
A. I would consider, yes, that they were substantiated.
**Q. And then at that point security's role stops; is that correct?**
A. Correct. Yes. Ultimately we do want to see what effort the outcome is so that we can document the case appropriately, but yes.
**Q. What kind of documentation do you keep after the outcome is decided?**
A. Typically it is a note in the investigative document that you will have seen in the document that you were just sharing, that was a UPS corporate security report. Whatever the outcome of the deliberation is, it will be referenced in that case file.
**Q. Okay. How is this investigative report -- how are these reports usually transmitted to the staff manager and HR?**
A. Via e-mail.
**Q. Okay. So there would be an e-mail chain showing that this investigation is complete; here is our report?**
A. That is correct.
**Q. Okay. Let's go to the other**

Page 26

**investigation. I'm going to show you what we've marked as Exhibit 6 previously. Do you recognize this document?**
A. This is one of the ones I listed out at the beginning, correct?
**Q. I believe so, yes. I believe this is the Idaho Falls investigation summary.**
A. Yes, marked April -- August 29th, 2023.
**Q. Yeah, I'm guessing that's not the real date this happened. Would that be your understanding?**
A. No -- yeah, you'll see at the top right on the second line that black box, it shows 21-MTN, that's the case number. I think that there's some sort of auto populating update formula for that date there, but it's not accurate.
**Q. All right. So the findings show that from January -- or June 1st, '21, to August 1, '21, there are 40 futures, 1,463 not in one, and 572 no such number exceptions; is that correct?**
A. I read it the same way.
**Q. Okay. Are you familiar with the outcome of this investigation?**
A. Yes.
**Q. What happened following this**

Page 27

**investigation?**
A. To my knowledge Heidi Peck was discharged from UPS.
**Q. Okay. As part of security do you do anything -- do you look at past employment history at all when you're conducting an investigation like this?**
A. When we're conducting the investigation?
**Q. Yes.**
A. I would. In this case specifically we were aware that Ms. Peck had recently had an investigation conducted into her center in Rexburg several months previously.
**Q. Okay. And that one you mentioned was -- what was the scan that would be used at that center?**
A. Which center?
**Q. The Rexburg center, that you hadn't heard of.**
A. That was a misflow exception, from my understanding of reading that report.
**Q. Okay. And I don't see any misflows here; is that correct?**
A. I don't see them either.
**Q. Okay. I guess is there anything in here showing that the futures were mislabeled? I couldn't**

Page 28

**ever find that in this investigation. I'm sure having reviewed it, you have some highlights on yours if you can tell me where to look.**
A. Bear with me momentarily.
Can you repeat the question for me?
**Q. Where does it show that there was futures mislabeled?**
A. If you scroll down to inside of the document labeled page 5 of 7, the D-HP-002482, the interview of -- I'm going to butcher this. My apologies.
**Q. She goes by Mimi from what I've heard.**
A. Okay. All right. If you look towards -- just above "The interview concluded at 12:17" there, you'll see that Ms. Lewis states that she gave -- maybe in the middle of the paragraph about five lines up from the end of that paragraph there, "She gave an example of SurePost that gets misloaded onto a car going to a remote location when the delivery location is local. She said that she scans those as either not in one, future, or closed. Lewis admitted that she has trained local sort sups and clerks to place those exceptions on missed packages."
So you'll see here that Ms. Lewis stated that she trained local supervisors and clerks to

Page 29

place, in essence, what would be considered a nonservice failure scan on service failures through the use of not in one, future, or closed.
**Q. Okay. But I don't see them saying that any of these actual future packages were mislabeled. That's -- that was my question.**
A. So if -- when she said -- when she gave an example of SurePost -- that's a service level within UPS -- gets misloaded onto a car going to a remote location. A misload would be if Clyde Fitzmaurice has a package that's supposed to go on the first truck on the line but I put it on the wrong truck, and then that truck goes out into the mountain outside of Idaho Falls, that is a service failure as defined by UPS because the person that loaded those package cars made a mistake and put the package on the wrong car.
That would be considered or should be a missed on road scan, which is a service failure. If it's applied with a -- what does she say here -- a not in one, future, or closed, those are not service failures.
**Q. I understand that. So I understand that she was wrong on the training, but I don't see where that ever actually translated to a package getting**

Page 30

**scanned. I don't see any finding along those lines.**
**Does that makes sense to you? It is one thing to say she understood this wrong. It's another thing to say on June 4th at 2:00 p.m. she scanned this package as future when it should have been scanned as misload. So I'm not seeing any actual substantiated that anything was misscanned, just that a lower employee who later testified that she had not made Heidi Peck aware of her understanding because she didn't think it was an issue, testified that she misunderstood it.**
**So is there anything in this report that actually shows on this date this package was scanned as future when it should not have been? And I can give you more time if you would like to review it more. I'm just confused of where we see a future being used.**
A. And you're speaking specifically in this document to the future scan related to Heidi Peck?
**Q. I am. Because in that e-mail, Exhibit 2 that we looked at earlier, future is the one that was called out. And during the deposition of Troy Emerson, he mentioned that those 40 futures were his main concern. So I'm trying to see where there is a future -- a finding that there was a future that was**

Page 31

**mislabeled.**
A. I do not believe in this document that it specifically speaks to future.
**Q. Okay. So as the representative for UPS, who do you understand made the decision to terminate Heidi Peck's employment?**
A. My understanding would have been Steven Redding, the HR director at the time, and Troy Emerson.
**Q. Okay. So if Troy Emerson says, "This was my decision," would you disagree with that?**
A. Can you repeat the question for me?
**Q. If Troy Emerson said, "I made up my mind to terminate her and it was my decision," would you disagree with that?**
**MR. CLIFTON:** Objection to form.
**Q. BY MR. STEGELMEIER: You can answer.**
A. So if Troy said, "It was my decision to terminate Heidi"?
**Q. Yes.**
A. Is there a different way you can state that question?
**Q. Not really. If Troy told -- do you disagree with Troy's understanding that it was up to him to make that call?**

Page 32

**MR. CLIFTON:** Objection to form.
**THE WITNESS:** It was ultimately Troy's decision.
**Q. BY MR. STEGELMEIER: Okay. That's what I wanted to know. Let's stop sharing screens for a second. I can go back to sharing screens, back to Exhibit 6.**
**So later on it states that there was an interview with Heidi Peck on September 28th but there's no -- there's no discussion of an HR person being present; is that correct or is there somewhere in there?**
A. You'll see at the top or the introductory paragraph, if you will, who was present for the interview.
**Q. Okay. If Heidi had asked for an HR representative, would that be reflected in here?**
A. It would have been.
**Q. Okay. Was there any other investigations conducted after this one regarding Heidi?**
A. Investigations after --
**Q. This Exhibit 6, the Idaho Falls investigation.**
A. Not that I'm aware of.

Page 33

**Q. Okay. In this Clay Holloway says that the interview went from 1351 to 1424. Would you have any reason to doubt that time frame?**
A. I do not.
**Q. Is this investigation report reviewed by anyone else besides Clay once he puts it together?**
A. How do you mean?
**Q. For instance, he references Nic Luper or Luper. Nicholas Luper was also there. Would Nicholas Luper look through this prior to it being submitted?**
A. I would anticipate, yes.
**Q. And this same thing -- same with the Rexburg would have been transmitted via e-mail?**
A. Yes.
**Q. What's your general turnaround time on investigations such as this?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Can you define the different stages?
**Q. BY MR. STEGELMEIER: So once this investigation -- so the last interview, from what I read, was on September 28, 2021. It concluded at 1424. About how much longer after that would you expect a security manager or security supervisor to**

Page 34

**finalize his investigation and submit it?**
A. So specifically how long -- once the final interview has been conducted, you know, the investigative work has been concluded. The question is how long between the conclusion and the -- the conclusion of the investigation and the finalization of the investigative report?
**Q. Yes.**
A. There's not a specific deadline or a hard and fast rule of what that turnaround specifically would be.
**Q. Okay.**
A. But the norm would be anywhere between probably one to three weeks.
**Q. Okay. Do you have a goal that you set within your group saying I want investigations done within this amount of time?**
A. Well, that's rather general.
**Q. Is that one of the matrixes that you track?**
A. What specifically?
**Q. Of how long investigations sit open?**
A. It is, yes.
**Q. So what's your goal time for how long an investigation is open?**

Page 35

A. Typically under 60 days, but it is subject to approval if it is a complex investigation, subject to a security manager and my approval to have it age longer than that.
**Q. Okay. So if you go over 60 days from open to submission, then you have to get it approved?**
A. Yeah, which would be a discussion between the investigator and their manager.
**Q. Okay. So let me go back up to the top of this one. It looks like it was started on 20 July; is that correct?**
A. That is when the reporter in this case brought a concern to Mr. Holloway.
**Q. Okay. Is that the initiation of it or what do you consider the initiation of the investigation?**
A. I would say when the case for the investigation was opened in what we had at the time, which was the IRS system.
**Q. Okay. Can interviews be conducted before an IRS is opened --**
A. Yes.
**Q. -- or an investigation is opened in IRS?**
A. Yes.
**Q. Do you have a record of when this was --**

Page 36

**this investigation was opened?**
A. I'm sure that we do. I'm not sure if it's on this document.
**Q. Then you would also have records of when this was transmitted to Troy Emerson?**
A. Yes.
**Q. I think that's all I had for that one.**
**So the decision was made -- let me go back to -- so you have information related to UPS's decision to terminate Heidi and investigations. The decision was ultimately made to terminate her. Why on December 13th?**
A. Why on December 13th?
**Q. Yes.**
A. I would assume that's after Emerson and Redding, the HR director, conducted their reviews and that was the date that they chose between themselves.
**Q. Okay. So it's not like you have a bunch of people to fire in December before the bonuses vest?**
A. I'm not sure I understood the question.
**Q. That's fine.**
**Okay. You said you were prepared to speak regarding the fifth one, right? The fifth point here, "All communication between Heidi Peck and**

**your employees regarding reporting requirements"?**
A. Yes.
**Q. Did Heidi Peck have a cell phone issued by UPS?**
A. I don't know the answer to that.
**Q. Let me look at the report. Is there anything in this report that you're aware of where they looked at text messages or e-mails she sent from her phone to her subordinates regarding reporting requirements?**
A. From her phone?
**Q. From her phone or from her e-mail, anything like that? Was that ever part of this investigation?**
A. My understanding, according to the investigative documents here, is that Mr. Holloway did some pulling of e-mails. But there's no indication that we looked at anything to do with her text communications.
**Q. Okay. But UPS would have possession of Ms. Peck's work phone after she was terminated, correct?**
A. If she would have been issued a work phone, that would have been one of the items that we collected.



**Q. Same with laptops, tablets, or anything that was issued by the -- by UPS would have been collected, correct? Is that correct?**
A. Correct.
**Q. And have you gone back and looked at any of those text messages, e-mails, anything between her and her subordinates regarding reporting requirements?**
A. No.
**Q. Okay. Why were you designated as the representative on No. 5 if you didn't go look at that information?**
**MR. CLIFTON:** Objection as to form.
**THE WITNESS:** Yeah, I'm not sure I understand the question.
**Q. BY MR. STEGELMEIER: What were you prepared to testify then regarding all communication between Heidi Peck and your employees regarding reporting requirements?**
A. I'm prepared to discuss the nine documents that were -- that I reviewed prior to this meeting.
**Q. Okay. So you didn't look at any text messages between Heidi and her subordinates saying: Make sure you're following the reporting**



**requirements?**
A. I did not look at any text messages with Heidi Peck.
**Q. And there's nothing on the investigative report from Clay Holloway that suggested that he did either?**
A. "Either" being?
**Q. He also did not do any checking of text messages or e-mails from Heidi?**
A. Other than the e-mail that Heidi sent to Troy Emerson, that's the only e-mail that I'm aware of that was found in this investigation.
**Q. Okay. As the security -- in your role as a security person at UPS, are you entitled to look through company-issued laptops, cell phones, things like that, as part of your investigation if you feel it's important?**
A. Company issued?
**Q. Yep, company issued.**
A. Yes.
**Q. But there's nothing on here that shows that Clay wanted to -- or did in this instance; is that correct?**
A. Obviously he pulled one e-mail that Heidi had sent to Mr. Emerson.



**Q. Okay. Aside from that, nothing in there?**
A. Bear with me for one moment. I just want to take a look at the summary here real quick.
**Q. No worries. I get paid by the hour.**
A. Yeah, you'll see that on page 2 of, I believe, the document we were just looking for, Mr. Holloway states in the second paragraph there starting on indent on 24th August '21, the end of that there, "A request for e-mail communications was made." So Mr. Holloway did make some e-mail requests there speaking to that e-mail.
**Q. Okay. But no text message requests or anything like that?**
A. I did not see that in this investigatory summary.
**MR. STEGELMEIER:** All right. We might take a break for -- let's do ten minutes. We've been going about an hour.
**MR. CLIFTON:** Sounds good.
**MR. STEGELMEIER:** Come back in ten minutes.
(A recess was taken from 1:31 p.m. to 1:42 p.m.)
**Q. BY MR. STEGELMEIER: We'll go back on the record.**

Page 41

Let's move on to information regarding your investigation of Floyd Reinhardt. Do you know who Floyd Reinhardt is?
A. I do.
Q. How do you know Floyd?
A. Well, I didn't know him personally.
Q. Okay. Just through the investigation?
A. Correct.
Q. Were you involved in the investigation when it occurred in 2021?
A. I was Clay Holloway's manager, but I was not involved in the investigation.
Q. Okay. As a manager do you review investigations before they're submitted?
A. Yes.
Q. What's your role in that review? Are you doing quality control? In what role are you reviewing those?
A. Yeah, I'll take a look through the investigation unto itself and ensure, as you said, there's some sort of quality control done. And then from there going back to our previous conversation if there are substantiated policy violations that are -- come of the investigation, then they'll be forwarded over to the appropriate parties.

Page 42

Q. As the manager, are you the one that does that forwarding or is it straight from the investigator?
A. It can go either way.
Q. Okay. So in 2021 Floyd was investigated as well. Do you recall if those -- the issues were substantiated in that case?
A. They were.
Q. Do you recall what happened with Floyd in 2021?
A. My understanding is that we concluded our investigation and Floyd went on some sort of leave of absence, returned for a short amount of time, went on another leave, and then retired.
Q. Okay. So he wasn't ever terminated for this misconduct?
A. He was not terminated.
Q. Let me pull up his investigation. All right. Was this one of the documents you stated that you had reviewed?
A. Bear with me momentarily and let me validate that. Let's see, 0674, yes, this is one of the ones that I reviewed.
Q. Okay. So it says here in the findings, the last caret -- I think it was called yesterday --

Page 43

that he willfully acknowledged the use of emergency condition scan to avoid service failures and that was substantiated? That was part of this investigation?
A. Yes.
Q. Okay. So we have 2,486 emergency condition scans and zero service failures.
What's an emergency scan supposed to be used for?
A. An emergency condition scan would typically be used if there's an act of God, perhaps like if you have a Hurricane Katrina, right, and we cannot deliver to the city of New Orleans, all those packages that are in our network that are due for delivery in the city of New Orleans, I'm sure at the time -- it was 19 years ago -- were marked as emergency conditions.
But on a much more, I suppose, more day-to-day use if you were a package driver in Boise, Idaho, and you had a mountain route and you were unable to get to certain homes where you had deliveries for on the mountains due to packed snow and ice that we -- that you cannot safely deliver to, then the driver themselves would apply an emergency conditions scan to the packages that were due to those homes.

Page 44

Q. Okay. But it's not for breakdowns?
A. No, because a breakdown is something UPS incurred, right? Either the driver got into an accident or the maintenance wasn't done prudently enough to keep the vehicle running. A breakdown would be considered service failure.
Q. What would you code that?
A. That would be missed on road. So if the driver goes out with a full car of packages and the driver breaks down, those packages would be missed on road.
Q. One other issue that they note in here is excess Amazon volume that couldn't be processed on the preload was scanned in as emergency. Is that appropriate?
A. That is not appropriate.
Q. What's your scan for that or what was your scan for that?
A. That would be what we would call left in building scan. It's still, quote-unquote, a service failure. But a package that does not leave the operating facility is left in building and, in essence, has the same indication of a service failure that a missed on road would.
Q. Okay. I'm guessing that Amazon becoming

**the largest ground delivery company has helped with those scans, reduced those numbers; would that be a fair statement?**
A. I can't necessarily offer guidance of what the current Amazon percent of volume is.
**Q. It was a joke. I'm sorry. I shouldn't be teasing you about not being the largest ground deliverer anymore.**
**And then this last bullet point in here where "Reinhardt admitted to using emergency condition for service provider who still had volume but had exceeded DOT hours."**
**What would you scan that, someone who exceeded DOT hours?**
A. That would be missed on road.
**Q. Okay. So missed on road seems like kind of a catchall?**
A. Missed on road would be pieces of packages that leave our processing property facility on a delivery vehicle and because of UPS's own fault, we cannot get those delivered. That is what missed on road is --
**Q. What is a --**
A. -- in the simplest of terms.
**Q. Okay. What is a not in one?**



A. The not in one would be, for example, if I had a package that was coming to my home that was delivery -- scheduled for delivery today, and either it's signature required and I'm not home -- obviously, we need that signature -- that would be a, quote, not in one. So we would reattempt delivery the following day. So UPS is not responsible for not delivering that package. We weren't able to that day. And it's not a service failure. It's -- it's not a power issue that we caused the package not to be delivered.
**Q. Okay. What happens when it is UPS's fault that a package doesn't get delivered? What comes of that?**
A. It's a service failure.
**Q. Why is that important or why does that matter?**
A. In a number of aspects. No. 1, if a center is struggling with service failures, it will indicate to the district leadership that something is not running well in that center. So if we don't report service failures, it doesn't give the appropriate visibility to our leadership for them to dig in and make sure that our customers are being serviced appropriately.



There is also a secondary issue where in which if UPS is, in essence, at fault for a service failure, the customer can file for what is called a GSR, which is a guaranteed service refund. If we said we're going to deliver your package by a certain date and time and we don't do that because we have issues with our network, then the customer can obtain that service refund. If something is scanned as a future or an emergency or what we're talking about, these exceptions that are nonservice failures, the customer is not eligible for a service refund.
**Q. Okay. So if I order something and it gets put on the wrong feeder truck and ends up in Salt Lake instead of Idaho Falls, I can file for a GSR?**
A. Well, the shipper can. Those are really the folks that are our customer. They're the ones that pay --
**Q. Okay.**
A. -- for those shipments typically, but yes.
**Q. So as a consumer I have to complain to the shipper who complains to them?**
A. Correct.
**Q. Okay. I'm trying to figure out what to**



**do next time FedEx sends my packages the wrong way.**
**So this investigation, it appears it began around 29 of July. It says -- I mean, it says right here that Clay Holloway initiated an investigation. So that would have started the 60-day clock; is that correct?**
A. That would start the investigation.
**Q. Okay. What's an SEAS?**
A. I don't want to get the acronym wrong, but it's an internal UPS program. It stands for something to the effect of service exceptions and analysis. So it's a way that UPSers of all sorts can see how packages are flowing through the network.
**Q. Okay. So this investigation, it looks like there was an interview conducted on October 28th. That seems to be the last one. There's some attachments to these investigations.**
**Do you know if those are still in your system? Do you retain investigations after they're complete?**
A. Well, these attachments look like they are embedded in this Word document here. So this Word document, I'm sure, is still available.
**Q. Okay. So they would have those attachments with them and you could actually pull up**

Page 49

**this SEAS data and see what was there?**
A. I would anticipate so, yes.
**Q. Let me go back to this one. This is back on Exhibit 6. I just want to see what attachments are on this one. You have the Lewis statement, Richardson, Hobbs, Thueson, future exceptions. So this data would still be embedded, you would expect, in the native format of this investigation?**
A. Can you restate or refine that question?
**Q. In the Word document you would expect that these attachments would still be in there?**
A. Yes.
**Q. All right. Let me go back to Floyd's.**
**So after this investigation was finalized, it would have been transmitted via e-mail to the appropriate parties the same as with Ms. Peck's?**
A. Yes.
**Q. Okay. And there would be an e-mail showing what date that was?**
A. Yes.
**Q. But your understanding that for one reason or the other Mr. Reinhardt's employment was never terminated?**

Page 50

A. That is my understanding.
**Q. And it's your understanding that this investigation found substantiated misreporting of different packages?**
A. That is my understanding.
**Q. How long did you work with Clay Holloway?**
A. Can you define "with"?
**Q. How long were you his supervisor?**
A. I want to say maybe just under a year.
**Q. Okay. How closely --**
A. It might have been shorter than that.
**Q. Were you based out of the same -- the same center?**
A. No.
**Q. Where were you based out of at the time?**
A. Denver, Colorado.
**Q. Where are you currently based out of?**
A. Denver, Colorado.
**Q. Okay. Where was Mr. Holloway based out of?**
A. Billings, Montana.
**Q. Okay. How often did you meet with Mr. Holloway or have conversations with him?**
A. In the first question to that, "meet with," is that virtual or physically?

Page 51

**Q. Either.**
A. So at least once a week.
**Q. Okay.**
A. The second question, if you're still looking for an answer to that, have conversations with him, it would have been close to -- close to daily, three to four times a week.
**Q. What were your weekly meetings about?**
A. Typically I would have a -- I had, what, three and a half states' worth of UPS facilities, so I would have a once-a-week meeting with all the supervisors in my alignment. We'd talk about cases that were going on, physical security initiatives, training requirements, really anything that was being pushed down from our leadership.
**Q. Okay. What kind of employee was Clay Holloway?**
A. When he was my employee, he was a -- he was at least a borderline strong security supervisor.
**Q. Okay. Have you learned anything about him recently that has made you reconsider your evaluation of him?**
A. Can you define "recently"?
**Q. Since 2022.**

Page 52

A. Beginning in January of 2023 or --
**Q. No. Beginning in January of 2022.**
A. Beginning of 2022. Can you restate the original question?
**Q. Have you learned anything about Mr. Holloway since the beginning of January -- or since January of 2022 that would change how you feel about him?**
A. Yes.
**Q. What have you learned?**
A. Clay made a number of decisions that were not in line with our expected conduct in his position or that of what he had exhibited in the years prior.
**Q. What kind of choices did he make?**
A. Dishonest ones.
**Q. Okay. You say choices. Can you give me examples?**
A. Well, obviously we can refer to the document. There's one that's, I suppose, respected by Mr. -- or titled from Mr. Chavez that really delves into that.
**MR. STEGELMEIER:** We'll head -- I believe we're at 11. So this will be Exhibit 11. Just so you know, this is the investigative summary.

(Exhibit 11 marked.)
**Q. BY MR. STEGELMEIER: Is this the document you were discussing -- you were talking about?**
A. Yes.
**Q. Okay. So Mr. Chavez, it seems like he -- did he take your position there? Were you promoted and he came to fill in that position?**
A. That's correct.
**Q. Okay. So Mr. Holloway was over Montana and Wyoming at the time; is that correct?**
A. That's correct.
**Q. So what do you learn from this investigation that made you change your mind about Mr. Holloway?**
A. Well, specifically Mr. Holloway was tasked to investigate a concern that had to do with either some sort of gender or sexual harassment, at least the allegations were as such. And Mr. Holloway was dishonest with his peer, as well as his manager, on whether he was fully engaged and present in the investigation.
**Q. Okay. And it looks like here on the third paragraph that Alecia Todd even raised concerns saying that she felt like it wasn't up to standard**



**and he expressed bias. And the reported sharing office space and the findings were unsubstantiated. And she felt that it was continuing.**
**So this is from a previous investigation she's reporting; is that correct?**
A. Yes. Looking at the case numbers on the second line of that paragraph, the EPIM number is 2021-12. That would have been a case that started in 2021. 12 is the month indicator.
**Q. Okay. And then Mr. Chavez spoke with you about it. What did you tell him when he called and spoke to you about Mr. Holloway?**
A. I don't recall that specific conversation with Mr. Chavez.
**Q. Okay. It shows that's about March 5th when these issues first started coming up; is that correct?**
A. That is what the record indicates. I do recall several points to Ms. Todd's subordinates, I suppose, there in Billings. Ms. Todd felt that one of her subordinates was stealing time. It was another management person. But ultimately Clay did not find the claim substantiated.
**Q. Okay. Did she feel like that was -- did she feel like that wasn't fair, the investigation?**



A. That's how she felt. In my memory of what Ms. Todd's allegations were, the employee was allowed to work at home and it was extremely difficult to determine how much time the employee was spending actually working at home. And the advice that I gave at the time was if you don't think that your person is working at home and they're not doing their due diligence, they have an office; make them come to the office.
**Q. Okay. So then it continues on. I believe -- it seems like on the 24th of May is where it kind of heats up a little bit, where Clay called and said he was overworked and stressed out. Would Clay call you about stuff like that, to tell you he was overworked and stressed out?**
A. When?
**Q. In 2021.**
A. When I was Clay's manager?
**Q. Yes.**
A. I don't recall Clay ever telling me that he was stressed out and overworked, or whatever it was, when I was his manager.
**Q. Okay. Later I believe it ultimately comes out that he claimed to have interviewed someone and it didn't -- and someone else actually**



**interviewed them; is that correct?**
A. That's correct.
**Q. Is that -- is that kind of a concern to you as a security manager?**
A. Yes.
**Q. Why is that concerning to you?**
A. As I said before, the matter that Clay was assigned to investigate, I believe that this interview was with the reported party -- I believe it was Mr. Murphy, looking at this. Mr. Murphy was alleged to have either engaged in some sort of a gender harassment or sexual harassment, and Mr. Holloway as the security supervisor should have conducted that interview. And Mr. Holloway, if I remember the documentation here correctly, asked the center manager, Rob Wood, to conduct this -- this interview for him.
**Q. Okay. The concern when you find one of your investigators -- it seems like he then represented that he had actually conducted that interview, if I remember correctly. Does it concern you when you find that there might be a falsification in a report?**
A. Yes.
**Q. When you find that, what kind of steps**

**do you take to correct that?**
A. The steps that I took in this specific incident was that I referred the matter to my -- my boss at the time, and we initiated -- we initiated an investigation of Mr. Holloway himself.
**Q. Okay. And then what was the ultimate outcome of that investigation?**
A. It was substantiated that Clay Holloway had been dishonest.
**Q. Is this the investigation you're talking about, this document?**
A. This is, it looks like, just the write-up from Clay -- there we go.
**Q. This is the summary?**
A. Yeah. Scroll down for a moment. Yep.
**Q. Okay.**
A. This is the investigative summary performed by Jason Vacek and Kevin Olds into Clay Holloway.
**Q. Okay. What was the outcome of that investigation or --**
**MR. CLIFTON:** Did we mark this as an exhibit? I'm sorry. I didn't mean to interrupt.
**MR. STEGELMEIER:** I think it's still part of 11. I can break it out if you would rather though.



We can call this one 12.
**MR. CLIFTON:** That's fine.
**MR. STEGELMEIER:** We'll go ahead and call this one 12 and then I'll just break it out when I send it over.
(Exhibit 12 marked.)
**Q. BY MR. STEGELMEIER: So after the investigation was completed, was Mr. Holloway's employment terminated?**
A. Mr. Holloway went on a leave of absence as we were still -- either as they were still putting the investigative report -- he was actually removed from service the day that he was interviewed. You'll find that date in the summary here.
**Q. Okay.**
A. And he did not return to work for, I believe, the rest of the year of '22.
**Q. Okay. What happened in '23?**
A. I had a conversation with Mr. Holloway wherein which we discharged his full-time employment and he temporarily became a part-time hub supervisor in Billings and ultimately he's no longer with the firm now.
**Q. Okay. So he was allowed to continue working after falsifying investigations?**



A. I'm not sure if he ever returned to work. There was several, I suppose, leaves of absences and then an injury after that.
**Q. Okay. But he was offered a position as a part-time hub manager in Billings?**
A. Part-time hub supervisor.
**Q. Hub supervisor. Okay. This is after having been found to have falsified investigations?**
A. Yes.
**Q. Okay. When you find one of your security people has falsified an investigation, I mean, do you look at any of his other investigations or just figured it was a one-off?**
A. It could be seen in the document that you're looking at here, there are other matters that were looked at.
**Q. Okay. So my experience is coming from kind of a criminal look-back, that when an officer is terminated for dishonesty, it brings into question every past conviction. And I believe there was a video circulated a while ago about some officers who had their body cam on and were found hiding drugs in -- planting drugs on someone. And then it drew into question everything those officers had ever done.**
**Does that happen when an investigator is**



**found to be falsifying an investigation?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Can you narrow the question, please?
**Q. BY MR. STEGELMEIER: Yes. After Clay Holloway was found to be falsifying an investigation, did you relook at the investigation of Heidi Peck to determine if that was done up to snuff?**
A. Yes. I looked at the investigation of Heidi Peck.
**Q. What did you do to verify that it was done correctly?**
A. I looked at the statements, the attachments, policy reviews, and found that the narrative -- the narrative was congruent with the attachments. Therefore, I did not find any issues with the investigation.
**Q. But none of those interviews were recorded; is that correct?**
A. They were not recorded.
**Q. So you were relying on what Clay had written to determine whether or not that was what was said?**
A. In congruence with the statements and the policy reviews that were attached to the

investigation.
**Q. What do you mean "in congruence"?**
A. Do they align.
**Q. Okay. Was there a statement submitted from Heidi Peck?**
A. There was not.
**Q. Would it surprise you if Heidi Peck said that there was not a 30-minute conversation between her and Clay Holloway on that day?**
A. Can you restate the question?
**Q. In the investigation Clay Holloway reports approximately a 30-minute conversation between him and Heidi Peck; is that correct?**
A. Yes, there are interview notes that are in there.
**Q. Would it surprise you to learn that Heidi Peck said that conversation lasted less than five minutes?**
A. I would say that the interview notes that are recorded in that investigative summary are what I'm familiar with.
**Q. Okay. But Clay has falsified other interview notes, correct?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Falsified other interview



notes, not that I'm aware of.
**Q. BY MR. STEGELMEIER: So he stated that he interviewed Mr. Murphy but he had not; is that correct?**
A. That is correct. You asked about interview notes though.
**Q. Okay. So there was never a note where he wrote down, yes, I interviewed Murphy?**
A. Well, he sent a text message to Chavez that implied that he had conducted that interview, but there was never a produced document detailing an interview.
**Q. Okay. Would you be able to go back and look at the phone records for Mr. Holloway to see how long that phone call lasted between him and Heidi Peck?**
A. Today?
**Q. Just whenever.**
A. That would be a request to whoever the cellular provider would have been for Clay's phone. So I don't know if that would be recoverable or not.
**Q. Okay. But as the cell provider, UPS has the ability to request records for its devices, correct?**
**MR. CLIFTON:** Objection. This is beyond the



scope of the 30(b)(6) notice.
**MR. STEGELMEIER:** I think you're wrong on that, Ricky.
**MR. CLIFTON:** Why is that?
**MR. STEGELMEIER:** It's a communication between Heidi Peck and your employees involved in the decision to terminate Heidi Peck.
**MR. CLIFTON:** Yes, but the question is about whether we can recover cellular data from an AT&T provider. I believe that is well beyond the scope. So he can -- he won't be answering on behalf of the corporation there.
**Q. BY MR. STEGELMEIER: Let's go to reporting requirements. What are different things that people can write down for a package?**
A. Write down different things for a package?
**Q. What are their reporting options?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Yeah. I'm familiar with more, I suppose, defined processes of exception guidelines, I guess. There are more specific questions to that.
**Q. BY MR. STEGELMEIER: Well, just in general you've been identified as someone who can provide information related to your reporting**



**requirements in 2022.**
A. Right.
**Q. So I'm just wanting to know, like, what different options people had to report a package at that time?**
A. So what I think that you're getting at is that when it goes back to the conversation of service failures versus exceptions that are not under our control. So if UPS, in essence, is unable to service a package, unable to service a package because of our own fault, that should be recorded or reported as a service failure versus if there are acts of God or weather conditions that don't allow for us to deliver a package, then they should be recorded under the appropriate exception.
**Q. Okay. How was that training conducted?**
A. Typically if someone were to be promoted, they would be -- especially at the time in 2022, they would go through a course, in essence, of how and what to report packages. I think that was part of the QIP process goal.
Additionally, at the time many districts would have annual policy certifications, and that was referenced, I believe, in that William Joiner investigation that the industrial engineering

Page 65

supervisor, Mr. Steve Johns, distributed materials for the managers and supervisors to review and acknowledge, which Heidi herself stated that the last couple times that I received these things, I signed them without reading them.
**Q. Okay. And so that's -- could be different depending on what center you're at, the policy that's being applied?**
A. The policies are uniform to the domestic United States.
**Q. So everyone in the U.S. knows what an emergency package is and how to mark that?**
A. Yes.
**Q. Okay. There's no difference between one center and another?**
A. No.
**Q. Does it change year to year?**
A. The pandemic was a little bit different but typically not. The guidelines of missed on road, emergency conditions, known closed, future, those have all been the same for the amount of time that I've been knowledgeable to that.
**Q. Okay. Let's jump around a little bit. We're getting near the end so I just have a few things.**

Page 66

**Was Floyd Reinhardt's employment ever terminated?**
A. Floyd Reinhardt retired from UPS.
**MR. STEGELMEIER:** Okay. I'm going to show you -- I'm going to write down something and then I'll show you.
(Exhibit 13 marked.)
**Q. BY MR. STEGELMEIER: I'll show you Exhibit 13. These are some responses to request for admission that we received from UPS.**
**I'll draw your attention to request for admission No. 8. So you said Floyd Reinhardt retired from UPS, correct?**
A. That's what I said.
**Q. So his employment would not have been terminated in 2021?**
A. Let me think for a moment. "Please admit that Floyd Reinhardt's employment was not terminated in 2021."
Floyd Reinhardt was not terminated in 2021.
**Q. I just wanted to check that one.**
**Going back to Floyd, so I think you covered this earlier. I just want to make sure from my notes I have it. There would be an e-mail of when**

Page 67

**your finalized investigation regarding Floyd would have been transmitted to his supervisor, correct?**
A. Yes.
**Q. And that would show exactly what date he got it and the final outcome of that?**
A. The date that they got it. I don't know about the final outcome.
**Q. The final outcome of your investigation, correct?**
A. Can you put that question all into one form, please?
**Q. Would that e-mail show the date that they received the final investigation?**
A. Yes.
**Q. Is it normal for you to send out preliminary investigation reports to people?**
A. On a complex investigation to get -- to forewarn folks that there is an investigation brewing that could have some consequence, it would not be abnormal.
**Q. Would there be an e-mail along those lines saying, hey, we're doing an investigation into this person; just a heads-up something is coming?**
A. It could be an e-mail. It could be a phone call.

Page 68

**Q. Okay. Will you keep a record of that?**
A. "That" being?
**Q. Of a preliminary investigation report to someone?**
A. If it was via e-mail, then it would be in archives.
**Q. If it was via phone call, would you make a note in the investigative file?**
A. Not necessarily.
**Q. So when you say "complex investigation," do you think the investigation of Floyd Reinhardt, would that qualify as a complex investigation?**
A. Relatively, yes.
**Q. Okay. Do you know if you ever made a call to Troy Emerson regarding that one?**
A. I don't believe that I did. From my memory I believe that my director at the time and Troy Emerson did have discussions surrounding that.
**Q. Okay. So you mentioned earlier, service failures are a problem for UPS because they could result in some financial issues and other things. Would this reflect on the district manager if there were multiple service failures within -- or misreporting within his district?**
A. How do you mean "reflect"?

Page 69

**Q. Would there have been investigation of a district manager if two or three business managers within his district were being investigated for misreporting?**
A. Would there have been -- just so I understood, would there have been an investigation into a district manager if two or three of their business managers were -- what was the final part to that?
**Q. Found to be misreporting.**
A. If there was no evidence suggesting that, you know, say a division manager or a district manager was instructing that behavior, no.
**Q. So if the district manager is not instructing the behavior, he wouldn't be disciplined for misreporting by two people within his district?**
**MR. CLIFTON:** Objection. Beyond the scope. He can answer in his lay capacity.
**Q. BY MR. STEGELMEIER: You can go ahead and answer.**
A. Sorry. One more time for the question, please?
**Q. Just a curiosity, was Doug Barry ever investigated regarding this misreporting?**
**MR. CLIFTON:** Same objection.

Page 70

**THE WITNESS:** Not to my knowledge.
**Q. BY MR. STEGELMEIER: Okay. But Floyd Reinhardt and Heidi Peck were both investigated for misreporting?**
A. That's correct.
**Q. And they fall under Doug Barry's district?**
A. Division, yes.
**Q. So your reporting requirements wouldn't look to the division manager to see if there's a failure there?**
A. As the investigations were being conducted and the two relative managers were being interviewed, under UPS policy both of them had a responsibility to abide by the duty-to-disclose policy. So if they were being directed by their leader to falsify service failures and violate UPS policy, that would have been where they should have -- where we would have expected them to disclose that.
**Q. Okay. So under your reporting requirements though is there a difference between someone who is being instructed by their manager to misreport and someone who just does it because that's what someone else told them?**

Page 71

A. I'm not sure I understood the question.
**Q. Floyd Reinhardt state -- his report states that he willfully acknowledged the misreporting and instructing his employees, correct?**
A. That's what it says.
**Q. In Heidi Peck's report it says that everyone said Heidi didn't know about this. Someone else told me to do it; is that correct?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Sorry, what did Heidi state?
**Q. BY MR. STEGELMEIER: We can go look at it. Hold on. We'll pull that up.**
**If so we're looking here under the findings. We have a few different people, right? We have Christina -- I'm not going to say her last name -- right here at the second caret. It sounds like this directive came from Mimi Lewis, correct?**
**MR. CLIFTON:** Which exhibit are we looking at?
**MR. STEGELMEIER:** This, I believe, is 6.
**THE WITNESS:** Sorry. The question is?
**Q. BY MR. STEGELMEIER: Was Christina instructed by Heidi Peck to do this misreporting?**
A. Let me take a look at her -- it doesn't necessarily say that -- sorry. "Nerioosai stated

Page 72

that the directive came from on-road supervisor Mimieau Lewis." That must be what Nerioosai said.
**Q. Okay. And then Scott Richardson says that that came from Christina. I'm not going to say her last name. I don't want to get in trouble.**
A. Richardson?
**Q. Scott Richardson, the third caret there.**
A. Yeah. He says in that -- in there it's by Nerioosai, but also if you take a look at his interview notes, he recalled an instance from Saturday, 4 September '21, where he spoke with Ms. Peck that night. She told him to mark down the remaining packages as emergency conditions and he put it in the breakdown.
**Q. Where are we at on this one?**
A. That looks like page 4 of 7. That's the Scott Richardson interview notes.
**Q. Okay.**
A. Second to last paragraph.
**Q. Okay. So 31 is emergency condition?**
A. Correct.
**Q. And then put in the comments "breakdown." Okay.**
A. Yeah, so those by our own exception and guidelines should have been reported as missed on

road.
**Q. Okay. But if they were trying to hide that, would they have put down breakdown in the comments?**
A. The commentary wouldn't be reflected on any report. It would just have a stroke count of emergency conditions or a stroke count on missed on road.
**Q. Okay. So why are there comments then?**
A. Typically that's something for the drivers to record specifics for a delivery.
**Q. But it seems like someone who is trying to hide missed packages wouldn't put that in the comments.**
A. I can't speculate to the -- to that guidance that was given. It should have been recorded as missed on road.
**Q. Okay. All right. So we have him saying that one instance where there was a breakdown. Are you aware of the facts of what caused that breakdown?**
A. I'm only aware of what's in this -- in this summary here.
**Q. Okay. Mimi Lewis stated that she was trained by her former supervisor and her -- in the way that she did stuff; is that correct?**



A. That's what she states.
**Q. Okay. So besides the one instance where there was one breakdown -- and I'm not even sure if that's in this time frame. Does it state what time frame that was in? I must have missed it. Hold on. 4 September. Okay. Makes sense.**
**Outside of that it seems like most of these came from someone else though, right? Is that correct?**
A. How do you mean?
**Q. I mean, it seems like Heidi Peck wasn't aware of anything besides the breakdowns that she cited as emergency condition?**
A. Through reading this document, that's the one item where it seems that Ms. Peck directed the use of an improper exception code.
**Q. Which is consistent with what Floyd Reinhardt did, correct, where he directed breakdowns to be slotted as emergency condition?**
A. It says that in there?
**Q. I can pull that one up for you. Up here he admitted to using emergency conditions for breakdowns that occur weekly.**
A. Yes. Those are -- then yes to the question.



**Q. So two managers are using emergency condition in the same division. Would it appear that the reporting requirement for that division was breakdowns were emergency condition?**
A. Sorry. I missed the second half of that question.
**Q. It seems like the practice in that division was to slate breakdowns as emergency condition.**
A. A practice that is not consistent with ethical reporting guidelines.
**Q. Okay. Is there a financial benefit to misreport packages?**
A. Is there a financial benefit to misrecord packages?
**Q. Yes.**
A. We spoke about the guaranteed service refunds before, but that financial benefit would be so far on the back end of UPS mobile business services that the local package centers would not see a realization of that.
**Q. What reason would a business manager have to misreport a package?**
A. So that they do not have to answer to their leadership of why they are not servicing our



customers.
**Q. Okay. What happens if they're not servicing the customers and they have these missed packages?**
A. Well, it depends on the frequency and the amount of the service failures. If there's a one-off and, you know, there is a breakdown and the driver -- you know, the transmission falls out of a truck and we can't deliver a hundred packages, it is what it is. Right? We have a hundred service failures.
Now, if we have an on-road supervisor or a manager that consistently demonstrates that they cannot run their center to include the service that our customers pay for, then those management folks will be held accountable and put through action plans or improvement plans to ensure that our customers get what they paid for.
**Q. Okay. Would they be terminated for having too many missed packages?**
A. Theoretically, yes. If a management person is put on a performance improvement plan and they are coached and worked with and they still can't lead to that, the performance improvement plan could lead to separation, but I don't believe that I've

ever seen that. More often than not those folks would -- if it was a manager they would be demoted. Or an on-road supervisor would be moved to a different management role. That would be much more likely to happen.

**Q. That raises a question going back to information related to your decision to terminate Heidi Peck. Why wasn't Heidi Peck put on a performance improvement plan or demoted or given some other discipline instead of just terminated?**

A. Because this was a dishonesty and integrity-related violation and not a performance violation.

**Q. Okay. But Floyd Reinhardt's wasn't?**

A. Well, this was the second investigation. The Holloway investigation was the second investigation into honesty and reporting with Ms. Peck in the calendar year of 2021. Mr. Reinhardt, that was his first.

**Q. Okay. But Mr. Reinhardt received the same training and coaching as Heidi, correct?**

A. When?

**Q. On that June 4th e-mail from Troy Emerson.**

A. Well, in addition to that document that



we looked over, Mr. Joiner's document where they keep -- they went through the exception and guidelines, Mr. Johns from industrial engineering was there.

**Q. Okay. But, I mean, everyone knew, though, that, hey, this is the way it's supposed to go. I'm sure that Mr. Reinhardt signed similar documents and still willfully encouraged people to misreport stuff but yet he wasn't terminated?**

A. That was his first investigation.

**Q. Okay. Is it normal like a two-strike policy?**

A. I would -- I would characterize not necessarily a two-strike policy across the board for all types of dishonesty or even any sort of a policy violation. I would certainly draw a conclusion of the northwest district in 2021 that if somebody were to have been found falsifying service failures, that they would be coached and counseled on a first offense and then the second offense the opinion would have been that this person has already been spoken with, been investigated, been coached/counseled, what have you.

**Q. So outside of the document from Mr. Joiner and the e-mail is there any evidence or**



**anything regarding coaching, counseling, performance improvement plans after that first investigation?**

A. I do not have that documentation.

**Q. Okay. Who would have that?**

A. Well, it's reflected in Mr. Joiner's document that -- I'll pull it up here and we can reference it. But something to the effect of HR to provide retraining.

**Q. And that's the e-mail from Mr. -- from Mr. Emerson?**

A. It could have been that.

**Q. And that would be considered retraining?**

A. It could be considered as such.

**Q. If there was other retraining, would there be documentation of it?**

A. Not necessarily. Mr. Barry or Mr. Emerson could have had personal conversations with Ms. Peck at the time.

**Q. And those aren't ever documented?**

A. I don't know if they were.

**Q. If they were documented, would they show up in Mr. Holloway's investigation?**

A. They did not in my review. If they were to have taken place, they did not show up in Mr. Holloway's documentation.



**Q. Is that something --**

A. In my review of it.

**Q. Is that something you would expect an investigator to look into?**

A. Ultimately what our investigators investigate -- it seems kind of redundant there -- is taking an allegation and determining whether it is factual or not, and then subsequently determining whether that -- if it happened or not -- whatever it may be -- whether it violates a UPS policy. Upon the reviewal stage of that substantiated policy violation, that's when the items that you just referenced would be considered.

**MR. STEGELMEIER:** Okay. Let's take another ten-minute break. We've been going about another hour and then we might be done or I might find something else. So let's take a break and we'll come back.

**MR. CLIFTON:** Sounds good.

(A recess was taken from 2:45 p.m. to 2:55 p.m.)

**MR. STEGELMEIER:** I don't have any other questions. Do you have any questions, Ricky?

**MR. CLIFTON:** Just two quick questions for clarification.

Page 81

EXAMINATION

**BY MR. CLIFTON:**

**Q. Clyde, you stated that after the 2022 investigation into Clay Holloway himself, you re-reviewed Clay Holloway's investigation into Heidi Peck; is that right?**

A. Yes.

**Q. And you stated that you reviewed witness statements that were included in that report. Are those statements signed by the witnesses themselves?**

A. They should be. Let me take a look at that document. It's the one that I have starting D-HP-001602. No, sorry. That's the wrong one. Sorry. That was Floyd Reinhardt.

It's the one I have titled Idaho Falls, dash, Holloway summary beginning D-HP-002478. If you scroll all the way down to the bottom with the attachments there, that would be page 6 and 7. You'll see that attachments 1 and 2 seem to have an embedded statement and policy as well as a number of other policies where I believe the lady starting with the last name N and then Thueson. Those would be the statements, yes. And if I remember correctly, they're handwritten statements that are signed by the person that is giving the statement.

Page 82

**MR. CLIFTON:** Okay. Pass the witness.

(A discussion was held off the record.)

**MR. STEGELMEIER:** I'm done. We're good.

(The deposition concluded at 3:12 p.m.)

Page 83

REPORTER'S CERTIFICATE

STATE OF IDAHO )
) ss.
COUNTY OF BONNEVILLE )

I, Sandra D. Terrill, CSR, RPR, and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined Matthew Clyde Fitzmaurice, the witness named in the foregoing deposition, was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true, and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 6th day of March 2024.

Sandra D. Terrill
Idaho CSR No. 702,
Notary Public in and for
the State of Idaho

## A

**abide (1)** 70:15
**ability (1)** 62:23
**able (2)** 46:8;62:13
**abnormal (1)** 67:20
**above (1)** 28:14
**absence (2)** 42:13;58:10
**absences (1)** 59:3
**accident (1)** 44:4
**according (1)** 37:15
**accountable (1)** 76:16
**accurate (1)** 26:16
**acknowledge (1)** 65:3
**acknowledged (2)** 43:1;71:3
**acronym (1)** 48:9
**across (2)** 13:25;78:14
**act (1)** 43:10
**action (1)** 76:16
**acts (1)** 64:13
**actual (2)** 29:5;30:6
**actually (7)** 29:25;30:13;48:25;55:5,25;56:20;58:12
**add (2)** 17:23;18:2
**addition (1)** 77:25
**Additionally (2)** 18:21;64:22
**address (1)** 5:7
**administered (1)** 12:15
**admission (2)** 66:10,12
**admit (1)** 66:18
**admitted (3)** 28:21;45:10;74:22
**advance (1)** 4:17
**advice (1)** 55:5
**against (1)** 17:3
**age (1)** 35:4
**agents (1)** 6:8
**ago (2)** 43:15;59:21
**ahead (2)** 58:3;69:19
**Alecia (1)** 53:24
**align (1)** 61:3
**alignment (1)** 51:13
**allegation (4)** 11:18;12:14;24:6;80:7
**allegations (5)** 13:12,12;24:24;53:19;55:2
**alleged (2)** 12:16;56:11
**allow (1)** 64:13
**allowed (2)** 55:3;58:24
**along (2)** 30:1;67:21
**Amazon (3)** 44:13,25;45:5
**amended (1)** 5:13
**amount (4)** 34:17;42:13;65:21;76:6
**analysis (1)** 48:12
**annual (1)** 64:23
**answered (1)** 17:12
**anticipate (3)** 23:1;33:12;49:2
**anymore (1)** 45:8
**apologies (1)** 28:11
**apologize (1)** 4:16
**appear (1)** 75:2
**appears (1)** 48:2
**applied (2)** 29:20;65:8
**apply (1)** 43:23
**appropriate (9)** 13:13,15;22:19;41:25;44:15,16;46:23;49:17;64:15
**appropriately (3)** 18:13;25:8;46:25
**approval (2)** 35:2,3
**approved (1)** 35:6
**approximately (1)** 61:12
**April (1)** 26:8
**archives (1)** 68:6
**area (2)** 11:3;14:20
**areas (3)** 5:21,22;10:8
**arise (1)** 14:20
**around (2)** 48:3;65:23
**Aside (1)** 40:1
**aspects (1)** 46:18
**assign (1)** 14:12
**assigned (2)** 13:17;56:8
**assume (1)** 36:15
**AT&T (1)** 63:9
**Atkinson (1)** 15:15
**attached (1)** 60:25
**attachments (9)** 48:17,21,25;49:5,12;60:14,16;81:18,19
**attention (1)** 66:11
**attorney (1)** 4:19
**August (3)** 26:8,18;40:9
**auto (1)** 26:15
**automatically (1)** 19:25
**availability (1)** 16:6
**available (1)** 48:23
**avenues (1)** 11:17
**avoid (1)** 43:2
**aware (11)** 12:8;24:23;27:11;30:9;32:25;37:7;39:11;62:1;73:20,21;74:12

## B

**back (25)** 7:24;12:13;13:22;14:9;17:24;18:2;20:8;23:9;32:6,6;35:9;36:9;38:5;40:21,24;41:22;49:3,4,14;62:13;64:7;66:23;75:19;77:6;80:18
**Barry (2)** 69:23;79:16
**Barry's (1)** 70:6
**based (5)** 16:5;50:13,16,18,20
**basically (1)** 16:18
**Bear (4)** 19:21;28:4;40:3;42:21
**became (1)** 58:21
**becoming (1)** 44:25
**began (1)** 48:3
**beginning (6)** 26:5;52:1,2,3,6;81:16
**behalf (1)** 63:11
**behavior (2)** 69:13,15
**benefit (3)** 75:12,14,18
**Besides (5)** 9:8,15;33:6;74:2,12
**beyond (3)** 62:25;63:10;69:17
**bias (1)** 54:1
**big (1)** 18:10
**Bill (4)** 15:14;16:22;18:5,8
**Billings (4)** 50:22;54:20;58:22;59:5
**bit (3)** 55:12;65:18,23
**black (1)** 26:13
**board (1)** 78:14
**body (4)** 13:13,15,18;59:22
**Boise (2)** 14:17;43:18
**bonuses (1)** 36:19
**borderline (1)** 51:20
**boss (2)** 23:1;57:4
**both (2)** 70:3,14
**bottom (7)** 7:16,25;8:17;9:13;18:18;19:17;81:17
**box (1)** 26:13
**break (6)** 5:6;40:18;57:25;58:4;80:15,17
**breakdown (9)** 44:2,5;72:14,23;73:3,19,20;74:3;76:7
**breakdowns (6)** 44:1;74:12,18,23;75:4,8
**breaks (1)** 44:10
**brewing (1)** 67:18
**brings (1)** 59:19
**brought (1)** 35:13
**building (2)** 44:20,22
**bullet (1)** 45:9
**bunch (1)** 36:18
**business (4)** 69:2,8;75:19,22
**butcher (1)** 28:10

## C

**calendar (1)** 77:18
**call (12)** 10:7;13:3;24:15;31:25;44:19;55:14;58:1,3;62:15;67:25;68:7,15
**called (7)** 12:16;18:22;30:22;42:25;47:3;54:11;55:12
**calls (1)** 17:2
**cam (1)** 59:22
**came (7)** 13:25;18:9;53:8;71:17;72:1,4;74:8
**Can (49)** 4:10;5:16;11:14;13:3;14:13;15:5;17:8,16,16;19:19;20:12;21:23;23:16;25:7;28:3,

5;30:14;31:12,17,21;32:6;33:19;35:20;42:4;47:3,7,14,16;48:12;49:10;50:8;51:24;52:3,17,19;57:25;58:1;60:3;61:10;63:9,11,15,24;67:10;69:18,19;71:11;74:21;79:6
**capacity (1)** 69:18
**car (4)** 28:19;29:9,17;44:9
**caret (3)** 42:25;71:16;72:7
**cars (1)** 29:16
**case (12)** 4:19;14:15;24:3;25:8,16;26:14;27:10;35:12,17;42:7;54:6,8
**cases (1)** 51:13
**catchall (1)** 45:17
**caused (2)** 46:10;73:20
**cell (7)** 17:4,7,8,9;37:3;39:15;62:22
**cellular (2)** 62:20;63:9
**center (14)** 12:18;15:1,2;27:12,15,16,17;46:19,21;50:14;56:16;65:7,15;76:14
**centers (1)** 75:20
**certain (2)** 43:20;47:5
**Certainly (2)** 16:20;78:16
**certifications (1)** 64:23
**chain (1)** 25:21
**change (3)** 52:7;53:14;65:17
**characterize (1)** 78:13
**charge (1)** 21:14
**charged (1)** 15:2
**Chavez (5)** 52:21;53:6;54:10,14;62:9
**Chavez' (1)** 8:24
**check (1)** 66:22
**checking (1)** 39:8
**choices (2)** 52:15,17
**chose (1)** 36:17
**Christina (3)** 71:15,22;72:4
**circulated (1)** 59:21
**cited (1)** 74:13
**city (2)** 43:12,14
**claim (1)** 54:23
**claimed (1)** 55:24
**clarification (1)** 80:25
**Clay (33)** 6:21;7:3,12,13,18,20;8:9,24;10:15;33:1,6;39:5,22;41:11;48:4;50:6;51:17;52:11;54:22;55:12,14,20;56:7;57:8,13,18;60:5,21;61:9,11,22;81:4,5
**Clay's (2)** 55:18;62:20
**clerks (2)** 28:22,25
**CLIFTON (23)** 5:2;17:15;31:16;32:1;33:18;38:13;40:20;57:22;58:2;60:2;61:24;62:25;63:4,8,19;69:17,25;71:9,18;80:19,24;81:2;82:1
**clock (1)** 48:6
**close (2)** 51:7,7
**closed (4)** 28:21;29:3,21;65:20
**closely (1)** 50:11
**Clyde (5)** 4:3,12;14:2;29:10;81:3
**coached (2)** 76:23;78:19
**coached/counseled (1)** 78:22
**coaching (2)** 77:21;79:1
**code (3)** 19:5;44:7;74:16
**codes (1)** 21:8
**coding (1)** 8:16
**collected (2)** 37:25;38:3
**colloquially (1)** 10:3
**Colorado (3)** 11:5;50:17,19
**coming (4)** 46:2;54:16;59:17;67:23
**commentary (2)** 17:21;73:5
**comments (4)** 72:22;73:4,9,14
**common (1)** 11:20
**communication (3)** 36:25;38:17;63:5
**communications (3)** 6:12;37:19;40:10
**company (4)** 12:16;39:18,19;45:1
**company-issued (1)** 39:15
**complain (1)** 47:22
**complains (1)** 47:23
**complaint (5)** 8:3;11:16,18;12:14;13:25
**complaints (1)** 12:19
**complete (3)** 24:4;25:22;48:20
**completed (1)** 58:8
**complex (4)** 35:2;67:17;68:10,12
**compliance (2)** 13:9,10
**concern (12)** 7:21;13:5,11,17;14:3,15;30:24;35:13;53:17;56:3,18,21
**concerned (1)** 13:3
**concerning (1)** 56:6
**concerns (2)** 14:19;53:24
**concluded (5)** 28:14;33:23;34:4;42:11;82:4
**conclusion (3)** 34:5,6;78:16
**condition (10)** 43:2,6,9;45:11;72:20;74:13,19;75:2,4,9
**conditions (7)** 43:16,24;64:13;65:20;72:13;73:7;74:22
**conduct (2)** 52:12;56:16
**conducted (14)** 6:7;15:18;16:4;27:12;32:20;34:3;35:20;36:16;48:15;56:14,20;62:10;64:16;70:13
**conducting (3)** 16:7;27:6,8
**confidential (1)** 9:12
**confused (1)** 30:16
**confusion (1)** 15:10
**congruence (2)** 60:24;61:2
**congruent (1)** 60:15
**conjunction (1)** 24:16
**consequence (1)** 67:19
**consider (2)** 25:2;35:15
**considered (6)** 29:1,18;44:6;79:12,13;80:13
**consistent (2)** 74:17;75:10
**consistently (1)** 76:13
**consolidated (1)** 9:11
**consumer (1)** 47:22
**continue (1)** 58:24
**continued (1)** 14:10
**continues (1)** 55:10
**continuing (1)** 54:3
**control (3)** 41:17,21;64:9
**conversation (7)** 41:22;54:14;58:19;61:8,12,17;64:7
**conversations (3)** 50:24;51:6;79:17
**conviction (1)** 59:20
**copy (3)** 22:14;23:18,24
**corporate (5)** 4:24;5:8;13:9,10;25:14
**corporation (1)** 63:12
**correctly (5)** 15:14;56:15,21;60:12;81:23
**Cory (1)** 4:18
**counsel (1)** 9:16
**counseled (1)** 78:19
**counseling (1)** 79:1
**count (2)** 73:6,7
**couple (1)** 65:4
**course (1)** 64:19
**covered (2)** 14:18;66:24
**criminal (1)** 59:18
**curiosity (1)** 69:23
**current (1)** 45:5
**currently (1)** 50:18
**customer (5)** 19:25;47:3,7,11,17
**customers (5)** 46:24;76:1,3,15,17

## D

**daily (1)** 51:8
**dash (17)** 7:13,16;8:1,1,6,9,13,15,21,21,25;9:3,3,6,7,12;81:16
**data (4)** 13:24;49:1,7;63:9
**date (14)** 5:19;9:1;20:10,11;26:10,15;30:13;36:17;47:6;49:21;58:14;67:4,6,12
**day (5)** 20:12;46:7,9;58:13;61:9
**days (2)** 35:1,5
**day-to-day (1)** 43:18
**deadline (1)** 34:9
**December (3)** 36:12,13,19
**decide (3)** 11:11,12;16:8
**decided (1)** 25:10
**decision (12)** 6:3;7:4;31:5,11,14,18;32:3;36:8,10,11;63:7;77:7
**decisions (1)** 52:11

**deemed (1)** 24:24
**define (3)** 33:19;50:8;51:24
**defined (2)** 29:15;63:21
**delay (1)** 19:25
**deliberation (1)** 25:15
**deliver (5)** 43:12,22;47:5;64:14; 76:9
**delivered (5)** 22:11;23:10;45:21; 46:11,13
**deliverer (1)** 45:8
**deliveries (1)** 43:21
**delivering (1)** 46:8
**delivery (8)** 28:19;43:14;45:1,20; 46:3,3,6;73:11
**delves (1)** 52:22
**demonstrates (1)** 76:13
**demoted (2)** 77:2,9
**Denver (2)** 50:17,19
**department (3)** 13:10;24:11,12
**depending (1)** 65:7
**depends (1)** 76:5
**depo (2)** 4:20,25
**deposition (7)** 4:1;5:14;7:7;9:15; 12:7;30:22;82:4
**Derrit's (1)** 7:21
**description (1)** 19:8
**desert (1)** 10:10
**designated (1)** 38:10
**detailing (1)** 62:11
**details (1)** 13:4
**determination (2)** 11:10;24:13
**determine (3)** 55:4;60:8,22
**determining (2)** 80:7,8
**devices (1)** 62:23
**D-HP-001602 (1)** 81:13
**D-HP-002478 (1)** 81:16
**D-HP-002482 (1)** 28:9
**difference (2)** 65:14;70:22
**different (15)** 5:9;11:14,17;21:19; 22:11;31:21;33:19; 50:4;63:14,16;64:4; 65:7,18;71:14;77:4
**difficult (1)** 55:4
**dig (1)** 46:24
**diligence (1)** 55:8
**directed (4)** 11:15;70:16;74:15, 18
**directive (2)** 71:17;72:1
**director (9)** 10:1,3,4,12,14,21; 31:8;36:16;68:17
**disagree (3)** 31:11,15,24
**discern (1)** 11:19
**discharged (2)** 27:3;58:20
**discipline (3)** 24:13,18;77:10
**disciplined (1)** 69:15
**disclose (1)** 70:19
**discretion (2)** 16:10,19
**discuss (2)** 5:8;38:20
**discussing (2)** 5:23;53:3
**discussion (4)** 5:4;32:10;35:7;82:2
**discussions (1)** 68:18
**Dishonest (3)** 52:16;53:20;57:9
**dishonesty (3)** 59:19;77:11;78:15
**distributed (1)** 65:1
**distribution (1)** 23:19
**district (16)** 10:1,3,5,10,21; 46:20;68:22,24;69:2,3, 7,12,14,16;70:7;78:17
**districts (2)** 10:9;64:22
**district-wide (2)** 18:1;23:11
**division (10)** 19:14;20:16;22:25; 24:15;69:12;70:8,10; 75:2,3,8
**document (33)** 8:2,22;9:4;17:25; 18:5;19:12;22:4,17,21; 23:12;25:8,12,13;26:3; 28:9;30:19;31:2;36:3; 40:7;48:22,23;49:11; 52:20;53:3;57:11; 59:14;62:11;74:14; 77:25;78:1,24;79:6; 81:12
**documentation (6)** 17:25;25:9;56:15; 79:3,15,25
**documented (2)** 79:19,21
**documents (11)** 7:9,11;9:8,10,21; 20:6;22:19;37:16; 38:21;42:19;78:8
**domestic (1)** 65:9
**domiciled (1)** 14:17
**done (9)** 19:11;34:16;41:21; 44:4;59:24;60:8,12; 80:16;82:3
**dot (6)** 7:22,22;8:3,4;45:12, 14
**doubt (1)** 33:3
**Doug (2)** 69:23;70:6
**down (16)** 5:20;15:9;18:5;19:3, 22;28:8;44:10;51:16; 57:15;62:8;63:15,16; 66:5;72:12;73:3;81:17
**draw (2)** 66:11;78:16
**drew (1)** 59:23
**driver (7)** 8:16;43:18,23;44:3, 9,10;76:8
**drivers (2)** 21:7;73:11
**drugs (2)** 59:22,23
**due (4)** 43:13,21,24;55:8
**duly (1)** 4:5
**during (2)** 15:21;30:22
**Dustin (1)** 18:9
**duty-to-disclose (1)** 70:15

## E

**earlier (4)** 15:10;30:21;66:24; 68:19
**easy (1)** 10:20
**echo (1)** 5:3
**effect (2)** 48:11;79:7
**effort (1)** 25:7
**either (13)** 13:3;23:1;27:23; 28:21;39:6,7;42:4; 44:3;46:3;51:2;53:18; 56:11;58:11
**eligible (1)** 47:11
**else (7)** 9:9;33:6;55:25; 70:25;71:8;74:8;80:17
**e-mail (27)** 18:16,18,24;19:8; 23:9;24:1;25:20,21; 30:20;33:14;37:12; 39:10,11,24;40:10,11, 12;49:16,20;66:25; 67:12,21,24;68:5; 77:23;78:25;79:9
**e-mails (6)** 9:18,20;37:8,17; 38:6;39:9
**embedded (3)** 48:22;49:7;81:20
**emergency (20)** 43:1,5,7,9,16,23; 44:14;45:10;47:9; 65:12,20;72:13,20; 73:7;74:13,19,22;75:1, 4,8
**Emerson (14)** 18:17;30:23;31:9,10, 13;36:5,15;39:11,25; 68:15,18;77:24;79:10, 17
**employed (2)** 10:15,17
**employee (7)** 15:23;16:1;30:8; 51:17,19;55:2,4
**employees (7)** 6:13;23:4,7;37:1; 38:18;63:6;71:4
**employment (9)** 7:3;27:5;31:6;49:24; 58:9,20;66:1,15,18
**encouraged (1)** 78:8
**end (6)** 17:21,24;28:17;40:9; 65:24;75:19
**ends (1)** 47:13
**engaged (2)** 53:21;56:11
**engagement (1)** 18:13
**engineer (1)** 14:9
**engineering (4)** 19:15;22:24;64:25; 78:3
**enough (1)** 44:5
**ensure (2)** 41:20;76:17
**entitled (1)** 39:14
**EPIM (1)** 54:7
**especially (1)** 64:18
**essence (9)** 11:13;18:12,19;24:9; 29:1;44:23;47:2;64:9, 19
**ethical (1)** 75:11
**ethics (1)** 13:1
**EthicsPoint (1)** 8:15
**evaluation (1)** 51:23
**Even (4)** 22:4;53:24;74:3; 78:15
**everyone (3)** 65:11;71:7;78:5
**evidence (2)** 69:11;78:25
**exactly (1)** 67:4
**EXAMINATION (3)** 4:8;5:21;81:1
**examined (1)** 4:5
**example (4)** 21:23;28:18;29:8; 46:1
**examples (1)** 52:18
**exceeded (2)** 45:12,14
**Excel (2)** 18:18,20
**exception (15)** 18:6,11;19:5;20:18; 21:7;22:1,5,8,20;

27:19;63:21;64:15;72:24;74:16;78:2
**exceptions (12)**
20:24;21:1,2,19,21;22:16;26:20;28:23;47:10;48:11;49:7;64:8
**excess (1)**
44:13
**Exhibit (17)**
5:12,15;15:4;17:22;18:25;26:2;30:20;32:7,23;49:4;52:24;53:1;57:22;58:6;66:7,9;71:18
**exhibited (1)**
52:13
**expect (4)**
33:25;49:8,11;80:3
**expected (2)**
52:12;70:19
**experience (1)**
59:17
**explains (1)**
19:24
**expressed (1)**
54:1
**extremely (1)**
55:3

**F**

**facilities (3)**
21:13,17;51:11
**facility (2)**
44:22;45:19
**facts (1)**
73:20
**factual (1)**
80:8
**failure (11)**
29:2,14,19;44:6,21,23;46:9,15;47:3;64:12;70:11
**failures (16)**
12:17;14:25;29:2,22;43:2,6;46:19,22;47:10;64:8;68:20,23;70:17;76:6,11;78:18
**fair (2)**
45:3;54:25
**fall (1)**
70:6
**Falls (8)**
8:6,9;26:7;29:14;32:23;47:14;76:8;81:15
**falsification (1)**
56:22
**falsified (4)**
59:8,11;61:22,25
**falsify (1)**
70:17
**falsifying (4)**
58:25;60:1,6;78:18
**familiar (7)**
11:7,22;21:7;22:7;26:22;61:21;63:20
**familiarity (1)**
14:14
**far (2)**
10:7;75:19
**fast (2)**
16:17;34:10
**fault (4)**
45:20;46:13;47:2;64:11
**FedEx (1)**
48:1
**feeder (1)**
47:13
**feel (4)**
39:16;52:7;54:24,25
**felt (4)**
53:25;54:3,20;55:1
**Ferguson (1)**
15:15
**few (4)**
15:9;20:4;65:24;71:14
**fifth (2)**
36:24,24
**figure (1)**
47:25
**figured (1)**
59:13
**file (7)**
12:2,6;23:3;25:16;47:3,14;68:8
**files (1)**
23:7
**fill (1)**
53:8
**final (7)**
24:13;34:3;67:5,7,8,13;69:8
**finalization (1)**
34:6
**finalize (1)**
34:1
**finalized (2)**
49:16;67:1
**financial (4)**
68:21;75:12,14,18
**find (9)**
28:1;54:23;56:18,22,25;58:14;59:10;60:16;80:16
**finding (3)**
19:20;30:1,25
**findings (4)**
26:17;42:24;54:2;71:14
**fine (3)**
14:7;36:22;58:2
**fire (1)**
36:19
**firm (1)**
58:23
**first (9)**
4:5;7:12;29:12;50:25;54:16;77:19;78:10,19;79:2
**Fitzmaurice (6)**
4:3,12,14;5:6;14:2;29:11
**F-i-t-z-m-a-u-r-i-c-e (1)**
4:13
**five (2)**
28:16;61:18
**flowing (1)**
48:13
**Floyd (24)**
6:17,22;7:13,20;23:17;41:2,3,5;42:5,9,12;66:1,3,12,18,20,23;67:1;68:11;70:2;71:2;74:17;77:14;81:14
**Floyd's (1)**
49:14
**folks (5)**
13:2;47:17;67:18;76:15;77:1
**follow (1)**
14:9
**following (3)**
26:25;38:25;46:7
**follows (2)**
4:2,6
**footprint (3)**
13:21;14:1,5
**forewarn (1)**
67:18
**Form (10)**
17:15;31:16;32:1;33:18;38:13;60:2;61:24;63:19;67:11;71:9
**format (2)**
18:19;49:8
**former (1)**
73:24
**formula (1)**
26:15
**forth (1)**
7:18
**forwarded (2)**
7:10;41:24
**forwarding (1)**
42:2
**found (10)**
14:24;39:12;50:3;59:8,22;60:1,6,14;69:10;78:18
**four (1)**
51:8
**frame (4)**
16:3;33:3;74:4,5
**frequency (1)**
76:5
**frequently (1)**
22:6
**full (2)**
4:11;44:9
**full-time (1)**
58:20
**fully (1)**
53:21
**function (2)**
11:21;14:14
**future (16)**
19:8;28:21;29:3,5,21;30:5,14,16,19,21,25,25;31:3;47:9;49:6;65:20
**futures (4)**
26:19;27:25;28:7;30:23

**G**

**gave (4)**
28:15,18;29:7;55:6
**gender (2)**
53:18;56:12
**general (3)**
33:16;34:18;63:24
**gentleman (1)**
18:17
**gentlemen (1)**
18:22
**gets (4)**
14:11;28:18;29:9;47:13
**given (3)**
17:9;73:16;77:9
**gives (1)**
19:17
**giving (1)**
81:25
**goal (3)**
34:15,24;64:21
**God (2)**
43:10;64:13
**goes (4)**
28:12;29:13;44:9;64:7
**good (3)**
40:20;80:19;82:3
**ground (2)**
45:1,7
**group (1)**
34:16
**GSR (2)**
47:4,15
**GSS (5)**
19:4;20:25;21:9,11,15
**guaranteed (2)**
47:4;75:17
**guess (4)**
17:8,12;27:24;63:22
**guessing (2)**
26:9;44:25
**guidance (3)**
19:17;45:4;73:16
**guideline (2)**
18:11;20:18
**guidelines (8)**
18:7;19:5;22:20;63:21;65:19;72:25;75:11;78:3
**guys (1)**
16:22

**H**

**half (2)**
51:11;75:5
**halfway (1)**
18:5
**hand (1)**
19:23
**handwritten (1)**
81:24
**happen (2)**
59:25;77:5
**happened (7)**
17:11,19;26:10,25;42:9;58:18;80:9
**happens (2)**
46:12;76:2
**harassment (3)**
53:18;56:12,12
**hard (2)**
16:16;34:10
**hardly (1)**
21:22
**head (1)**
52:23
**heads-up (1)**
67:23
**Healthline (1)**
8:3
**heard (3)**
22:5;27:18;28:12
**hearing (1)**
5:2
**heats (1)**
55:12
**Heidi (59)**
4:19;6:4,8,12,22;11:8,23;15:14;17:22;18:6,7,8,9,17;20:1,3,9,11,16;22:14,18;23:15;27:2;30:9,19;31:6,19;32:9,16,21;36:10,25;37:3;38:18,24;39:3,9,10,25;60:7,10;61:5,7,13,17;62:15;63:6,7;65:3;70:3;71:6,7,10,23;74:11;77:8,8,21;81:5
**Heidi's (2)**
20:15;23:1
**held (3)**

5:4;76:16;82:2
**helped (1)** 45:1
**herself (1)** 65:3
**hey (2)** 67:22;78:6
**hidden (2)** 12:17;14:25
**hide (2)** 73:2,13
**hiding (1)** 59:22
**highlights (1)** 28:2
**himself (2)** 57:5;81:4
**history (1)** 27:5
**Hobbs (1)** 49:6
**Hold (2)** 71:12;74:5
**Holloway (39)** 6:21;7:3;8:6,10,12, 24;10:15,17;33:1; 35:13;37:16;39:5;40:8, 11;48:4;50:7,20,24; 51:18;52:6;53:10,15, 16,19;54:12;56:13,14; 57:5,8,19;58:10,19; 60:6;61:9,11;62:14; 77:16;81:4,16
**Holloway's (5)** 41:11;58:8;79:22,25; 81:5
**home (5)** 46:2,4;55:3,5,7
**homes (2)** 43:20,25
**honesty (1)** 77:17
**hotline (1)** 13:1
**hour (3)** 40:5,19;80:16
**hours (2)** 45:12,14
**HP (4)** 8:1,21;9:3,13
**HR (14)** 15:20,24;16:11,19; 17:25;24:11,12,21; 25:19;31:8;32:10,16; 36:16;79:7
**hub (4)** 58:21;59:5,6,7
**human (1)** 24:16
**hundred (2)** 76:9,10
**hundreds (4)** 20:25;21:2,7,18
**Hurricane (1)** 43:11

**I**

**ice (1)** 43:22
**ID (1)** 22:24
**Idaho (15)** 8:6,9;11:6;12:18; 14:16,17,19;19:14; 22:2;26:7;29:14;32:23; 43:19;47:14;81:15
**identified (1)** 63:24
**image (1)** 19:1
**IMG831 (1)** 19:2
**implied (1)** 62:10
**imply (1)** 20:5
**important (2)** 39:17;46:16
**improper (1)** 74:16
**improvement (5)** 76:17,22,24;77:9; 79:2
**inaudible (1)** 5:1
**incident (1)** 57:3
**include (1)** 76:14
**included (2)** 19:7;81:9
**includes (1)** 20:16
**incurred (1)** 44:3
**indeed (1)** 14:25
**indent (1)** 40:9
**indicate (1)** 46:20
**indicates (2)** 17:22;54:18
**indication (2)** 37:18;44:23
**indicator (1)** 54:9
**industrial (3)** 19:15;64:25;78:3
**Information (11)** 6:3,6,16,20,24;7:2; 36:9;38:12;41:1;63:25; 77:7
**initiate (3)** 11:14,21;13:8
**initiated (3)** 48:4;57:4,4
**initiation (2)** 35:14,15
**initiatives (1)** 51:14
**injury (1)** 59:3
**input (1)** 24:16
**inside (3)** 21:13,17;28:8
**instance (6)** 4:4;33:8;39:22; 72:10;73:19;74:2
**instead (2)** 47:14;77:10
**instructed (2)** 70:23;71:23
**instructing (3)** 69:13,15;71:4
**integrity (1)** 20:3
**integrity-related (1)** 77:12
**internal (1)** 48:10
**interrupt (2)** 18:23;57:23
**interview (29)** 8:24;15:16,18,21,25; 16:4,12;19:14;28:10, 14;32:9,15;33:2,22; 34:3;48:15;56:9,14,17, 21;61:14,19,23,25; 62:6,10,12;72:10,17
**interviewed (6)** 55:24;56:1;58:13; 62:3,8;70:14
**interviews (2)** 35:20;60:18
**intimate (1)** 14:14
**intimately (1)** 21:5
**into (19)** 7:13;8:12;9:11;11:8; 14:3;27:12;29:13;44:3; 52:22;57:18;59:19,23; 67:10,22;69:7;77:17; 80:4;81:4,5
**introductory (1)** 32:14
**investigate (4)** 14:21;53:17;56:8; 80:6
**investigated (5)** 42:5;69:3,24;70:3; 78:22
**investigation (98)** 6:7;7:13,18;8:9,12; 11:11,13,15,19,21,23; 12:9,13;14:23;15:6; 16:8;17:19,20;24:10; 25:1,22;26:1,7,23;27:1, 6,8,12;28:1;32:24; 33:5,22;34:1,6,25;35:2, 16,18,23;36:1;37:14; 39:12,16;41:2,7,9,12, 20,24;42:12,18;43:3; 48:2,5,7,14;49:9,15; 50:3;53:14,22;54:4,25; 57:5,7,10,21;58:8; 59:11;60:1,6,7,9,17; 61:1,11;64:25;67:1,8, 13,16,17,18,22;68:3, 10,11,12;69:1,6;77:15, 16,17;78:10;79:2,22; 81:4,5
**investigations (17)** 6:17,21;11:8;16:23; 32:20,22;33:17;34:16, 22;36:10;41:14;48:17, 19;58:25;59:8,12; 70:12
**investigation's (1)** 24:4
**investigative (15)** 13:13,15,18;23:12; 25:12,17;34:4,7;37:16; 39:4;52:25;57:17; 58:12;61:20;68:8
**investigator (6)** 9:7;14:12;35:8;42:3; 59:25;80:4
**investigators (3)** 17:5;56:19;80:5
**investigatory (1)** 40:15
**involve (1)** 16:9
**involved (6)** 12:10;14:16;16:19; 41:9,12;63:6
**involves (1)** 24:6
**IRS (3)** 35:19,21,23
**issue (9)** 17:4;18:1,8,10; 23:11;30:10;44:12; 46:10;47:1
**issued (5)** 37:3,23;38:2;39:18, 19
**issues (5)** 42:6;47:7;54:16; 60:16;68:21
**item (1)** 74:15
**items (2)** 37:24;80:12

**J**

**January (6)** 8:15;26:18;52:1,2,6, 7
**Jason (1)** 57:18
**job (2)** 10:2;11:1
**Joe (1)** 8:24
**Johns (7)** 15:15;19:13,16; 22:24;23:2;65:1;78:3
**Joiner (6)** 9:7;11:25;14:16; 15:14;64:24;78:25
**Joiner's (3)** 12:3;78:1;79:5
**joke (1)** 45:6
**July (6)** 7:14;8:10,13,25; 35:11;48:3
**jump (1)** 65:23
**June (3)** 26:18;30:4;77:23

**K**

**Katrina (1)** 43:11
**keep (6)** 10:20;23:7;25:9; 44:5;68:1;78:2
**kept (1)** 23:3
**Kevin (1)** 57:18
**kind (14)** 7:5,6;14:4,9;18:18; 25:9;45:16;51:17; 52:15;55:12;56:3,25; 59:18;80:6
**knew (2)** 18:8;78:5
**knowledge (4)** 5:25;23:6;27:2;70:1
**knowledgeable (1)** 65:22
**known (1)** 65:20
**knows (1)** 65:11

**L**

**labeled (1)** 28:9
**lady (1)** 81:21
**Lake (1)** 47:14
**laptops (2)** 38:1;39:15

**largest (2)** 45:1,7
**last (14)** 4:11,13;7:2;9:4;20:4;33:22;42:25;45:9;48:16;65:3;71:15;72:5,19;81:22
**lasted (2)** 61:17;62:15
**later (4)** 10:19;30:8;32:8;55:23
**lay (1)** 69:18
**lead (2)** 76:24,25
**leader (1)** 70:17
**leadership (5)** 11:16;46:20,23;51:16;75:25
**leading (1)** 6:8
**learn (2)** 53:13;61:16
**learned (3)** 51:21;52:5,10
**least (3)** 51:3,20;53:19
**leave (5)** 42:13,14;44:21;45:19;58:10
**leaves (1)** 59:2
**left (4)** 19:23;24:20;44:19,22
**less (1)** 61:17
**level (2)** 24:15;29:8
**Lewis (7)** 28:15,21,24;49:5;71:17;72:2;73:23
**likely (1)** 77:5
**line (4)** 26:13;29:12;52:12;54:7
**lines (3)** 28:17;30:1;67:22
**list (3)** 15:11,12;23:20
**listed (2)** 15:17;26:4
**little (4)** 10:19;55:12;65:18,23
**loaded (1)** 29:15
**local (4)** 28:20,22,25;75:20
**location (3)** 28:19,20;29:10
**log (1)** 13:18
**long (8)** 10:11;34:2,5,22,24;50:6,9;62:15
**longer (3)** 33:24;35:4;58:22
**look (23)** 13:19,22;18:15;27:5;28:3,13;33:10;37:6;38:11,23;39:2,14;40:4;41:19;48:21;59:12;62:14;70:10;71:11,24;72:9;80:4;81:11
**look-back (1)** 59:18
**looked (13)** 8:23;9:5,10;12:13;14:3;30:21;37:8,18;38:5;59:16;60:9,13;78:1
**looking (11)** 6:2,6;18:3;19:13;40:7;51:6;54:6;56:10;59:15;71:13,18
**looks (10)** 15:8;18:19;19:6;20:11;23:23;35:10;48:14;53:23;57:12;72:16
**Lori (1)** 15:15
**lower (1)** 30:8
**Luper (4)** 33:8,9,9,10

**M**

**Maegan (1)** 15:14
**main (1)** 30:24
**maintenance (1)** 44:4
**makes (4)** 11:10;24:13;30:2;74:6
**making (1)** 12:23
**management (8)** 15:1;21:16;22:2;24:6;54:22;76:15,21;77:4
**manager (35)** 11:2;16:2,3,9,12;17:13;19:15;23:1;24:15,15,20;25:19;33:25;35:3,8;41:11,13;42:1;53:20;55:18,22;56:4,16;59:5;68:22;69:2,7,12,13,14;70:10,23;75:22;76:13;77:2
**managers (6)** 20:15;65:2;69:2,8;70:13;75:1
**many (5)** 20:8,23;21:21;64:22;76:20
**March (1)** 54:15
**margin (1)** 19:23
**mark (4)** 5:12;57:22;65:12;72:12
**marked (11)** 5:15;7:16;9:12;15:4;18:25;26:2,8;43:15;53:1;58:6;66:7
**materials (1)** 65:1
**matrix (1)** 19:5
**matrixes (1)** 34:19
**matter (4)** 13:19;46:17;56:7;57:3
**matters (1)** 59:15
**Matthew (3)** 4:3,12;14:2
**May (6)** 9:7,10;11:23;12:8;55:11;80:10
**Maybe (4)** 10:19;19:1;28:16;50:10
**mean (10)** 15:12;33:7;48:3;57:23;59:12;61:2;68:25;74:10,11;78:5
**meet (2)** 50:23,25
**meeting (2)** 38:22;51:12
**meetings (2)** 16:22;51:9
**memorize (1)** 21:19
**memory (2)** 55:1;68:17
**mentioned (5)** 5:7;19:16;27:14;30:23;68:19
**mentions (1)** 16:21
**mess (1)** 4:16
**message (2)** 40:13;62:9
**messages (7)** 9:19,20;37:8;38:6,24;39:2,9
**middle (1)** 28:16
**might (5)** 40:17;50:12;56:22;80:16,16
**Mimi (3)** 28:12;71:17;73:23
**Mimieau (1)** 72:2
**mind (2)** 31:13;53:14
**minutes (3)** 40:18,21;61:18
**misconduct (1)** 42:16
**misflow (3)** 22:1,5;27:19
**misflows (1)** 27:21
**mislabeled (4)** 27:25;28:7;29:5;31:1
**misload (3)** 18:8;29:10;30:6
**misloaded (2)** 28:18;29:9
**misloads (1)** 18:10
**misrecord (1)** 75:15
**misreport (4)** 70:24;75:13,23;78:9
**misreporting (9)** 50:3;68:24;69:4,10,16,24;70:4;71:4,23
**misscanned (1)** 30:7
**missed (19)** 22:10;28:23;29:19;44:8,10,24;45:15,16,18,21;65:19;72:25;73:7,13,17;74:5;75:5;76:3,20
**misseds (1)** 20:8
**mistake (1)** 29:16
**misunderstood (1)** 30:11
**mobile (1)** 75:19
**moment (3)** 40:3;57:15;66:17
**momentarily (3)** 19:21;28:4;42:21
**Montana (3)** 11:6;50:22;53:10
**month (3)** 10:13;20:11;54:9
**months (1)** 27:13
**More (10)** 21:4;30:15,16;43:17,17;63:20,22;69:21;77:1,4
**most (2)** 11:20;74:7
**mostly (1)** 20:12
**mountain (4)** 10:7,10;29:13;43:19
**mountains (1)** 43:21
**move (1)** 41:1
**moved (1)** 77:3
**much (4)** 33:24;43:17;55:4;77:4
**Mulloy (1)** 15:15
**multiple (1)** 68:23
**Murphy (4)** 56:10,10;62:3,8
**must (2)** 72:2;74:5
**myriad (1)** 11:13

**N**

**name (7)** 4:11,11,13,18;71:16;72:5;81:22
**named (1)** 18:17
**narrative (2)** 60:15,15
**narrow (1)** 60:3
**native (1)** 49:8
**Navex (4)** 12:16,25;13:6,8
**near (1)** 65:24
**necessarily (6)** 16:11;45:4;68:9;71:25;78:14;79:16
**need (3)** 16:11;21:19;46:5
**needs (1)** 11:19
**Negative (1)** 9:17
**Nerioosai (3)** 71:25;72:2,9
**network (3)** 43:13;47:7;48:13
**new (3)** 13:17;43:12,14
**next (3)** 8:22;24:5;48:1
**Nic (1)**

33:8
**Nichols (2)**
33:9,10
**night (1)**
72:12
**nine (2)**
7:9;38:20
**nomenclature (2)**
10:6,8
**none (1)**
60:18
**nonservice (2)**
29:2;47:10
**norm (1)**
34:13
**normal (3)**
15:20;67:15;78:11
**northwest (2)**
10:9;78:17
**note (4)**
25:11;44:12;62:7;
68:8
**notes (10)**
12:23;18:4;61:14,19,
23;62:1,6;66:25;72:10,
17
**notice (3)**
4:25;5:13;63:1
**noticed (2)**
5:20;24:3
**notification (1)**
13:16
**notifies (1)**
19:25
**nuance (1)**
22:11
**nuanced (1)**
21:22
**Number (14)**
6:10;7:25;8:17,20;
9:2;12:20;13:3,4;
26:14,20;46:18;52:11;
54:7;81:20
**numbers (3)**
9:13;45:2;54:6

**O**

**Objection (12)**
17:15;31:16;32:1;
33:18;38:13;60:2;
61:24;62:25;63:19;
69:17,25;71:9
**obtain (1)**
47:7
**Obviously (3)**
39:24;46:5;52:19
**occur (1)**
74:23
**occurred (1)**
41:10
**October (1)**
48:16
**off (2)**
5:4;82:2
**offense (2)**
78:20,20
**offer (1)**
45:4
**offered (1)**
59:4
**office (3)**
54:2;55:8,9
**officer (1)**
59:18
**officers (2)**
59:21,24
**often (2)**
50:23;77:1
**Olds (1)**
57:18
**once (4)**
33:6,21;34:2;51:3
**once-a-week (1)**
51:12
**one (68)**
7:12,17,17,20,23,24;
8:18,20;9:1,2,6;11:24;
15:7;16:5,13,21;21:25;
22:6;23:25;24:12;26:4,
19;27:14;28:21;29:3,
21;30:2,21;32:20;
34:14,19;35:10;36:7,
24;37:24;39:24;40:3;
42:1,19,22;44:12;
45:25;46:1,6;48:16;
49:3,5,23;52:20;54:20;
56:18;58:1,4;59:10;
65:14;66:22;67:10;
68:15;69:21;72:15;
73:19;74:2,3,15,21;
81:12,13,15
**one-off (2)**
59:13;76:7
**ones (7)**
5:24;6:11;9:12;26:4;
42:23;47:17;52:16
**online (2)**
13:21;14:1
**only (3)**
14:13;39:11;73:21
**on-road (4)**
18:6;72:1;76:12;
77:3
**onto (2)**
28:18;29:9
**open (3)**
34:22,25;35:6
**opened (4)**
35:18,21,23;36:1
**operating (1)**
44:22
**operation (1)**
14:20
**operational (1)**
10:8
**opinion (1)**
78:20
**options (2)**
63:18;64:4
**order (2)**
10:20;47:12
**original (1)**
52:4
**Orleans (2)**
43:12,14
**ORS (1)**
18:9
**out (20)**
5:24;19:8;20:20;
26:4;29:13;30:22;44:9;
47:25;50:13,16,18,20;
55:13,15,21,24;57:25;
58:4;67:15;76:8
**outcome (10)**
14:22;25:7,10,14;
26:22;57:7,20;67:5,7,8
**outside (5)**
9:23;12:6;29:14;
74:7;78:24
**over (9)**
7:10;10:5;11:3;13:9;
35:5;41:25;53:10;58:5;
78:1
**oversaw (1)**
11:5
**oversee (1)**
10:6
**overworked (3)**
55:13,15,21
**own (5)**
17:7,8;45:20;64:11;
72:24

**P**

**package (24)**
18:6,11;29:11,16,16,
25;30:5,13;43:18;
44:21;46:2,8,10,13;
47:5;63:15,17;64:4,10,
10,14;65:12;75:20,23
**packages (23)**
7:22;18:13;19:9;
21:14,20;28:23;29:5;
43:13,24;44:9,10;
45:19;48:1,13;50:4;
64:20;72:13;73:13;
75:13,15;76:4,9,20
**packed (1)**
43:21
**page (5)**
18:3;28:9;40:6;
72:16;81:18
**pages (1)**
15:9
**paid (2)**
40:5;76:18
**pandemic (1)**
65:18
**panhandle (1)**
14:19
**paper (1)**
13:20
**paragraph (8)**
19:24;28:16,17;
32:14;40:8;53:24;54:7;
72:19
**parenthesis (2)**
8:7,16
**part (10)**
11:5,6;19:13;27:4;
37:13;39:16;43:3;
57:24;64:21;69:8
**parties (5)**
15:1,17,18;41:25;
49:17
**part-time (3)**
58:21;59:5,6
**party (1)**
56:9
**Pass (1)**
82:1
**past (2)**
27:5;59:20
**pay (2)**
47:18;76:15
**Peck (38)**
4:19;6:4,8,13,22;
11:8,23;15:14;17:22;
19:17;27:2,11;30:9,19;
32:9;36:25;37:3;38:18;
39:3;60:7,10;61:5,7,13,
17;62:16;63:6,7;70:3;
71:23;72:12;74:11,15;
77:8,8,18;79:18;81:6
**Peck's (4)**
31:6;37:21;49:18;
71:6
**peer (1)**
53:20
**people (11)**
4:21;12:22;15:11;
36:19;59:11;63:15;
64:4;67:16;69:16;
71:14;78:8
**percent (1)**
45:5
**performance (5)**
76:22,24;77:9,12;
79:1
**performed (2)**
6:21;57:18
**Perhaps (2)**
22:25;43:10
**person (12)**
15:20,24;16:7;29:15;
32:10;39:14;54:22;
55:7;67:23;76:22;
78:21;81:25
**personal (1)**
79:17
**personally (1)**
41:6
**personnel (2)**
21:16;24:7
**person's (1)**
24:14
**phone (12)**
17:9;37:3,9,11,12,21,
24;62:14,15,20;67:25;
68:7
**phones (5)**
12:22;17:4,7,8;39:15
**phonetic (1)**
7:21
**physical (1)**
51:14
**physically (1)**
51:1
**pieces (1)**
45:18
**place (3)**
28:23;29:1;79:24
**plaintiff (1)**
4:5
**plan (3)**
76:22,24;77:9
**plans (3)**
76:16,17;79:2
**planting (1)**
59:23
**please (5)**
6:1;60:4;66:17;
67:11;69:22
**pm (8)**
4:1;15:19;30:4;
40:22,23;80:20,21;
82:4
**point (6)**
5:24;13:1;16:21;
25:4;36:25;45:9
**points (1)**
54:19
**policies (2)**
65:9;81:21
**policy (16)**
17:3;24:10;41:23;
60:14,25;64:23;65:8;
70:14,16,18;78:12,14,
15;80:10,11;81:20
**populating (1)**
26:15
**portable (1)**
21:12
**position (5)**
9:25;52:13;53:7,8;
59:4
**possession (1)**
37:20
**power (1)**
46:10
**practice (2)**
75:7,10
**preliminary (2)**

67:16;68:3
**preload (1)**
44:14
**preparation (2)**
9:15,19
**prepare (1)**
7:7
**prepared (3)**
36:23;38:17,20
**preparing (2)**
12:7,7
**present (5)**
15:21,24;32:11,14;53:21
**previous (3)**
20:12;41:22;54:4
**previously (4)**
15:4;18:25;26:2;27:13
**prior (3)**
33:10;38:21;52:14
**probably (3)**
11:20;18:7;34:14
**problem (1)**
68:20
**proceeded (1)**
4:1
**process (4)**
14:10;20:1;21:6;64:21
**processed (1)**
44:13
**processes (1)**
63:21
**processing (1)**
45:19
**produced (2)**
4:4;62:11
**professionals (1)**
13:11
**profile (1)**
10:2
**program (1)**
48:10
**promoted (2)**
53:8;64:18
**property (1)**
45:19
**provide (3)**
13:4;63:25;79:8
**provider (4)**
45:11;62:20,22;63:10
**providing (1)**
17:25
**prudently (1)**
44:4
**pull (5)**
42:18;48:25;71:12;74:21;79:6
**pulled (1)**
39:24
**pulling (1)**
37:17
**purposes (1)**
17:9
**pursuant (1)**
4:20
**pushed (1)**
51:16
**put (12)**
23:4;29:12,16;47:13;67:10;72:13,22;73:3,13;76:16,22;77:8
**puts (1)**
33:6
**putting (1)**
58:11

**Q**

**QIP (1)**
64:21
**qualify (1)**
68:12
**quality (2)**
41:17,21
**quick (3)**
18:24;40:4;80:24
**quote (1)**
46:6
**quote-unquote (2)**
22:1;44:20

**R**

**raised (1)**
53:24
**raises (1)**
77:6
**rather (2)**
34:18;57:25
**RE (1)**
7:21
**read (5)**
20:4;22:17,23;26:21;33:23
**reading (4)**
15:13;27:20;65:5;74:14
**real (2)**
26:9;40:4
**realization (1)**
75:21
**really (4)**
31:23;47:16;51:15;52:21
**reason (3)**
33:3;49:24;75:22
**reasons (1)**
13:2
**reattempt (1)**
46:6
**Rebekah (1)**
15:15
**recall (6)**
14:22;42:6,9;54:13,19;55:20
**recalled (1)**
72:10
**receive (2)**
11:16;13:16
**received (7)**
22:18;23:17;24:1;65:4;66:10;67:13;77:20
**recently (3)**
27:11;51:22,24
**recess (2)**
40:22;80:20
**recognize (1)**
26:2
**recommendations (1)**
24:18
**reconsider (1)**
51:22
**record (10)**
4:11;5:4;13:20;22:15;35:25;40:25;54:18;68:1;73:11;82:2
**recorded (9)**
12:20;16:25;17:2;60:19,20;61:20;64:11,15;73:17
**records (4)**
7:5;36:4;62:14,23
**recover (1)**
63:9
**recoverable (1)**
62:21
**Redding (2)**
31:8;36:16
**reduced (1)**
45:2
**redundant (1)**
80:6
**refer (2)**
14:18;52:19
**reference (1)**
79:7
**referenced (3)**
25:15;64:24;80:13
**references (1)**
33:8
**referred (2)**
24:11;57:3
**refine (1)**
49:10
**reflect (2)**
68:22,25
**reflected (3)**
32:17;73:5;79:5
**refund (3)**
47:4,8,11
**refunds (1)**
75:18
**regarding (17)**
6:13,17,21;24:13,18;32:20;36:24;37:1,9;38:7,17,18;41:1;67:1;68:15;69:24;79:1
**Reinhardt (17)**
6:17,22;23:17;41:2,3;45:10;66:3,12,20;68:11;70:3;71:2;74:18;77:19,20;78:7;81:14
**Reinhardt's (4)**
49:24;66:1,18;77:14
**relate (1)**
9:21
**related (12)**
6:3,7,16,20,24;7:3;11:25;14:2;30:19;36:9;63:25;77:7
**relative (1)**
70:13
**Relatively (1)**
68:13
**relook (1)**
60:7
**relying (1)**
60:21
**remaining (1)**
72:13
**remember (4)**
12:9;56:15,21;81:23
**remote (2)**
28:19;29:10
**removed (1)**
58:12
**repeat (2)**
28:5;31:12
**report (23)**
8:3,15;13:8;25:14,18,23;27:20;30:12;33:5;34:7;37:6,7;39:5;46:22;56:23;58:12;64:4,20;68:3;71:2,6;73:6;81:9
**reported (4)**
54:1;56:9;64:12;72:25
**reporter (1)**
35:12
**reporting (20)**
6:13,17,25;12:15;20:3;21:6;37:1,9;38:7,19,25;54:5;63:14,18,25;70:9,21;75:3,11;77:17
**reports (3)**
25:18;61:12;67:16
**representative (6)**
4:24;5:8;16:12;31:4;32:17;38:11
**represented (1)**
56:20
**request (6)**
15:24;40:10;62:19,23;66:9,11
**requested (1)**
16:5
**requests (2)**
40:11,13
**required (1)**
46:4
**requirement (1)**
75:3
**requirements (13)**
6:14,18,25;37:1,10;38:8,19;39:1;51:15;63:14;64:1;70:9,22
**re-reviewed (1)**
81:5
**resources (1)**
24:16
**respected (1)**
52:20
**respond (1)**
16:15
**responded (1)**
18:17
**responses (1)**
66:9
**responsibility (1)**
70:15
**responsible (1)**
46:7
**rest (1)**
58:17
**restate (4)**
17:16;49:10;52:3;61:10
**result (5)**
17:12,14,19,20;68:21
**resulting (1)**
24:10
**retain (2)**
23:2;48:19
**retired (3)**
42:14;66:3,12
**retrained (4)**
15:2;17:13,14,23
**retraining (6)**
18:1;19:7,11;79:8,12,14
**return (1)**
58:16
**returned (2)**
42:13;59:1
**reverse (1)**
14:8
**review (9)**
9:9,18;12:6;30:15;41:13,16;65:2;79:23;80:2
**reviewal (1)**
80:11
**reviewed (8)**
7:6,9;28:2;33:5;38:21;42:20,23;81:8
**reviewing (4)**
12:2,10;22:4;41:18
**reviews (3)**

36:16;60:14,25
**Rexburg (12)** 9:6;12:18;14:16; 15:1,7;18:9;20:8;22:2; 25:1;27:12,17;33:14
**Richardson (5)** 49:6;72:3,6,7,17
**Ricky (3)** 7:10;63:3;80:23
**right (29)** 4:10,14;5:11;6:2,11; 7:5,16;9:14;15:24; 18:23;22:8;23:22; 26:12,17;28:13;36:24; 40:17;42:19;43:11; 44:3;48:4;49:14;64:2; 71:14,16;73:18;74:8; 76:10;81:6
**road (12)** 29:19;44:8,11,24; 45:15,16,18,22;65:19; 73:1,8,17
**Rob (1)** 56:16
**role (5)** 25:4;39:13;41:16,17; 77:4
**route (1)** 43:19
**Rule (4)** 4:20;5:13;16:17; 34:10
**rules (1)** 18:12
**run (1)** 76:14
**running (2)** 44:5;46:21

## S

**safely (1)** 43:22
**Salt (1)** 47:14
**same (15)** 9:10;19:12,16;26:21; 33:13,13;38:1;44:23; 49:17;50:13,14;65:21; 69:25;75:2;77:21
**Saturday (1)** 72:11
**saying (7)** 6:10;29:4;34:16; 38:24;53:25;67:22; 73:18
**scan (14)** 18:13;22:1;27:15; 29:2,19;30:19;43:2,7,9, 24;44:17,18,20;45:13
**scanned (6)** 30:1,4,6,13;44:14; 47:8
**scanner (5)** 20:25;21:10,11,12, 15
**scanning (2)** 7:21;21:14
**scans (3)** 28:20;43:6;45:2
**scheduled (1)** 46:3
**scope (3)** 63:1,10;69:17
**Scott (3)** 72:3,7,17
**screen (3)** 5:17;16:22;23:16
**screens (2)** 32:5,6
**scroll (7)** 5:20;18:2;19:3; 23:10;28:8;57:15; 81:17
**SEAS (2)** 48:8;49:1
**second (14)** 7:20,24;23:10;26:13; 32:6;40:8;51:5;54:7; 71:16;72:19;75:5; 77:15,16;78:20
**secondary (1)** 47:1
**security (32)** 10:1,3,3,6,7,12,14, 21,21;11:2,11,12,14, 16;14:14,16;16:7,14; 17:4;24:17;25:14;27:4; 33:25,25;35:3;39:13, 14;51:14,20;56:4,13; 59:11
**security's (1)** 25:4
**seeing (1)** 30:6
**seem (1)** 81:19
**seems (15)** 20:15;22:18,24;24:1; 45:16;48:16;53:6; 55:11;56:19;73:12; 74:7,11,15;75:7;80:6
**send (4)** 13:9,12;58:5;67:15
**sending (1)** 19:8
**sends (1)** 48:1
**sense (2)** 30:2;74:6
**sent (9)** 13:14;20:4,8,20; 23:14;37:8;39:10,25; 62:9
**separation (1)** 76:25
**September (4)** 32:9;33:23;72:11; 74:6
**service (35)** 12:17;14:25;29:2,8, 14,19,21;43:2,6;44:6, 20,23;45:11;46:9,15, 19,22;47:2,4,8,11; 48:11;58:13;64:8,10, 10,12;68:19,23;70:17; 75:17;76:6,10,14; 78:18
**serviced (2)** 18:14;46:25
**services (1)** 75:20
**servicing (2)** 75:25;76:3
**set (1)** 34:15
**several (5)** 4:25;5:8;27:13; 54:19;59:2
**sexual (2)** 53:18;56:12
**shared (2)** 16:22;20:15
**sharing (6)** 7:8;24:2;25:13;32:5, 6;54:1
**sheet (4)** 18:19;20:17;21:3; 22:16
**shipments (1)** 47:20
**shipper (2)** 47:16,23
**short (1)** 42:13
**shorter (1)** 50:12
**show (13)** 5:12;15:3;19:19; 26:1,17;28:6;66:4,6,8; 67:4,12;79:21,24
**showed (2)** 18:6;22:19
**showing (6)** 13:24;18:12;22:15; 25:22;27:25;49:21
**shows (4)** 26:13;30:13;39:21; 54:15
**sign (2)** 20:5;23:4
**signature (2)** 46:4,5
**signed (9)** 20:7;22:15,18,18; 23:5;65:4;78:7;81:10, 24
**similar (1)** 78:7
**simplest (1)** 45:24
**sit (1)** 34:22
**site (1)** 12:15
**slate (1)** 75:8
**slotted (1)** 74:19
**snow (1)** 43:21
**snuff (1)** 60:8
**somebody (1)** 78:17
**someone (14)** 15:23;45:13;55:24, 25;59:23;63:24;64:17; 68:4;70:23,24,25;71:7; 73:12;74:8
**sometimes (2)** 16:23,24
**somewhere (1)** 32:11
**sorry (14)** 5:2;7:20,23;9:2; 18:23;45:6;57:23; 69:21;71:10,21,25; 75:5;81:13,14
**sort (8)** 15:21;26:15;28:22; 41:21;42:12;53:18; 56:11;78:15
**sorts (2)** 22:11;48:12
**Sounds (3)** 40:20;71:16;80:19
**space (1)** 54:2
**speak (4)** 9:14;14:13;21:4; 36:24
**speaking (3)** 5:25;30:18;40:12
**speaks (2)** 20:14;31:3
**special (1)** 22:24
**specific (4)** 34:9;54:13;57:2; 63:22
**specifically (10)** 12:10;14:15;21:9; 27:10;30:18;31:3;34:2, 11,21;53:16
**specifics (1)** 73:11
**speculate (1)** 73:15
**spell (1)** 4:11
**Spelling (1)** 4:12
**spending (1)** 55:5
**spoke (5)** 9:21;54:10,12;72:11; 75:17
**spoken (2)** 4:21;78:21
**staff (3)** 24:14,20;25:19
**stage (1)** 80:11
**stages (1)** 33:20
**standard (1)** 53:25
**stands (1)** 48:10
**start (3)** 15:5,16;48:7
**started (6)** 14:10,11;35:10;48:5; 54:8,16
**starting (3)** 40:9;81:12,21
**state (5)** 4:10;31:21;71:2,10; 74:4
**stated (9)** 23:13;28:24;42:19; 62:2;65:3;71:25;73:23; 81:3,8
**statement (5)** 45:3;49:6;61:4; 81:20,25
**statements (6)** 60:13,24;81:9,10,23, 24
**states (7)** 18:5;28:15;32:8; 40:8;65:10;71:3;74:1
**states' (1)** 51:11
**stealing (1)** 54:21
**STEGELMEIER (34)** 4:9,18;5:5,11,16; 17:18;31:17;32:4; 33:21;38:16;40:17,21, 24;52:23;53:2;57:24; 58:3,7;60:5;62:2;63:2, 5,13,23;66:4,8;69:19; 70:2;71:11,20,22; 80:14,22;82:3
**step (1)** 24:5
**steps (3)** 7:6;56:25;57:2
**Steve (9)** 15:15;18:22;19:13, 24;20:1,8,10,14;65:1
**Steven (1)** 31:7

**still (13)**
10:17;44:20;45:11;48:18,23;49:7,12;51:5;57:24;58:11,11;76:23;78:8
**stop (3)**
7:8;24:2;32:5
**stops (1)**
25:5
**stored (1)**
22:22
**straight (1)**
42:2
**stressed (3)**
55:13,15,21
**stroke (2)**
73:6,7
**strong (1)**
51:20
**struggling (1)**
46:19
**stuff (6)**
5:7;14:4;23:4;55:14;73:25;78:9
**subject (2)**
35:2,3
**submission (1)**
35:6
**submit (1)**
34:1
**submitted (3)**
33:11;41:14;61:4
**subordinates (5)**
37:9;38:7,24;54:19,21
**subsequently (1)**
80:8
**substantiated (11)**
24:9,24;25:3;30:7;41:23;42:7;43:3;50:3;54:23;57:8;80:11
**suggested (1)**
39:5
**suggesting (1)**
69:11
**summary (13)**
8:6,12;15:11;26:7;40:4,16;52:25;57:14,17;58:14;61:20;73:22;81:16
**supervisor (17)**
12:3;14:17;19:15;22:25;33:25;50:9;51:20;56:13;58:21;59:6,7;65:1;67:2;72:1;73:24;76:12;77:3
**supervisors (4)**
20:12;28:25;51:13;65:2
**suppose (7)**
11:17;18:19;43:17;52:20;54:20;59:2;63:21
**supposed (3)**
29:11;43:7;78:6
**sups (1)**
28:22
**sure (19)**
4:20;6:10;13:23;14:5;20:9;28:1;36:2,2,21;38:14,25;43:14;46:24;48:23;59:1;66:24;71:1;74:3;78:7
**SurePost (2)**
28:18;29:8
**surmise (1)**
15:17
**surprise (2)**
61:7,16
**surrounding (1)**
68:18
**sworn (1)**
4:5
**system (4)**
13:16;19:24;35:19;48:19

**T**

**tablets (1)**
38:1
**talk (1)**
51:13
**talking (5)**
15:6;18:24;47:9;53:3;57:10
**tasked (1)**
53:17
**team (1)**
22:2
**Teams (1)**
16:23
**teasing (1)**
45:7
**telephone (1)**
17:2
**telling (1)**
55:20
**template (2)**
18:12,20
**temporarily (1)**
58:21
**ten (2)**
40:18,21
**ten-minute (1)**
80:15
**terminate (9)**
6:3;7:4;31:5,14,19;36:10,11;63:7;77:7
**terminated (13)**
37:21;42:15,17;49:25;58:9;59:19;66:2,16,19,20;76:19;77:10;78:9
**termination (1)**
6:8
**terms (1)**
45:24
**territory (1)**
10:7
**testified (3)**
4:6;30:8,10
**testify (1)**
38:17
**text/interview (1)**
18:4
**Theoretically (1)**
76:21
**Therefore (1)**
60:16
**third (4)**
5:13;8:2;53:24;72:7
**third-party (3)**
12:16,19;13:1
**though (8)**
16:9;22:8,14;57:25;62:6;70:22;74:8;78:6
**three (6)**
11:20;34:14;51:8,11;69:2,7
**three-quarters (1)**
19:22
**Thueson (2)**
49:6;81:22
**times (2)**
51:8;65:4
**titled (6)**
7:13,17,18;9:6;52:21;81:15
**today (4)**
4:23;9:15;46:3;62:17
**Todd (2)**
53:24;54:20
**Todd's (2)**
54:19;55:2
**together (1)**
33:6
**told (4)**
31:23;70:25;71:8;72:12
**took (2)**
5:6;57:2
**top (4)**
15:5;26:12;32:13;35:9
**topics (3)**
4:25;5:9;13:3
**towards (2)**
17:21;28:13
**track (1)**
34:20
**trained (3)**
28:22,25;73:24
**training (6)**
20:2,14;29:24;51:15;64:16;77:21
**translated (1)**
29:25
**transmission (1)**
76:8
**transmitted (5)**
25:18;33:14;36:5;49:16;67:2
**triage (1)**
13:11
**trouble (2)**
19:20;72:5
**Troy (12)**
18:17;30:22;31:8,10,13,18,23;36:5;39:11;68:15,18;77:23
**Troy's (2)**
31:24;32:2
**truck (5)**
29:12,13,13;47:13;76:9
**try (1)**
4:17
**trying (4)**
30:24;47:25;73:2,12
**turnaround (2)**
33:16;34:10
**Two (8)**
10:13;20:10;69:2,7,16;70:13;75:1;80:24
**two-strike (2)**
78:11,14
**type (1)**
16:1
**typed (1)**
14:3
**types (1)**
78:15
**Typically (9)**
21:16;25:11;35:1;43:10;47:20;51:10;64:17;65:19;73:10

**U**

**ultimate (1)**
57:6
**Ultimately (7)**
25:6;32:2;36:11;54:22;55:23;58:22;80:5
**unable (3)**
43:20;64:9,10
**under (8)**
35:1;50:10;64:8,15;70:6,14,21;71:13
**understood (5)**
14:5;30:3;36:21;69:6;71:1
**uniform (1)**
65:9
**United (1)**
65:10
**unsubstantiated (1)**
54:2
**unto (1)**
41:20
**up (20)**
4:16;18:3;23:10;28:17;31:13,24;35:9;42:18;47:13;48:25;53:25;54:16;55:12;60:8;71:12;74:21,21;79:6,22,24
**update (1)**
26:15
**upon (2)**
11:18;80:10
**UPS (38)**
5:8,14;9:25;10:8,9,15,17;13:7,9,10,13;17:3,4,6;25:13;27:3;29:9,15;31:4;37:4,20;38:2;39:14;44:2;46:7;47:2;48:10;51:11;62:22;64:9;66:3,10,13;68:20;70:14,17;75:19;80:10
**UPSers (1)**
48:12
**UPS's (3)**
36:9;45:20;46:12
**use (6)**
21:12;22:19;29:3;43:1,18;74:16
**used (6)**
21:22;22:6;27:15;30:17;43:8,10
**using (4)**
22:2;45:10;74:22;75:1
**usually (1)**
25:18

**V**

**Vacek (1)**
57:18
**validate (1)**
42:22
**various (2)**
9:21;11:17
**vehicle (2)**
44:5;45:20
**verify (1)**
60:11
**versus (2)**
64:8,12
**vest (1)**
36:20
**Via (5)**
25:20;33:14;49:16;68:5,7
**video (1)**
59:21
**violate (1)**
70:17
**violates (1)**
80:10

**violation (5)** 24:10;77:12,13; 78:16;80:12
**violations (1)** 41:23
**virtual (1)** 51:1
**visibility (1)** 46:23
**volume (3)** 44:13;45:5,11

## W

**walk (1)** 20:23
**way (11)** 13:21;14:8;19:22; 26:21;31:21;42:4;48:1, 12;73:25;78:6;81:17
**ways (2)** 11:14,20
**weather (2)** 8:16;64:13
**website (1)** 13:4
**week (2)** 51:3,8
**weekly (2)** 51:9;74:23
**weeks (1)** 34:14
**weren't (1)** 46:8
**What's (14)** 4:22;8:20,22;9:1,25; 12:12;21:11;33:16; 34:24;41:16;43:7; 44:17;48:8;73:21
**whenever (1)** 62:18
**wherein (1)** 58:20
**willfully (3)** 43:1;71:3;78:8
**William (3)** 9:7;11:24;64:24
**within (9)** 13:13;14:25;29:9; 34:16,17;68:23,24; 69:3,16
**without (1)** 65:5
**witness (13)** 4:4;17:16;32:2; 33:19;38:14;60:3; 61:25;63:20;70:1; 71:10,21;81:8;82:1
**witnesses (1)** 81:10
**Wood (1)** 56:16
**Word (3)** 48:22,23;49:11
**work (9)** 17:9;21:16;34:4; 37:21,23;50:6;55:3; 58:16;59:2
**worked (1)** 76:23
**working (3)** 55:5,7;58:25
**worries (1)** 40:5
**worth (1)** 51:11
**write (3)** 63:15,16;66:5
**write-up (1)** 57:13
**written (1)** 60:22
**wrong (9)** 29:12,17,24;30:3; 47:13;48:1,9;63:2; 81:13
**wrote (1)** 62:8
**Wyoming (2)** 11:5;53:11

## Y

**year (8)** 20:9,10,10;50:10; 58:17;65:17,17;77:18
**years (3)** 10:13;43:15;52:14
**Yep (2)** 39:19;57:15
**yesterday (1)** 42:25

## Z

**zero (1)** 43:6
**Zoom (1)** 16:23

## 0

**001441 (1)** 8:1
**001923 (1)** 8:21
**002 (1)** 8:7
**002486 (1)** 9:3
**0674 (1)** 42:22

## 1

**1 (3)** 26:18;46:18;81:19
**1,463 (1)** 26:19
**1:31 (1)** 40:22
**1:42 (1)** 40:23
**10 (4)** 5:12,15;7:22,22
**11 (5)** 6:24;52:24,24;53:1; 57:25
**12 (4)** 54:9;58:1,4,6
**12:00 (1)** 15:19
**12:17 (1)** 28:14
**12:30 (1)** 4:1
**13 (2)** 66:7,9
**1351 (1)** 33:2
**13th (2)** 36:12,13
**1424 (2)** 33:2,24
**1-800 (2)** 12:15,20
**19 (1)** 43:15
**1st (1)** 26:18

## 2

**2 (6)** 6:2;7:24;18:25; 30:20;40:6;81:19
**2,486 (1)** 43:5
**2:00 (1)** 30:4
**2:45 (1)** 80:20
**2:55 (1)** 80:21
**20 (1)** 35:11
**2019 (1)** 7:22
**2021 (21)** 7:4,14;8:10,15;9:7; 10:22,23;11:1,23;16:4; 33:23;41:10;42:5,10; 54:9;55:17;66:16,19, 21;77:18;78:17
**2021-12 (1)** 54:8
**2022 (10)** 6:25;8:13,25;51:25; 52:2,3,7;64:1,19;81:3
**2023 (3)** 7:4;26:8;52:1
**21 (5)** 8:4;26:18,18;40:9; 72:11
**21-MTN (1)** 26:13
**22 (1)** 58:17
**23 (1)** 58:18
**24th (2)** 40:9;55:11
**28 (1)** 33:23
**28th (2)** 32:9;48:16
**29 (1)** 48:3
**29th (1)** 26:8

## 3

**3:12 (1)** 82:4
**30b6 (3)** 4:20;5:13;63:1
**30-minute (2)** 61:8,12
**31 (1)** 72:20

## 4

**4 (5)** 6:6;8:3;72:11,16; 74:6
**40 (2)** 26:19;30:23
**4th (2)** 30:4;77:23

## 5

**5 (5)** 6:12;8:3;15:4;28:9; 38:11
**5-28-2021 (1)** 15:19
**572 (1)** 26:19
**5th (1)** 54:15

## 6

**6 (7)** 6:16;26:2;32:7,23; 49:4;71:20;81:18
**60 (2)** 35:1,5
**60-day (1)** 48:5

## 7

**7 (3)** 28:9;72:16;81:18

## 8

**8 (1)** 66:12

## 9

**9 (1)** 6:20