# EXHIBIT M

**In The Matter Of:**

*PECK vs.*

*UNITED PARCEL SERVICE, INC.*

---

*ALECIA TODD*

*February 28, 2024*

---

*T&T Reporting, LLC*

*477 Shoup Avenue, Suite 105*

*Idaho Falls, Idaho 83402*

*(208) 529-5491*

**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

HEIDI PECK, an individual, )
Plaintiff, ) Case No.
vs. ) F:22-cv-00381-AKB
UNITED PARCEL SERVICE, INC., an Ohio corporation, )
Defendant. )

DEPOSITION OF ALECIA TODD

Wednesday, February 28, 2024, 9:00 a.m.

BE IT REMEMBERED that the deposition of Alecia Todd was taken by the attorney for the plaintiff by Zoom before Sandra D. Terrill, Court Reporter and Notary Public, in and for the State of Idaho, in the above-entitled matter.



A P P E A R A N C E S

For the Plaintiff:
HALL ANGELL & ASSOCIATES, LLP
BY: CORY R. STEGELMEIER
1075 Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
(208) 522-3003
crs@hasattorneys.com

For the Defendant:
SCHMOYER REINHARD, LLP
BY: RICHARD L. CLIFTON, JR.
8000 IH 10 West, Suite 1600
San Antonio, Texas 78230
(210) 447-8033
rclifton@sr-llp.com



E X A M I N A T I O N


| ALECIA TODD | Page |
|---|---|
| BY MR. STEGELMEIER.......................... | 4 |


E X H I B I T S


| No. | | Page |
|---|---|---|
| Exhibit 8. | Notice of Deposition Duces ...... Tecum of Alecia Todd | 6 |
| Exhibit 9. | EDR Program Manual............... | 32 |




(The deposition proceeded at 9:00 a.m. as follows:)

Alecia Todd, produced as a witness at the instance of the plaintiff, having been first duly sworn, was examined and testified as follows:

EXAMINATION

**BY MR. STEGELMEIER:**

**Q. Ms. Todd, my name is Cory Stegelmeier. I represent Heidi Peck in a lawsuit that she has brought against UPS.**
**Can you state your full name and spell your last name for the record.**
A. Yes, Alecia Tylynn Todd. T-o-d-d is my last name.
**Q. Okay. And where do you currently reside, Ms. Todd?**
A. I physically live in Camas, Washington.
**Q. Okay. And who lives there with you?**
A. My husband and my children.
**Q. Okay. So this -- have you ever had your deposition taken before, Ms. Todd?**
A. Yes.
**Q. In what instances was your deposition taken?**

A. As part of a different case that we had with UPS that ended -- yeah.
**Q. Just once or multiple times?**
A. One time. Many years ago. Yep.
**Q. So you're probably a little familiar with the rules. I'm going to review just a few brief, just so that we make sure that we're all on the same page.**
**It probably wasn't by Zoom, was it, your previous deposition?**
A. No, not by Zoom.
**Q. Probably before this whole new world opened up to us.**
**It's important that we don't speak over each other. Sandy will be recording everything we say. It's easier for her if you let me finish my questions and I let you finish your answers. It's especially true with Zoom. It's a lot -- in day-to-day life we tend to speak over each other anyway, but on Zoom it's even more so. So if you can wait for me to finish my question before you start your answers and I'll do the same for you. Does that make sense?**
A. Yes, that makes sense.
**Q. You passed the second test. The second**



**thing I was going to note is answer with yes and nos and verbal answers. The uh-huhs and head nods and things like that don't come through so well. So if you'll remember that.**
**And the final thing I just want to make you aware of, there may be times that Mr. Clifton will make objections. Unless he instructs you not to answer, the objections are mostly for the record for later discussion with the court. There's not a judge here today to rule on objections, so after an objection, I'll still have you answer the question unless he instructs you otherwise.**
**Does that work for you?**
A. Yes.
**MR. STEGELMEIER:** All right. I'm going to go ahead and show you then to start out -- this will be Exhibit 8. The numbers don't make sense because we're continuing on from a deposition that was taken yesterday.
(Exhibit 8 marked.)
**Q. BY MR. STEGELMEIER: Are you seeing a notice of deposition for Alecia Todd?**
A. Yes.
**Q. I believe I misspelled your name and I apologize for that.**



**Have you done anything to prepare for this deposition?**
A. Have I done anything?
**Q. Besides talk to your attorneys.**
A. No.
**Q. Okay. Did you review any documents in preparation for this deposition?**
A. No.
**Q. Did you receive a copy of this notice of deposition?**
A. Yes.
**Q. Okay. On the second page -- so it's a deposition duces tecum. It's a fancy word. I think it means "bring with you." To be honest, I don't know half of what the legal words mean, but it's where we list out some things we would like you to look at and see if you have anything responsive to this.**
**So in preparation for this deposition, did you see if you had any materials, writings, documents that would be relevant -- I guess you didn't review anything so the first one doesn't make sense.**
**The second one, do you have any records or recordings relating to the termination of Heidi**



**Peck?**
A. I do not.
**Q. Okay. Do you have any notes or documents or e-mails related to Ms. Peck?**
A. I do not.
**Q. So are you currently employed by UPS?**
A. I am.
**Q. What's your current position?**
A. My current position is an HR business partner for the northwest district.
**Q. What kind of -- go back a little bit. What kind of education after -- or training after high school did you have for that? Did you attend any college, I guess? Let's clear it up.**
A. Yes, I attended college.
**Q. Where did you go to college?**
A. I went to two different colleges. I went to University of Alaska Anchorage, and then I went to an online college through the Edcor program.
**Q. When did you go to the University of Alaska Anchorage?**
A. A year after high school, so 1998.
**Q. Okay. Did you obtain a degree from the University of Alaska?**
A. No.

Page 9

**Q. Okay. How long did you go there?**
A. Approximately 2 1/2 years.
**Q. And then what was the online university you said you went to?**
A. It was Edcor. So it was an online program, a degree-completion program.
**Q. Okay. And when did you do your online stuff?**
A. I did that from 2021 until 2022.
**Q. Okay. Did you obtain a degree from them?**
A. No.
**Q. So after you left the University of Alaska, did you go to work somewhere or what did you do after Alaska?**
A. I feel like that was two questions. Which question --
**Q. What did you do after you left the University of Alaska?**
A. What did I do for what? What is --
**Q. Just in general. Did you go -- did you start employment?**
A. I started multiple part-time jobs out of college and then got a part-time job at UPS.
**Q. When did you start working for UPS?**

Page 10

A. Okay. I started working for UPS in 1999 -- '98, '99.
**Q. While you were still in Alaska?**
A. That is correct.
**Q. What was your first job at UPS?**
A. My first job at UPS, I was an administrative assistant.
**Q. Okay. When did you switch over to the HR side?**
A. Not until 2018.
**Q. Do you have any special training or certificates with regard to your HR work?**
A. Yes.
**Q. What are those?**
A. There's going to be a lot to list. There aren't -- I could answer the question easier by saying there aren't any outside of UPS. They are all internal trainings within UPS, so they wouldn't be recognized outside of UPS.
**Q. Okay. Because I know I did a deposition of an HR specialist a while ago, and they had some national accreditation board or something like that.**
**So everything that you have with UPS is internal to UPS?**
A. That is correct.

Page 11

**Q. That makes it easier. So in 2018 when you switched to the HR side, what was your title or -- yeah, what was your title?**
A. My title was full-time supervisor HR specialist.
**Q. What does a full-time HR supervisor -- or full-time supervisor HR specialist do?**
A. We were responsible for the onboarding of --
**Q. Okay.**
A. Yeah, onboarding. And then we had a large section of supporting the other operations groups. So it was more of a support function. There's a very long list of things that I was responsible for.
**Q. Okay. When you say other -- supporting other groups, what other groups are there at UPS?**
A. Specifically the operations group is a large majority.
**Q. Okay.**
A. But there are also other support functions such as safety and labor.
**Q. Okay.**
A. There's various groups.
**Q. All right. What was your position in**

Page 12

**2021, in December of '21 specifically?**
A. My position in December of 2021 was an HR manager, and the title was an area HR manager.
**Q. How is the HR group's -- so let me -- I'm just trying to wrap my head around this. So HR is a different division from operations at UPS, correct?**
A. Yes.
**Q. So you don't necessarily answer to anyone in the -- on the operational side; is that correct?**
A. That is not correct.
**Q. So you answer to -- are you under then an operational manager?**
A. That is not correct. There is a hierarchy of a dotted line and a solid line. So I have a solid line to an HR director and an HR vice president. And then I have a dotted line of responsibility to a -- the president of the district who is operations.
**Q. Okay. On the HR side how are your -- how is that different levels, different -- I guess is an area manager, HR manager area manager, different than a full-time supervisor HR specialist?**
A. I don't understand the question exactly.

**Q. Okay. So 2018 you were a full-time supervisor and HR specialist, correct?**
A. Yes.
**Q. And then by 2021 you were an HR manager area manager?**
A. Yes.
**Q. Is there a difference there or just different title?**
A. There is a difference.
**Q. Is it a promotion from full-time supervisor HR specialist to HR manager area manager?**
A. You are correct.
**Q. So what does the HR side look like? I know on the operational side you have your districts, your divisions, your regions, your zones. How is the HR side divided?**
A. So in district we have our own hierarchy of HR representatives. So the northwest district would have an HR section. And within that section you would have various different levels of nonmanagement and management.
**Q. Okay. So what's the bottom of HR? As you come into HR, where do you start?**
A. The bottom -- so the lower hierarchy, is that what your question is?



**Q. Yes, the lowest.**
A. The lowest hierarchy would be an internship or an entry-level administrative employee.
**Q. Okay.**
A. That's the first --
**Q. So go from that.**
A. So from that there would be a part-time supervisor or a full-time supervisor, depending on your area.
**Q. Okay.**
A. And then from that there would be a -- there could be different levels of manager, but there's -- a manager mix is a progression, depending on -- depending on your area of responsibility, managers are different. So you can be promoted into multiple different responsibilities depending on your title.
**Q. Okay. And then in 2021 you were the HR manager -- you were an area manager then?**
A. That is correct.
**Q. Who did you report to in 2021?**
A. 2021 I reported to a director Steve Redding.
**Q. Okay. And he was the regional director?**
A. He was the district -- the northwest



district director.
**Q. Okay. What were your duties as an area manager?**
A. My duties included the managing of our team. So all the employees that were -- reported up to me. We had a vast amount of tasks and responsibilities. It's anything from onboarding and hiring, employee issues, teaching and training, coaching, counseling. We manage a lot of the labor-specific regulations to make sure that we were within compliance for those for each individual area.
**Q. Okay. How many employees were under you?**
A. At the time approximately between 15 and 20 employees during 2021.
**Q. How many employees are under you now?**
A. I have no employees now.
**Q. You have no employees, okay.**
**Is HR UPS generally involved in disciplining employees?**
A. I don't understand what "involved" would be specific to in your question.
**Q. Are you consulted prior to employee discipline?**
A. Are we consulted prior to employee



discipline? Yes.
**Q. Okay. What kind of role do you play in that? Is it just checking boxes or do they -- is it a collaborative effort?**
A. It would depend on the case. It would depend on the scenario. It could be a very -- depending on the situation.
**Q. Okay. If someone came to you and said I'm firing this person, what would be your response?**
A. I would need a lot more detail in order to respond to that.
**Q. If they just said, "Hey, I'm the zone president; I'm firing this person"?**
A. Is the question in my current role or the question in 2021?
**Q. 2021.**
A. Okay. So let's repeat your question and I'll get it closer to it.
**Q. So we'll pretend that I am a district manager and I come to you and say, "I'm firing employee X. I've made up my mind; I'm firing them," what would you say to me?**
A. I would say we would need to have a review and we would need to gather all of the information. We would have to include all of the

decision makers, and we would have to schedule something in order to decipher what happened.
**Q. So what kind of stuff are you reviewing before you make a disciplinary -- a termination decision?**
A. It would depend on the case. It's very specific in each case. So an example I would be able to give a better -- what we would require, but they are specifically different.
**Q. Would you look at, like, employee history for that?**
A. No, termination cases are based off of -- primarily they're based off of an investigation typically, an investigation into events that would have taken place. And then that information would have been reviewed at different levels depending on the type of employee that it involved.
**Q. What are you reviewing that information for?**
A. What would my role --
**Q. Yes.**
A. -- be in reviewing the information for?
I guess to determine if there was a violation of policy and what's the level and to fact find the case and to see if we had a complete



investigation prior to having the discussions.
**Q. Okay. Is there ever a review of those investigations for accuracy?**
A. I don't understand the question.
**Q. Do you ever look to see if the investigation is based on credible information?**
A. So one more time. In my role am I looking for it to see if it's credible?
**Q. Yes.**
A. Yes.
**Q. Okay. And then after the decision is made, do you ever get the other side of the story prior to a termination decision?**
A. I don't understand that question.
**Q. When there's a decision to terminate, do you let the other person share their side of the story or do you just call them in and say: Sit there, listen to us, and you're terminated?**
A. Okay. I don't make determinations for termination.
**Q. Okay. But you're involved --**
A. That's not my role.
**Q. But are you on the call when the termination takes place?**
A. It would depend on the case. So not



every time.
**Q. In the instance of Heidi Peck, were you involved in that call?**
A. Which call specifically?
**Q. To terminate her employment.**
A. It was not -- no, I was not on the original call.
**Q. You weren't on that call?**
A. No.
**Q. Do you know who was?**
A. Well --
**Q. So on December 13th of 2021 you were not on a call between Troy Emerson and Heidi Peck?**
A. I was on a call with Heidi Peck and Troy on that date, but that was not a decision date. That was a date of a conversation Troy had with his employee.
**Q. What was that conversation?**
A. The conversation that I was on with Troy and with Heidi Peck, Troy was -- gave information regarding the employment status of Heidi Peck.
**Q. What information did he give?**
A. He told -- he communicated to Heidi that she was being terminated for a policy violation.
**Q. Was Heidi allowed to speak during that**



**call?**
A. She was allowed to speak during that call, yes.
**Q. So it's your testimony you never told her that she couldn't speak during that call?**
A. I never told her she could not speak at that meeting.
**Q. Okay. Did you record that call?**
A. No.
**Q. Why not?**
A. We do not record. It's not a UPS policy.
**Q. You don't record any calls?**
A. No.
**Q. What about Teams meetings?**
A. No.
**Q. You don't record Teams meetings?**
A. No.
**Q. So if someone told me you did, then that would be a misspoke -- a miscommunication?**
A. You are correct.
**Q. Why don't you record stuff at UPS?**
A. It's against our policy.
**Q. Okay. Does UPS conduct annual reviews?**
A. Yes.

**Q. Are annual reviews looked at prior to making a termination decision?**
A. No.
**Q. Why not?**
A. Investigations are specific to the event.
**Q. Okay. But you don't care about the history of the employee at all when it's time to make that decision?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** It's not part --
**Q. BY MR. STEGELMEIER: So it's based solely on the investigation and nothing else?**
A. Correct.
**Q. So you don't look at any outside factors at all?**
A. I don't understand that question.
**Q. You don't look at past trainings?**
A. No.
**Q. You don't look at past investigations?**
A. I don't look -- I don't understand that question.
**Q. So it's based solely on a single investigation for a termination, correct?**
A. Yes.



**Q. You don't look at past disciplinary history?**
A. That would depend on the type of employee.
**Q. What different types of employees do you have?**
A. We have union and we have management and we have nonmanagement employees.
**Q. So in a management employee, would you look at previous investigations for a termination?**
A. It would depend on the infraction. Some of the infractions we would.
**Q. Is there a difference between a willful infraction and just an infraction?**
A. I don't understand the question.
**Q. So if there's an infraction found and it turns out that it was willful, the infraction, does that weigh into your decision?**
A. No, an infraction is an infraction.
**Q. Okay. What kind of records do you keep at the HR department?**
A. I apologize. Can you repeat that question?
**Q. Yes. What kind of records do you keep of your employees?**



A. I do not keep record of employees.
**Q. Does your HR department keep records?**
A. Yes.
**Q. What kind of records are kept?**
A. That's a -- I wouldn't be able to answer that question without making an assumption.
**Q. Okay. So you don't know what kind of record you guys keep of people?**
A. Not necessarily because that's not my role to keep records.
**Q. Whose role is it to keep records?**
A. Our compliance group.
**Q. What does the compliance group do?**
A. They monitor and they keep track of all of our records and they verify that we have all of the records required.
**Q. Required by whom?**
A. Different -- whatever labor and law that's out for each specific state.
**Q. Okay. Those records aren't something you would look at prior to making a termination decision?**
A. If it was not part of the investigation, it's not part of the review.
**Q. Who determines what goes into the**



**investigation?**
A. Who determines -- I wouldn't know. I'm not the one collecting the data so that wouldn't be something I could answer specifically.
**Q. Do you know generally who conducts investigations?**
A. Yes.
**Q. Who conducts investigations?**
A. Our security group.
**Q. And it's up to them to determine the scope of their investigation?**
A. I don't understand your question.
**Q. Is HR consulted as part of the investigations?**
A. I don't understand the time in which the consulting question would come into play.
**Q. Prior to an investigation taking place, does HR get consulted on one?**
A. No.
**Q. So security determines the scope of an investigation and what they will look at?**
A. Yes.
**Q. And then the termination decision is based solely on that investigation?**
A. No.

Page 25

**Q. Okay. What do you look at besides the investigation when you make a termination decision?**
A. It would depend on the case.
**Q. For a manager being terminated, what would you look at outside of the investigation?**
A. It would depend on the case.
**Q. For Heidi Peck what was looked at outside of the investigation?**
A. For Heidi Peck the investigation was all that was looked at.
**Q. So nothing else was looked at besides the investigation which was conducted by security?**
A. You are correct.
**Q. And security is the one that determined the scope of how wide that investigation would be?**
A. Yes.
**Q. Was it the lead investigator then that makes that determination?**
A. No.
**Q. Who makes the determination?**
A. It's a collaborative group within the security department. I wouldn't know the name of the person that does that.
**Q. Okay. We'll look at the investigation later and I might have some more questions.**

Page 26

**Are you familiar with the bonus structure, the manager incentive program at UPS?**
A. Yes.
**Q. Explain that to me. How does it work?**
A. It works differently for different levels of management. It's an incentive to go into management.
**Q. Okay. Is it a yearly bonus?**
A. Can you repeat -- can you be more specific with your question?
**Q. If I'm there from January 1st to December 31st as a manager, am I eligible for a bonus if there's no disciplinary action?**
A. There is an award that is given with a recommendation from each manager and division manager. The award is awarded to people who are within the calendar year in good standings with the company and are a model employee for that duration from January 1st to December 31st.
**Q. What determines if you're in good standing with the company on December 31st?**
A. The recommending manager and division manager.
**Q. Is HR involved at all in determining if someone is eligible for a bonus?**

Page 27

A. No.
**Q. So HR doesn't do investigations? They don't determine what -- I'm just a little confused of what HR actually does at UPS. I'm sorry. It seems kind of strange -- HR usually would be looking back at an employee record determining if there was a basis for a termination or conducting an investigation, just a lot of things are being involved with discipline. Are you involved in, like, suspensions or anything like that? Does HR do that?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Yeah, I don't know -- I don't know -- I can't answer that question. It's not specific enough.
**Q. BY MR. STEGELMEIER: So HR hires people, right?**
A. Yes.
**Q. Do they do anything else at UPS?**
A. Yes.
**Q. What else do they do?**
A. We promote people.
**Q. How are promotion decisions made?**
A. There's many different factors to bring in a promotion.
**Q. Okay. Who ultimately is the one who**

Page 28

**decides, yes, this person will be promoted? Is it HR or is it a district or regional manager?**
A. It's none of those things.
**Q. Okay. So who does it?**
A. The person that they report to would then be the person deciding that the person is ready for the next promotion. So if it was a part-time supervisor, it could be a full-time supervisor manager that would determine if that person is ready for the next level of promotion.
**Q. So it's not HR who is doing the promotion?**
A. No. There's a whole process outside of us that does it.
**Q. Okay. Are you familiar with the term "progressive discipline"?**
A. Yes.
**Q. What's your understanding of that?**
A. It's a term for union employees.
**Q. Okay. It doesn't apply for management employees?**
A. It does not.
**Q. Okay. So UPS doesn't have a policy of using a progressive discipline with their management?**
A. That is correct.

**Q. Is it like a zero tolerance policy with management employees?**
A. I can't answer that question.
**Q. Are you familiar with the EDR process at UPS?**
A. Yes.
**Q. Who manages that process?**
A. The EDR process is managed from a section of UPS called employee services.
**Q. So not by HR though?**
A. It is an HR function outside of -- there are many functions within HR. Many groups. There is a group inside of HR but outside of the district.
**Q. Are you familiar with the EDR process?**
A. Yes.
**Q. What's your understanding of the process?**
A. An employee can request a -- put in a request to be considered to have a case looked at for a number of reasons. They put a request in electronically. It goes to an e-mail. The e-mail comes back, whether it's been accepted, and then an investigator from that group will then reach out to the employee and then fact-finding -- gather facts regarding their request.



**Q. Okay. What is the purpose of an EDR at UPS?**
A. EDR is an appeal process. It allows people a chance to have a case or something that they feel is in conflict with a decision that was made at UPS to be reviewed.
**Q. Okay. So it's kind of a safeguard on the decision that was made?**
A. I can't make -- I can't answer that.
**Q. Okay. What are the steps of the EDR process?**
A. The first step is initiation from the employee.
**Q. Okay.**
A. They would apply for it. They would request. They could either do it electronically or on paper, an e-mail into a group, a mailbox. That's the first step.
**Q. Okay. What's the second step?**
A. That case would then go into a queue. The queue would then get an investigator assigned to it. The investigator would then reach out to the employee.
**Q. Who is the investigator on this instance?**



A. Which instance?
**Q. Where does the investigator come from, I guess? I don't need to know exactly but is it --**
A. It's employee services. So employee services is a branch of HR.
**Q. Okay.**
A. It's a whole different entity than what I'm under.
**Q. Okay. So the investigator looks into it, and then what happens after that?**
A. It has a series of steps that can take place depending on what they determined. So there's a lot of different outcomes that can come from that. If they were accepted into the program -- like I said, if they were accepted, then the investigator would reach out to the employee and have a conversation and a meeting.
**Q. Okay. Then what's after they sit down and talk? What goes on after that?**
A. I don't know the next stage and detail because I'm not in that group.
**Q. Okay. Are you aware of a peer review board?**
A. No.
**MR. STEGELMEIER:** You don't know that. Okay.



Might look at this right quick. I think we're at 9. So this one will be Exhibit 9.
(Exhibit 9 marked.)
**Q. BY MR. STEGELMEIER: Let's look at the front page. Have you ever seen this manual before, Ms. Todd?**
A. It looks familiar.
**Q. So it sounds like from the introduction here that the EDR process seems like a way to work to resolve problems, successful in peacekeeping -- is it normal -- I guess with your limited experience with the EDR process, is it normal for UPS to just decide they don't want to be involved in it anymore?**
A. I can't answer that question.
**Q. Okay. I think there was something here. All right.**
**Will you read this first paragraph for me right here. "The guidelines of the EDR program are binding."**
A. Okay. Yes.
**Q. So is it your understanding that once you enter the EDR process, both the employee and UPS are bound by the guidelines of that program?**
A. That is not what that -- that's not how I read that.

**Q. Okay. Tell me how you read it differently.**
A. It's not my responsibility to interpret what this is stating. My understanding is that this program is voluntary by the employee. The employee is voluntary -- if they want to go into it, it's a choice that they can make to go into EDR.
**Q. Okay. But --**
A. The guidelines of EDR are binding upon the employee and UPS. That's what this is stating.
**Q. Yeah. So are the guidelines -- so you interpret that to mean that UPS isn't bound by the guidelines of EDR?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** I'm unable to answer this question.
**Q. BY MR. STEGELMEIER: That's fine. I'm not surprised. Well, there's no sense going further with that.**
**Do you know Floyd Reinhardt?**
A. Yes.
**Q. How do you know Floyd Reinhardt?**
A. Floyd Reinhardt was an UPS employee, a manager that worked for us.
**Q. Okay. Did you know him in a**



**professional setting or personal?**
A. I'm familiar with his name as an employee that worked for UPS.
**Q. Okay. Were you aware that there was an investigation regarding Floyd Reinhardt in 2021 and early 2022?**
A. I would need more specifics to know if I was familiar with it.
**Q. Well, I'll show you -- hold on. Let me get the number. This has previously been marked as Exhibit No. 3. I guess you can just review the findings right quick and tell me if you remember this one.**
A. I was not on this case.
**Q. You weren't on this case at all?**
A. I was not on this case specifically.
**Q. Okay. How are these investigations usually sent out?**
A. Can you redefine your question?
**Q. Are they hand-delivered? Are they sent by UPS? Are they e-mailed?**
A. I don't understand your question.
**Q. Okay. So investigations when they take place at UPS, they are sent to different individuals, correct?**



A. I don't understand when you say cases are -- I don't understand what that means.
**Q. You understand what "investigations" mean?**
A. Yes.
**Q. When an investigation is performed, how is it delivered to different people?**
A. I wouldn't be able to answer that specifically without having the case in front -- which case it was that I was involved with. So I don't have enough information of my own to answer that clearly.
**Q. All right. Ms. Todd, let's look to the investigation into Heidi Peck. You were involved in this, correct?**
A. I have limited amount of exposure to this case.
**Q. Did you see this investigative report? Did you see this investigative report?**
A. I see it in front of me right now.
**Q. Did you see it in 2021?**
A. I don't remember seeing it in 2021.
**Q. Okay. How were you aware that there was a call between you and Troy Emerson and Heidi Peck?**
A. I was invited for a call to attend.



**Q. How were you invited?**
A. I was sent an e-mail requesting my attendance to a conversation between Troy and Heidi.
**Q. What did that e-mail state?**
A. It was an invitation to a meeting for Troy and Heidi. It didn't have any other information to it. It was just an invite.
**Q. Have you produced that as part of this case?**
A. I don't have access to it.
**Q. Why don't you have access to it?**
A. I don't know.
**Q. But you don't know if you saw this report prior to that call?**
A. I don't remember.
**Q. What was your role on that call?**
A. My role was to be present during the call and to observe the conversation that was going to take place.
**Q. Why?**
A. It was normal to have an HR person/representative be in the room if requested upon by a manager.
**Q. Did you take notes during that call?**
A. No.

Page 37

**Q. So HR is just there for when people ask them to be included in a call?**
A. Yes.
**Q. Why would they want you on a call?**
A. We're at the request of the employee. I don't always know that answer. It's his standard to have -- if they requested an HR person is present.
**Q. Does the employee have a right to request an HR representative be present during a call?**
A. Yes.
**Q. What about during an investigation?**
A. Yes.
**Q. So if the employee requests HR be present, the investigator is supposed to involve HR?**
A. They can request.
**Q. What happens if security says we're not going to do that?**
A. It would have to be reviewed.
**Q. Okay. Is it -- would HR normally be involved in an investigation, a confrontational interview during an investigation?**
A. I cannot answer that.
**Q. Okay. Let me show you -- this has previously been marked Exhibit 5. Go down here a ways. There's an interview I had a question about.**

Page 38

**So this is a summary of an investigation that was conducted to Heidi Peck. In this one it lists the people who are present and we have Heidi Peck. Do you see where that is?**
A. Yes.
**Q. She is the interviewee; Bill Joiner, the interviewer; Maegan Ferguson, security supervisor; Rebekah Mulloy, security manager; Lori Atkinson, HR representative; and Steve Johns, IE.**
**Do you know Lori Atkinson?**
A. She's an employee with UPS, yes.
**Q. Okay. So this is a case where someone requested that HR be present at an interview, right?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** I cannot answer that.
**Q. BY MR. STEGELMEIER: But HR was present?**
A. I can't answer that.
**Q. Is it normal to falsify investigations at UPS?**
A. No.
**Q. Do you have any reason to believe that this investigation was falsified?**
A. No.
**Q. So based on the summary of this investigation, would you believe that HR was present?**

Page 39

A. I wouldn't be able to answer that.
**Q. Why would they write HR there if they weren't present at the investigation?**
A. I didn't write it. I wouldn't be able to tell you why they did that.
**Q. But you would rely on a report like this to make a termination decision, correct?**
A. No.
**Q. Well, you just said earlier that you look at investigation to decide if there's going to be a termination.**
A. Correct.
**Q. So you wouldn't look at an investigation like this to determine if there was going to be a termination?**
A. Please repeat your question.
**Q. Well, you're sitting here telling me that this investigation says that Lori Atkinson was present there, but you don't trust that. But yet at the same time you said you rely solely on investigation to make a termination decision?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** I don't know the question. What is the question?

Page 40

**Q. BY MR. STEGELMEIER: I think that -- so Heidi Peck was terminated based on an investigation, correct?**
A. Not correct.
**Q. Why was Heidi Peck terminated?**
A. For a policy violation.
**Q. How was that policy violation determined?**
A. It was determined from the management group that reviewed the case.
**Q. What did they review?**
A. I was not in the review so I don't -- I wouldn't know everything that they reviewed.
**Q. Well, you previously have testified that an investigation is what you looked at to determine if someone will be terminated; is that correct or no?**
A. It is part of what is looked at.
**Q. Okay. What else is looked at? Because I asked you that earlier and you had a different answer.**
A. I wouldn't know everything that was in it because I wasn't in this review.
**Q. You do understand you're under oath, right?**
A. Yes.

Page 41

**Q. Okay. So you can't tell me looking at this investigation if Bill Joiner just lied about Lori Atkinson being present?**
A. I cannot tell you that.
**Q. Okay. Let's look at this investigation. For -- wait -- yep, this is the right one. So this investigation was conducted by Clay Holloway, or can you tell me that?**
A. I cannot tell you that.
**Q. Do you trust documents that come from UPS?**
A. I cannot answer that question.
**Q. Is it normal to falsify documents at UPS?**
A. No.
**Q. Okay. So we have an investigation that's been produced by UPS that says from Clay Holloway but you don't trust that?**
A. I don't hear a question.
**Q. You don't trust that, correct? Sorry, let me -- you don't trust that?**
A. I'm unable to answer your question.
**Q. How long have you worked at UPS?**
A. Over 24 years.
**Q. Have you ever been subject to**

Page 42

**discipline?**
A. No.
**Q. Have you ever been investigated?**
A. Yes.
**Q. What were you investigated for?**
A. I do not remember. Multiple things.
**Q. Give me an example.**
A. I'm unable to answer that question.
**Q. You don't remember what you were investigated for?**
A. It would have been a really long time ago so I don't remember specifically.
**Q. You don't even remember generally?**
A. Specifically say investigated, I have been investigated? Or part of an investigation? That's where I'm --
**Q. You've been investigated.**
A. Yeah, I'm unable to answer your question.
**Q. Okay. Tell me what you remember from the phone call with Troy Emerson and Heidi Peck.**
A. From the meeting -- the one meeting that we attended? Is that --
**Q. Yes.**
A. I remember from that conversation that

Page 43

there was a conversation to talk directly to Heidi to give her the outcome of the determination, that there would be termination of her employment for policy violation. And I also remember at the end of the meeting I gave Heidi the instructions of how to -- how to apply for the EDR and navigated giving her the information she would need to apply for it.
**Q. Okay. What policy violations did Heidi commit?**
A. It was proven dishonesty.
**Q. What policy is that in violation of?**
A. That is the policy, "proven dishonesty."
**Q. What was the basis for that determination?**
A. A substantiated security investigation.
**Q. Did you look at that security investigation?**
A. I did not.
**Q. You can't even tell me if it's real or not?**
A. I cannot.
**Q. It could be falsified?**
A. I don't know.
**Q. That's possible? Yes?**
A. I don't know.

Page 44

**Q. So you don't know means you don't know it was true but you don't know it was falsified?**
A. I don't know -- I don't have enough information to tell you yes or no.
**Q. So you don't have enough information to tell me that that was a substantiated investigation?**
A. I don't.
**Q. So we're not sure if it was substantiated or not?**
A. The investigation was substantiated.
**Q. How do you know that?**
A. That information was made clear whenever Troy delivered the message.
**Q. But you didn't actually look at it?**
A. I was not part of the review of the investigation.
**Q. Okay. So it could have been falsified?**
A. I don't hear a question.
**Q. That was a question.**
**Where did you go to high school?**
A. In Anchorage, Alaska.
**Q. Did you graduate with a degree -- or did you get a diploma from there?**
A. I did.
**Q. When was that?**

A. '97.
**Q. Had English classes as part of that?**
A. I'm sure, yes.
**Q. So do you remember if Heidi Peck said anything during that meeting?**
A. I don't remember.
**Q. But you remember that you didn't tell her she couldn't speak?**
A. You are correct.
**Q. And that's under oath, correct?**
A. Yes.
**Q. Okay. How often are you involved in calls for termination like this?**
A. When necessary I'm called upon to be in those meetings.
**Q. More than five?**
A. Yes.
**Q. More than ten?**
A. Yes.
**Q. Is it normal for the employee to get to tell their side of the story during these calls?**
A. That's me determining if it's normal? It's an option.
**Q. Option for who?**
A. There isn't a rule that says the



employee cannot speak during the meeting.
**Q. Okay. So if Heidi testifies that you told her she can't speak, then that's a misstatement by her?**
A. You are correct.
**Q. Okay. So if Heidi would have said, "Hey, wait. Let me tell you my side of the story," you wouldn't have interrupted her and said, "No, this isn't the place for that"?**
A. I don't remember saying that if that was what --
**Q. Okay. But if Troy said, "I'm just going to go fire her; I don't want her to tell me her side," would you have said something like that?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** Can you please repeat the question.
**MR. STEGELMEIER:** Will you read it back to her, please, Sandy?
(The record was read.)
**MR. CLIFTON:** Same objection.
**THE WITNESS:** I don't understand the part I would have said. Would I have said what?
**Q. BY MR. STEGELMEIER: Well, would you have told her that it wasn't the place for her to**



**tell her side of the story?**
A. No.
**Q. So you would have let Heidi speak?**
A. Yes.
**Q. Okay. And then you gave her the EDR manual, correct?**
A. Yes.
**Q. What did you tell her about EDR?**
A. I don't remember -- I don't remember the words I used specifically with EDR, but that it was self-driven by her. So she had every right to use it and gave her the information and then gave her my contact information to reach out to me if she needed assistance in applying for it.
**Q. Were you part of the EDR process with Heidi?**
A. No.
**Q. That would have been the employee resources?**
A. Employee services.
**Q. Services. Okay. And you're not familiar with any of those steps beyond just the first couple?**
A. I am familiar with the steps.
**Q. Are you familiar with the peer review**



**step?**
A. Yes.
**Q. What is the peer review step?**
A. The peer review step is a -- it's where the ES group would organize a review. The employee that applied for the appeal would request two of their peers to be on a committee to listen. UPS would then also give two comparable peer requests, people that we would select. They would get to hear the case from whoever was reporting it. So it would come from the security investigator or whoever presented the case, and then they would be able to ask questions and be supplied the documentation of investigation depending on the case.
**Q. What's the --**
A. And then --
**Q. What's the purpose of the peer review?**
A. The peer review is a chance for a group of people to rehear a situation and to determine if they have any other recommendations versus what the outcome was initially decided upon.
**Q. Okay. What does UPS do with those recommendations?**
A. UPS will consider recommendations.
**Q. Who does the consideration of those**

**recommendations?**
A. The director of HR.
**Q. Okay. And then is it normal for them to follow the recommendation or just ignore it?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** I'm not able to answer that question. It can go both ways.
**Q. BY MR. STEGELMEIER: Have you ever done any trainings on the EDR process?**
A. Please re -- I don't understand your question.
**Q. Have you been trained on the EDR process?**
A. No.
**Q. Would it surprise you to know a manager thinks that the EDR process is there to correct any mistakes he may have made during the termination?**
A. Would it surprise me to know?
**Q. Yes.**
A. No.
**Q. Okay. Would it surprise you to know that managers expect UPS to follow the peer review recommendation?**
A. No.
**Q. Okay. Why not?**



A. There is -- because it is a recommendation. There is a lot of interpretation of what is done with that recommendation.
**Q. Okay.**
A. And because it is done -- if it goes to peer group, it's done by peers. There's a lot of opinions that are not necessarily the same policy or procedures that are used when determining an employment action.
**Q. Okay. What different -- what else is different in that from the employment action?**
A. The people who are part of the decision-making process for an employment action are in that role of responsibility and are considered experts in that field, as opposed to a peer group where those employees aren't necessarily given the same opportunities to learn and to be part of the policies, the procedures, the normal methods in which a determination is found.
**Q. Okay. Wouldn't you agree that the peer review process also gets an expanded record to look at?**
A. I'm unable to answer that question.
**Q. Okay. From what we spoke about earlier, I'm just going to lay my cards out there. I do a lot**



**of employment defense work and I deal a lot with HR directors and deal with a lot of people prior to a termination decision. And generally I want the person -- the decision maker to have as much knowledge as available. I want them to have a paper trail. I want them to be able to substantiate and justify and sleep at night and stand behind their decision because if it goes to litigation, they're going to have to explain exactly what they looked at. Everything like that.**
**From what you've told me, it seems like there's a very limited amount of information that a decision maker actually looks at. They look at the investigation and whatever else they decide they want to look at that day. Is that -- am I misunderstanding you there? Are we encouraging decision makers to look at the whole record, look back at employment history, or are you and UPS just having your decision makers look at a snapshot when making an employment decision?**
**MR. CLIFTON:** Objection. Form.
**THE WITNESS:** The process for employment decision based off of an investigation has a complete set of steps. And in this case prior to initiating the termination determination, all of those steps



were followed.
**Q. BY MR. STEGELMEIER: What steps are those?**
A. That would be through the security group during their investigative process in determining whether a policy violation was substantiated --
**Q. How would -- sorry. Go ahead. I cut you off.**
A. It would include records and it would include interviews. It could vary depending on the policy that's being investigated and the person being investigated.
**Q. Okay. And how are you sure that those steps were followed in this case?**
A. I'm entrusting my security group to have completed and done their job and substantiated and had a complete case before review. A review would have taken place, but I would not have been in that review. That review would have been outside of me with management higher than I was. So not privy to that information of specifics.
But that was not my role during this time. My role was to be in a meeting and listen to the conversation.
**Q. Okay. Would it change your faith in**

Page 53

**that process if you knew that the investigator was later investigated himself for dishonesty?**
A. No.
**Q. You still trust the process?**
A. Yes.
**Q. So proven dishonesty is a violation of policy, correct?**
A. Yes.
**Q. Is it something that can be -- result in termination?**
A. Yes.
**Q. Are there other disciplinary measures that can be taken?**
A. Yes.
**Q. What other disciplinary measures are available?**
A. Depending on the case and the severity of it, there would be other things to consider.
**Q. Like what?**
A. If the person was a promoted person and there was a level below that person, there could be a determination for demotion.
**Q. Okay. Any other disciplinary things available?**
A. There could be a merit increase that

Page 54

could be affected as part of a disciplinary action. There could be training and retraining. There could also be displacing them from that building, depending on the policy. We could geographically move people if it was determined that that was the appropriate discipline that needed to take place.
**MR. STEGELMEIER:** Let's take about a ten-minute break. Let me look through my notes and we might be able to cut you loose early. We'll see. Go off the record then.
(A recess was taken from 10:08 a.m. to 10:18 a.m.)
**Q. BY MR. STEGELMEIER: Ms. Todd, was there anything during the break that you thought of that you would like to go back and correct or clarify about your previous testimony?**
A. No.
**Q. I have just a few more questions and then we'll get you out of here.**
**You mentioned earlier that if someone wants to have HR present during an investigation, they are allowed to; is that correct?**
A. Yes.
**Q. Is that true of management as well?**
A. Yes.

Page 55

**Q. So if a manager is contacted by security for an investigation and says I want HR present, what's supposed to happen?**
A. Security is supposed to reach out to HR.
**Q. Are they -- go ahead. Sorry. I cut you off again. I apologize.**
A. They're supposed to communicate to HR to get a representative.
**Q. Okay. Are they supposed to do that before they continue that interview?**
A. No.
**Q. So they can complete their interview after someone requests management but then they're supposed to involve management -- or HR. Then they're supposed to involve HR later?**
A. Security is the authority during the investigation and they can deem whether or not an HR person is allowed to be present, but they are supposed to communicate it with us if there is a request for an HR person.
**Q. How is that communicated?**
A. Any of the ways. It can be text or IM or e-mail or word of mouth.
**Q. Okay. But if they don't want to have HR there, they can say, no, we're just going to go ahead**

Page 56

**and finish this interview?**
A. When you say "they" --
**Q. Security.**
A. So security doesn't want HR there, they can just go ahead with the investigation?
**Q. Yes.**
A. You are correct. They're a governing factor. They run the investigative-type process.
**Q. Okay. So HR isn't -- doesn't have the ability to oversee investigations of its employees?**
A. I'm not able to answer that question.
**Q. Okay. But security is the last say when it comes to investigations?**
A. It's their investigation. So if their investigation is complete, it is a complete product.
**Q. Okay. So HR has no oversight on investigations?**
A. Correct. Oversight.
**MR. STEGELMEIER:** That's scary. But it's not my company.
I think that's all the questions I have. We'll let Ricky do any follow-ups he may have.
**MR. CLIFTON:** We'll reserve our questions for the time of trial. We'll read and sign.
(The deposition concluded at 10:21 a.m.)

REPORTER'S CERTIFICATE

STATE OF IDAHO ) ss.
COUNTY OF BONNEVILLE )

I, Sandra D. Terrill, CSR, RPR, and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined Alecia Todd, the witness named in the foregoing deposition, was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true, and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 28th day of February 2024.

Sandra D. Terrill
Idaho CSR No. 702,
Notary Public in and for
the State of Idaho

## A

ability (1) 56:10
able (10) 17:7;23:5;35:8;39:2, 5;48:12;49:6;51:6; 54:9;56:11
accepted (3) 29:22;31:14,15
access (2) 36:10,11
accreditation (1) 10:22
accuracy (1) 18:3
action (5) 26:13;50:9,11,13; 54:1
actually (3) 27:4;44:14;51:13
administrative (2) 10:7;14:3
affected (1) 54:1
again (1) 55:6
against (2) 4:11;20:23
ago (3) 5:4;10:21;42:12
agree (1) 50:20
ahead (5) 6:16;52:7;55:5,25; 56:5
Alaska (8) 8:18,21,24;9:14,15, 19;10:3;44:21
Alecia (3) 4:3,14;6:22
allowed (4) 19:25;20:2;54:22; 55:18
allows (1) 30:3
always (1) 37:6
amount (3) 15:6;35:16;51:12
Anchorage (3) 8:18,21;44:21
annual (2) 20:24;21:1
anymore (1) 32:13
apologize (3) 6:25;22:22;55:6
appeal (2) 30:3;48:6
applied (1) 48:6
apply (4) 28:20;30:15;43:6,7
applying (1) 47:14
appropriate (1) 54:5
Approximately (2) 9:2;15:14
area (10) 12:3,23,23;13:5,11; 14:9,14,19;15:2,11
around (1) 12:5
assigned (1) 30:21
assistance (1) 47:14
assistant (1) 10:7
assumption (1) 23:6
Atkinson (4) 38:9,11;39:19;41:3
attend (2) 8:13;35:25
attendance (1) 36:3
attended (2) 8:15;42:23
attorneys (1) 7:4
authority (1) 55:16
available (3) 51:5;53:16,24
award (2) 26:14,16
awarded (1) 26:16
aware (4) 6:6;31:22;34:4; 35:23

## B

back (6) 8:11;27:6;29:22; 46:18;51:18;54:15
based (9) 17:12,13;18:6;21:12, 23;24:24;38:25;40:2; 51:23
basis (2) 27:7;43:13
behind (1) 51:7
below (1) 53:21
Besides (3) 7:4;25:1,11
better (1) 17:8
beyond (1) 47:22
Bill (2) 38:7;41:2
binding (2) 32:19;33:9
bit (1) 8:11
board (2) 10:22;31:23
bonus (4) 26:1,8,12,25
both (2) 32:22;49:7
bottom (2) 13:22,24
bound (2) 32:23;33:12
boxes (1) 16:3
branch (1) 31:5
break (2) 54:8,14
brief (1) 5:7
bring (2) 7:14;27:23
brought (1) 4:11
building (1) 54:3
business (1) 8:9

## C

calendar (1) 26:17
call (22) 18:17,23;19:3,4,7,8, 13,14;20:1,3,5,8;35:24, 25;36:14,16,18,24; 37:2,4,10;42:21
called (2) 29:9;45:14
calls (3) 20:13;45:13,21
Camas (1) 4:18
came (1) 16:8
Can (23) 4:12;5:20;14:15; 22:22;26:9,9;29:18; 31:11,13;33:7;34:11, 19;37:16;41:7;46:16; 49:7;53:9,13;55:12,17, 22,25;56:5
cards (1) 50:25
care (1) 21:7
case (27) 5:1;16:5;17:6,7,25; 18:25;25:3,6;29:19; 30:4,20;34:14,15,16; 35:9,10,17;36:9;38:13; 40:10;48:10,12,14; 51:24;52:14,17;53:17
cases (2) 17:12;35:1
certificates (1) 10:12
chance (2) 30:4;48:18
change (1) 52:25
checking (1) 16:3
children (1) 4:20
choice (1) 33:7
clarify (1) 54:15
classes (1) 45:2
Clay (2) 41:7,17
clear (2) 8:14;44:12
clearly (1) 35:12
Clifton (11) 6:6;21:10;27:11; 33:14;38:15;39:23; 46:15,21;49:5;51:21; 56:23
closer (1) 16:18
coaching (1) 15:9
collaborative (2) 16:4;25:21
collecting (1) 24:3
college (5) 8:14,15,16,19;9:24
colleges (1) 8:17
commit (1) 43:9
committee (1) 48:7
communicate (2) 55:7,19
communicated (2) 19:23;55:21
company (3) 26:18,21;56:20
comparable (1) 48:8
complete (6) 17:25;51:23;52:17; 55:12;56:15,15
completed (1) 52:16
compliance (3) 15:11;23:12,13
concluded (1) 56:25
conduct (1) 20:24
conducted (3) 25:12;38:3;41:7
conducting (1) 27:7
conducts (2) 24:5,8
conflict (1) 30:5
confrontational (1) 37:21
confused (1) 27:3
consider (2) 48:24;53:18
consideration (1) 48:25
considered (2) 29:19;50:14
consulted (4) 15:23,25;24:13,18
consulting (1) 24:16
contact (1) 47:13
contacted (1) 55:1
continue (1) 55:10
continuing (1) 6:18
conversation (9) 19:16,18,19;31:17; 36:3,18;42:25;43:1; 52:24
copy (1) 7:9
Cory (1) 4:9
counseling (1) 15:9
couple (1) 47:23
court (1) 6:9
credible (2) 18:6,8
current (3) 8:8,9;16:14
currently (2) 4:16;8:6
cut (3) 52:7;54:9;55:5

## D

data (1)

24:3
**date (3)**
19:15,15,16
**day (1)**
51:15
**day-to-day (1)**
5:19
**deal (2)**
51:1,2
**December (6)**
12:1,2;19:12;26:12,19,21
**decide (3)**
32:12;39:11;51:14
**decided (1)**
48:21
**decides (1)**
28:1
**deciding (1)**
28:6
**decipher (1)**
17:2
**decision (24)**
17:1,5;18:11,13,15;19:15;21:2,9;22:18;23:22;24:23;25:2;30:5,8;39:8,22;51:3,4,8,13,17,19,20,23
**decision-making (1)**
50:13
**decisions (1)**
27:22
**deem (1)**
55:17
**defense (1)**
51:1
**degree (3)**
8:23;9:10;44:22
**degree-completion (1)**
9:6
**delivered (2)**
35:7;44:13
**demotion (1)**
53:22
**department (3)**
22:21;23:2;25:22
**depend (8)**
16:5,6;17:6;18:25;22:3,11;25:3,6
**depending (11)**
14:8,13,14,16;16:7;17:16;31:12;48:14;52:10;53:17;54:3
**deposition (13)**
4:1,22,24;5:10;6:18,22;7:2,7,10,13,19;10:20;56:25
**detail (2)**
16:10;31:20
**determination (7)**
25:18,20;43:2,14;50:19;51:25;53:22
**determinations (1)**
18:19
**determine (7)**
17:23;24:10;27:3;28:9;39:15;40:15;48:19
**determined (5)**
25:14;31:12;40:8,9;54:5
**determines (4)**
23:25;24:2,20;26:20
**determining (5)**
26:24;27:6;45:22;50:8;52:5
**difference (3)**
13:7,9;22:13
**different (24)**
5:1;8:17;12:6,22,22,23;13:8,20;14:12,15,16;17:9,16;22:5;23:18;26:5;27:23;31:7,13;34:24;35:7;40:19;50:10,11
**differently (2)**
26:5;33:2
**diploma (1)**
44:23
**directly (1)**
43:1
**director (5)**
12:17;14:22,24;15:1;49:2
**directors (1)**
51:2
**disciplinary (7)**
17:4;22:1;26:13;53:12,15,23;54:1
**discipline (7)**
15:24;16:1;27:9;28:16,24;42:1;54:6
**disciplining (1)**
15:20
**discussion (1)**
6:9
**discussions (1)**
18:1
**dishonesty (4)**
43:10,12;53:2,6
**displacing (1)**
54:3
**district (9)**
8:10;12:19;13:17,18;14:25;15:1;16:19;28:2;29:13
**districts (1)**
13:14
**divided (1)**
13:16
**division (3)**
12:6;26:15,22
**divisions (1)**
13:15
**documentation (1)**
48:13
**documents (5)**
7:6,21;8:4;41:10,13
**done (7)**
7:1,3;49:8;50:3,5,6;52:16
**dotted (2)**
12:16,18
**down (2)**
31:18;37:25
**duces (1)**
7:13
**duly (1)**
4:5
**duration (1)**
26:18
**during (18)**
15:15;19:25;20:2,5;36:17,24;37:9,12,22;45:5,21;46:1;49:17;52:5,22;54:14,21;55:16
**duties (2)**
15:2,4

**E**

**earlier (4)**
39:10;40:19;50:24;54:20
**early (2)**
34:6;54:9
**easier (3)**
5:16;10:16;11:1
**Edcor (2)**
8:19;9:5
**EDR (21)**
29:4,8,14;30:1,3,10;32:9,12,18,22;33:7,9,13;43:6;47:5,8,10,15;49:9,12,16
**education (1)**
8:12
**effort (1)**
16:4
**either (1)**
30:16
**electronically (2)**
29:21;30:16
**eligible (2)**
26:12,25
**else (7)**
21:13;25:11;27:18,20;40:18;50:10;51:14
**e-mail (6)**
29:21,21;30:17;36:2,4;55:23
**e-mailed (1)**
34:21
**e-mails (1)**
8:4
**Emerson (3)**
19:13;35:24;42:21
**employed (1)**
8:6
**employee (36)**
14:3;15:8,23,25;16:21;17:10,17;19:17;21:8;22:4,9;26:18;27:6;29:9,18,24;30:13,23;31:4,4,16;32:22;33:5,5,10,23;34:3;37:5,8,14;38:12;45:20;46:1;47:18,20;48:5
**employees (16)**
15:5,12,15,16,17,18,20;22:5,8,25;23:1;28:19,21;29:2;50:16;56:10
**employment (11)**
9:22;19:5,21;43:3;50:9,11,13;51:1,18,20,22
**encouraging (1)**
51:16
**end (1)**
43:4
**ended (1)**
5:2
**English (1)**
45:2
**enough (4)**
27:14;35:11;44:3,5
**enter (1)**
32:22
**entity (1)**
31:7
**entrusting (1)**
52:15
**entry-level (1)**
14:3
**ES (1)**
48:5
**especially (1)**
5:18
**even (3)**
5:20;42:13;43:19
**event (1)**
21:6
**events (1)**
17:14
**exactly (3)**
12:25;31:3;51:9
**EXAMINATION (1)**
4:7
**examined (1)**
4:5
**example (2)**
17:7;42:7
**Exhibit (6)**
6:17,20;32:2,3;34:11;37:25
**expanded (1)**
50:21
**expect (1)**
49:22
**experience (1)**
32:11
**experts (1)**
50:15
**Explain (2)**
26:4;51:9
**exposure (1)**
35:16

**F**

**fact (1)**
17:24
**fact-finding (1)**
29:24
**factor (1)**
56:8
**factors (2)**
21:15;27:23
**facts (1)**
29:24
**faith (1)**
52:25
**falsified (4)**
38:23;43:22;44:2,17
**falsify (2)**
38:19;41:13
**familiar (11)**
5:5;26:1;28:15;29:4,14;32:7;34:2,8;47:22,24,25
**fancy (1)**
7:13
**feel (2)**
9:16;30:5
**Ferguson (1)**
38:8
**few (2)**
5:6;54:18
**field (1)**
50:15
**final (1)**
6:5
**find (1)**
17:25
**findings (1)**
34:12
**fine (1)**
33:17
**finish (4)**
5:16,17,21;56:1
**fire (1)**
46:13
**firing (4)**
16:9,13,20,21
**first (9)**
4:5;7:22;10:5,6;14:5;30:12,18;32:17;47:23
**five (1)**
45:16
**Floyd (4)**
33:20,22,23;34:5
**follow (2)**

49:4,22
**followed (2)**
52:1,14
**follows (2)**
4:2,6
**follow-ups (1)**
56:22
**Form (8)**
21:10;27:11;33:14;38:15;39:23;46:15;49:5;51:21
**found (2)**
22:16;50:19
**front (3)**
32:5;35:9,20
**full (1)**
4:12
**full-time (8)**
11:4,6,7;12:24;13:1,10;14:8;28:8
**function (2)**
11:13;29:11
**functions (2)**
11:22;29:12
**further (1)**
33:18

## G

**gather (2)**
16:24;29:24
**gave (5)**
19:20;43:5;47:5,12,12
**general (1)**
9:21
**generally (4)**
15:19;24:5;42:13;51:3
**geographically (1)**
54:4
**gets (1)**
50:21
**given (2)**
26:14;50:16
**giving (1)**
43:6
**goes (5)**
23:25;29:21;31:19;50:5;51:8
**good (2)**
26:17,20
**governing (1)**
56:7
**graduate (1)**
44:22
**group (16)**
11:18;23:12,13;24:9;25:21;29:13,23;30:17;31:21;40:10;48:5,18;50:6,15;52:4,15
**groups (5)**
11:13,17,17,24;29:12
**group's (1)**
12:4
**guess (7)**
7:21;8:14;12:22;17:23;31:3;32:11;34:11
**guidelines (5)**
32:18,23;33:9,11,13
**guys (1)**
23:8

## H

**half (1)**
7:15
**hand-delivered (1)**
34:20
**happen (1)**
55:3
**happened (1)**
17:2
**happens (2)**
31:10;37:17
**head (2)**
6:2;12:5
**hear (3)**
41:19;44:18;48:9
**Heidi (28)**
4:10;7:25;19:2,13,14,20,21,23,25;25:7,9;35:14,24;36:3,6;38:3,4;40:2,5;42:21;43:1,5,8;45:4;46:2,6;47:3,16
**Hey (2)**
16:12;46:7
**hierarchy (4)**
12:16;13:17,24;14:2
**high (3)**
8:13,22;44:20
**higher (1)**
52:20
**himself (1)**
53:2
**hires (1)**
27:15
**hiring (1)**
15:8
**history (4)**
17:11;21:8;22:2;51:18
**hold (1)**
34:9
**Holloway (2)**
41:7,18
**honest (1)**
7:14
**HR (72)**
8:9;10:9,12,21;11:2,4,6,7;12:3,3,4,5,17,17,21,23,24;13:2,4,11,11,13,16,18,19,22,23;14:18;15:19;22:21;23:2;24:13,18;26:24;27:2,4,5,10,15;28:1,11;29:10,11,12,13;31:5;36:21;37:1,7,9,14,15,20;38:9,14,17;39:1,3;49:2;51:1;54:21;55:2,4,7,14,15,17,20,24;56:4,9,16
**husband (1)**
4:20

## I

**IE (1)**
38:10
**ignore (1)**
49:4
**IM (1)**
55:22
**important (1)**
5:14
**incentive (2)**
26:2,6
**include (3)**
16:25;52:9,10
**included (2)**
15:4;37:2
**increase (1)**
53:25
**individual (1)**
15:11
**individuals (1)**
34:24
**information (17)**
16:25;17:15,18,22;18:6;19:20,22;35:11;36:6;43:7;44:4,5,12;47:12,13;51:12;52:21
**infraction (7)**
22:11,14,14,16,17,19,19
**infractions (1)**
22:12
**initially (1)**
48:21
**initiating (1)**
51:24
**initiation (1)**
30:12
**inside (1)**
29:13
**instance (4)**
4:4;19:2;30:25;31:1
**instances (1)**
4:24
**instructions (1)**
43:5
**instructs (2)**
6:7,12
**internal (2)**
10:18,24
**internship (1)**
14:3
**interpret (2)**
33:3,12
**interpretation (1)**
50:2
**interrupted (1)**
46:8
**interview (6)**
37:22;38:1,14;55:10,12;56:1
**interviewee (1)**
38:7
**interviewer (1)**
38:8
**interviews (1)**
52:10
**into (14)**
13:23;14:15;17:14;22:18;23:25;24:16;26:6;30:17,20;31:9,14;33:6,7;35:14
**introduction (1)**
32:8
**investigated (9)**
42:3,5,10,14,15,17;52:11,12;53:2
**investigation (55)**
17:13,14;18:1,6;21:13,24;23:23;24:1,11,17,21,24;25:2,5,8,9,12,15,24;27:8;34:5;35:6,14;37:12,21,22;38:2,23;39:1,4,11,14,19,22;40:2,15;41:2,5,7,16;42:15;43:15,17;44:6,10,16;48:14;51:14,23;54:21;55:2,17;56:5,14,15
**investigations (15)**
18:3;21:5,20;22:10;24:6,8,14;27:2;34:17,23;35:3;38:19;56:10,13,17
**investigative (3)**
35:18,19;52:5
**investigative-type (1)**
56:8
**investigator (11)**
25:17;29:23;30:21,22,24;31:2,9,15;37:15;48:11;53:1
**invitation (1)**
36:5
**invite (1)**
36:7
**invited (2)**
35:25;36:1
**involve (3)**
37:15;55:14,15
**involved (13)**
15:19,21;17:17;18:21;19:3;26:24;27:9,9;32:13;35:10,14;37:21;45:12
**issues (1)**
15:8

## J

**January (2)**
26:11,19
**job (4)**
9:24;10:5,6;52:16
**jobs (1)**
9:23
**Johns (1)**
38:10
**Joiner (2)**
38:7;41:2
**judge (1)**
6:9
**justify (1)**
51:7

## K

**keep (8)**
22:20,24;23:1,2,8,10,11,14
**kept (1)**
23:4
**kind (10)**
8:11,12;16:2;17:3;22:20,24;23:4,7;27:5;30:7
**knew (1)**
53:1
**knowledge (1)**
51:5

## L

**labor (2)**
11:22;23:18
**labor-specific (1)**
15:10
**large (2)**
11:12,19
**last (3)**
4:13,15;56:12
**later (4)**
6:9;25:25;53:2;55:15
**law (1)**
23:18
**lawsuit (1)**
4:10
**lay (1)**
50:25
**lead (1)**
25:17
**learn (1)**
50:17
**left (2)**
9:13,18
**legal (1)**
7:15

**level (3)**
17:24;28:10;53:21
**levels (5)**
12:22;13:20;14:12;17:16;26:6
**lied (1)**
41:2
**life (1)**
5:19
**limited (3)**
32:11;35:16;51:12
**line (4)**
12:16,16,17,18
**list (3)**
7:16;10:15;11:14
**listen (3)**
18:18;48:7;52:23
**lists (1)**
38:4
**litigation (1)**
51:8
**little (3)**
5:5;8:11;27:3
**live (1)**
4:18
**lives (1)**
4:19
**long (4)**
9:1;11:14;41:23;42:11
**look (30)**
7:17;13:13;17:10;18:5;21:15,18,20,21;22:1,10;23:21;24:21;25:1,5,24;32:1,4;35:13;39:11,14;41:5;43:16;44:14;50:21;51:13,15,17,17,19;54:8
**looked (9)**
21:1;25:7,10,11;29:19;40:15,17,18;51:9
**looking (3)**
18:8;27:5;41:1
**looks (3)**
31:9;32:7;51:13
**loose (1)**
54:9
**Lori (4)**
38:9,11;39:19;41:3
**lot (11)**
5:18;10:15;15:9;16:10;27:8;31:13;50:2,6,25;51:1,2
**lower (1)**
13:24
**lowest (2)**
14:1,2

## M

**Maegan (1)**
38:8
**mailbox (1)**
30:17
**majority (1)**
11:19
**maker (2)**
51:4,13
**makers (3)**
17:1;51:17,19
**makes (4)**
5:24;11:1;25:18,20
**making (4)**
21:2;23:6,21;51:20
**manage (1)**
15:9
**managed (1)**
29:8
**management (13)**
13:21;22:7,9;26:6,7;28:20,24;29:2;40:9;52:20;54:24;55:13,14
**manager (30)**
12:3,3,14,23,23,23;13:4,5,11,11;14:12,13,19,19;15:3;16:20;25:4;26:2,12,15,16,22,23;28:2,9;33:24;36:23;38:9;49:15;55:1
**managers (2)**
14:15;49:22
**manages (1)**
29:7
**managing (1)**
15:4
**manual (2)**
32:5;47:6
**Many (6)**
5:4;15:12,16;27:23;29:12,12
**marked (4)**
6:20;32:3;34:10;37:25
**materials (1)**
7:20
**may (3)**
6:6;49:17;56:22
**mean (3)**
7:15;33:12;35:4
**means (3)**
7:14;35:2;44:1
**measures (2)**
53:12,15
**meeting (9)**
20:7;31:17;36:5;42:22,22;43:5;45:5;46:1;52:23
**meetings (3)**
20:15,17;45:15
**mentioned (1)**
54:20
**merit (1)**
53:25
**message (1)**
44:13
**methods (1)**
50:18
**might (3)**
25:25;32:1;54:9
**mind (1)**
16:21
**miscommunication (1)**
20:20
**misspelled (1)**
6:24
**misspoke (1)**
20:20
**misstatement (1)**
46:3
**mistakes (1)**
49:17
**misunderstanding (1)**
51:16
**mix (1)**
14:13
**model (1)**
26:18
**monitor (1)**
23:14
**more (10)**
5:20;11:13;16:10;18:7;25:25;26:9;34:7;45:16,18;54:18
**mostly (1)**
6:8
**mouth (1)**
55:23
**move (1)**
54:4
**much (1)**
51:4
**Mulloy (1)**
38:9
**multiple (4)**
5:3;9:23;14:16;42:6

## N

**name (7)**
4:9,12,13,15;6:24;25:22;34:2
**national (1)**
10:22
**navigated (1)**
43:6
**necessarily (4)**
12:9;23:9;50:7,16
**necessary (1)**
45:14
**need (6)**
16:10,23,24;31:3;34:7;43:7
**needed (2)**
47:13;54:6
**new (1)**
5:12
**next (3)**
28:7,10;31:20
**night (1)**
51:7
**nods (1)**
6:2
**none (1)**
28:3
**nonmanagement (2)**
13:21;22:8
**normal (9)**
32:11,12;36:21;38:19;41:13;45:20,22;49:3;50:18
**normally (1)**
37:20
**northwest (3)**
8:10;13:18;14:25
**nos (1)**
6:1
**note (1)**
6:1
**notes (3)**
8:3;36:24;54:8
**notice (2)**
6:22;7:9
**number (2)**
29:20;34:10
**numbers (1)**
6:17

## O

**oath (2)**
40:23;45:10
**objection (10)**
6:11;21:10;27:11;33:14;38:15;39:23;46:15,21;49:5;51:21
**objections (3)**
6:7,8,10
**observe (1)**
36:18
**obtain (2)**
8:23;9:10
**off (6)**
17:12,13;51:23;52:8;54:10;55:6
**often (1)**
45:12
**onboarding (3)**
11:8,11;15:7
**once (2)**
5:3;32:21
**One (13)**
5:4;7:22,24;18:7;24:3,18;25:14;27:25;32:2;34:13;38:3;41:6;42:22
**online (4)**
8:19;9:3,5,7
**opened (1)**
5:13
**operational (3)**
12:10,14;13:14
**operations (4)**
11:12,18;12:6,20
**opinions (1)**
50:7
**opportunities (1)**
50:17
**opposed (1)**
50:15
**option (2)**
45:23,24
**order (2)**
16:10;17:2
**organize (1)**
48:5
**original (1)**
19:7
**otherwise (1)**
6:12
**out (13)**
6:16;7:16;9:23;22:17;23:19;29:23;30:22;31:16;34:18;47:13;50:25;54:19;55:4
**outcome (2)**
43:2;48:21
**outcomes (1)**
31:13
**outside (9)**
10:17,19;21:15;25:5,8;28:13;29:11,13;52:19
**over (4)**
5:14,19;10:8;41:24
**oversee (1)**
56:10
**oversight (2)**
56:16,18
**own (2)**
13:17;35:11

## P

**page (3)**
5:8;7:12;32:5
**paper (2)**
30:17;51:5
**paragraph (1)**
32:17
**part (15)**
5:1;21:11;23:23,24;24:13;36:8;40:17;42:15;44:15;45:2;46:22;47:15;50:12,17;54:1
**partner (1)**
8:10
**part-time (4)**
9:23,24;14:7;28:7
**passed (1)**
5:25
**past (3)**
21:18,20;22:1

**peacekeeping (1)** 32:10
**Peck (18)** 4:10;8:1,4;19:2,13,14,20,21;25:7,9;35:14,24;38:3,5;40:2,5;42:21;45:4
**peer (11)** 31:22;47:25;48:3,4,8,17,18;49:22;50:6,15,20
**peers (2)** 48:7;50:6
**people (13)** 23:8;26:16;27:15,21;30:4;35:7;37:1;38:4;48:9,19;50:12;51:2;54:4
**performed (1)** 35:6
**person (17)** 16:9,13;18:16;25:23;28:1,5,6,6,9;37:7;51:4;52:11;53:20,20,21;55:18,20
**person/representative (1)** 36:22
**personal (1)** 34:1
**phone (1)** 42:21
**physically (1)** 4:18
**place (10)** 17:15;18:24;24:17;31:12;34:24;36:19;46:9,25;52:18;54:6
**plaintiff (1)** 4:5
**play (2)** 16:2;24:16
**Please (4)** 39:17;46:16,19;49:10
**policies (1)** 50:18
**policy (17)** 17:24;19:24;20:12,23;28:23;29:1;40:6,7;43:3,8,11,12;50:7;52:6,11;53:7;54:4
**position (4)** 8:8,9;11:25;12:2
**possible (1)** 43:24
**preparation (2)** 7:7,19
**prepare (1)** 7:1
**present (14)** 36:17;37:7,9,15;38:4,14,17;39:1,4,20;41:3;54:21;55:2,18
**presented (1)** 48:12
**president (3)** 12:18,19;16:13
**pretend (1)** 16:19
**previous (3)** 5:10;22:10;54:16
**previously (3)** 34:10;37:25;40:14
**primarily (1)** 17:13
**prior (10)** 15:23,25;18:1,13;21:1;23:21;24:17;36:14;51:2,24
**privy (1)** 52:20
**probably (3)** 5:5,9,12
**problems (1)** 32:10
**procedures (2)** 50:8,18
**proceeded (1)** 4:1
**process (22)** 28:13;29:4,7,8,14,17;30:3,11;32:9,12,22;47:15;49:9,13,16;50:13,21;51:22;52:5;53:1,4;56:8
**produced (3)** 4:4;36:8;41:17
**product (1)** 56:15
**professional (1)** 34:1
**program (8)** 8:19;9:6,6;26:2;31:14;32:18,23;33:5
**progression (1)** 14:13
**progressive (2)** 28:16,24
**promote (1)** 27:21
**promoted (3)** 14:15;28:1;53:20
**promotion (6)** 13:10;27:22,24;28:7,10,12
**proven (3)** 43:10,12;53:6
**purpose (2)** 30:1;48:17
**put (2)** 29:18,20

## Q

**queue (2)** 30:20,21
**quick (2)** 32:1;34:12

## R

**re (1)** 49:10
**reach (5)** 29:23;30:22;31:16;47:13;55:4
**read (6)** 32:17,25;33:1;46:18,20;56:24
**ready (2)** 28:6,9
**real (1)** 43:19
**really (1)** 42:11
**reason (1)** 38:22
**reasons (1)** 29:20
**Rebekah (1)** 38:9
**receive (1)** 7:9
**recess (1)** 54:11
**recognized (1)** 10:19
**recommendation (5)** 26:15;49:4,23;50:2,3
**recommendations (4)** 48:20,23,24;49:1
**recommending (1)** 26:22
**record (14)** 4:13;6:8;20:8,11,13,17,22;23:1,8;27:6;46:20;50:21;51:17;54:10
**recording (1)** 5:15
**recordings (1)** 7:25
**records (11)** 7:24;22:20,24;23:2,4,10,11,15,16,20;52:9
**Redding (1)** 14:23
**redefine (1)** 34:19
**regard (1)** 10:12
**regarding (3)** 19:21;29:25;34:5
**regional (2)** 14:24;28:2
**regions (1)** 13:15
**regulations (1)** 15:10
**rehear (1)** 48:19
**Reinhardt (4)** 33:20,22,23;34:5
**related (1)** 8:4
**relating (1)** 7:25
**relevant (1)** 7:21
**rely (2)** 39:7,21
**remember (17)** 6:4;34:12;35:22;36:15;42:6,9,12,13,20,25;43:4;45:4,6,7;46:10;47:9,9
**repeat (5)** 16:17;22:22;26:9;39:17;46:16
**report (6)** 14:21;28:5;35:18,19;36:14;39:7
**reported (2)** 14:22;15:5
**reporting (1)** 48:10
**represent (1)** 4:10
**representative (3)** 37:9;38:10;55:8
**representatives (1)** 13:18
**request (10)** 29:18,19,20,25;30:16;37:5,9,16;48:6;55:20
**requested (3)** 36:22;37:7;38:14
**requesting (1)** 36:2
**requests (3)** 37:14;48:8;55:13
**require (1)** 17:8
**required (2)** 23:16,17
**reserve (1)** 56:23
**reside (1)** 4:17
**resolve (1)** 32:10
**resources (1)** 47:19
**respond (1)** 16:11
**response (1)** 16:9
**responsibilities (2)** 14:16;15:7
**responsibility (4)** 12:19;14:14;33:3;50:14
**responsible (2)** 11:8,15
**responsive (1)** 7:17
**result (1)** 53:9
**retraining (1)** 54:2
**review (24)** 5:6;7:6,22;16:24;18:2;23:24;31:22;34:11;40:11,12,22;44:15;47:25;48:3,4,5,17,18;49:22;50:21;52:17,17,19,19
**reviewed (5)** 17:16;30:6;37:19;40:10,13
**reviewing (3)** 17:3,18,22
**reviews (2)** 20:24;21:1
**Ricky (1)** 56:22
**right (14)** 6:15;11:25;27:16;32:1,16,18;34:12;35:13,20;37:8;38:14;40:24;41:6;47:11
**role (12)** 16:2,14;17:20;18:7,22;23:10,11;36:16,17;50:14;52:22,23
**room (1)** 36:22
**rule (2)** 6:10;45:25
**rules (1)** 5:6
**run (1)** 56:8

## S

**safeguard (1)** 30:7
**safety (1)** 11:22
**same (6)** 5:8,22;39:21;46:21;50:7,17
**Sandy (2)** 5:15;46:19
**saw (1)** 36:13
**saying (2)** 10:17;46:10
**scary (1)** 56:19
**scenario (1)** 16:6
**schedule (1)**

17:1
**school (3)** 8:13,22;44:20
**scope (3)** 24:11,20;25:15
**second (5)** 5:25,25;7:12,24; 30:19
**section (4)** 11:12;13:19,19;29:9
**security (19)** 24:9,20;25:12,14,22; 37:17;38:8,9;43:15,16; 48:11;52:4,15;55:1,4, 16;56:3,4,12
**seeing (2)** 6:21;35:22
**seems (3)** 27:5;32:9;51:11
**select (1)** 48:9
**self-driven (1)** 47:11
**sense (5)** 5:23,24;6:17;7:23; 33:18
**sent (4)** 34:18,20,24;36:2
**series (1)** 31:11
**services (5)** 29:9;31:4,5;47:20,21
**set (1)** 51:24
**setting (1)** 34:1
**severity (1)** 53:17
**share (1)** 18:16
**show (3)** 6:16;34:9;37:24
**side (13)** 10:9;11:2;12:10,21; 13:13,14,16;18:12,16; 45:21;46:7,14;47:1
**sign (1)** 56:24
**single (1)** 21:23
**Sit (2)** 18:17;31:18
**sitting (1)** 39:18
**situation (2)** 16:7;48:19
**sleep (1)** 51:7
**snapshot (1)** 51:19
**solely (4)** 21:13,23;24:24; 39:21
**solid (2)** 12:16,17
**someone (7)** 16:8;20:19;26:25; 38:13;40:16;54:20; 55:13
**somewhere (1)** 9:14
**sorry (4)** 27:4;41:20;52:7; 55:5
**sounds (1)** 32:8
**speak (10)** 5:14,19;19:25;20:2, 5,6;45:8;46:1,3;47:3
**special (1)** 10:11
**specialist (6)** 10:21;11:5,7;12:24; 13:2,11
**specific (6)** 15:22;17:7;21:5; 23:19;26:10;27:14
**Specifically (10)** 11:18;12:1;17:9; 19:4;24:4;34:16;35:9; 42:12,14;47:10
**specifics (2)** 34:7;52:21
**spell (1)** 4:12
**spoke (1)** 50:24
**stage (1)** 31:20
**stand (1)** 51:7
**standard (1)** 37:6
**standing (1)** 26:21
**standings (1)** 26:17
**start (5)** 5:21;6:16;9:22,25; 13:23
**started (2)** 9:23;10:1
**state (3)** 4:12;23:19;36:4
**stating (2)** 33:4,10
**status (1)** 19:21
**STEGELMEIER (18)** 4:8,9;6:15,21;21:12; 27:15;31:25;32:4; 33:17;38:17;40:1; 46:18,24;49:8;52:2; 54:7,13;56:19
**step (6)** 30:12,18,19;48:1,3,4
**steps (8)** 30:10;31:11;47:22, 24;51:24,25;52:2,14
**Steve (2)** 14:22;38:10
**still (3)** 6:11;10:3;53:4
**story (5)** 18:12,17;45:21;46:7; 47:1
**strange (1)** 27:5
**structure (1)** 26:2
**stuff (3)** 9:8;17:3;20:22
**subject (1)** 41:25
**substantiate (1)** 51:6
**substantiated (6)** 43:15;44:6,9,10; 52:6,16
**successful (1)** 32:10
**summary (2)** 38:2,25
**supervisor (11)** 11:4,6,7;12:24;13:2, 11;14:8,8;28:8,8;38:8
**supplied (1)** 48:13
**support (2)** 11:13,21
**supporting (2)** 11:12,16
**supposed (8)** 37:15;55:3,4,7,9,14, 15,19
**sure (5)** 5:7;15:10;44:8;45:3; 52:13
**surprise (3)** 49:15,18,21
**surprised (1)** 33:18
**suspensions (1)** 27:10
**switch (1)** 10:8
**switched (1)** 11:2
**sworn (1)** 4:5

## T

**talk (3)** 7:4;31:19;43:1
**tasks (1)** 15:6
**teaching (1)** 15:8
**team (1)** 15:5
**Teams (2)** 20:15,17
**tecum (1)** 7:13
**telling (1)** 39:18
**ten (1)** 45:18
**tend (1)** 5:19
**ten-minute (1)** 54:8
**term (2)** 28:15,19
**terminate (2)** 18:15;19:5
**terminated (6)** 18:18;19:24;25:4; 40:2,5,16
**termination (23)** 7:25;17:4,12;18:13, 20,24;21:2,24;22:10; 23:21;24:23;25:2;27:7; 39:8,12,16,22;43:3; 45:13;49:17;51:3,25; 53:10
**test (1)** 5:25
**testified (2)** 4:6;40:14
**testifies (1)** 46:2
**testimony (2)** 20:4;54:16
**though (1)** 29:10
**thought (1)** 54:14
**times (2)** 5:3;6:6
**title (6)** 11:2,3,4;12:3;13:8; 14:17
**today (1)** 6:10
**Todd (9)** 4:3,9,14,17,22;6:22; 32:6;35:13;54:13
**T-o-d-d (1)** 4:14
**told (7)** 19:23;20:4,6,19; 46:3,25;51:11
**tolerance (1)** 29:1
**track (1)** 23:14
**trail (1)** 51:6
**trained (1)** 49:12
**training (4)** 8:12;10:11;15:8; 54:2
**trainings (3)** 10:18;21:18;49:9
**trial (1)** 56:24
**Troy (11)** 19:13,14,16,19,20; 35:24;36:3,6;42:21; 44:13;46:12
**true (3)** 5:18;44:2;54:24
**trust (6)** 39:20;41:10,18,20, 21;53:4
**trying (1)** 12:5
**turns (1)** 22:17
**two (4)** 8:17;9:16;48:6,8
**Tylynn (1)** 4:14
**type (2)** 17:17;22:3
**types (1)** 22:5
**typically (1)** 17:14

## U

**uh-huhs (1)** 6:2
**ultimately (1)** 27:25
**unable (5)** 33:15;41:22;42:8,18; 50:23
**under (6)** 12:13;15:12,16;31:8; 40:23;45:10
**union (2)** 22:7;28:19
**University (6)** 8:18,20,24;9:3,13,19
**Unless (2)** 6:7,12
**up (5)** 5:13;8:14;15:5; 16:21;24:10
**upon (4)** 33:9;36:23;45:14; 48:21
**UPS (46)** 4:11;5:2;8:6;9:24, 25;10:1,5,6,17,18,19, 23,24;11:17;12:6; 15:19;20:11,22,24; 26:2;27:4,18;28:23; 29:5,9;30:2,6;32:12, 22;33:10,12,23;34:3,

21,24;38:12,20;41:11,14,17,23;48:7,22,24;49:22;51:18
**use (1)** 47:11
**used (2)** 47:10;50:8
**using (1)** 28:24
**usually (2)** 27:5;34:18

**V**

**various (2)** 11:24;13:20
**vary (1)** 52:10
**vast (1)** 15:6
**verbal (1)** 6:2
**verify (1)** 23:15
**versus (1)** 48:20
**vice (1)** 12:17
**violation (8)** 17:24;19:24;40:6,7;43:4,11;52:6;53:6
**violations (1)** 43:8
**voluntary (2)** 33:5,6

**W**

**wait (3)** 5:21;41:6;46:7
**wants (1)** 54:21
**Washington (1)** 4:18
**way (1)** 32:9
**ways (3)** 38:1;49:7;55:22
**weigh (1)** 22:18
**weren't (3)** 19:8;34:15;39:4
**What's (10)** 8:8;13:22;17:24;28:18;29:16;30:19;31:18;48:15,17;55:3
**whenever (1)** 44:12
**whole (4)** 5:12;28:13;31:7;51:17
**Whose (1)** 23:11
**wide (1)** 25:15
**willful (2)** 22:13,17
**within (6)** 10:18;13:19;15:11;25:21;26:17;29:12
**without (2)** 23:6;35:9
**witness (10)** 4:4;21:11;27:12;33:15;38:16;39:24;46:16,22;49:6;51:22
**word (2)** 7:13;55:23
**words (2)** 7:15;47:10
**work (6)** 6:13;9:14;10:12;26:4;32:9;51:1
**worked (3)** 33:24;34:3;41:23
**working (2)** 9:25;10:1
**works (1)** 26:5
**world (1)** 5:12
**wrap (1)** 12:5
**write (2)** 39:3,5
**writings (1)** 7:20

**Y**

**year (2)** 8:22;26:17
**yearly (1)** 26:8
**years (3)** 5:4;9:2;41:24
**Yep (2)** 5:4;41:6
**yesterday (1)** 6:19

**Z**

**zero (1)** 29:1
**zone (1)** 16:12
**zones (1)** 13:15
**Zoom (4)** 5:9,11,18,20

**1**

**1/2 (1)** 9:2
**10:08 (1)** 54:11
**10:18 (1)** 54:12
**10:21 (1)** 56:25
**13th (1)** 19:12
**15 (1)** 15:14
**1998 (1)** 8:22
**1999 (1)** 10:2
**1st (2)** 26:11,19

**2**

**2 (1)** 9:2
**20 (1)** 15:15
**2018 (3)** 10:10;11:1;13:1
**2021 (14)** 9:9;12:1,2;13:4;14:18,21,22;15:15;16:15,16;19:12;34:5;35:21,22
**2022 (2)** 9:9;34:6
**21 (1)** 12:1
**24 (1)** 41:24

**3**

**3 (1)** 34:11
**31st (3)** 26:12,19,21

**5**

**5 (1)** 37:25

**8**

**8 (2)** 6:17,20

**9**

**9 (3)** 32:2,2,3
**9:00 (1)** 4:1
**97 (1)** 45:1
**98 (1)** 10:2
**99 (1)** 10:2