# EXHIBIT Q

**In The Matter Of:**

*PECK vs.*
*UNITED PARCEL SERVICE, INC.*

---

*TROY EMERSON*
*February 27, 2024*

---

*T&T Reporting, LLC*
*477 Shoup Avenue, Suite 105*
*Idaho Falls, Idaho 83402*
*(208) 529-5491*

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

HEIDI H. PECK, an individual, Plaintiff, vs. UNITED PARCEL SERVICE, INC., an Ohio Corporation, Defendant.

Case No. 4:22-cv-00381-AKB

REMOTE DEPOSITION OF TROY EMERSON

Tuesday, February 27, 2024, 9:01 a.m.

BE IT REMEMBERED that the deposition of Troy Emerson was taken by the attorney for the plaintiff, by Zoom, before Jessica Simpson, Court Reporter and Notary Public, in and for the State of Idaho, in the above-entitled matter.



A P P E A R A N C E S

R E M O T E

For the Plaintiff:
HALL ANGELL & ASSOCIATES, LLP
BY: CORY R. STEGELMEIER
1075 South Utah Avenue, Suite 150
Idaho Falls, Idaho 83402
(208) 522-3003
crs@hasattorneys.com

For the Defendant:
SCHMOYER REINHARD LLP
BY: RICHARD L. CLIFTON
8000 IH 10 West, Suite 1600
San Antonio, Texas 78230
(210) 447-8033
rclifton@sr-llp.com



E X A M I N A T I O N


| TROY EMERSON | Page |
|---|---|
| BY MR. STEGELMEIER | 4 |
| BY MR. CLIFTON | 109 |
| BY MR. STEGELMEIER | 114 |


E X H I B I T S


| No. | | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition Duces Tecum of Troy Emerson | 6 |
| Exhibit 2 | E-mail | 8 |
| Exhibit 3 | Investigation Summary Rexburg | 65 |
| Exhibit 4 | Floyd Reinhardt Employee Documentation | 68 |
| Exhibit 5 | Investigation Report | 77 |
| Exhibit 6 | Investigation Summary Idaho Falls | 88 |
| Exhibit 7 | Defendant's Revised Disclosure Statement | 106 |




(The deposition proceeded at 9:01 a.m. as follows:)

Troy Emerson, produced as a witness at the instance of the plaintiff, having been first duly sworn, was examined and testified as follows:

**EXAMINATION**

**BY MR. STEGELMEIER:**

**Q. Mr. Emerson, my name is Cory Stegelmeier. I represent Heidi Peck in a lawsuit that she's brought against UPS.**
**Can you state your full name and spell your last name for record?**
A. Troy Robert Emerson, E-m-e-r-s-o-n.
**Q. And, Mr. Emerson, have you ever had your deposition taken before?**
A. Yes.
**Q. Okay. And what instances did you have your deposition taken?**
A. For a wrongful termination case when I was in Southern California.
**Q. Okay. I'm guessing that wasn't by Zoom?**
A. No.
**Q. So just a few ground rules -- I'm sure**

**you understand the general format of a deposition. It's a chance for us to ask you questions and you get to answer and everything is on the record and under oath.**
**Because of that, if there's ever a question that you don't fully understand, if you could ask me to clarify. Because everything that -- I'll just assume that all your answers, you understand my questions. And so if you don't understand, if you could ask for clarification. Does that make sense?**
A. Yes.
**Q. And also -- you're doing a good job -- all answers need to be yes or noes. It's hard for the court reporter to record nods or head shakes. Things like that.**
**And finally, with Zoom, it's kind of hard -- we have a tendency to talk over each other in general, everyday conversations, so I would ask you to wait until I finish the question. It's really hard on Zoom because sometimes there's a little bit of a delay. Does that work for you?**
A. Yes.
**Q. If you ever need a break today, just let me know and we will take a break.**



**With that, could you tell me where you are currently?**
A. Happy Valley, Oregon.
**Q. Okay. Who lives with you?**
A. My wife and my daughter.
**Q. Okay. Where were you born and raised?**
A. Bend, Oregon.
**Q. Okay. I'm going to share my screen with you and show you what we'll mark as Exhibit 1 and this will be the notice of deposition.**
**(Exhibit 1 marked.)**
**Q. BY MR. STEGELMEIER: Are you seeing a notice of deposition duces tecum?**
A. Yes.
**Q. Have you seen this before?**
A. This particular item?
**Q. Yeah.**
A. Yeah. I believe I got that in -- via e-mail.
**Q. Okay. Have you done anything to prepare for this deposition besides speak with your counsel?**
A. No.
**Q. Okay. Have you gone back and looked at any documents in preparation for this deposition?**
A. Just one e-mail in particular.



**Q. What was the e-mail?**
A. It was the retraining e-mail that I sent to my managers, including Ms. Peck.
**Q. What date was that?**
A. The exact date, I don't recall. I want to say it was June 2021.
**Q. Do you have a copy of that with you today?**
A. I do.
**Q. Could I maybe -- let me stop sharing screens and have you share that with me. I'm not sure I've seen that e-mail.**
A. Please bear with me. It's been a minute since I've been on Zoom.
**Q. You're fine. We got real good with it in 2020.**
**So this is dated June 4?**
A. Correct.
**Q. Okay. And why did you review this e-mail in particular?**
A. Frankly, to make sure I had a copy of Heidi acknowledging she understood the proper use of future exceptions on packages.
**Q. Okay. And what's your understanding of what the future use -- or future use was supposed to be used for?**



A. Well, as it states on the screen, "Packages, by request of the consignee, will be delivered at a future date which is more than one day in the future. Applies for long-term closings, such as schools during winter break and for store openings. Note: Packages must have scanning activity after nine days of future so that they are not charged as missing delivery scan."
**Q. Okay. So you can go ahead and stop sharing. I think -- let me go ahead and share. And I just want to make sure that this is the same e-mail so that we have the right exhibits. So this one has, at the top, an e-mail from Clay Holloway. Is this the same e-mail, just different format?**
A. Let me read it, please.
**Q. Go ahead.**
A. It is the same. It's just missing the attachment because it had been forwarded.
**Q. So we'll mark this as Exhibit 2.**
**(Exhibit 2 marked.)**
**Q. BY MR. STEGELMEIER: So you reviewed this e-mail prior to this deposition?**
A. Yes.
**Q. You say you wanted to make sure that you**

**understood that she had received this, right?**
A. Correct.
**Q. Okay. Why was that important to you?**
A. That I followed through sending out the retraining as I had committed to --
**Q. Okay.**
A. -- and that she had confirmed that she had gotten it.
**Q. And this was in June of 2021?**
A. Correct.
**Q. Okay. Did you look at anything else in preparation for your deposition?**
A. No.
**Q. Okay. We'll go back to Exhibit 1, the notice of deposition. This is a fancy word -- lawyers like to use fancy words sometimes -- it's a deposition duces tecum. So you're supposed to bring with you certain documents related to this action.**
**Did you look to see if you had anything besides just that e-mail? Well, I guess the e-mail is the only thing you reviewed in preparation for this deposition? Nothing else?**
A. Correct.
**Q. Okay. Do you know if you have any tapes, recordings, audio records, or anything related**



**to the termination of Heidi Peck besides this e-mail?**
A. I do not.
**Q. Do you have any text messages or e-mails with anyone else about her termination?**
A. No.
**Q. Okay. Do you keep any written notes regarding her termination?**
A. No.
**Q. Okay. Fair enough. Do you keep a journal or a diary or anything like that?**
A. I used to.
**Q. Did you keep one in 2021?**
A. I don't know if I was still maintaining it in 2021 and -- I don't know if I was still maintaining it in 2021.
**Q. Is this something you would put in? I know as a journal keeper myself, I quite often vent about work in there as a form of therapy. Is that something that you would have done? Put something about Heidi's termination in your journal?**
A. No.
**Q. You said there wouldn't have been any text messages or e-mails or anything like that back and forth regarding her termination?**
A. No. None that I have.



**Q. When you say "none that you have," are there some that you sent while you were still at UPS?**
A. To clarify, I am still at UPS.
**Q. Okay. You're still at UPS. You still have access to your phones, e-mails, records like that?**
A. Yes.
**Q. So did you send any text messages or e-mails back and forth regarding her termination?**
A. There may have been some during that period, yes. Since, no.
**Q. Okay. I think -- will you go back and check to make sure and see if you've produced all of those to your attorneys?**
A. The one that I represented on the screen is the one I have currently on my laptop. That's all I have on my laptop.
**Q. Okay. Let's go back a little bit. When did you graduate high school?**
A. 1981.
**Q. Where did you graduate from?**
A. Bend Senior High School.
**Q. Did you do any college after high school?**
A. I did.



**Q. Where did you go to college?**
A. My first school was Pacific University.
**Q. Did you get a degree from Pacific?**
A. I did not.
**Q. How long did you attend Pacific?**
A. Roughly five months.
**Q. Okay. Where is the second school you went to?**
A. Southern Oregon University.
**Q. When did you go to Southern Oregon?**
A. Fall of '82. Graduated spring of '86.
**Q. Why did you switch from Pacific to Southern Oregon?**
A. I didn't like being away from home, and I tore up my knee and needed to have surgery.
**Q. How did you hurt your knee?**
A. Playing racquetball.
**Q. That'll do it. What did you graduate from Southern Oregon with or in?**
A. I have a bachelor's of science, business administration and accounting. I also have a bachelor of science, economics.
**Q. Did you get those at the same time?**
A. Yes.
**Q. After you graduated, what did you do?**

Page 13

A. After graduation I was working for Safeway.
**Q. Safeway?**
A. Yes.
**Q. What was your job at Safeway?**
A. Produce clerk, night checker.
**Q. How long were you with Safeway?**
A. Approximately two years.
**Q. Okay. That was after graduation?**
A. During college and after graduation.
**Q. Okay. When did you leave Safeway?**
A. August 1987.
**Q. Where did you go then?**
A. I came to UPS.
**Q. What was your first job at UPS?**
A. Package car driver.
**Q. Okay. Why do you call them package cars? They seem like trucks.**
A. That's what most people call them. We call them package cars.
**Q. Okay. How long were you a package car driver?**
A. 22 months, approximately.
**Q. Okay. What kind of training did you have to be a package car driver?**

Page 14

A. Initially I had to take a road test.
**Q. Okay.**
A. I had to pass the road test and then wait to see if I got hired.
**Q. Okay. I'm sure that things have changed a lot. How did you track your packages and things in 1987?**
A. On paper sheets with carbon copy.
**Q. Okay.**
A. Or carbon sheet in between.
**Q. So you did that for 22 months as a package car driver?**
A. Yes.
**Q. What kind of reporting requirements did you have for your different packages?**
A. I was to record every package on my car. I was to obtain any next-day air or two-day air labels. They went in my left pocket. My COD money went in my right pocket, chest pockets on my shirt.
**Q. Okay. And then you just had delivered or not delivered? Or did you have, like, all the future, emergency, all those?**
A. I don't recall ever having emergencies or futures. It was either not in or it was delivered.

Page 15

**Q. Okay. And then after 22 months as a package car driver, what did you do?**
A. I was promoted to a full-time supervisor.
**Q. Okay. What kind of job duties did you have at that point?**
A. My first job duty as a full-time supervisor was time study observer.
**Q. What is that?**
A. That is where you will get on car with a package car driver; you will time what they do throughout the day; you evaluate their methods and whether they're using the proper delivery methods or not. And then you sum the study, and they're either -- because of geography -- given more time or less time to complete their duties in a given day.
**Q. So basically seeing if people are being efficient or whatnot?**
A. Correct.
**Q. Okay. How long were you there?**
A. That job lasted probably about six months.
**Q. Okay. Then did you get promoted again, I'm guessing?**
A. No.

Page 16

**Q. What happened then?**
A. At that point I returned to the Medford, Oregon, package center, and I was an on-road supervisor.
**Q. Okay. Where were your other two positions at?**
A. The time study -- I was working out of Portland at the time while I was doing time study.
**Q. Okay. And the package car, you were in Medford?**
A. Correct.
**Q. What were your duties as an on-road supervisor in Medford?**
A. The general responsibilities of an on-road supervisor: You have a set number of drivers, 20, 25, maybe more; you're responsible for making sure that they're delivering all their packages; you get on car with them and do their safety compliance training: spacing, visibility, et cetera.
And the other part of that -- back then -- you would have two nights a week -- one night, two nights a week -- you were responsible for closing down the center, which meant you wait until the last package driver comes in; you make sure the

local store is getting the package cars unloaded that have pickup volume in them; and then you lock up the building and go home.
**Q. Okay. What kind of training did you -- besides safety -- what kind of training did you provide to your package car drivers?**
A. Methods training, proper delivery methods.
**Q. Okay. At that point were you still on paper and pen for everything with carbon copies?**
A. Yes.
**Q. Okay. How long were you there in Medford as an on-road supervisor?**
A. Approximately one year.
**Q. Okay. Where did you go after that?**
A. After that I was -- my family and I were moved to Portland and I became the Oregon district air IE, industrial engineer.
**Q. Air IE, industrial engineer?**
A. That's what IE stands for, correct.
**Q. Okay. What kind of stuff do you do as an industrial engineer?**
A. In that position I was responsible for building what we call "work measurement," making sure that we're following proper pass -- this was at the



Portland airport -- and being as efficient as possible while we were running the hub operation, as well as the ramp operation.
**Q. Okay. So you're at the airport just making sure that everything flowed faster, I guess?**
A. Correct.
**Q. Okay. Is it normal for UPS to move people around based on different job offerings and things like that? Or do you usually stay in one location?**
A. I can't speak for others. My career, I have been moved four times.
**Q. Okay. As a supervisor, later on in your career, have you often asked people to move for jobs? Or do you usually try to keep them in their same area?**
A. As a supervisor, that was not my job to relocate people.
**Q. Okay. Were you in charge of hiring different people?**
A. No.
**Q. Okay. How long were you in Portland?**
A. Approximately ten years.
**Q. During that time, if an airplane couldn't take off, what would you mark those packages**



**as?**
A. That was not in my purview. That would have been on the operator to take care of any exceptions.
**Q. So you were more just trying to help people work more efficiently and not really track what was happening with the packages?**
A. Correct.
**Q. Okay. After Portland, that puts us probably -- what are we? Right around the 2000s, early 2000s, at that point?**
A. Correct.
**Q. Where did you go then after Portland?**
A. We were relocated to San Francisco.
**Q. Okay. What was your job there?**
A. Technology support group manager.
**Q. So about now is when things are getting digitized?**
A. That began approximately 1991, 1992.
**Q. Okay. So what did you do as a technology group -- technology group manager? Is that what you said?**
A. Technology support.
**Q. Okay. What was your job there? What was your day-to-day like?**



A. Day-to-day I managed a group of technicians. Some were responsible for maintaining our external systems for our shipping customers. Now known as WorldShip, then known as MaxiShip. That was a minute ago.
I was also responsible for developing any plans for building wiring, new buildings. Anything that involved computers, I was responsible for that.
**Q. Okay. You said about 1991 is when they started digitizing everything. How far along was it in the early 2000s?**
A. We had digitized theater operations, and I believe we were on DIAD II, maybe DIAD III at that time.
**Q. And the DIADs, those are your little PalmPilot looking things?**
A. More of a PalmPilot now; more of a sheet of plywood back then.
**Q. Okay. How long were you there?**
A. We were in the Bay Area for four years.
**Q. Okay. So you mentioned different systems and things like that, the names of different systems. I'm sure since 1987 you've seen quite a few different systems at UPS; is that correct?**

A. Yes.
**Q. Have you also seen a bunch of different priorities? I'm sure different leaders bring up different things that are important to them.**
A. Can you restate that, please?
**Q. So some leaders might focus on safety. I've seen that a lot. Where they say, Safety is key. That's the number one thing. I don't care about anything else as long as you're safe.**
**Others seem to focus on profitability. Where they need -- they don't specifically say that safety is more important, but they more put their focus on a different thing. Have you seen that with different managers that you've worked under?**
**MR. CLIFTON:** Objection to form.
**Q. BY MR. STEGELMEIER: People putting a focus on different things?**
**THE WITNESS:** Ricky, did you say something?
**MR. CLIFTON:** I objected to form, but you can answer.
**THE WITNESS:** I have.
**Q. BY MR. STEGELMEIER: So it's not uncommon for one manager to have their pet project? I guess, to make it simpler.**
A. That can happen.



**Q. Okay. As a manager, did you ever have a pet project that was really important to you?**
A. In what role?
**Q. Let's start with your technology support role. Did you have one thing that you focused on that you wanted to make sure your guys got? Or your girls?**
A. That the system stayed operational.
**Q. Okay. We'll probably discuss that later when we get closer to the events that are more relevant to this.**
**After you left San Francisco, where did you go?**
A. We were moved to Southern California, specifically, Orange County.
**Q. Okay. What was your role in Orange County?**
A. My first role was the Pacific region operational excellence manager.
**Q. Region operational excellence manager. That's a nice title. What was your job? What was your duties as the operational excellence manager?**
A. My duties included training and support of operations. Basically, from Central California down to -- excuse me, basically, the state of



California.
**Q. Okay.**
A. We would have competitions for best service. I would report in high-level meetings with the region president and district presidents and present to them. I would share new service initiatives with those same people, as well as their division managers. Those are a few of the duties that were under my purview at the time.
**Q. Okay. So break it down for me. A region, a district, what's the hierarchy? What's our chain of command here? Are we starting with branches? What's the lowest level at UPS and then what's the highest?**
A. The highest is Atlanta, 55 Glenlake.
**Q. Okay.**
A. And the lowest would be package center and/or hub sort.
**Q. Okay. So you started at hub sort, then the package center, and then do you get to a region?**
A. A district.
**Q. A district first. And then a region?**
A. Correct.
**Q. And then the next step from region is everybody?**



A. Essentially. Yes.
**Q. Okay. So as the regional operations excellence manager, are you the top dog in the region? Or is it just a part of that?**
A. It's just a part of that.
**Q. Okay. Who's the top dog in a region? What do they call them?**
A. Region president.
**Q. Okay. How many districts were in the Pacific region?**
A. At that time 28, I believe.
**Q. Okay. And then how many -- I guess it probably depends on the district as to how many package centers are in a district; is that correct?**
A. Correct.
**Q. Okay. So you had different competitions among your district to see -- for different delivery goals and stuff?**
A. Correct.
**Q. Can you give me an example of one of those?**
A. The big one we had every year was called "The Race for Operational Excellence."
**Q. Okay. How was that scored or graded? What were they looking for?**

A. There would be different business metrics, such as delivery scan, as an example. I would chart the results by district and by division manager each week. And then each week, at the end of the week, we would have a call where we would celebrate that week's winner.
And then at the end of the competition -- I want to say it lasted about six weeks -- we would then crown a winner, and they would get a trophy, basically, from the region president.
**Q. Okay. What -- just a trophy? Or some financial incentive?**
A. In my time, it was just a trophy.
**Q. Okay. So if they didn't do so well, did they get scolded? Did they get in trouble?**
A. Not to my knowledge. No.
**Q. So it was just kind of bragging rights? We get a trophy if we do good?**
A. Correct.
**Q. So no financial incentive to work harder? No financial penalty for doing poorly?**
A. To my knowledge, that's correct.
**Q. Okay. So when you would announce the metrics for how you were going to score that competition, would they often, kind of, shift their**



**focus towards that metric that you announced was going to be important for the competition?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** Somewhat. Not all.
**Q. BY MR. STEGELMEIER: All right. So you were -- how long were you the regional operational excellence manager?**
A. Approximately 18 months.
**Q. What did you do after that?**
A. My next assignment was the Gardena package division manager.
**Q. Is a division above a region?**
A. No. It's a part of a region.
**Q. So different divisions within a region?**
A. Correct.
**Q. Are divisions different from districts?**
A. They reside within a district --
**Q. Okay.**
A. -- which resides within a region.
**Q. So is this a demotion? Or was it just, kind of, a lateral transfer?**
A. It was a lateral.
**Q. So you went from over the region -- so Gardena, what was your title?**
A. Package division manager.



**Q. Were you the top of that division then?**
A. Yes.
**Q. Okay. What were your job duties as the division manager?**
A. How much time do we have?
**Q. We got eight hours.**
A. To make sure I dispatched all package volume every day.
**Q. Okay.**
A. That my drivers were safe on road, that my drivers were efficient on road, and that my drivers made sure they picked up all pickup volume while they were on road.
I also managed, in that building, three package centers. So three center managers, approximately seven on-road supervisors, and a preload as well was my responsibility.
**Q. Okay. Just one preload?**
A. Yes.
**Q. Okay. And how long were you there?**
A. Approximately one year.
**Q. Okay. So during that time -- we're into the technology era -- do you recall how you were supposed to slate missed packages or emergencies or futures?**



A. Yes.
**Q. Has that changed?**
A. Missed packages were to be recorded in the DIAD as missed.
**Q. Okay.**
A. Our process in Gardena, while I was there, was to put those missed packages in front of the package center so they were visible so that when I came in in the morning, assuming -- so that when I came in the morning I could walk in front of the center and see what our service results were from the day prior.
**Q. Okay. Did you have to report missed packages to your district people?**
A. Yes. I did.
**Q. Had you had an excess amount of missed packages, was that something you'd get in trouble for?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** Not trouble, but I would have to review what my process was and what my plan was to not have missed packages.
**Q. BY MR. STEGELMEIER: Okay. Did you have an incentive to mark them as not missed?**
A. No.

**Q. There's no reason for you to mismark a package?**
A. No.
**Q. Okay. So after that year as the division manager, where did you go after that?**
A. I then became the South Cal small hubs division manager.
**Q. Okay. So just another division? Just another lateral transfer?**
A. Correct.
**Q. Did you apply for these different jobs? Or was it just the needs of UPS said, hey, Mr. Emerson, we need you over here now?**
A. The latter is true, the needs of UPS.
**Q. So you weren't looking to leave Gardena or Orange County or anything like that? They just said, we'd like you to come over here and do this now?**
A. Correct.
**Q. How long were you at the South Cal small hubs division?**
A. The first stint? Approximately 18 months to 2 years.
**Q. Okay. And then you came back, I'm guessing?**



A. At that point I was transferred to the South Cal feeder division manager position.
**Q. What's the difference between a feeder and a small hub?**
A. Hubs sort packages and load them.
**Q. Okay.**
A. Feeders move them, tractor-trailer.
**Q. Okay. So those wiggle-wagons we grew up calling them, the doubles and triples going down the highway from UPS, that was yours, as a feeder?**
A. Correct.
**Q. And then those would go to a hub, which would then put them on a package car and deliver them?**
A. Some would go to preloads, which then they were unloaded and put on package cars.
**Q. Okay.**
A. Some would go to other hubs to have a refined sort, meaning sort them down finer. And some were already ready to go to the railroad. The rail yard, as an example, that would be another destination.
**Q. Okay. So how long were you the feeder division manager for South Cal?**
A. The first stint, about two years.



**Q. So you went small hubs, feeder. Then where did you go?**
A. In 2010, I was then transferred to the Ontario Regional Gateway in Ontario, California.
**Q. I'm glad you clarified that. I thought you went to Canada.**
**So the regional gateway, that sounds like an airport; is that correct?**
A. Correct.
**Q. And what was your job at the regional gateway? Were you a division manager there as well?**
A. I was.
**Q. Okay. How long were you at the regional gateway?**
A. Approximately one year.
**Q. Okay. How far is Ontario -- is Ontario in Southern California too?**
A. It is. Yes.
**Q. Okay. Then where did you go after that one?**
A. Then I got moved across the street, literally, to the Ontario ground hub division.
**Q. So same, division manager, just a different division?**
A. Correct.



**Q. Is it normal for UPS to move division managers around so often?**
A. I can't say so often. That was my experience.
**Q. Okay. When you were getting moved into these divisions, was it to fix problems? Was it for -- why were they moving you to all these divisions so often?**
A. Experience. To obtain experience.
**Q. Okay. How long were you the ground hub division manager?**
A. The first time, approximately two years.
**Q. Okay. We're getting to about 2013 by now, plus or minus?**
A. Plus or minus.
**Q. Okay. So after the ground hub division, you go back to one of the previous ones? Or a new one?**
A. Correct. Previous.
**Q. Which one did you go to?**
A. Back to feeder.
**Q. Okay. So about 2013, plus or minus, you went back to the feeder division. And then how long did you stay there this time?**
A. About a year.

**Q. Okay. Then where did you go after that?**
A. I was then asked to return to the Ontario ground hub division.
**Q. Okay. And how long do you stay there this time?**
A. That was roughly six or seven months maybe.
**Q. Okay. As division manager, what kind of training would you provide to your on-road supervisors for how to slate packages or mark packages?**
A. What do you mean by "mark packages"?
**Q. Like missed, delivered, emergency. Things like that.**
A. As a division manager, I would follow up on those exception packages. The training was provided by their immediate manager. They were responsible for that training.
**Q. Who was their immediate manager?**
A. Center manager in a package operation.
**Q. Okay. So the center managers are responsible for providing management to the on-road supervisors for how to mark exceptions and other packages?**
A. That's correct.



**Q. Okay. When you were at the Ontario Regional Gateway, if an airplane couldn't take off, what did they usually mark those packages?**
A. It depended on the exception.
**Q. Okay. If the airplane broke down?**
A. Then it would be "broke down," and those packages, ultimately, would show a delay due to -- I can't remember the exact phrase for that exception, but it would be due to airplane breakdown.
**Q. Okay. What if there was a weather event and they couldn't take off?**
A. We'd apply a weather exception to those packages and try to reestimate delivery time.
**Q. Why are there different markings for a late delivery? I mean, as a consumer, you just see "delayed"; isn't that correct?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** So better, I guess, to better put them in the proper bucket. So, basically, what is UPS's responsibility? Meaning, the plane breaks, we can't deliver the packages. If there's a weather event, an act of God, then that is not UPS's fault, and we want to make sure that we mark them accurately based on the exception.
**Q. BY MR. STEGELMEIER: Okay. Who looks at the markings?**



A. Anybody can look at them.
**Q. So as a consumer, if my package is late, I can go see why?**
A. I haven't tracked as a consumer. But if you go and look at it, it will specifically say "weather delay" or something, "weather event," and then the system will try to recalculate the next delivery date.
**Q. Okay. Does it affect -- is there some government program that is affected if a package is marked missed or emergency, one versus the other?**
A. What do you mean by "government"?
**Q. Like, will you get in trouble with the government if you mark the package as "emergency" when it was really just missed?**
A. Not to my knowledge. No.
**Q. Or if someone marks a breakdown as an "emergency" instead of "missed" or instead of -- if someone marks a breakdown as an "emergency" instead of just "breakdown"?**
A. Those two exceptions, if it's a weather event, an act of God, we are not responsible. If we have a breakdown or a missed package, the organization, UPS, is liable to refund the shipping fees in that case.



**Q. So if a package car breaks down, I can get my money back?**
A. If you pursued it, you could.
**Q. Okay. And what about just a missed? If they just missed -- decided not to do it because they missed it, can I could get my money back?**
A. If you pursued it.
**Q. Do you know the numbers of how many people pursued that? Is it a problem with UPS?**
A. I have no idea.
**Q. Who told you that people could get their money back for a missed package?**
A. Who?
**Q. Yes. What's your basis for that?**
A. That's our company policy.
**Q. Okay. As a division manager, did you ever issue a refund for a missed package?**
A. That wasn't part of my responsibility.
**Q. Okay. Were you aware of anyone getting a refund issued for a missed package?**
A. No.
**Q. Did you ever get a call where someone told you, hey, you missed a package, so I had to issue a refund?**

A. No.
**Q. Okay. So, I guess, just to speed things up, when did you leave South California? When did you go towards -- when did you leave South California? Let's go that far.**
A. 2016. July 2016.
**Q. Where did you go in July of 2016?**
A. We came back to Portland.
**Q. Okay. And how long were you in Portland that time?**
A. Until the beginning -- not beginning, February 2022. Still in Portland, no longer in operations.
**Q. Okay. What was your job in Portland in 2016 through 2022?**
A. From 2016 to approximately September 2017, I was the northwest district feeder division manager.
**Q. How far did that northwest division -- or district, right?**
A. Correct.
**Q. How far did that district extend?**
A. We have Alaska, Oregon, Washington, Idaho, Montana, and Wyoming.
**Q. Okay. So you're over the feeder trucks**



**in that district, correct?**
A. Correct.
**Q. Okay. And then in September 2017, what did you -- what did your role change to?**
A. I was promoted to the northwest district transportation operations manager.
**Q. Okay. So northwest district transportation operations manager?**
A. Correct.
**Q. And then you had that role through 2021?**
A. No.
**Q. What was your role in 2021?**
A. In 2021 I was the south zone package operations manager.
**Q. Okay. What was your duties as the south zone package operation manager?**
A. My responsibility was over the state of all package operations, including local sort and preload --
**Q. Okay.**
A. -- for Oregon, Idaho, Montana, and Wyoming.
**Q. Okay. So what was your day-to-day like in 2021?**
A. What my routine was?



**Q. Yep. What were your general -- how did you make sure that people were doing what they were supposed to?**
A. In preloads, I would go to different buildings a few days a week to watch and see, observe their methods, and their efficiencies. I would go out with center managers to observe package car drivers from a safety perspective and an efficiency perspective and validating methods.
**Q. Okay.**
A. Several meetings, as a district, we would have during the week. Typically arrive 4:30, 5:00 in the morning, depending on the day, go home 4:30, 5:00 at night.
**Q. Okay. How many districts are in the south zone?**
A. South zone is a part of the northwest district.
**Q. Okay. So the district is above the zone?**
A. Correct.
**Q. Okay. How many divisions are in a zone?**
A. It will vary.
**Q. How many divisions do you have in the south zone?**



A. I'm counting. I believe, at the time, it was five divisions.
**Q. Okay. So as a zone manager, were you in charge of setting goals and policies for your zone?**
A. I was in charge of enforcing district policies. Yes.
**Q. Who set the district policies?**
A. District president.
**Q. Who was that in 2021?**
A. Joe Braham.
**Q. What was his policy -- what kind of policies did he enact in 2021?**
A. Not policies, per se, metrics. So preload performance, on-road performance. Those kinds of things. Policy is typically set at the corporate level.
**Q. So he was focused on preload performance at that time?**
A. Yes.
**Q. Okay. What kind of stuff did he do to -- what kind of metrics was he looking for with preload?**
A. Preload pieces per hour, preload safety, missed loads, putting packages on the wrong car. Those type of metrics.

Page 41

**Q. Okay. And if there was a center that was underperforming, what would you do?**
A. I would typically work with that center manager and the division manager to understand what their plan was to improve.
**Q. Okay. Was Doug Berry one of your division managers at this time?**
A. Yes.
**Q. You'd work with them and try to help them improve you said. What happened if they didn't improve?**
A. Then we typically go back and rethink their plan.
**Q. Okay. How so?**
A. So if they were, as an example, let's just say it was a safety concern that they had, an example, and they were going to do ten observations a day on package car drivers and they were still having safety concerns, that new plan might look like evaluating those drivers trainings and put a supervisor on car with those drivers --
**Q. Okay.**
A. -- as an example.
**Q. That's a good example. How often did you have to terminate business managers when you were the zone package operation manager?**

Page 42

A. Once.
**Q. Just once?**
A. Yes.
**Q. Okay. Was that Heidi Peck?**
A. Correct.
**Q. Okay. Ever have issues with other people having too many missed packages?**
A. I know that, initially, we had -- I had a report that we were having a similar problem in an area of responsibility of another manager.
**Q. What happened with that other manager?**
A. He ended up retiring. He went on disability for a period of that time, and then he ended up retiring prior to the conclusion of that investigation.
**Q. Okay. So you never had a phone call where you told him that he was going to be terminated?**
A. I told him that he was being investigated --
**Q. Okay.**
A. -- and that we would reconvene when we had concluded the investigation.
**Q. How long do these investigations usually take?**

Page 43

A. I'm not an expert on that. I don't know.
**Q. Okay. Does UPS conduct annual reviews of its employees?**
A. Yes.
**Q. What kind of stuff goes into those annual reviews?**
A. Usually a look at that person's results for that given time, so at six months and then at twelve months.
**Q. Okay. If there's issues with their performance, are they given a performance improvement plan or things like that to help them get better?**
A. That could happen.
**Q. Okay. Does UPS have, kind of, a policy of graduated discipline where they start low and step up higher?**
A. There is a process. Yes.
**Q. Explain that process to me.**
A. So if an individual is not performing at a prescribed level, typically, there'll be a sit-down. They'll come up with a plan with their manager or a division manager, or potentially with me, if it's the division manager.

Page 44

And then they have -- we continue to monitor those results. If they get better, fantastic, it worked. If they stay the same or get worse, we could prescribe that that individual has, say, 30 days to improve to maybe three elements. If that person improves, great, we did what we -- we accomplished what we needed to accomplish.
If they do not, at that point, a separate meeting would be held where that individual would be told you have X amount of time, could be 60 days, could be 90 days, to improve on these specific elements. Typically, it's two, three, maybe four, but usually two or three to give the individual an opportunity to improve and focus on something very specific. And if they don't improve at that time, they could be told that their raise, their stock, or their job is in jeopardy.
**Q. Okay. But, generally, before you get to the termination point, you're going to -- you have other tools that you could put in place? Like, you're not going to get a raise this next year or you're not going to get your bonus for the year. Things like that?**
**MR. CLIFTON:** Object to form.
**THE WITNESS:** From a performance perspective,

Page 45

yes.
**Q. BY MR. STEGELMEIER: Okay. And are there times when you say, this is so bad, we're firing you right now?**
A. That has happened. Yes.
**Q. Okay. Does UPS prefer to keep people? Or does it prefer to start over and say, we're going to fire this one and start new?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** I can't answer that on behalf of UPS.
**Q. BY MR. STEGELMEIER: As a south zone package operational manager, do you prefer to fire people, start new, or try to rehabilitate?**
A. My preference is to keep the people.
**Q. Okay. So you prefer to maybe take away a bonus for a year versus fire someone?**
A. If I had to, yes.
**Q. Okay.**
A. I don't take people losing their jobs lightly.
**Q. That's good. I'm glad to hear that.**
**During your time at UPS, have you ever been subject to a disciplinary action?**
A. Describe disciplinary.

Page 46

**Q. Where you either lost -- didn't receive a raise or lost a bonus, something financially to discipline you?**
A. No.
**Q. Okay. Have you had counseling sessions where they've called you in to talk to you about different things?**
A. No.
**Q. Okay. Would that be -- I mean, without having any discipline, I guess if they called you in tomorrow and fired you, it'd be kind of a shock, wouldn't it?**
A. It would.
**Q. Okay. So usually, though, I mean, from your perspective, when you're looking at an employee, do you look at their past history at the company before you decide whether to terminate them?**
A. Well, I don't have a great deal of experience as I've terminated one full-time manager. There have been instances with part-time management where an employee was having a problem coming to work.
We sat the employee down, told them what we expected. The employee agreed, gave it to us in writing. This was a very long time ago. Got back on

Page 47

track, but then again, chose not to come to work. So in that case, yes, I looked at their past.
**Q. Okay. With Heidi Peck, did you look at her past disciplinary history before terminating her employment?**
A. I did not.
**Q. Is that something that you think would have been important to look at?**
A. In this case, I do not.
**Q. Okay. What is the manager incentive program?**
A. That is at the end of every year, you have the opportunity to earn what we call our bonus. You can use that bonus to purchase UPS shares of stock, or now you can just take it all in cash.
**Q. Okay. What's the timeframe for that? Is that yearly?**
A. Yes.
**Q. So if someone is there on December 31, then they get -- they're entitled to their bonus?**
A. Yes.
**Q. Okay. So if they're fired on December 30, they lose that bonus?**
A. Correct.
**Q. But if they're fired on January 2,**

Page 48

**they're still getting that bonus?**
A. Correct.
**Q. Okay. Have you dealt with people who've lost their bonus before, where you've had to take it away for a discipline issue?**
A. I have.
**Q. Do you usually warn them before you take away their bonus?**
A. The one I was involved with was when I was new to the district, coming back to the district, and it was an investigation that had been open and closed. I was basically just the bad news guy.
**Q. Okay. So I know you've only fired one person. Have you been around and heard of other people getting fired, I'm sure, in your career?**
A. Just to clarify, one manager.
**Q. One manager. Sorry. You've only fired one manager, but I'm sure you've heard of managers getting fired or been around when other managers were fired?**
A. I have.
**Q. Is it normal to fire them right before the end of the year?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** I can't speak to that in terms

of timing.
**Q. BY MR. STEGELMEIER: So you're not aware of people waiting until two weeks before the bonus is set to fire them?**
A. No.
**Q. Okay. As a zone manager, does it matter to you how much bonuses are paid out to people under you?**
A. No.
**Q. It doesn't affect you one way or the other?**
A. It does not.
**Q. Doesn't go against your cost for the zone?**
A. It does not.
**Q. Okay. So the other people that you have fired, do you do that as soon as you decide it's warranted? Or have you ever waited a little bit to see?**
A. Once I feel I have the facts is when I'll make a decision.
**Q. Okay. So you don't sit on it for a little bit?**
A. No.
**Q. Okay. So let's go back to the reporting**



**process. Who makes the decision of how packages should be reported?**
A. Can you restate that, please?
**Q. Who sets the policy for how packages should be reported?**
A. That is typically our corporate group.
**Q. Okay. Is it open to interpretation? Like, could someone read it and say, hey, this one should be reported this way, and then someone else disagree with that?**
A. That could happen. Most people will ask what it means before they do something with it.
**Q. All right. Who's in charge of deciding that, though? You have, like, an arbitration method?**
A. No. Typically our engineering group clarifies any practices when it comes to scanning packages, et cetera. They're the ones that we would ask for clarity, if we needed it.
**Q. Okay. Does security play a role in determining how packages should be reported?**
A. They don't determine how they should be reported. No.
**Q. So if you had a security guy who disagreed with the manager on the reporting of a package, who would you side with?**



A. I would look at the facts and then decide -- make my decision based on whatever, you know, method we are supposed to pull. I would read the method and then I would make that decision. I wouldn't particularly side with anyone.
**Q. Okay. So you would base it off your understanding of it? That's how you would go with it?**
A. Correct.
**Q. Okay. So if you said, this package needs to be slated as this, is there any reason for a center manager to disagree with you and say, no, I'm going to do it this way?**
A. There shouldn't be.
**Q. So it makes sense for them to just do what you tell them to, right?**
A. Yes.
**Q. Do they have any financial incentive to label them different ways?**
A. Immediately, I would say no.
**Q. Have you ever fired a manager for having missed packages?**
A. For having missed packages? No. I have not.
**Q. Okay. Have you ever demoted a manager**



**for having missed packages?**
A. I have not.
**Q. Have you ever withheld a bonus from someone for having missed packages?**
A. I have not.
**Q. Have you ever promoted someone for having fewer missed packages?**
A. Promotions are based on overall results. That would probably be one of them.
**Q. Okay. So it's just one in a whole litany of factors that you look at, though?**
A. Correct.
**Q. Is your bonus depending on the number of missed packages you have?**
A. No.
**Q. How is your bonus calculated?**
A. The corporation sets what we call a "factor." That factor is then multiplied times your annual salary. So I'll use simple numbers to explain here in a second.
**Q. That's good. I appreciate that.**
A. And then there is a -- I don't remember the specific term -- but there is another factor involved based on your position within the organization. So full-time supervisor to unit

manager, division manager, operations manager, and it continues to go up. So as an example, let's say I make a $100,000 a year.
**Q. Okay.**
A. This year, the factor was 50 percent. That means my bonus, the gross rate, is $50,000.
**Q. Okay.**
A. And then as a division manager, let's say your target is 50 percent. That means as a division manager then my pretax bonus is $25,000.
**Q. Okay.**
A. And those are just examples.
**Q. Okay.**
A. Because round numbers are easier to figure out.
**Q. Okay. But they don't look to your missed packages to determine that, right?**
A. That could be a factor if you chose not to recommend somebody for MIP.
**Q. Yeah. But you've never done that?**
A. I have not.
**Q. Okay. What happens if a driver has a lot of missed packages?**
A. Typically, that driver is going to be brought into the center manager's office and explain



him or herself as to why they have an abundance of missed packages.
**Q. Okay. So there might be an incentive for a driver to misreport a missed package then?**
A. Potentially.
**Q. Okay. But for a manager, there's not really much incentive there?**
A. There is not.
**Q. Okay. So if a manager doesn't have an incentive to misreport a package, why would they misreport a package?**
A. I can't answer that.
**Q. Okay. Are you familiar with the EDR process at UPS at all?**
A. I have a general knowledge of it.
**Q. What's your general knowledge of that?**
A. That if a person is, we'll just say demoted, we'll say from a manager to a full-time suit, the person being demoted has the opportunity to sit in front of a panel. I believe it's four or five people, of which they get to choose one, I believe.
And I don't know how that process works. I've never sat in it once the EDR goes. I just know they have an opportunity to basically state their case.



**Q. Okay.**
A. Simply put.
**Q. And once the panel makes the recommendation, what happens with that recommendation?**
A. That part, I don't know. I'm sorry.
**Q. Okay. So it doesn't come to you as the -- so when Heidi went through this, you weren't aware of the recommendation of the peer review panel?**
A. I was not.
**Q. Okay. Do you know who Clay Holloway is?**
A. He was a security area supervisor.
**Q. You say "was." What happened?**
A. He may have been reassigned. I haven't been in touch with him in some time.
**Q. Okay. Did you know him personally?**
A. No.
**Q. Okay. Were you aware that he was the one who performed the investigation of Heidi Peck?**
A. Yes.
**Q. Would it change your feelings towards Heidi's termination if you know that he was later investigated for falsifying investigations?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** Based on the facts I saw on



scanning information, it would not.
**Q. BY MR. STEGELMEIER: Okay. So if he said that he talked with Heidi on the phone and it turned out that he had not, that wouldn't affect your view of this at all?**
A. No. Again, it's based on the facts of scanning information.
**Q. Okay. How are those facts collected and presented?**
A. I don't know how they were collected other than from our scanning systems.
**Q. Okay. So you're not concerned that the person who collected the facts was later investigated for falsifying investigation?**
A. I have no knowledge --
**MR. CLIFTON:** Objection.
**Q. BY MR. STEGELMEIER: But now that you know that he was, that doesn't change your viewpoint at all?**
A. No.
**Q. Okay. That's good to know. What kind of follow-up on the facts of Heidi's investigation did you do?**
A. I really just received the investigation.

Page 57

**Q. You just what?**
A. I received the facts.
**Q. From Clay Holloway?**
A. And Carey Kuhl.
**Q. And you didn't do any independent investigation?**
A. I did not.
**Q. Who is Carey Kuhl?**
A. She was the director, division manager level, of the area security group at the time.
**Q. Okay. Do you have any e-mails or texts about Clay Holloway?**
A. I do not.
**Q. Before you terminated Heidi, did you review her employee file?**
A. In what regard?
**Q. Just to look for past discipline or anything like that?**
A. I did not.
**Q. But you understand what an employee file is, right?**
A. Yes.
**MR. STEGELMEIER:** Ricky, I believe we've made several requests for employee files, and this is the second UPS employee that knows what an employee file

Page 58

is. So I feel like we're getting more and more evidence that UPS has employee files. So I think this is something you need to consider seriously if you want to sit in front of a judge.
**MR. CLIFTON:** It's a generic term, Cory. We've been giving you employee files, the documents you request on the employees. We don't have employee files at UPS. That's just the case. It's a common phrase. I'm sure Troy understands what it means.
**MR. STEGELMEIER:** I'm sure you understand what that means too, Ricky. But we'll get to that at a different time.
We've been going for a little bit. Let's take a little bit of a break and we'll come back. We'll go off the record.
(Recess was taken from 10:14 a.m. to 10:24 a.m.)
**Q. BY MR. STEGELMEIER: Mr. Emerson, was there anything in your testimony before the break that you'd like to correct or add to that you thought of during the break?**
A. No, sir.
**Q. Okay. So misreported packages is an issue is what I'm learning from this; is that correct?**

Page 59

A. I'm sorry. I didn't hear all that. Misreporting?
**Q. Yes. That's a problem?**
A. It is.
**Q. Why?**
A. It is an integrity issue.
**Q. Okay. Is that the only issue with it?**
A. No. We're lying to the customer.
**Q. Okay. Does it affect UPS at all, though?**
A. It could.
**Q. How so?**
A. People entrust UPS with their merchandise. In a case where that customer has found out that UPS is not taking care of their merchandise as we promised, the customer would leave us.
**Q. Okay. So if someone is misreporting, though, in your mind, that's grounds for termination?**
A. Yes.
**Q. Every time?**
A. I think there's different circumstances.
**Q. Explain that to me.**
A. If an individual was doing something that they didn't ask about and they made a mistake, probably not. If that individual continued to do

Page 60

that and knew about it, then that's a problem.
**Q. Okay. So if someone says I'm marking these as emergency every time because that's the way I've always done it, that's a problem?**
A. It would be. I mean, at some point that individual should ask the question.
**Q. Okay. At what stage -- who marks these packages? Who's marking them as delivered? Who's marking the packages, I guess, as delivered, missed, future? Who does that?**
A. It can be done a couple of different ways. The package driver, if he or she is, say, going down a road that's blocked by snow or some other incident, would report that package. If the package -- if we have mass packages that came back due to a weather incident, as an example, we would we scan those back at the building typically because we don't want the driver caught up scanning tons of packages.
**Q. Okay. I guess, is it different to you, a manager who is telling people this is the way to mark the packages and it's wrong; is that person worse than a manager that their on-road supervisors are telling people how to mark packages and not checking with the manager?**

**MR. CLIFTON:** Objection, form.
**THE WITNESS:** So can you restate the first part of that, please?
**Q. BY MR. STEGELMEIER: Yeah. So if you have a manager who is saying, we're marking everything as emergency for breakdowns, for weather delays, for being inundated by Amazon, would that cause you concern?**
A. It would.
**Q. Okay. What about a manager where their on-road supervisor is telling people, hey, don't report it miss, report it this way, but doesn't actually check with the manager on the proper reporting processes?**
A. I would consider that a problem.
**Q. Okay. Are you more upset with manager one who is telling people to misreport stuff, or manager two who doesn't know that their subordinates are misreporting stuff?**
A. Manager one. I would expect the manager to understand the process.
**Q. And you would expect the manager to not tell people to misreport stuff?**
A. Correct.
**Q. Okay. How did you communicate with your**



**subordinates while you were the south zone package operation manager?**
A. Either in person, by e-mail, or by phone.
**Q. Okay. Did you ever text people about stuff?**
A. I would.
**Q. Okay. Do you have a phone issued by UPS?**
A. I do.
**Q. Do your managers generally have UPS-issued phones?**
A. I don't know if they all have. Some do.
**Q. Okay. Okay. Do you know who Floyd Reinhardt is?**
A. Yes.
**Q. Who is he?**
A. He is a retired manager from UPS.
**Q. Okay. Do you know him personally?**
A. I wouldn't say personally. No.
**Q. Okay. Were you aware that he was investigated for misreporting packages in 2021?**
A. I am.
**Q. Okay. Did you review that report?**
A. Back then, yes.



**Q. What's your recollection of that?**
A. My recollection, it was late 2021, don't remember the specific month, I was handed some details of misreporting packages. I don't remember exactly what. It's been a minute. I know that shortly thereafter he went out on disability; and then shortly after that, my job as the south zone package operations manager was eliminated from first of February, mid-February; and shortly after that, Floyd retired.
**Q. Okay. Do you remember having a telephone call with Floyd in February of 2022?**
A. I don't know what month, but I did have a phone conversation with him about it where I made him aware that I knew there was an active investigation going on and that we would reconvene once that investigation was closed.
**Q. So what's the difference between an active and a closed investigation?**
A. That we're still gathering facts, active. Closed, we believe we have all the facts.
**Q. Okay. So is it normal for an active investigation to go four months without any further fact finding?**
A. I don't know what's normal for



investigations.
**Q. Okay. Did you tell him that he was getting terminated when you talked to him?**
A. I did not.
**Q. Was that phone call recorded?**
A. It was not.
**Q. Was there anyone else on that phone call with you?**
A. I do not recall.
**Q. Okay. So if he says that you told him he was getting fired on that phone call, you think he's not remembering it right?**
A. I'm not going to say what he's saying or what he thinks.
**Q. Okay. Did you let him talk during that phone call?**
A. Yes.
**Q. Okay. Did he raise issues with some of the statements made by Clay Holloway in the investigation?**
A. I don't recall one way or another.
**Q. Okay. So it's your testimony that investigation wasn't finalized in February when you had the call with him; is that correct?**
A. Again, I don't remember what month we

had the call, and it had not been finalized, to my recollection.
**Q. Okay. I'm going to show you, I believe we are at 3. I'm pretty sure that's right.**
**(Exhibit 3 marked.)**
**Q. BY MR. STEGELMEIER: So this is a document that's been produced in discovery by Clay Holloway. And if you look at the beginning, the findings, is it normal to have investigative summary like this that's not complete? To have findings on things like this?**
A. I don't know the security process, so I don't know what would be normal or not.
**Q. Okay. But there's findings in here. Then there was -- I believe if we look at this first center from July 25, 2021, to September 2, '21, show 2,486 emergency condition scans and zero service failures. Do you read that there?**
A. I do.
**Q. Putting back on for a second, your south zone package operation manager hat, is that concerning?**
A. It is.
**Q. Okay. Let's go down to this last bullet point there where it says "Floyd Reinhardt." You can**



**go ahead and read that. You can read it to yourself or you can read it out loud. It's up to you, but let me know when you're done reading it.**
A. Okay.
**Q. So it specifically states that he "willfully acknowledged the use of emergency condition scans to avoid service failures." Does that draw integrity issues?**
A. It would to me. Yes.
**Q. So admitting to "using emergency condition scans for breakdowns that occur weekly," that's an issue?**
A. It would be. That'd be the incorrect application.
**Q. "Using emergency scans for excess Amazon volume that cannot be processed on the preload," that's an issue?**
A. It would be.
**Q. All right. Go ahead. Sorry I interrupted.**
A. No. I said it would be. Excuse me.
**Q. So "emergency condition scans for service providers who still had volume, but it exceeded DOT hours," and then disciplining those drivers, that's an issue?**



A. It would be. Yes.
**Q. What's the proper way to mark a breakdown?**
A. I don't know the exact code, but it would be something like breakdown, and then they would record the missed packages.
**Q. Okay. What's the proper way to record when the Amazon volume couldn't be processed? I guess you probably don't have that anymore, but back before Amazon was the world's largest carrier, what was the code?**
A. I don't remember the exact code, but we could get exclusions if they exceeded capacity.
**Q. Okay. So that's -- but not emergency, though?**
A. Correct.
**Q. And it's your testimony you decided not to fire Floyd Reinhardt, correct?**
A. I hadn't made that final decision.
**Q. Okay. But this didn't give you -- I mean, let's look down here. So the dates we're seeing are September 2021, here's a July 29, 2021, a September 27, 2021, October 26, 2021, and October 28, 2021, is the last date on here when Reinhardt was interviewed.**



**So you met with him in February, approximately, or you don't remember the date you met with him, early 2022, two to three months after this last interview, and you felt like you still didn't have enough facts to make a determination?**
A. As I stated.
**Q. And it's also your testimony that he retired later that year?**
A. Correct.
**Q. Okay. So we have 2,486 emergency conditions where we have him willfully admitting to using that to avoid service failures, and you didn't terminate his employment; is that correct?**
A. That is correct.
**Q. Do you have any e-mails or text messages with anyone regarding your decision not to fire Floyd?**
A. I do not.
**Q. I'm going to show you -- we'll call this 4.**
**(Exhibit 4 marked.)**
**Q. BY MR. STEGELMEIER: So this is a document that was produced showing that Floyd was voluntarily terminated on June 30, 2022. Do you have any reason to dispute that date?**

Page 69

A. I do not. I don't know what his final retirement date was.
**Q. Well, you knew that he'd retired?**
A. Yes.
**Q. After reporting over 2,000 packages as emergency condition to willfully avoid the reporting requirement?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** As I stated earlier in testimony, he'd gone out on disability --
**Q. BY MR. STEGELMEIER: Okay.**
A. -- and then my job was eliminated. So I never had the final opportunity to terminate, if that's what was going to be my decision.
**Q. Okay. But you talked to him once while this investigation was going about it, though?**
A. Correct.
**Q. As a mentoring or counseling session trying to help him? What was the purpose of that phone call?**
A. To let him know I was being made aware that there was an investigation ongoing in his area of responsibility regarding misrecording packages.
**Q. Okay. Go ahead and stop sharing that.**
**So you were the zone manager. Who was**

Page 70

**over Floyd in the district, I guess? Or division?**
A. Division. That would have been Doug Berry.
**Q. Doug Berry was over the division?**
A. Yes.
**Q. Did Doug make hiring and firing decisions?**
A. In some cases, yes.
**Q. Why didn't he make the firing decision with regard to Floyd Reinhardt?**
A. I don't know. That wouldn't have been his final decision.
**Q. Why does that come to you?**
A. It would have come to me and HR.
**Q. Okay. So you work with HR for final firing decisions?**
A. Yes.
**Q. So you worked with HR when you were discussing whether or not to fire Floyd?**
A. I don't recall if we had a discussion about Floyd.
**Q. Okay. Who would you have worked with in HR on that?**
A. Typically, the director of HR.
**Q. Okay. Who was that in 2021?**

Page 71

A. I believe that was still Steve Redding.
**Q. Okay. Would he have been on the call with you with Floyd? Do you know?**
A. Not necessarily. I don't remember him being on the call.
**Q. Okay. Let's move on to Heidi Peck. When did you first meet Heidi?**
A. I don't know a specific date. I know I made a trip out when I became the south zone ops manager. I made a trip to Idaho. So it would have been maybe August, September of 2019.
**Q. Okay. How often did you work with Heidi?**
A. Work with? Not much.
**Q. Okay.**
A. Generally e-mail communication.
**Q. What kind of communication did you have back and forth with her?**
A. If Doug was on vacation, I would ask her questions about different service results of the preload, et cetera. She would contact me if Doug was gone, if she was having any concerns on her preload or on-road.
**Q. Okay. What was your impression of Heidi?**

Page 72

A. In what regard?
**Q. As a manager under you. How did you feel about her?**
A. To clarify, she was under Doug.
**Q. As a manager under Doug, who is under you, how did you feel about her?**
A. I didn't have feelings one way or another.
**Q. Did you ever have any concerns regarding her performance prior to 2021?**
A. I know they were times where I'd ask some questions, what she was doing to correct a specific element, yes.
**Q. Okay. Would she usually get that element corrected?**
A. I know she was working on it, wouldn't necessarily get corrected.
**Q. Okay. Was she ever disciplined prior to 2021?**
A. Not by myself, no.
**Q. Are you aware of any other discipline that she would have had prior to 2021?**
A. I am not.
**Q. So if you were to -- I know you mentioned earlier that you didn't look for past**

Page 73

**performance issues with her when you decided to terminate her, but if you were to hear that she had not ever had any discipline, would that surprise you?**
A. No.
**Q. Would it surprise you to know that she received her bonus every year?**
A. Would not surprise me.
**Q. Okay. So it seems in 2021 there was a push to look into these different reports. Where did it come from?**
A. I don't know.
**Q. Was it above you? Was it below? Was it something that showed up on your matrix?**
A. No. Those kinds of things were always part of my business metrics, but I don't know who directed all that.
**Q. Okay. What investigations happened into Heidi's reporting in 2021?**
A. The one in June, and then I believe it was August there was a subsequent follow-up investigation. Those are the two I was aware of.
**Q. Okay. Did you initiate those?**
A. I did not.
**Q. How were they initiated?**
A. I do not know.

Page 74

**Q. Okay. What were the findings of those investigations?**
A. In June, that packages were being brought back and a future exception was being applied, which is when I sent that e-mail. District president thought that if it's happening one place it's probably happening everywhere so let's put out the proper process, which I did. She replied, "Got it," and then subsequently, I believe, August, continued the practice.
**Q. Okay. Did she continue the practice in the same center?**
A. I can't remember if it was Idaho Falls and Rexburg, both. I don't remember that.
**Q. Okay.**
A. But those were two of her centers.
**Q. All right. And you're convinced that she was aware that these practices were going on?**
A. I am.
**Q. Okay. What's your basis of that?**
A. Just based on what I read from the results security dug up.
**Q. Okay. The results that Clay put in that report?**
A. Yes.

Page 75

**Q. Okay. So what did you decide to do at that point?**
A. At which point?
**Q. After you read the investigation.**
A. At that point, the second investigation -- the first investigation I sent that out to all of the managers in my zone how to properly use future. After the second investigation is then when I met with HR, don't remember when, in relation to when I got the results --
**Q. Okay.**
A. -- and we talked through the nature of the investigation and the results.
**Q. Okay. Did you communicate at all by e-mail or text during these? Or just phone calls?**
A. Communicated which part, sir?
**Q. About -- with HR?**
A. I believe that was actually -- I was in Seattle at the time where the HR director was located and we met face-to-face.
**Q. Okay. And who was the HR director?**
A. Steve Redding.
**Q. Okay. And what did you ultimately decide to do?**
A. Terminate.

Page 76

**Q. Did you consider other options?**
A. We discussed them.
**Q. Why didn't you go with a different option?**
A. Based on the fact that it happened twice after she confirmed that she understood the process.
**Q. What other time did it happen after she confirmed the process?**
A. In August they found the same results were going on.
**Q. So that's the second time. The first time was before you sent out that e-mail?**
A. Correct.
**Q. So you believe that one paragraph e-mail was sufficient retraining that she shouldn't have had issues going forward?**
A. For an experienced manager, yes.
**Q. Have you had any other issues with people misreporting stuff after that e-mail --**
A. The only other thing --
**Q. -- besides Floyd Reinhardt?**
A. Thank you. That's all I was going to say.
**Q. Okay. But that e-mail wasn't sufficient for the termination of Floyd, though?**

Page 77

A. Again, the timing didn't work.
**Q. Okay. But the investigation was around the same time, wasn't it?**
A. It was later, based on the document you showed. I do not know when I got those results.
**Q. Okay. So your testimony is: Had you received those results prior to your phone call with him, you would have terminated him as well?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** I believe that would have been the final decision. Yes.
**Q. BY MR. STEGELMEIER: Okay. So those investigations, in your mind, are identical and you should have terminated them both based on the results, correct?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** Yes.
**Q. BY MR. STEGELMEIER: Okay. Let's look at the Rexburg investigation. I believe we're on 5 at this point. If I'm wrong, just yell at me.**
**(Exhibit 5 marked.)**
**Q. BY MR. STEGELMEIER: All right. So this one, it looks like, was conducted by William Joiner. Who is he?**
A. I don't remember that name.

Page 78

**Q. Okay. And it's for falsified delivery record. We're showing a $0 value on that. So financially this doesn't affect UPS at all, correct?**
A. I don't know that to be true or false.
**Q. Why would it be in the report if it's not true?**
A. Again, that's a security thing and they're not in my realm of responsibility.
**Q. But you rely on their reports to make your decisions, correct?**
A. Correct.
**Q. Did you ever look into what these reports mean? Or just glance through them?**
A. No. I read through them.
**Q. Okay. But you weren't concerned about the fact that there's a $0 value and ask what that meant?**
A. In my opinion, there's no way for them to know what a customer would do.
**Q. So they don't know, but yet, you're relying on their investigation to make a decision regarding someone's livelihood, correct?**
A. The dollar value is not important or relevant to me.
**Q. Okay. The willful changing of the codes**

Page 79

**is?**
A. Yes.
**Q. Okay. But if there was no finding of a willful change of the code, you still just thought that that was good enough for termination?**
A. Can you restate that, please?
**Q. So if a manager didn't know what their people under them were doing, you still felt that was good enough for termination?**
A. I don't know what the manager knew or didn't know, other than what was written in these reports.
**Q. Okay. So if the report wrote that other people testified that this came from past supervisors and not the current manager, you still felt that the current manager was responsible for it?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** Yes. The manager -- the business manager's responsible for everything.
**Q. BY MR. STEGELMEIER: Okay. But not when they willfully change a code, though, to misreport?**
A. That would be their responsibility as well.
**Q. Okay. All right. So it sounds like they were notified of an ethics concern about**

Page 80

**misreporting stuff. And so you're -- so this is a big issue, right? Misreporting packages?**
A. Yes.
**Q. And your remedy to this was to send out a single e-mail, right?**
A. Correct.
**Q. Did you have any phone calls?**
A. Not to my recollection.
**Q. Did you schedule any additional training?**
A. No.
**Q. Just a single e-mail?**
A. Correct.
**Q. Okay. Looks like there was a few interviews in here. Do you know, is it normal when there's -- so there's some fact finding, if you look up here, this is a fact-finding interview. And then later on we have another fact-finding interview on 26 May.**
**And then we get down to, I believe, there's some other type of area. Hold on let me find it. So you read through this? This was your June investigation, right? Of the Rexburg center?**
A. I believe it was. Yes.
**Q. So you read through this and felt like**

Page 81

**this wasn't sufficient to terminate Heidi Peck at that time, correct?**
A. I felt, based on these findings, that it needed to be stated that this is not the correct process and it needs to cease. That was in my e-mail.
**Q. But just for futures, right?**
A. That was for futures. That's correct.
**Q. Okay. So you didn't send out an e-mail for anything besides futures?**
A. I did not.
**Q. So is it the futures that got Heidi fired? Or was it just overall misreporting?**
A. Ultimately, overall.
**Q. So did you send out e-mails regarding the other types of reporting?**
A. I did not.
**Q. Just futures?**
A. Correct.
**Q. And only the single e-mail?**
A. Correct.
**Q. Okay. So here's the summary of it. So it looks like it was started by a Rock Springs center manager, and then they notified them and started looking into it.**

Page 82

**So this one they found. It's right down here, "Result: That during the interviews with security, the claims were substantiated and dated back two to three years involving management personnel that were no longer there."**
**So is it normal for someone to carry on -- let's put it this way: It sounds like at UPS it's not uncommon for people to be assigned a few different jobs; is that correct?**
A. Correct.
**Q. Is it normal for them to stick with the way they were taught originally how to do something?**
A. If they're transferred to a similar position, yes.
**Q. Okay. So they don't start from scratch every time, right?**
A. I would think not.
**Q. So when you were a divisional manager --**
A. One moment, sir.
**Q. Go ahead.**
A. Can you restate that? Restart. You asked the question, "They typically don't restart," I think is how you said it?
**Q. Yeah. Restart from scratch with training and everything?**

Page 83

A. For themselves?
**Q. Well, just in that position.**
A. For themselves, no.
**Q. Okay. So if you were -- let's put it this way: When you were the divisional manager, if you had a new on-road supervisor transferred from a different division into your division, would you retrain them on how to report packages?**
A. Most likely not.
**Q. Well, you just assumed that they knew what they were doing and that they were doing it right?**
A. Again, this is an on-road sup. That would be the responsibility of the center manager, as I stated earlier.
**Q. Okay. So would you expect a center manager to redo training with an on-road sup every time they got a new one?**
A. There are times that a center manager will take them A to Z, yes.
**Q. Okay. You moved around a lot as divisional manager, right?**
A. Yes.
**Q. Did your district manager start over with you every single time?**

Page 84

A. No.
**Q. Did they just assume that you knew what you were doing?**
A. In some cases I was new to that role. For example, when I was moved to South Cal hubs and my operations manager was responsible for figuring out what I know and filling in the gaps, not the district manager.
**Q. Okay. But it's not unreasonable for your immediate supervisor to assume that you know how to do your job if you've been doing it for a few years?**
A. I agree with that statement.
**Q. Okay. So after the Rexburg investigation where it found misreporting, you sent out that e-mail. Did Heidi lose her bonus at that point?**
A. No.
**Q. Was she written up at that point?**
A. Not to my knowledge.
**Q. And did she receive any notice or anything in her annual review stating that, hey, we've had this issue with Heidi and it needs to be documented going forward?**
A. I do not -- I did not do her reviews.

Page 85

That's Doug Berry's responsibility.
**Q. Okay. Did you look at her reviews before you terminated her?**
A. I don't recall.
**Q. Did you talk to -- so you talked to HR before you terminated her. Did they ask you to go back and look at anything before making the decision to terminate her?**
A. Not to my recollection. No.
**Q. Did they ask you to even see if stuff was documented before you terminated her?**
A. I don't recall.
**Q. So you just basically went from an employee who has been there 16 years, bonus eligible every year, with one e-mail in June, to firing?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** Yes.
**Q. BY MR. STEGELMEIER: Okay. So outside of that single e-mail, would you consider that a disciplinary e-mail that you sent to her on June 4?**
A. The e-mail regarding the future process?
**Q. Yes.**
A. No. Because it was sent to all managers.
**Q. Okay. So there was nothing saying,**

Page 86

**Heidi, we need you to do better on this or you could be in trouble; is that correct?**
A. Not from me, no.
**Q. Okay. And you're not aware of that from anyone else either?**
A. I can't speak to that. I have no knowledge of that.
**Q. You're the one who made the decision to terminate her, correct?**
A. Correct. With the support of HR.
**Q. So you talked to HR, that's it, but it ultimately was your decision?**
A. Yes.
**Q. How does that go to you and skip over Doug Berry?**
A. That decision usually comes from the higher levels than the division manager.
**Q. Why is that?**
A. To make sure we follow the process.
**Q. What's the process?**
A. The proper review with HR, which I did. HR in agreement with what my decision is --
**Q. Okay.**
A. -- and then I take care of it.
**Q. So proper review, though, doesn't**

Page 87

**include looking back at past annual reviews?**
A. I didn't look. I don't know what HR did.
**Q. Okay. But you -- you're the one who made the decision and you didn't look at it?**
A. Nope.
**Q. Okay. Did you look at how long she'd been at UPS at that time?**
A. No.
**Q. Okay. So the proper review is to call HR -- the proper process then is to call HR before you terminate someone?**
A. At that level, yes.
**Q. Okay. So there was no, like, stepped discipline? There's nothing progressive about it? It's just, let's go for termination?**
A. For something that egregious, yes.
**Q. So "egregious," explain that to me. How is this so egregious?**
A. One investigation brought it up; a second investigation brought it up again. If you're told not to do something or you know what the process is and you continue not to follow the process causing service failures and damage to the reputation, that's egregious.

Page 88

**Q. Did you look back at what happened in Rexburg after the first investigation?**
A. I don't know if I did or not.
**Q. Okay. Was that something you think was important to see? If there had been changes made there?**
A. It's still under her area of responsibility, which means it hadn't changed.
**Q. Okay. Let's look at 6. This will be the summary of the Idaho Falls investigation.**
**(Exhibit 6 marked.)**
**Q. BY MR. STEGELMEIER: So this is, I believe, this is the investigative report that you submitted that resulted in her termination; is that correct?**
A. It was the investigative report that continued to show the practice was still in place. Yes.
**Q. Okay. These ones look like it's about the same timeframe, if I'm not mistaken?**
A. The same timeframe as?
**Q. As Floyd Reinhardt's. I apologize. The same timeframe as Floyd Reinhardt's investigation. In fact, we're looking at -- if I do math right -- we have right here on the first finding there is 40**

Page 89

**futures, 1463 not in one, and 572 no such numbers. And future, that's the e-mail you sent, right?**
A. Correct.
**Q. So these 40 are what got her fired?**
A. What got her fired was the practice continued.
**Q. Did you look to see if these futures were actually properly labeled?**
A. I did not.
**Q. So Heidi -- if I can do some math right quick -- we're looking at just over 2,000, right? That's what got her fired, but Floyd had 2482 and he wasn't fired but you said he should have been, right?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** I believe that that would have been his final outcome. Yes.
**Q. BY MR. STEGELMEIER: Okay. But it wasn't his final outcome, correct?**
A. Due to timing, that's correct.
**Q. So he got to retire and Heidi got terminated, correct?**
A. That's correct.
**Q. Okay. So right here, the second one, we have direction from on-road supervisor Mimieau Lewis to do these, and then here we have Richardson was**

Page 90

**trained by -- I'm not going to say that name -- so he was trained by someone else to do these, correct?**
A. Correct.
**Q. And then we have down here again, Mimieau Lewis was unaware that this was wrong and that she had been trained by on-road supervisor James Strickland?**
A. To answer your first question, I don't know who trained Richardson to do that.
**Q. Okay. But right here he stated that he was trained by that name right there, Nerioosai. Christina, it looks like. But that's what the report stated, right? That he was trained by someone else to do that, correct?**
A. That's what the report states. Correct.
**Q. And Mimieau Lewis states that he was trained by James Strickland, correct?**
A. That's what it says.
**Q. And then we have down here, Heidi Peck denied any knowledge that they were using this in her facility, correct?**
A. That's what it says.
**Q. Okay. That's kind of different than Floyd Reinhardt, who willfully acknowledged the practice. That's your understanding, right?**

Page 91

A. Different words. That's correct.
**Q. Okay. So she doesn't know about it and she got fired. That's correct?**
A. I don't know what she knew other than it was continuing to go on in her centers.
**Q. Okay. But she retrained people, right?**
A. That's what is claimed. Yes.
**Q. Okay. Did you look into that to see if she'd retrained people?**
A. I did not.
**Q. Was there any investigation regarding whether or not she actually retrained people?**
A. I don't remember any of that. No.
**Q. Okay. So it's possible that she did retrain them and they just kept doing their own thing, right?**
A. That's possible.
**Q. How would you know if a package was misreported?**
A. Misreported how?
**Q. As in misscan something when it should have been missed?**
A. You would have to look at the history of that package and have conversations with the driver, et cetera.

Page 92

**Q. Okay. So one thing I noticed is different about these is -- from this report, from Floyd Reinhardt's -- is I don't ever see a finding that they were misscanned. Where Floyd's were clearly things that were misscanned as emergency.**
**I mean, I don't see anything showing that the futures were not actually futures. Can you show me -- can you read through these findings and tell me where you actually find that stuff was mislabeled or misreported?**
A. First carrot, second bullet: "On September 16, 2021, three misloaded packages were sheeted as 'closed.'" And it says, "Per instructions of package center supervisors."
**Q. Okay.**
A. That's improper.
**Q. Okay. Do you know that that place wasn't closed at the time?**
A. I don't. And I don't know what that place was.
**Q. So you don't know that that was misreported?**
A. Based on this statement, it was misreported.
**Q. Okay. But you didn't actually look into**

**it?**
A. I don't recall.
**Q. Okay. So if a package gets put on the wrong truck, and then by the time they figure out it's on the wrong truck, the business where they want to deliver is closed, what would you write that as?**
A. Misload, missed package. Not closed.
**Q. Okay. You know who Bryon Lowry was?**
A. I do not.
**Q. It says here that he's the one who contacted Floyd -- or Clay Holloway to start this investigation. Is it normal for people to tattle on each other, I guess?**
A. I wouldn't say normal, but if a management person is aware of an issue such as this, it is their responsibility to make others aware of it.
**Q. Okay. So you don't have a culture where someone gets ahead by ratting out other people?**
A. No.
**Q. What's DIR data?**
A. Delivery information, and I can't remember what the R stands for.
**Q. Okay. All right. So this is a two-month period that you found 40 future packages,**



**and that was the focus of your June 4 e-mail, correct?**
A. Future, yes.
**Q. It doesn't ever break it down by when those happened. So those 40 could have all happened before your June 4 e-mail, correct?**
A. I don't know. I don't know what range of data they pulled.
**Q. Okay. Well, it says right here, June 1 to August 1, but it doesn't break it down further?**
A. Correct.
**Q. How long does UPS store that DIR data?**
A. I don't know what our record retention is anymore. I believe it's six months, but I don't know that to be true or false, sir.
**Q. Okay. And you never looked back to see, to verify this data?**
A. No.
**Q. Just took their word for it?**
A. Yes.
**Q. Okay. Could you have gone back and looked at it?**
A. Gone back and looked at what?
**Q. At the data.**
A. I'm sorry. Which data are you referring



to?
**Q. The DIR. Could you have pulled the DIR report from June 1 to August 1?**
A. I honestly don't think I could.
**Q. So you're basically relying on security to tell you what is what?**
A. To give me the facts, yes.
**Q. Okay. And so you rely a lot on their integrity, correct?**
A. I do.
**Q. So if they have issues with integrity and issues with falsifying investigations, would that cause you concern?**
**MR. CLIFTON:** Objection, form.
**THE WITNESS:** It would.
**Q. BY MR. STEGELMEIER: Okay. So who determines how to -- so are security people in charge of determining how packages should be slated?**
A. No. As I stated earlier, we have our processes that are dictated from the corporate office on how to take care of scanning packages.
**Q. Okay. Have you ever been involved in an investigation where you were called by security to talk about something?**
A. Specifically what would that be, sir?



**Q. Just hotline report or any sort of investigation?**
A. Regarding myself?
**Q. The subject of it, yes.**
A. No.
**Q. Okay. Do you know if it's normal to have an HR representative available when you're having a conversation with a security person?**
A. Normal? I would say no.
**Q. Okay. As a security supervisor, Clay Holloway, do you think he would have had a cell phone from UPS?**
A. I can't answer that. I don't know.
**Q. Okay.**
A. It would be likely, I would think. Yes.
**Q. Okay. So he has in here a statement that on September 28, at 13:51, he called and interviewed Heidi Peck by telephone and that interview went through 14:24. Do you see where that is?**
A. I'm reading the caption now. One moment, please.
**Q. No worries.**
A. Okay. I've caught up to that part.
**Q. Okay. So if Heidi said that this**

**conversation lasted less than five minutes, would that give you concern that he reported that he had a 30-minute conversation with her?**
A. I wasn't a part of that, so I can't speak to how long that conversation was.
**Q. All right. So if phone records show that there was either a short or no conversation on that date, would that give you issues with this report?**
A. I'd probably ask the question, how long it really took.
**Q. All right. So basically if you were to find out now that Clay Holloway had lied in part of this investigation, would it give you concern about the entire investigation?**
A. As I stated earlier, no, based on the scanning data.
**Q. Okay. But you didn't actually look at the scanning data. Did you?**
A. I did not.
**Q. So if he lied on part of it regarding a telephone conversation, are you sure that he didn't lie on the other part of it about the scanning data?**
A. I don't know that he lied.
**Q. But if you did learn that he lied, would**



**that change your feeling about this?**
A. No.
**Q. No? How so?**
A. As I stated, I saw data that was provided to me. I made my decisions based on that.
**Q. Okay. So you decided that based on this data, that Heidi Peck should be terminated, correct?**
A. All the data, yes.
**Q. Okay. And the last interview here took place on September 28, 2021; is that correct?**
A. Yes. That's what it says.
**Q. Okay. How would you have received this report?**
A. Most likely via e-mail.
**Q. Okay. Do you recall when you received this e-mail?**
A. I do not.
**Q. Do you have that still?**
A. I do not.
**Q. Why not?**
A. E-mails after a period of time are removed from our local hard drives.
**Q. Okay. There's no preservation?**
A. Not locally, no.
**Q. Were you informed at any point that you**



**needed to preserve information regarding this lawsuit?**
A. Yes.
**Q. At what point were you -- well, at what point were you informed of that?**
A. I'd have to go back and look, but I did get the legal hold notice, and I did look on my hard drive for anything in relation to this matter, which was not available to me on my local drive.
**Q. Okay. So you deleted the e-mail that you got from security regarding this investigation?**
A. I did not delete it. It automatically is removed after a period of time, I believe one year.
**Q. Okay. Do you recall about when you got this e-mail?**
A. No. I do not.
**Q. Okay. What was your process after getting the e-mail?**
A. In terms of storing it?
**Q. In terms of just moving forward?**
A. My typical process is that I would have filed it in the divisional folder.
**Q. Okay. So I guess my concern is we have an investigation where the last interview was on**



**September 2021, but we don't have any action until December of 2021. And it's your testimony that this is an egregious offense, I believe; is that correct?**
A. It was. Yes.
**Q. Yet you waited two months to terminate her? Two, almost three?**
A. That's the timeline.
**Q. Okay. Did you terminate her before December so you could make sure she didn't get her bonus?**
A. No.
**Q. Was her bonus a consideration in her termination?**
A. No.
**Q. But it took you three months to terminate someone for an egregious offense?**
A. I'm sure once I initially talked to HR, they talked with our attorneys. That takes time.
**Q. Okay. So Heidi could get -- Heidi was terminated, with the last interview in September, in December. But Floyd wasn't terminated with the last interview in October. He didn't get terminated at all, all the way through June of next year. What's the difference?**
A. As I stated earlier, he went on

disability while the investigation was ongoing. My job was eliminated. He came back, went to work. I was no longer in charge of that area.

**Q. Okay. Were you aware that Heidi engaged in the EDR process?**

A. I did not know that she engaged in that. No.

**Q. Would it surprise to you to learn that a peer review recommended that she be reinstated as a business manager at a different location?**

A. Would it surprise me?

**Q. Yep.**

A. That's what the review is for. I wouldn't be surprised one way or another.

**Q. Okay. So what is the review for?**

A. As I stated earlier, it is for the employee -- excuse me, the person in question to state their side of the story, basically.

**Q. Okay. That reminds me, let's go back to September 13. Tell me about your phone call with Heidi. What happened there?**

A. As I recall, we set up a time to meet with Heidi, myself, and Alecia Todd, HR. I don't remember the exact discussion, but basically I told Heidi, based on the investigations that were



conducted and if the practice did not cease, I was going to terminate her employment with UPS.

**Q. Okay. Did you give her a chance to tell her side of the story?**

A. I did not.

**Q. Was she allowed to speak at all during that phone call?**

A. She was allowed to speak, as I recall she did not.

**Q. It's your testimony that you told her to go ahead and tell me what happened? Or just you let her speak?**

A. No. That was not going to be the time for her to share her story.

**Q. So Alecia Todd never told her you can't talk during this call?**

A. That was never stated to Heidi to my recollection.

**Q. Is this call recorded?**

A. No.

**Q. Why not?**

A. It's not a practice at UPS.

**Q. Okay. Do you recall any calls at UPS with management and stuff?**

A. Only teams meetings, that I'm aware of.



**Q. Okay. But this one was done on a telephone?**

A. Correct.

**Q. Okay. So you stated that the EDR process is to make sure that stuff is done right, correct?**

A. No. I stated that it was a process to allow the individual in question to state their side of the story in front of a group of people.

**Q. All right. So why wouldn't you want to know her side of the story before terminating her?**

A. I had already made the decision that I was going to terminate her, and she has another process to go through, EDR, to take care of that part of it.

**Q. How strictly does UPS follow the EDR process?**

A. I can't speak to that. I've never been a part of it.

**Q. Okay. But your testimony was you didn't care what she had to say, she was terminated you when you got through reading the report?**

**MR. CLIFTON:** Objection, form.

**THE WITNESS:** What I stated in my testimony was that was not the place for her to state her case.



**Q. BY MR. STEGELMEIER: Okay. So you've been in management for a significant amount of time, correct?**

A. Yes.

**Q. You probably fired a lot of people and hired a lot of people, correct?**

A. I am not responsible for hiring, that is an HR process, and I can't say that I have fired a lot of people.

**Q. Okay. So is this something that you take lightly or not?**

A. As I stated earlier, I don't take this lightly.

**Q. Okay. But it wasn't important for you to learn the other side of the story before making your decision?**

A. That's correct. There's a process for that. It's EDR.

**Q. And it's your understanding that the EDR process is to rectify any mistakes that you may have made; is that correct?**

A. That's correct.

**Q. So if a peer review had said, hey, give her her job back, what would your expectation be?**

**MR. CLIFTON:** Objection, form.

Page 105

THE WITNESS: That she would be reinstated.
Q. BY MR. STEGELMEIER: Okay. Are you aware that UPS has the discretion to ignore the EDR process?
A. I don't know that to be true or false.
Q. Okay. So you think if the peer review said give her her job back, they should've given her her job back?
A. That's what the process is for. Yes, sir.
Q. Okay. Well, we've been going for about another hour. Let's take a little break and we'll come back. Let's do another ten minutes. Does that work?
A. Yes, sir.
Q. All right. Thank you.
(Recess was taken from 11:25 a.m. to 11:35 a.m.)
Q. BY MR. STEGELMEIER: Mr. Emerson, was there anything during that break that you thought of regarding your past testimony that you wanted to correct or add to?
A. No, sir.
Q. All right. We won't be here too much longer, Mr. Emerson. I just want to go over one last

Page 106

document with you. I think we're at 7.
(Exhibit 7 marked.)
Q. BY MR. STEGELMEIER: So this one is documents that were provided by UPS during discovery, and the part that I'm interested in reviewing with you is the following people who are likely to have information regarding this matter.
We already discussed Douglas Berry. He was the division manager, I believe, correct?
A. Correct.
Q. Okay. And then who's Clive Fitzmaurice?
A. I'm sorry. I don't know that name.
Q. Okay. Do you know Robert Hooper?
A. No, sir.
Q. What about this Bryan McHugh?
A. Bryan McHugh is the current director of human resources for the northwest district.
Q. Okay. But it was Steve Redding who was the director at the time that you terminated Heidi Peck, correct?
A. Correct.
Q. You know who Kevin Olds is?
A. I don't know that name.
Q. Then Steve Redding we discussed, and he's the one that you called and spoke with before

Page 107

terminating Heidi, right?
A. Correct.
Q. I probably just said that.
So after you were the south package zone manager, you said that the position was done away with? Or you just got moved? What happened in that?
A. That position was eliminated.
Q. Was it combined with a different position? Or just the zone went away?
A. All package operations manager positions were eliminated across the U.S.
Q. Okay. So now they just fall under the districts?
A. Correct. So in today's world, the division manager now reports directly to the district manager.
Q. Okay. Are you currently a district manager? What is your current position?
A. My current position is director, schedule time and pay, global business services. My assignment now is based in Atlanta.
Q. Okay. So you went to the big corporate, right? Is that correct?
A. Correct.
Q. Congratulations. That's a good move.

Page 108

And they allow you to work remotely?
A. I am currently working remotely. However, we have a return to office coming up that will probably impact me and I will have to return to office, which is fine.
Q. Just have to go across the country to Atlanta?
A. No. I'd be assigned somewhere here in Portland.
Q. Then Alecia Todd, she was the one who was on the phone call with you when Heidi was terminated, correct?
A. Correct.
Q. What other involvement did Alecia Todd have in this matter?
A. None that I recall. It was all with Steve.
Q. Do you know a Jason -- I'm not going to try to say his last name.
A. Vacek. I do not know that individual.
Q. And I'm guessing you're also someone who has knowledge about this, where you made the decision to terminate Heidi?
A. Yes. I have knowledge of it. Yes.
Q. Okay. So after the zone package

Page 109

**managers went away, then the firing decision for business manager, did that go back to the division managers? Or did that go to the district managers?**
A. I don't know what their current process is to be honest. I've been removed from the district for two years now.
**Q. Okay. Well, I think that's all the questions I have for you. See if Ricky has any follow-up.**

**EXAMINATION**
**BY MR. CLIFTON:**
**Q. I just have a few questions. All right. Troy, I just wanted to ask you a few clarifying questions about some of the statements today.**
**Opposing counsel brought up that there was a report in the investigation into Floyd Reinhardt, and I believe it was marked as Exhibit 3. The investigator stated that there were 2,486 emergency condition packages. I just wanted to know about how many packages are moved daily out of one of those facilities?**
A. In Floyd's area?
**Q. Floyd.**
A. Okay. Daily, this was old knowledge, 10

Page 110

to 13,000.
**Q. Okay. You were also asked a few times whether you had conducted your own investigation after you received security investigation results. Was it your job to reinvestigate or confirm that security had done their job?**
A. It is not my job to do that. No.
**Q. And have you ever done that before?**
A. I have not.
**Q. Okay. You also stated that you confer with HR before terminating an employee because that's part of the process; is that right?**
A. Correct.
**Q. All right. And can HR push back and recommend against terminating an individual?**
A. They can.
**Q. Okay. So how many times, to your knowledge, was Heidi Peck investigated for misreporting service failures?**
A. To my knowledge, twice.
**Q. Okay. And approximately when was the first investigation?**
A. Late May, early June 2021.
**Q. What facility?**
A. First one was Rexburg.

Page 111

**Q. Okay. And do you remember what the conclusion of that first investigation was?**
A. That they were misrecording packages that should have been recorded as missed packages.
**Q. And was Heidi disciplined for that?**
A. No.
**Q. Okay. So she was given the opportunity to correct it?**
A. Yes.
**Q. And you were also asked if you sent that e-mail after the conclusions of this first investigation and you said you did; is that correct?**
A. Correct.
**Q. Okay. And what was Heidi's response to that e-mail?**
A. "Got it."
**Q. Do you know if Heidi was otherwise spoken to about the findings of her investigation?**
A. I do not know that.
**Q. Okay. Would Heidi, as a business manager, know that misrecording was an unacceptable practice even without you sending her that e-mail?**
A. Yes.
**Q. When was the second investigation into Heidi?**

Page 112

A. Late August that same year. August that same year.
**Q. And at what facility?**
A. Idaho Falls.
**Q. And what was the conclusion of that investigation?**
A. That the practice continued of incorrectly recording packages.
**Q. And was she disciplined for that?**
A. Ultimately, yes. Between the first and the second, yes.
**Q. Okay. And how many times was Floyd investigated?**
A. Just once, to my knowledge.
**Q. And what was the conclusion of his investigation?**
A. That in his area of responsibility they were also misrecording packages.
**Q. Okay. You stated earlier that the investigation was not concluded; was that incorrect?**
A. When I talked to him, it was not complete. But when it was eventually complete was when he was out on disability, and then my job was eliminated.
**Q. Do you have anything to show that Floyd**

Page 113

**continued the practice after he was informed about the first investigation?**
A. Nothing to my knowledge.
**Q. And it was also pointed out that Floyd admitted to the practice and that Heidi didn't; is that right?**
A. That's what the report said.
**Q. Okay. And is being forthcoming expected during investigations?**
A. I don't know the answer to that. I don't conduct those investigations. That's security.
**Q. Okay. Had you made a decision to discipline Floyd?**
A. Based on the final results, I believe I had. Yes.
**Q. You said the final result didn't come out until he was on leave; is that right?**
A. Around that time, that's correct.
**Q. Around what time?**
A. When he went out on disability.
**Q. Okay. Did you talk to HR about it?**
A. I don't believe I had at that point. Because, again, hadn't been finalized and I wasn't prepared to share my final decision.
**Q. Okay. You didn't go through that HR**

Page 114

**call and checks process?**
A. Based on the timing of disability, job elimination, and so forth, I did not.
**Q. Ultimately, who is responsible for ensuring that on-road supervisors properly train their drivers?**
A. The center manager.
**Q. Okay. And you were asked a question about the EDR process earlier, but you said that you weren't involved in that process; is that correct?**
A. Correct.
**Q. You know how the process works?**
A. I gave a general understanding of the process. I don't know every detail of the process.
**Q. Thank you, sir. No further questions.**

**FURTHER EXAMINATION**
**BY MR. STEGELMEIER:**
**Q. Just have a follow-up on that. Do you know how many packages move through the Idaho Falls area each day?**
A. Again, sir, old knowledge, probably 23,000 or so, maybe a little more. Again, that's very old knowledge. That's speculative.
**Q. Okay. But more than move through**

Page 115

**Cheyenne in a day?**
A. Yes.
**Q. Okay. So you mentioned that the center managers are in charge of training their on-road supervisors, correct?**
A. Correct.
**Q. Who's in charge of making sure the center managers do the right thing?**
A. The division manager.
**Q. Okay. Was Floyd Reinhardt in Doug Berry's division?**
A. Yes.
**Q. Was Doug Berry ever subject to any discipline for these misreported packages?**
A. No.
**Q. So he had two center managers: One got terminated; one had a significant amount of willfully misreported packages, and he wasn't terminated or disciplined at all?**
A. "He" being Doug Berry?
**Q. Yes.**
A. That's correct.
**Q. Okay. Were you ever disciplined for these misreported packages?**
A. No.

Page 116

**Q. Did anyone ever talk to you and say, hey, you need to get your zone under control, you're having misreported packages?**
A. There was discussion before I sent that e-mail that we probably need to do that just to stop it before it gets started.
**Q. Okay. So there's 23,000 packages a day through Idaho Falls, and we have 40 futures slated in a two-month period, and you felt that was sufficient to terminate Heidi's employment?**
A. The decision was made based on an investigation that was conducted, that the process was published, and it need -- the inappropriate use of future needed to cease, but yet it continued in her area of responsibility.
**Q. Okay. So 40 over a two-month period was sufficient for the termination, though?**
A. As I stated, it was -- which she confirmed, "Got it" -- that the use of future for anything other than future was to cease, and that was strike two.
**Q. And that was June 4, right?**
A. Correct.
**Q. But you looked at data from June 1 through August 1, right?**

A. I did not look at it. Security looked at that data.

**Q. And they never broke it down to say which date each one was?**

A. Not to my knowledge. I don't think it was in that report.

**Q. Okay. You mentioned that Floyd Reinhardt's investigation was complete before you left; is that correct?**

A. I don't know the exact date when his investigation was complete.

**Q. Okay. So you're not sure if it was complete before he left or not?**

A. Correct.

**Q. Okay. But just to reiterate, he wasn't ever terminated, correct?**

A. Correct.

**MR. STEGELMEIER:** I think that's all I have.

**MR. CLIFTON:** We'll reserve our questions for the time of trial.

**MR. STEGELMEIER:** We'll take our normal order, Jessie. Just whatever Blake usually does.

**THE COURT REPORTER:** Mr. Clifton, do you want a copy?

**MR. CLIFTON:** We'll take an e-tran.



(The deposition concluded at 11:50 a.m.)



REPORTER'S CERTIFICATE

STATE OF IDAHO )
) ss.
COUNTY OF BONNEVILLE )

I, Jessica Simpson, SRT, and Notary Public in and for the State of Idaho, do hereby certify:

That prior to being examined Troy Emerson, the witness named in the foregoing deposition, was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true, and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 12th day of March 2024.

Jessica Simpson
Idaho SRT No. SRT-1216,
Notary Public in and for
the State of Idaho

## $

**$0 (2)** 78:2,16
**$100,000 (1)** 53:3
**$25,000 (1)** 53:10
**$50,000 (1)** 53:6

## A

**above (3)** 26:12;39:19;73:12
**abundance (1)** 54:1
**access (1)** 11:5
**accomplish (1)** 44:7
**accomplished (1)** 44:7
**accounting (1)** 12:21
**accurately (1)** 34:23
**acknowledged (2)** 66:6;90:24
**acknowledging (1)** 7:22
**across (3)** 31:21;107:11;108:6
**act (2)** 34:22;35:23
**action (3)** 9:18;45:24;100:1
**active (4)** 63:15,19,21,22
**activity (1)** 8:8
**actually (8)** 61:13;75:18;89:8;91:12;92:7,9,25;97:18
**add (2)** 58:20;105:22
**additional (1)** 80:9
**administration (1)** 12:21
**admitted (1)** 113:5
**admitting (2)** 66:10;68:11
**affect (5)** 35:10;49:10;56:4;59:9;78:3
**affected (1)** 35:11
**again (12)** 15:23;47:1;56:6;64:25;77:1;78:7;83:13;87:21;90:4;113:23;114:22,23
**against (3)** 4:12;49:13;110:15
**ago (2)** 20:5;46:25
**agree (1)** 84:13
**agreed (1)** 46:24
**agreement (1)** 86:22
**ahead (9)** 8:10,11,17;66:1,19;69:24;82:20;93:19;102:11
**air (4)** 14:17,17;17:18,19
**airplane (4)** 18:24;34:2,5,9
**airport (3)** 18:1,4;31:8
**Alaska (1)** 37:23
**Alecia (4)** 101:23;102:15;108:10,14
**allow (2)** 103:8;108:1
**allowed (2)** 102:6,8
**almost (1)** 100:6
**along (1)** 20:11
**always (2)** 60:4;73:14
**Amazon (4)** 61:7;66:15;67:8,10
**among (1)** 24:17
**amount (4)** 28:16;44:10;104:2;115:17
**and/or (1)** 23:18
**announce (1)** 25:23
**announced (1)** 26:1
**annual (5)** 43:4,8;52:19;84:22;87:1
**anymore (2)** 67:9;94:14
**apologize (1)** 88:22
**application (1)** 66:14
**applied (1)** 74:5
**Applies (1)** 8:5
**apply (2)** 29:11;34:12
**appreciate (1)** 52:21
**Approximately (14)** 13:8,23;17:14;18:23;19:19;26:8;27:16,21;29:22;31:15;32:12;37:16;68:2;110:21
**arbitration (1)** 50:14
**area (13)** 18:16;20:21;42:11;55:12;57:10;69:22;80:21;88:7;101:3;109:23;112:17;114:21;116:15
**around (9)** 18:8;19:10;32:2;48:14,19;77:2;83:21;113:18,19
**arrive (1)** 39:12
**assigned (2)** 82:8;108:8
**assignment (2)** 26:10;107:21
**assume (3)** 5:8;84:2,10
**assumed (1)** 83:10
**assuming (1)** 28:9
**Atlanta (3)** 23:15;107:21;108:7
**attachment (1)** 8:19
**attend (1)** 12:5
**attorneys (2)** 11:14;100:18
**audio (1)** 9:25
**August (10)** 13:12;71:11;73:20;74:9;76:9;94:10;95:3;112:1,1;116:25
**automatically (1)** 99:12
**available (2)** 96:7;99:9
**avoid (3)** 66:7;68:12;69:6
**aware (16)** 36:20;49:2;55:9,18;62:21;63:15;69:21;72:21;73:21;74:18;86:4;93:15,16;101:4;102:25;105:3
**away (7)** 12:14;45:16;48:5,8;107:5,9;109:1

## B

**bachelor (1)** 12:22
**bachelor's (1)** 12:20
**back (44)** 6:23;9:14;10:23;11:9,12,18;16:21;20:19;29:24;32:17,21,23;36:3,7,13;37:8;41:12;46:25;48:10;49:25;58:15;60:15,17;62:25;65:20;67:9;71:18;74:4;82:4;85:7;87:1;88:1;94:16,21,23;99:6;101:2,19;104:24;105:7,8,13;109:2;110:14
**bad (2)** 45:3;48:12
**base (1)** 51:6
**based (21)** 18:8;34:24;51:2;52:8,24;55:25;56:6;74:21;76:5;77:4,14;81:3;92:23;97:16;98:5,6;101:25;107:21;113:14;114:2;116:11
**basically (12)** 15:17;22:24,25;25:10;34:19;48:12;54:24;85:13;95:5;97:12;101:18,24
**basis (2)** 36:15;74:20
**Bay (1)** 20:21
**bear (1)** 7:13
**became (3)** 17:17;29:6;71:9
**began (1)** 19:19
**beginning (3)** 37:11,11;65:8
**behalf (1)** 45:10
**below (1)** 73:12
**Bend (2)** 6:7;11:22
**Berry (7)** 41:6;70:3,4;86:15;106:8;115:13,20
**Berry's (2)** 85:1;115:11
**besides (6)** 6:21;9:20;10:1;17:5;76:21;81:10
**best (1)** 23:3
**better (5)** 34:18,18;43:14;44:2;86:1
**big (3)** 24:22;80:2;107:22
**bit (6)** 5:21;11:18;49:18,23;58:13,14
**Blake (1)** 117:22
**blocked (1)** 60:13
**bonus (21)** 44:22;45:17;46:2;47:13,14,20,23;48:1,4,8;49:3;52:3,13,16;53:6,10;73:6;84:16;85:14;100:10,12
**bonuses (1)** 49:7
**born (1)** 6:6
**both (2)** 74:14;77:14
**bragging (1)** 25:17
**Braham (1)** 40:10
**branches (1)** 23:13
**break (11)** 5:24,25;8:6;23:10;58:14,19,21;94:4,10;105:12,20
**breakdown (7)** 34:9;35:18,20,21,24;67:3,5
**breakdowns (2)** 61:6;66:11
**breaks (2)** 34:20;36:2
**bring (2)** 9:17;21:3
**broke (3)** 34:5,6;117:3
**brought (6)** 4:12;53:25;74:4;87:20,21;109:16
**Bryan (2)** 106:15,16
**Bryon (1)** 93:8
**bucket (1)** 34:19
**building (5)** 17:3,24;20:7;27:14;60:17
**buildings (2)** 20:7;39:5
**bullet (2)** 65:24;92:11
**bunch (1)**

21:2
**business (10)**
12:20;25:1;41:25;73:15;79:19;93:5;101:10;107:20;109:2;111:20

## C

**Cal (5)**
29:6,20;30:2,24;84:5
**calculated (1)**
52:16
**California (8)**
4:22;22:14,24;23:1;31:4,17;37:3,5
**call (30)**
13:17,19,20;17:24;24:7;25:5;36:23;42:17;47:13;52:17;63:12;64:5,7,11,16,24;65:1;68:19;69:20;71:2,5;77:7;87:10,11;101:20;102:7,16,19;108:11;114:1
**called (6)**
24:22;46:6,10;95:23;96:17;106:25
**calling (1)**
30:9
**calls (3)**
75:15;80:7;102:23
**came (8)**
13:14;28:9,10;29:24;37:8;60:15;79:14;101:2
**Can (25)**
4:13;8:10;21:5,19,25;24:20;35:2,4;36:2,7;47:14,15;50:3;60:11;61:2;65:25;66:1,2;79:6;82:21;89:10;92:7,8;110:14,16
**Canada (1)**
31:6
**capacity (1)**
67:13
**caption (1)**
96:21
**car (17)**
13:16,21,25;14:12,16;15:2,10,11;16:9,18;17:6;30:13;36:2;39:7;40:24;41:18,21
**carbon (3)**
14:8,10;17:10
**care (7)**
19:3;21:8;59:15;86:24;95:21;103:14,21
**career (3)**
18:11,14;48:15
**Carey (2)**
57:4,8
**carrier (1)**
67:10
**carrot (1)**
92:11
**carry (1)**
82:6
**cars (4)**
13:18,20;17:1;30:16
**case (8)**
4:21;36:1;47:2,9;54:25;58:8;59:14;103:25
**cases (2)**
70:8;84:4
**cash (1)**
47:15
**caught (2)**
60:18;96:24
**cause (2)**
61:8;95:13
**causing (1)**
87:23
**cease (4)**
81:5;102:1;116:14,20
**celebrate (1)**
25:6
**cell (1)**
96:11
**center (26)**
16:3,24;23:17,20;27:15;28:8,11;33:20,21;39:7;41:1,3;51:12;53:25;65:16;74:12;80:23;81:23;83:14,16,19;92:14;114:7;115:3,8,16
**centers (4)**
24:14;27:15;74:16;91:5
**Central (1)**
22:24
**certain (1)**
9:18
**cetera (4)**
16:20;50:17;71:21;91:25
**chain (1)**
23:12
**chance (2)**
5:2;102:3
**change (6)**
38:4;55:21;56:18;79:4,21;98:1
**changed (3)**
14:5;28:2;88:8
**changes (1)**
88:5
**changing (1)**
78:25
**charge (8)**
18:19;40:4,5;50:13;95:17;101:3;115:4,7
**charged (1)**
8:9
**chart (1)**
25:3
**check (2)**
11:13;61:13
**checker (1)**
13:6
**checking (1)**
60:25
**checks (1)**
114:1
**chest (1)**
14:19
**Cheyenne (1)**
115:1
**choose (1)**
54:21
**chose (2)**
47:1;53:18
**Christina (1)**
90:12
**circumstances (1)**
59:21
**claimed (1)**
91:7
**claims (1)**
82:3
**clarification (1)**
5:10
**clarified (1)**
31:5
**clarifies (1)**
50:16
**clarify (4)**
5:7;11:3;48:16;72:4
**clarifying (1)**
109:14
**clarity (1)**
50:18
**Clay (10)**
8:14;55:11;57:3,12;64:19;65:7;74:23;93:11;96:10;97:13
**clearly (1)**
92:5
**clerk (1)**
13:6
**CLIFTON (25)**
21:15,19;26:3;28:19;34:17;44:24;45:9;48:24;55:24;56:16;58:5;61:1;69:8;77:9,16;79:17;85:16;89:14;95:14;103:23;104:25;109:12;117:19,23,25
**Clive (1)**
106:11
**closed (7)**
48:12;63:17,19,21;92:18;93:6,7
**closed' (1)**
92:13
**closer (1)**
22:10
**closing (1)**
16:24
**closings (1)**
8:5
**COD (1)**
14:18
**code (5)**
67:4,11,12;79:4,21
**codes (1)**
78:25
**collected (3)**
56:8,10,13
**college (3)**
11:23;12:1;13:10
**combined (1)**
107:8
**coming (3)**
46:21;48:10;108:3
**command (1)**
23:12
**committed (1)**
9:5
**common (1)**
58:8
**communicate (2)**
61:25;75:14
**Communicated (1)**
75:16
**communication (2)**
71:16,17
**company (2)**
36:16;46:16
**competition (3)**
25:8,25;26:2
**competitions (2)**
23:3;24:16
**complete (7)**
15:16;65:10;112:22,22;117:8,11,13
**compliance (1)**
16:19
**computers (1)**
20:8
**concern (7)**
41:16;61:8;79:25;95:13;97:2,14;99:24
**concerned (2)**
56:12;78:15
**concerning (1)**
65:22
**concerns (3)**
41:19;71:22;72:9
**concluded (3)**
42:24;112:20;118:1
**conclusion (4)**
42:15;111:2;112:5,15
**conclusions (1)**
111:11
**condition (6)**
65:17;66:7,11,22;69:6;109:20
**conditions (1)**
68:11
**conduct (2)**
43:4;113:11
**conducted (4)**
77:23;102:1;110:3;116:12
**confer (1)**
110:10
**confirm (1)**
110:5
**confirmed (4)**
9:7;76:6,8;116:19
**Congratulations (1)**
107:25
**consider (4)**
58:3;61:15;76:1;85:19
**consideration (1)**
100:12
**consignee (1)**
8:3
**consumer (3)**
34:15;35:3,5
**contact (1)**
71:21
**contacted (1)**
93:11
**continue (3)**
44:1;74:11;87:23
**continued (7)**
59:25;74:10;88:17;89:6;112:7;113:1;116:14
**continues (1)**
53:2
**continuing (1)**
91:5
**control (1)**
116:2
**conversation (7)**
63:14;96:8;97:1,3,5,7,22
**conversations (2)**
5:19;91:24
**convinced (1)**
74:17
**copies (1)**
17:10
**copy (4)**
7:7,21;14:8;117:24
**corporate (4)**
40:16;50:6;95:20;107:22
**corporation (1)**
52:17
**corrected (2)**
72:15,17
**Cory (2)**
4:10;58:5
**cost (1)**
49:13

**counsel (2)**
6:21;109:16
**counseling (2)**
46:5;69:18
**counting (1)**
40:1
**country (1)**
108:6
**County (3)**
22:15,17;29:16
**couple (1)**
60:11
**court (2)**
5:15;117:23
**crown (1)**
25:9
**culture (1)**
93:18
**current (6)**
79:15,16;106:16;107:18,19;109:4
**currently (4)**
6:2;11:16;107:17;108:2
**customer (4)**
59:8,14,16;78:19
**customers (1)**
20:3

## D

**daily (2)**
109:21,25
**damage (1)**
87:24
**data (14)**
93:21;94:8,12,17,24,25;97:17,19,23;98:4,7,8;116:24;117:2
**date (12)**
7:4,5;8:4;35:9;67:24;68:2,25;69:2;71:8;97:8;117:4,10
**dated (2)**
7:17;82:3
**dates (1)**
67:21
**daughter (1)**
6:5
**day (10)**
8:4;15:12,16;27:8;28:12;39:13;41:18;114:21;115:1;116:7
**days (5)**
8:8;39:5;44:5,11,11
**day-to-day (3)**
19:25;20:1;38:23
**deal (1)**
46:18
**dealt (1)**
48:3
**December (5)**
47:19,23;100:2,9,21
**decide (5)**
46:17;49:17;51:2;75:1,24
**decided (4)**
36:6;67:17;73:1;98:6
**deciding (1)**
50:13
**decision (24)**
49:21;50:1;51:2,4;67:19;68:16;69:14;70:9,12;77:11;78:21;85:7;86:8,12,16,22;87:5;103:12;104:16;108:22;109:1;113:12,24;116:11
**decisions (4)**
70:7,16;78:10;98:5
**degree (1)**
12:3
**delay (3)**
5:22;34:7;35:7
**delayed (1)**
34:16
**delays (1)**
61:7
**delete (1)**
99:12
**deleted (1)**
99:10
**deliver (3)**
30:13;34:21;93:6
**delivered (7)**
8:4;14:20,21,25;33:13;60:8,9
**delivering (1)**
16:17
**delivery (10)**
8:9;15:13;17:7;24:17;25:2;34:13,15;35:9;78:1;93:22
**demoted (3)**
51:25;54:18,19
**demotion (1)**
26:20
**denied (1)**
90:20
**depended (1)**
34:4
**depending (2)**
39:13;52:13
**depends (1)**
24:13
**deposition (14)**
4:1,17,20;5:1;6:10,13,21,24;8:23;9:12,15,17,22;118:1
**Describe (1)**
45:25
**destination (1)**
30:22
**detail (1)**
114:14
**details (1)**
63:4
**determination (1)**
68:5
**determine (2)**
50:21;53:17
**determines (1)**
95:17
**determining (2)**
50:20;95:18
**developing (1)**
20:6
**DIAD (3)**
20:14,14;28:4
**DIADs (1)**
20:16
**diary (1)**
10:10
**dictated (1)**
95:20
**difference (3)**
30:3;63:18;100:24
**different (38)**
8:15;14:15;18:8,20;20:22,23,25;21:2,3,4,13,14,17;24:16,17;25:1;26:14,16;29:11;31:24;34:14;39:4;46:7;51:19;58:12;59:21;60:11,20;71:20;73:9;76:3;82:9;83:7;90:23;91:1;92:2;101:10;107:8
**digitized (2)**
19:18;20:13
**digitizing (1)**
20:11
**DIR (4)**
93:21;94:12;95:2,2
**directed (1)**
73:16
**direction (1)**
89:24
**directly (1)**
107:15
**director (7)**
57:9;70:24;75:19,21;106:16,19;107:19
**disability (7)**
42:14;63:6;69:10;101:1;112:23;113:20;114:2
**disagree (2)**
50:10;51:12
**disagreed (1)**
50:24
**disciplinary (4)**
45:24,25;47:4;85:20
**discipline (10)**
43:17;46:3,10;48:5;57:17;72:21;73:3;87:15;113:13;115:14
**disciplined (5)**
72:18;111:5;112:9;115:19,23
**disciplining (1)**
66:24
**discovery (2)**
65:7;106:4
**discretion (1)**
105:3
**discuss (1)**
22:9
**discussed (3)**
76:2;106:8,24
**discussing (1)**
70:19
**discussion (3)**
70:20;101:24;116:4
**dispatched (1)**
27:7
**dispute (1)**
68:25
**district (34)**
17:17;23:5,11,21,22;24:13,14,17;25:3;26:17;28:14;37:17,20,22;38:1,5,7;39:11,18,19;40:5,7,8;48:10,10;70:1;74:5;83:24;84:8;106:17;107:15,17;109:3,5
**districts (4)**
24:9;26:16;39:15;107:13
**division (46)**
23:8;25:3;26:11,12,25;27:1,4;29:5,7,8,21;30:2,24;31:11,22,23,24;32:1,11,16,23;33:3,8,15;36:17;37:18,19;41:4,7;43:24,25;53:1,8,10;57:9;70:1,2,4;83:7,7;86:17;106:9;107:15;109:2;115:9,11
**divisional (4)**
82:18;83:5,22;99:23
**divisions (7)**
26:14,16;32:6,8;39:22,24;40:2
**document (4)**
65:7;68:23;77:4;106:1
**documented (2)**
84:24;85:11
**documents (4)**
6:24;9:18;58:6;106:4
**dog (2)**
24:3,6
**dollar (1)**
78:23
**done (11)**
6:20;10:19;53:20;60:4,11;66:3;103:1,5;107:5;110:6,8
**DOT (1)**
66:24
**doubles (1)**
30:9
**Doug (13)**
41:6;70:2,4,6;71:19,21;72:4,5;85:1;86:15;115:10,13,20
**Douglas (1)**
106:8
**down (19)**
16:24;22:25;23:10;30:9,19;34:5,6;36:2;46:23;60:13;65:24;67:21;80:20;82:1;90:4,19;94:4,10;117:3
**draw (1)**
66:8
**drive (2)**
99:8,9
**driver (13)**
13:16,22,25;14:12;15:2,11;16:25;53:22,24;54:4;60:12,18;91:24
**drivers (11)**
16:16;17:6;27:10,11,12;39:8;41:18,20,21;66:25;114:6
**drives (1)**
98:22
**duces (2)**
6:13;9:17
**due (4)**
34:7,9;60:16;89:19
**dug (1)**
74:22
**duly (1)**
4:5
**during (16)**
8:6;11:10;13:10;18:24;27:22;39:12;45:23;58:21;64:15;75:15;82:2;102:6,16;105:20;106:4;113:9
**duties (8)**
15:5,16;16:12;22:22,23;23:8;27:3;38:15
**duty (1)**
15:7

## E

**earlier (10)**
69:9;72:25;83:15;95:19;97:16;100:25;101:16;104:12;112:19;114:9
**early (4)**
19:11;20:12;68:3;110:23
**earn (1)**
47:13

**easier (1)** 53:14
**economics (1)** 12:22
**EDR (10)** 54:13,23;101:5; 103:4,14,16;104:18,19; 105:3;114:9
**efficiencies (1)** 39:6
**efficiency (1)** 39:8
**efficient (3)** 15:18;18:1;27:11
**efficiently (1)** 19:6
**egregious (6)** 87:17,18,19,25; 100:3,16
**eight (1)** 27:6
**either (6)** 14:24;15:14;46:1; 62:3;86:5;97:7
**element (2)** 72:13,15
**elements (2)** 44:5,12
**eligible (1)** 85:14
**eliminated (6)** 63:8;69:12;101:2; 107:7,11;112:24
**elimination (1)** 114:3
**else (9)** 9:11,22;10:4;21:9; 50:9;64:7;86:5;90:2,13
**e-mail (43)** 6:19,25;7:1,2,12,20; 8:12,14,15,23;9:20,20; 10:1;62:3;71:16;74:5; 75:15;76:12,14,19,24; 80:5,12;81:6,9,20; 84:16;85:15,19,20,21; 89:2;94:1,6;98:14,16; 99:10,16,19;111:11,15, 22;116:5
**e-mails (8)** 10:3,23;11:5,9; 57:11;68:15;81:15; 98:21
**emergencies (2)** 14:23;27:24
**emergency (18)** 14:22;33:13;35:12, 15,19,20;60:3;61:6; 65:17;66:6,10,15,22; 67:14;68:10;69:6;92:5; 109:20
**Emerson (8)** 4:3,10,15,16;29:13; 58:18;105:19,25
**E-m-e-r-s-o-n (1)** 4:15
**employee (15)** 46:15,21,23,24; 57:15,20,24,25,25; 58:2,6,7;85:14;101:17; 110:11
**employees (2)** 43:5;58:7
**employment (4)** 47:5;68:13;102:2; 116:10
**enact (1)** 40:12
**end (4)** 25:4,7;47:12;48:23
**ended (2)** 42:13,15
**enforcing (1)** 40:5
**engaged (2)** 101:4,6
**engineer (3)** 17:18,19,22
**engineering (1)** 50:15
**enough (4)** 10:9;68:5;79:5,9
**ensuring (1)** 114:5
**entire (1)** 97:15
**entitled (1)** 47:20
**entrust (1)** 59:13
**era (1)** 27:23
**Essentially (1)** 24:1
**et (4)** 16:19;50:17;71:21; 91:25
**ethics (1)** 79:25
**e-tran (1)** 117:25
**evaluate (1)** 15:12
**evaluating (1)** 41:20
**even (2)** 85:10;111:22
**event (4)** 34:10,22;35:7,23
**events (1)** 22:10
**eventually (1)** 112:22
**everybody (1)** 23:25
**everyday (1)** 5:19
**everywhere (1)** 74:7
**evidence (1)** 58:2
**exact (6)** 7:5;34:8;67:4,12; 101:24;117:10
**exactly (1)** 63:5
**EXAMINATION (3)** 4:8;109:11;114:17
**examined (1)** 4:5
**example (10)** 24:20;25:2;30:21; 41:15,17,23,24;53:2; 60:16;84:5
**examples (1)** 53:12
**exceeded (2)** 66:24;67:13
**excellence (6)** 22:19,20,22;24:3,23; 26:7
**exception (6)** 33:16;34:4,8,12,24; 74:4
**exceptions (4)** 7:23;19:4;33:23; 35:22
**excess (2)** 28:16;66:15
**exclusions (1)** 67:13
**excuse (3)** 22:25;66:21;101:17
**Exhibit (11)** 6:9,11;8:20,21;9:14; 65:5;68:21;77:21; 88:11;106:2;109:18
**exhibits (1)** 8:13
**expect (3)** 61:20,22;83:16
**expectation (1)** 104:24
**expected (2)** 46:24;113:8
**experience (4)** 32:4,9,9;46:19
**experienced (1)** 76:17
**expert (1)** 43:2
**Explain (5)** 43:20;52:19;53:25; 59:22;87:18
**extend (1)** 37:22
**external (1)** 20:3

**F**

**face-to-face (1)** 75:20
**facilities (1)** 109:22
**facility (3)** 90:21;110:24;112:3
**fact (5)** 63:24;76:5;78:16; 80:16;88:24
**fact-finding (2)** 80:17,18
**factor (5)** 52:18,18,23;53:5,18
**factors (1)** 52:11
**facts (12)** 49:20;51:1;55:25; 56:6,8,13,22;57:2; 63:20,21;68:5;95:7
**failures (5)** 65:18;66:7;68:12; 87:24;110:19
**Fair (1)** 10:9
**Fall (2)** 12:11;107:12
**Falls (5)** 74:13;88:10;112:4; 114:20;116:8
**false (3)** 78:4;94:15;105:5
**falsified (1)** 78:1
**falsifying (3)** 55:23;56:14;95:12
**familiar (1)** 54:13
**family (1)** 17:16
**fancy (2)** 9:15,16
**fantastic (1)** 44:3
**far (5)** 20:11;31:16;37:5,19, 22
**faster (1)** 18:5
**fault (1)** 34:22
**February (5)** 37:12;63:9,12;64:23; 68:1
**feeder (9)** 30:2,3,10,23;31:1; 32:21,23;37:17,25
**Feeders (1)** 30:7
**feel (4)** 49:20;58:1;72:3,6
**feeling (1)** 98:1
**feelings (2)** 55:21;72:7
**fees (1)** 36:1
**felt (6)** 68:4;79:8,15;80:25; 81:3;116:9
**few (10)** 4:25;20:24;23:8; 39:5;80:14;82:8;84:11; 109:13,14;110:2
**fewer (1)** 52:7
**figure (2)** 53:15;93:4
**figuring (1)** 84:6
**file (3)** 57:15,20,25
**filed (1)** 99:23
**files (4)** 57:24;58:2,6,8
**filling (1)** 84:7
**final (11)** 67:19;69:1,13;70:12, 15;77:11;89:16,18; 113:14,16,24
**finalized (3)** 64:23;65:1;113:23
**finally (1)** 5:17
**financial (4)** 25:12,20,21;51:18
**financially (2)** 46:2;78:3
**find (3)** 80:21;92:9;97:13
**finding (5)** 63:24;79:3;80:16; 88:25;92:3
**findings (7)** 65:9,10,14;74:1; 81:3;92:8;111:18
**fine (2)** 7:15;108:5
**finer (1)** 30:19
**finish (1)** 5:20
**fire (8)** 45:8,13,17;48:22; 49:4;67:18;68:16; 70:19
**fired (19)** 46:11;47:22,25; 48:13,15,17,19,20; 49:17;51:21;64:11; 81:13;89:4,5,12,13; 91:3;104:5,8

**firing (6)**
45:4;70:6,9,16;85:15;109:1
**first (25)**
4:5;12:2;13:15;15:7;22:18;23:22;29:22;30:25;32:12;61:2;63:8;65:15;71:7;75:6;76:11;88:2,25;90:8;92:11;110:22,25;111:2,11;112:10;113:2
**Fitzmaurice (1)**
106:11
**five (4)**
12:6;40:2;54:20;97:1
**fix (1)**
32:6
**flowed (1)**
18:5
**Floyd (29)**
62:14;63:10,12;65:25;67:18;68:17,23;70:1,10,19,21;71:3;76:21,25;88:22,23;89:12;90:24;92:3;93:11;100:21;109:17,24;112:12,25;113:4,13;115:10;117:7
**Floyd's (2)**
92:4;109:23
**focus (7)**
21:6,10,13,17;26:1;44:14;94:1
**focused (2)**
22:5;40:17
**folder (1)**
99:23
**follow (4)**
33:15;86:19;87:23;103:16
**followed (1)**
9:4
**following (2)**
17:25;106:6
**follows (2)**
4:2,6
**follow-up (4)**
56:22;73:20;109:9;114:19
**form (20)**
10:18;21:15,19;26:3;28:19;34:17;44:24;45:9;48:24;55:24;61:1;69:8;77:9,16;79:17;85:16;89:14;95:14;103:23;104:25
**format (2)**
5:1;8:15
**forth (4)**
10:24;11:9;71:18;114:3
**forthcoming (1)**
113:8
**forward (3)**
76:16;84:24;99:21
**forwarded (1)**
8:19
**found (5)**
59:14;76:9;82:1;84:15;93:25
**four (5)**
18:12;20:21;44:13;54:20;63:23
**Francisco (2)**
19:14;22:12
**Frankly (1)**
7:21
**front (5)**
28:7,10;54:20;58:4;103:9
**full (1)**
4:13
**full-time (5)**
15:3,7;46:19;52:25;54:18
**fully (1)**
5:6
**further (4)**
63:23;94:10;114:15,17
**future (17)**
7:23,25,25;8:4,5,8;14:22;60:10;74:4;75:8;85:21;89:2;93:25;94:3;116:14,19,20
**futures (12)**
14:24;27:25;81:7,8,10,12,18;89:1,7;92:7,7;116:8

**G**

**gaps (1)**
84:7
**Gardena (4)**
26:10,24;28:6;29:15
**Gateway (5)**
31:4,7,11,14;34:2
**gathering (1)**
63:20
**gave (2)**
46:24;114:13
**general (7)**
5:1,19;16:14;39:1;54:15,16;114:13
**generally (3)**
44:18;62:11;71:16
**generic (1)**
58:5
**geography (1)**
15:15
**gets (3)**
93:3,19;116:6
**girls (1)**
22:7
**given (6)**
15:15,16;43:10,13;105:7;111:7
**giving (1)**
58:6
**glad (2)**
31:5;45:22
**glance (1)**
78:13
**Glenlake (1)**
23:15
**global (1)**
107:20
**goals (2)**
24:18;40:4
**God (2)**
34:22;35:23
**goes (2)**
43:7;54:23
**good (10)**
5:13;7:15;25:18;41:24;45:22;52:21;56:21;79:5,9;107:25
**government (3)**
35:11,13,15
**graded (1)**
24:24
**graduate (3)**
11:19,21;12:18
**Graduated (3)**
12:11,25;43:17
**graduation (3)**
13:1,9,10
**great (2)**
44:6;46:18
**grew (1)**
30:8
**gross (1)**
53:6
**ground (5)**
4:25;31:22;32:10,16;33:3
**grounds (1)**
59:18
**group (8)**
19:16,21,21;20:1;50:6,15;57:10;103:9
**guess (13)**
9:20;18:5;21:24;24:12;34:18;37:2;46:10;60:9,20;67:9;70:1;93:13;99:24
**guessing (4)**
4:23;15:24;29:25;108:21
**guy (2)**
48:12;50:23
**guys (1)**
22:6

**H**

**handed (1)**
63:3
**happen (4)**
21:25;43:15;50:11;76:7
**happened (13)**
16:1;41:10;42:12;45:5;55:13;73:17;76:5;88:1;94:5,5;101:21;102:11;107:6
**happening (3)**
19:7;74:6,7
**happens (2)**
53:22;55:4
**Happy (1)**
6:3
**hard (5)**
5:14,18,21;98:22;99:7
**harder (1)**
25:21
**hat (1)**
65:21
**head (1)**
5:15
**hear (3)**
45:22;59:1;73:2
**heard (2)**
48:14,18
**Heidi (41)**
4:11;7:22;10:1;42:5;47:3;55:8,19;56:3;57:14;71:6,7,13,25;81:1,12;84:16,23;86:1;89:10,20;90:19;96:18,25;98:7;100:19,19;101:4,21,23,25;102:17;106:19;107:1;108:11,23;110:18;111:5,17,20,25;113:5
**Heidi's (6)**
10:20;55:22;56:22;73:18;111:14;116:10
**held (1)**
44:9
**help (4)**
19:5;41:9;43:14;69:19
**here's (2)**
67:22;81:22
**herself (1)**
54:1
**hey (7)**
29:12;36:24;50:8;61:11;84:22;104:23;116:2
**hierarchy (1)**
23:11
**high (3)**
11:19,22,23
**higher (2)**
43:18;86:17
**highest (2)**
23:14,15
**high-level (1)**
23:4
**highway (1)**
30:10
**hired (2)**
14:4;104:6
**hiring (3)**
18:19;70:6;104:7
**history (3)**
46:16;47:4;91:23
**Hold (2)**
80:21;99:7
**Holloway (9)**
8:14;55:11;57:3,12;64:19;65:8;93:11;96:11;97:13
**home (3)**
12:14;17:3;39:13
**honest (1)**
109:5
**honestly (1)**
95:4
**Hooper (1)**
106:13
**hotline (1)**
96:1
**hour (2)**
40:23;105:12
**hours (2)**
27:6;66:24
**HR (25)**
70:14,15,18,23,24;75:9,17,19,21;85:5;86:10,11,21,22;87:2,11,11;96:7;100:17;101:23;104:8;110:11,14;113:21,25
**hub (9)**
18:2;23:18,19;30:4,12;31:22;32:10,16;33:3
**hubs (6)**
29:6,21;30:5,18;31:1;84:5
**human (1)**
106:17
**hurt (1)**
12:16

**I**

**Idaho (8)**
37:24;38:21;71:10;74:13;88:10;112:4;114:20;116:8
**idea (1)**
36:11
**identical (1)**
77:13
**IE (3)**
17:18,19,20
**ignore (1)**
105:3

**II (1)**
20:14
**III (1)**
20:14
**immediate (3)**
33:17,19;84:10
**Immediately (1)**
51:20
**impact (1)**
108:4
**important (9)**
9:3;21:4,12;22:2;
26:2;47:8;78:23;88:5;
104:14
**impression (1)**
71:24
**improper (1)**
92:16
**improve (7)**
41:5,10,11;44:5,11,
14,15
**improvement (1)**
43:13
**improves (1)**
44:6
**inappropriate (1)**
116:13
**incentive (8)**
25:12,20;28:24;
47:10;51:18;54:3,7,10
**incident (2)**
60:14,16
**include (1)**
87:1
**included (1)**
22:23
**including (2)**
7:3;38:18
**incorrect (2)**
66:13;112:20
**incorrectly (1)**
112:8
**independent (1)**
57:5
**individual (10)**
43:21;44:4,9,13;
59:23,25;60:6;103:8;
108:20;110:15
**industrial (3)**
17:18,19,22
**information (5)**
56:1,7;93:22;99:1;
106:7
**informed (3)**
98:25;99:5;113:1
**Initially (3)**
14:1;42:9;100:17
**initiate (1)**
73:22
**initiated (1)**
73:24
**initiatives (1)**
23:7
**instance (1)**
4:4
**instances (2)**
4:19;46:20
**instead (3)**
35:19,19,20
**instructions (1)**
92:13
**integrity (4)**
59:6;66:8;95:9,11
**interested (1)**
106:5
**interpretation (1)**
50:7
**interrupted (1)**
66:20
**interview (8)**
68:4;80:17,18;96:19;
98:9;99:25;100:20,22
**interviewed (2)**
67:25;96:18
**interviews (2)**
80:15;82:2
**into (13)**
27:22;32:5;43:7;
53:25;73:9,17;78:12;
81:25;83:7;91:8;92:25;
109:17;111:24
**inundated (1)**
61:7
**investigated (6)**
42:21;55:23;56:13;
62:22;110:18;112:13
**investigation (56)**
42:16,24;48:11;
55:19;56:14,22,25;
57:6;63:16,17,19,23;
64:20,23;69:16,22;
73:21;75:4,6,6,8,13;
77:2,19;78:21;80:23;
84:15;87:20,21;88:2,
10,23;91:11;93:12;
95:23;96:2;97:14,15;
99:11,25;101:1;
109:17;110:3,4,22;
111:2,12,18,24;112:6,
16,20;113:2;116:12;
117:8,11
**investigations (10)**
42:25;55:23;64:1;
73:17;74:2;77:13;
95:12;101:25;113:9,11
**investigative (3)**
65:9;88:13,16
**investigator (1)**
109:19
**involved (5)**
20:8;48:9;52:24;
95:22;114:10
**involvement (1)**
108:14
**involving (1)**
82:4
**issue (12)**
36:18,25;48:5;58:24;
59:6,7;66:12,17,25;
80:2;84:23;93:15
**issued (2)**
36:21;62:8
**issues (10)**
42:7;43:12;64:18;
66:8;73:1;76:16,18;
95:11,12;97:8
**item (1)**
6:16

**J**

**James (2)**
90:6,17
**January (1)**
47:25
**Jason (1)**
108:18
**jeopardy (1)**
44:17
**Jessie (1)**
117:22
**job (27)**
5:13;13:5,15;15:5,7,
21;18:8,17;19:15,24;
22:21;27:3;31:10;
37:14;44:17;63:7;
69:12;84:11;101:2;
104:24;105:7,8;110:5,
6,7;112:23;114:2
**jobs (4)**
18:14;29:11;45:20;
82:9
**Joe (1)**
40:10
**Joiner (1)**
77:23
**journal (3)**
10:10,17,20
**judge (1)**
58:4
**July (4)**
37:6,7;65:16;67:22
**June (17)**
7:6,17;9:9;68:24;
73:19;74:3;80:22;
85:15,20;94:1,6,9;
95:3;100:23;110:23;
116:22,24

**K**

**keep (6)**
10:6,9,12;18:15;
45:6,15
**keeper (1)**
10:17
**kept (1)**
91:15
**Kevin (1)**
106:22
**key (1)**
21:7
**kind (20)**
5:17;13:24;14:14;
15:5;17:4,5,21;25:17,
25;26:21;33:8;40:11,
20,21;43:7,16;46:11;
56:21;71:17;90:23
**kinds (2)**
40:15;73:14
**knee (2)**
12:15,16
**knew (7)**
60:1;63:15;69:3;
79:10;83:10;84:2;91:4
**knowledge (19)**
25:16,22;35:17;
54:15,16;56:15;84:20;
86:7;90:20;108:22,24;
109:25;110:18,20;
112:14;113:3;114:22,
24;117:5
**known (2)**
20:4,4
**knows (1)**
57:25
**Kuhl (2)**
57:4,8

**L**

**label (1)**
51:19
**labeled (1)**
89:8
**labels (1)**
14:18
**laptop (2)**
11:16,17
**largest (1)**
67:10
**last (11)**
4:14;16:25;65:24;
67:24;68:4;98:9;99:25;
100:20,21;105:25;
108:19
**lasted (3)**
15:21;25:8;97:1
**late (5)**
34:15;35:3;63:2;
110:23;112:1
**later (7)**
18:13;22:9;55:22;
56:13;68:8;77:4;80:18
**lateral (3)**
26:21,22;29:9
**latter (1)**
29:14
**lawsuit (2)**
4:11;99:2
**lawyers (1)**
9:16
**leaders (2)**
21:3,6
**learn (3)**
97:25;101:8;104:15
**learning (1)**
58:24
**leave (6)**
13:11;29:15;37:3,4;
59:16;113:17
**left (4)**
14:18;22:12;117:9,
13
**legal (1)**
99:7
**less (2)**
15:15;97:1
**level (5)**
23:13;40:16;43:22;
57:10;87:13
**levels (1)**
86:17
**Lewis (3)**
89:24;90:5,16
**liable (1)**
35:25
**lie (1)**
97:23
**lied (4)**
97:13,21,24,25
**lightly (3)**
45:21;104:11,13
**likely (4)**
83:9;96:15;98:14;
106:6
**litany (1)**
52:11
**literally (1)**
31:22
**little (9)**
5:21;11:18;20:16;
49:18,23;58:13,14;
105:12;114:23
**livelihood (1)**
78:22
**lives (1)**
6:4
**load (1)**
30:5
**loads (1)**
40:24
**local (4)**
17:1;38:18;98:22;
99:9
**locally (1)**
98:24
**located (1)**
75:19
**location (2)**
18:10;101:10
**lock (1)**
17:2
**long (23)**
12:5;13:7,21;15:20;

17:12;18:22;20:20;21:9;26:6;27:20;29:20;30:23;31:13;32:10,23;33:4;37:9;42:25;46:25;87:7;94:12;97:5,10
**longer (4)** 37:12;82:5;101:3;105:25
**long-term (1)** 8:5
**look (37)** 9:11,19;35:2,6;41:19;43:9;46:16;47:3,8;51:1;52:11;53:16;57:17;65:8,15;67:21;72:25;73:9;77:18;78:12;80:16;85:2,7;87:2,5,7;88:1,9,19;89:7;91:8,23;92:25;97:18;99:6,7;117:1
**looked (7)** 6:23;47:2;94:16,22,23;116:24;117:1
**looking (9)** 20:17;24:25;29:15;40:21;46:15;81:25;87:1;88:24;89:11
**looks (5)** 34:25;77:23;80:14;81:23;90:12
**lose (2)** 47:23;84:16
**losing (1)** 45:20
**lost (3)** 46:1,2;48:4
**lot (8)** 14:6;21:7;53:23;83:21;95:8;104:5,6,9
**loud (1)** 66:2
**low (1)** 43:17
**lowest (2)** 23:13,17
**Lowry (1)** 93:8
**lying (1)** 59:8

**M**

**maintaining (3)** 10:13,15;20:2
**makes (3)** 50:1;51:15;55:3
**making (6)** 16:17;17:24;18:5;85:7;104:15;115:7
**managed (2)** 20:1;27:14
**management (6)** 33:22;46:20;82:4;93:15;102:24;104:2
**manager (107)** 19:16,21;21:23;22:1,19,20,22;24:3;25:4;26:7,11,25;27:4;29:5,7;30:2,24;31:11,23;32:11;33:8,15,17,19,20;36:17;37:18;38:6,8,14,16;40:3;41:4,4;42:1,11,12;43:24,24,25;45:13;46:19;47:10;48:16,17,18;49:6;50:24;51:12,21,25;53:1,1,1,8,10;54:6,9,18;57:9;60:21,23,25;61:5,10,13,16,18,20,20,22;62:2,18;63:8;65:21;69:25;71:10;72:2,5;76:17;79:7,10,15,16,18;81:24;82:18;83:5,14,17,19,22,24;84:6,8;86:17;101:10;106:9;107:5,10,15,16,18;109:2;111:21;114:7;115:9
**managers (20)** 7:3;21:14;23:8;27:15;32:2;33:21;39:7;41:7,25;48:18,19;62:11;75:7;85:24;109:1,3,3;115:4,8,16
**manager's (2)** 53:25;79:19
**many (12)** 24:9,12,13;36:9;39:15,22,24;42:8;109:21;110:17;112:12;114:20
**mark (13)** 6:9;8:20;18:25;28:24;33:10,12,23;34:3,23;35:15;60:22,24;67:2
**marked (9)** 6:11;8:21;35:12;65:5;68:21;77:21;88:11;106:2;109:18
**marking (4)** 60:2,8,9;61:5
**markings (2)** 34:14;35:1
**marks (3)** 35:18,20;60:7
**mass (1)** 60:15
**math (2)** 88:24;89:10
**matrix (1)** 73:13
**matter (4)** 49:6;99:8;106:7;108:15
**MaxiShip (1)** 20:4
**may (5)** 11:10;55:14;80:19;104:20;110:23
**maybe (9)** 7:10;16:16;20:14;33:7;44:5,12;45:16;71:11;114:23
**McHugh (2)** 106:15,16
**mean (9)** 33:12;34:15;35:13;46:9,14;60:5;67:21;78:13;92:6
**meaning (2)** 30:19;34:20
**means (6)** 50:12;53:6,9;58:9,11;88:8
**meant (2)** 16:24;78:17
**measurement (1)** 17:24
**Medford (4)** 16:2,10,13;17:13
**meet (2)** 71:7;101:22
**meeting (1)** 44:9
**meetings (3)** 23:4;39:11;102:25
**mentioned (4)** 20:22;72:25;115:3;117:7
**mentoring (1)** 69:18
**merchandise (2)** 59:14,15
**messages (4)** 10:3,23;11:8;68:15
**met (4)** 68:1,2;75:9,20
**method (3)** 50:14;51:3,4
**methods (6)** 15:12,13;17:7,8;39:6,9
**metric (1)** 26:1
**metrics (6)** 25:2,24;40:13,21,25;73:15
**mid-February (1)** 63:9
**might (3)** 21:6;41:19;54:3
**Mimieau (3)** 89:24;90:5,16
**mind (2)** 59:18;77:13
**minus (3)** 32:14,15,22
**minute (3)** 7:13;20:5;63:5
**minutes (2)** 97:1;105:13
**MIP (1)** 53:19
**mislabeled (1)** 92:10
**Misload (1)** 93:7
**misloaded (1)** 92:12
**mismark (1)** 29:1
**misrecording (4)** 69:23;111:3,21;112:18
**misreport (6)** 54:4,10,11;61:17,23;79:21
**misreported (10)** 58:23;91:19,20;92:10,22,24;115:14,18,24;116:3
**Misreporting (11)** 59:2,17;61:19;62:22;63:4;76:19;80:1,2;81:13;84:15;110:19
**miss (1)** 61:12
**misscan (1)** 91:21
**misscanned (2)** 92:4,5
**missed (37)** 27:24;28:3,4,7,13,16,22,24;33:13;35:12,16,19,24;36:5,6,7,13,18,21,24;40:24;42:8;51:22,23;52:1,4,7,14;53:17,23;54:2,4;60:9;67:6;91:22;93:7;111:4
**missing (2)** 8:9,18
**mistake (1)** 59:24
**mistaken (1)** 88:20
**mistakes (1)** 104:20
**moment (2)** 82:19;96:22
**money (4)** 14:18;36:3,7,13
**monitor (1)** 44:2
**Montana (2)** 37:24;38:21
**month (3)** 63:3,13;64:25
**months (15)** 12:6;13:23;14:11;15:1,22;26:8;29:23;33:6;43:10,11;63:23;68:3;94:14;100:5,15
**more (15)** 8:4;15:15;16:16;19:5,6;20:18,18;21:12,12;22:10;58:1,1;61:16;114:23,25
**morning (3)** 28:9,10;39:13
**most (4)** 13:19;50:11;83:9;98:14
**move (8)** 18:7,14;30:7;32:1;71:6;107:25;114:20,25
**moved (9)** 17:17;18:12;22:14;31:21;32:5;83:21;84:5;107:6;109:21
**moving (2)** 32:7;99:21
**much (5)** 27:5;49:7;54:7;71:14;105:24
**multiplied (1)** 52:18
**must (1)** 8:7
**myself (4)** 10:17;72:20;96:3;101:23

**N**

**name (9)** 4:10,13,14;77:25;90:1,11;106:12,23;108:19
**names (1)** 20:23
**nature (1)** 75:12
**necessarily (2)** 71:4;72:17
**need (9)** 5:14,24;21:11;29:13;58:3;86:1;116:2,5,13
**needed (6)** 12:15;44:7;50:18;81:4;99:1;116:14
**needs (5)** 29:12,14;51:11;81:5;84:23
**Nerioosai (1)** 90:11
**new (10)** 20:7;23:6;32:17;41:19;45:8,14;48:10;83:6,18;84:4
**news (1)** 48:12
**next (5)** 23:24;26:10;35:8;44:21;100:23

**next-day (1)** 14:17
**nice (1)** 22:21
**night (3)** 13:6;16:23;39:14
**nights (2)** 16:22,23
**nine (1)** 8:8
**nods (1)** 5:15
**noes (1)** 5:14
**None (3)** 10:25;11:1;108:16
**Nope (1)** 87:6
**normal (15)** 18:7;32:1;48:22;63:22,25;65:9,13;80:15;82:6,11;93:12,14;96:6,9;117:21
**northwest (6)** 37:17,19;38:5,7;39:17;106:17
**Note (1)** 8:7
**notes (1)** 10:6
**notice (5)** 6:10,13;9:15;84:21;99:7
**noticed (1)** 92:1
**notified (2)** 79:25;81:24
**number (3)** 16:15;21:8;52:13
**numbers (4)** 36:9;52:19;53:14;89:1

## O

**oath (1)** 5:4
**Object (1)** 44:24
**objected (1)** 21:19
**Objection (18)** 21:15;26:3;28:19;34:17;45:9;48:24;55:24;56:16;61:1;69:8;77:9,16;79:17;85:16;89:14;95:14;103:23;104:25
**observations (1)** 41:17
**observe (2)** 39:5,7
**observer (1)** 15:8
**obtain (2)** 14:17;32:9
**occur (1)** 66:11
**October (3)** 67:23,23;100:22
**off (5)** 18:25;34:2,11;51:6;58:15
**offense (2)** 100:3,16
**offerings (1)** 18:8
**office (4)** 53:25;95:20;108:3,5
**often (8)** 10:17;18:14;25:25;32:2,3,8;41:24;71:12
**old (3)** 109:25;114:22,24
**Olds (1)** 106:22
**Once (9)** 42:2,3;49:20;54:23;55:3;63:17;69:15;100:17;112:14
**one (68)** 6:25;8:4,13;10:12;11:15,16;16:22;17:14;18:9;21:8,23;22:5;24:20,22;27:18,21;31:15,20;32:17,18,20;35:12;41:6;45:8;46:19;48:9,13,16,17,18;49:10;50:8;52:9,10;54:21;55:19;61:17,20;64:21;72:7;73:19;74:6;76:14;77:23;82:1,19;83:18;85:15;86:8;87:4,20;89:1,23;92:1;93:10;96:21;99:13;101:14;103:1;105:25;106:3,25;108:10;109:21;110:25;115:16,17;117:4
**ones (3)** 32:17;50:17;88:19
**ongoing (2)** 69:22;101:1
**only (7)** 9:21;48:13,17;59:7;76:20;81:20;102:25
**on-road (18)** 16:3,12,15;17:13;27:16;33:9,22;40:14;60:23;61:11;71:23;83:6,13,17;89:24;90:6;114:5;115:4
**Ontario (7)** 31:4,4,16,16,22;33:3;34:1
**open (2)** 48:11;50:7
**openings (1)** 8:7
**operation (7)** 18:2,3;33:20;38:16;42:1;62:2;65:21
**operational (7)** 22:8,19,20,22;24:23;26:6;45:13
**operations (12)** 20:13;22:24;24:2;37:13;38:6,8,14,18;53:1;63:8;84:6;107:10
**operator (1)** 19:3
**opinion (1)** 78:18
**opportunity (6)** 44:14;47:13;54:19,24;69:13;111:7
**Opposing (1)** 109:16
**ops (1)** 71:9
**option (1)** 76:4
**options (1)** 76:1
**Orange (3)** 22:15,16;29:16
**order (1)** 117:22
**Oregon (10)** 6:3,7;12:9,10,13,19;16:3;17:17;37:23;38:21
**organization (2)** 35:25;52:25
**originally (1)** 82:12
**others (3)** 18:11;21:10;93:16
**otherwise (1)** 111:17
**out (27)** 9:4;16:7;39:7;49:7;53:15;56:4;59:15;63:6;66:2;69:10;71:9;74:7;75:7;76:12;80:4;81:9,15;84:7,16;93:4,19;97:13;109:21;112:23;113:4,17,20
**outcome (2)** 89:16,18
**outside (1)** 85:18
**over (15)** 5:18;26:23;29:13,17;37:25;38:17;45:7;69:5;70:1,4;83:24;86:14;89:11;105:25;116:16
**overall (3)** 52:8;81:13,14
**own (2)** 91:15;110:3

## P

**Pacific (6)** 12:2,3,5,12;22:18;24:10
**Package (61)** 13:16,17,20,21,25;14:12,16;15:2,11;16:3,9,25;17:1,6;23:17,20;24:14;26:11,25;27:7,15;28:8;29:2;30:13,16;33:20;35:3,11,15,24;36:2,13,18,21,24;38:13,16,18;39:7;41:18;42:1;45:13;50:25;51:10;54:4,10,11;60:12,14,15;62:1;63:8;65:21;91:18,24;92:14;93:3,7;107:4,10;108:25
**packages (70)** 7:23;8:3,7;14:6,15;16:18;18:25;19:7;27:24;28:3,7,14,17,22;30:5;33:10,11,12,16,24;34:3,7,13,21;40:24;42:8;50:1,4,17,20;51:22,23;52:1,4,7,14;53:17,23;54:2;58:23;60:8,9,15,19,22,24;62:22;63:4;67:6;69:5,23;74:3;80:2;83:8;92:12;93:25;95:18,21;109:20,21;111:3,4;112:8,18;114:20;115:14,18,24;116:3,7
**paid (1)** 49:7
**PalmPilot (2)** 20:17,18
**panel (3)** 54:20;55:3,9
**paper (2)** 14:8;17:10
**paragraph (1)** 76:14
**part (19)** 16:21;24:4,5;26:13;36:19;39:17;55:6;61:3;73:15;75:16;96:24;97:4,13,21,23;103:14,19;106:5;110:12
**particular (3)** 6:16,25;7:20
**particularly (1)** 51:5
**part-time (1)** 46:20
**pass (2)** 14:3;17:25
**past (8)** 46:16;47:2,4;57:17;72:25;79:14;87:1;105:21
**pay (1)** 107:20
**Peck (13)** 4:11;7:3;10:1;42:5;47:3;55:19;71:6;81:1;90:19;96:18;98:7;106:20;110:18
**peer (4)** 55:9;101:9;104:23;105:6
**pen (1)** 17:10
**penalty (1)** 25:21
**people (47)** 13:19;15:17;18:8,14,18,20;19:6;21:16;23:7;28:14;36:10,12;39:2;42:8;45:6,14,15,20;48:3,15;49:3,7,16;50:11;54:21;59:13;60:21,24;61:11,17,23;62:5;76:19;79:8,14;82:8;91:6,9,12;93:12,19;95:17;103:9;104:5,6,9;106:6
**per (3)** 40:13,23;92:13
**percent (2)** 53:5,9
**performance (8)** 40:14,14,17;43:13,13;44:25;72:10;73:1
**performed (1)** 55:19
**performing (1)** 43:21
**period (7)** 11:11;42:14;93:25;98:21;99:13;116:9,16
**person (10)** 44:6;48:14;54:17,19;56:13;60:22;62:3;93:15;96:8;101:17
**personally (3)** 55:16;62:19,20
**personnel (1)** 82:5
**person's (1)** 43:9
**perspective (4)** 39:8,9;44:25;46:15
**pet (2)** 21:23;22:2
**phone (18)** 42:17;56:3;62:4,8;63:14;64:5,7,11,16;69:20;75:15;77:7;80:7;96:11;97:6;101:20;

102:7;108:11
**phones (2)**
11:5;62:12
**phrase (2)**
34:8;58:9
**picked (1)**
27:12
**pickup (2)**
17:2;27:12
**pieces (1)**
40:23
**place (7)**
44:20;74:6;88:17;
92:17,20;98:10;103:25
**plaintiff (1)**
4:5
**plan (6)**
28:21;41:5,13,19;
43:14,23
**plane (1)**
34:20
**plans (1)**
20:7
**play (1)**
50:19
**Playing (1)**
12:17
**Please (7)**
7:13;8:16;21:5;50:3;
61:3;79:6;96:22
**plus (3)**
32:14,15,22
**plywood (1)**
20:19
**pocket (2)**
14:18,19
**pockets (1)**
14:19
**point (19)**
15:6;16:2;17:9;
19:11;30:1;44:8,19;
60:5;65:25;75:2,3,5;
77:20;84:17,19;98:25;
99:4,5;113:22
**pointed (1)**
113:4
**policies (5)**
40:4,6,7,12,13
**policy (5)**
36:16;40:11,15;
43:16;50:4
**poorly (1)**
25:21
**Portland (11)**
16:8;17:17;18:1,22;
19:9,13;37:8,9,12,14;
108:9
**position (10)**
17:23;30:2;52:24;
82:14;83:2;107:5,7,9,
18,19
**positions (2)**
16:6;107:10
**possible (3)**
18:2;91:14,17
**potentially (2)**
43:24;54:5
**practice (11)**
74:10,11;88:17;89:5;
90:25;102:1,22;
111:22;112:7;113:1,5
**practices (2)**
50:16;74:18
**prefer (4)**
45:6,7,13,16
**preference (1)**
45:15
**preload (11)**
27:17,18;38:19;
40:14,17,22,23,23;
66:16;71:21,22
**preloads (2)**
30:15;39:4
**preparation (3)**
6:24;9:12,21
**prepare (1)**
6:20
**prepared (1)**
113:24
**prescribe (1)**
44:4
**prescribed (1)**
43:22
**present (1)**
23:6
**presented (1)**
56:9
**preservation (1)**
98:23
**preserve (1)**
99:1
**president (5)**
23:5;24:8;25:10;
40:8;74:6
**presidents (1)**
23:5
**pretax (1)**
53:10
**pretty (1)**
65:4
**previous (2)**
32:17,19
**prior (7)**
8:23;28:12;42:15;
72:10,18,22;77:7
**priorities (1)**
21:3
**probably (14)**
15:21;19:10;22:9;
24:13;52:9;59:25;67:9;
74:7;97:10;104:5;
107:3;108:4;114:22;
116:5
**problem (7)**
36:10;42:10;46:21;
59:3;60:1,4;61:15
**problems (1)**
32:6
**proceeded (1)**
4:1
**process (40)**
28:6,21;43:19,20;
50:1;54:14,22;61:21;
65:12;74:8;76:6,8;
81:5;85:21;86:19,20;
87:11,22,23;99:18,22;
101:5;103:5,7,14,17;
104:8,17,20;105:4,9;
109:4;110:12;114:1,9,
10,12,14,14;116:12
**processed (2)**
66:16;67:8
**processes (2)**
61:14;95:20
**Produce (1)**
13:6
**produced (4)**
4:4;11:13;65:7;
68:23
**profitability (1)**
21:10
**program (2)**
35:11;47:11
**progressive (1)**
87:15
**project (2)**
21:23;22:2
**promised (1)**
59:16
**promoted (4)**
15:3,23;38:5;52:6
**Promotions (1)**
52:8
**proper (13)**
7:22;15:13;17:7,25;
34:19;61:13;67:2,7;
74:8;86:21,25;87:10,
11
**properly (3)**
75:7;89:8;114:5
**provide (2)**
17:6;33:9
**provided (3)**
33:17;98:5;106:4
**providers (1)**
66:23
**providing (1)**
33:22
**published (1)**
116:13
**pull (1)**
51:3
**pulled (2)**
94:8;95:2
**purchase (1)**
47:14
**purpose (1)**
69:19
**pursued (3)**
36:4,8,10
**purview (2)**
19:2;23:9
**push (2)**
73:9;110:14
**put (15)**
10:16,19;21:12;28:7;
30:13,16;34:19;41:20;
44:20;55:2;74:7,23;
82:7;83:4;93:3
**puts (1)**
19:9
**putting (3)**
21:16;40:24;65:20

## Q

**quick (1)**
89:11
**quite (2)**
10:17;20:24

## R

**Race (1)**
24:23
**racquetball (1)**
12:17
**rail (1)**
30:20
**railroad (1)**
30:20
**raise (4)**
44:16,21;46:2;64:18
**raised (1)**
6:6
**ramp (1)**
18:3
**range (1)**
94:7
**rate (1)**
53:6
**ratting (1)**
93:19
**read (13)**
8:16;50:8;51:3;
65:18;66:1,1,2;74:21;
75:4;78:14;80:22,25;
92:8
**reading (3)**
66:3;96:21;103:22
**ready (1)**
30:20
**real (1)**
7:15
**really (7)**
5:20;19:6;22:2;
35:16;54:7;56:24;
97:11
**realm (1)**
78:8
**reason (3)**
29:1;51:11;68:25
**reassigned (1)**
55:14
**recalculate (1)**
35:8
**recall (15)**
7:5;14:23;27:23;
64:9,21;70:20;85:4,12;
93:2;98:15;99:15;
101:22;102:8,23;
108:16
**receive (2)**
46:1;84:21
**received (8)**
9:1;56:24;57:2;73:6;
77:7;98:12,15;110:4
**Recess (2)**
58:16;105:17
**recollection (6)**
63:1,2;65:2;80:8;
85:9;102:18
**recommend (2)**
53:19;110:15
**recommendation (3)**
55:4,5,9
**recommended (1)**
101:9
**reconvene (2)**
42:23;63:16
**record (9)**
4:14;5:3,15;14:16;
58:15;67:6,7;78:2;
94:13
**recorded (4)**
28:3;64:5;102:19;
111:4
**recording (1)**
112:8
**recordings (1)**
9:25
**records (3)**
9:25;11:5;97:6
**rectify (1)**
104:20
**Redding (4)**
71:1;75:22;106:18,
24
**redo (1)**
83:17
**reestimate (1)**
34:13
**referring (1)**
94:25
**refined (1)**
30:19
**refund (4)**
35:25;36:18,21,25
**regard (3)**
57:16;70:10;72:1
**regarding (16)**
10:7,24;11:9;68:16;
69:23;72:9;78:22;
81:15;85:21;91:11;
96:3;97:21;99:1,11;

105:21;106:7
**region (17)**
22:18,20;23:5,11,20,22,24;24:4,6,8,10;25:10;26:12,13,14,19,23
**regional (7)**
24:2;26:6;31:4,7,10,13;34:2
**rehabilitate (1)**
45:14
**Reinhardt (9)**
62:15;65:25;67:18,24;70:10;76:21;90:24;109:18;115:10
**Reinhardt's (4)**
88:22,23;92:3;117:8
**reinstated (2)**
101:9;105:1
**reinvestigate (1)**
110:5
**reiterate (1)**
117:15
**related (2)**
9:18,25
**relation (2)**
75:9;99:8
**relevant (2)**
22:11;78:24
**relocate (1)**
18:18
**relocated (1)**
19:14
**rely (2)**
78:9;95:8
**relying (2)**
78:21;95:5
**remedy (1)**
80:4
**remember (17)**
34:8;52:22;63:3,4,11;64:25;67:12;68:2;71:4;74:13,14;75:9;77:25;91:13;93:23;101:24;111:1
**remembering (1)**
64:12
**reminds (1)**
101:19
**remotely (2)**
108:1,2
**removed (3)**
98:22;99:13;109:5
**replied (1)**
74:8
**report (24)**
23:4;28:13;42:10;60:14;61:12,12;62:24;74:24;78:5;79:13;83:8;88:13,16;90:12,15;92:2;95:3;96:1;97:9;98:13;103:22;109:17;113:7;117:6
**reported (6)**
50:2,5,9,20,22;97:2
**reporter (2)**
5:15;117:23
**reporting (8)**
14:14;49:25;50:24;61:14;69:5,6;73:18;81:16
**reports (5)**
73:9;78:9,13;79:12;107:15
**represent (1)**
4:11
**representative (1)**
96:7
**represented (1)**
11:15
**reputation (1)**
87:24
**request (2)**
8:3;58:7
**requests (1)**
57:24
**requirement (1)**
69:7
**requirements (1)**
14:14
**reserve (1)**
117:19
**reside (1)**
26:17
**resides (1)**
26:19
**resources (1)**
106:17
**response (1)**
111:14
**responsibilities (1)**
16:14
**responsibility (14)**
27:17;34:20;36:19;38:17;42:11;69:23;78:8;79:22;83:14;85:1;88:8;93:16;112:17;116:15
**responsible (14)**
16:16,23;17:23;20:2,6,8;33:18,22;35:23;79:16,19;84:6;104:7;114:4
**Restart (3)**
82:21,22,24
**restate (5)**
21:5;50:3;61:2;79:6;82:21
**Result (2)**
82:2;113:16
**resulted (1)**
88:14
**results (16)**
25:3;28:11;43:9;44:2;52:8;71:20;74:22,23;75:10,13;76:9;77:5,7,15;110:4;113:14
**retention (1)**
94:13
**rethink (1)**
41:12
**retire (1)**
89:20
**retired (4)**
62:18;63:10;68:8;69:3
**retirement (1)**
69:2
**retiring (2)**
42:13,15
**retrain (2)**
83:8;91:15
**retrained (3)**
91:6,9,12
**retraining (3)**
7:2;9:5;76:15
**return (3)**
33:2;108:3,4
**returned (1)**
16:2
**review (14)**
7:19;28:21;55:9;57:15;62:24;84:22;86:21,25;87:10;101:9,13,15;104:23;105:6
**reviewed (2)**
8:22;9:21
**reviewing (1)**
106:5
**reviews (5)**
43:4,8;84:25;85:2;87:1
**Rexburg (6)**
74:14;77:19;80:23;84:14;88:2;110:25
**Richardson (2)**
89:25;90:9
**Ricky (4)**
21:18;57:23;58:11;109:8
**right (57)**
8:13;9:1;14:19;19:10;26:5;37:20;45:4;48:22;50:13;51:16;53:17;57:21;64:12;65:4;66:19;74:17;77:22;79:24;80:2,5,23;81:7;82:1,16;83:12,22;88:24,25;89:2,10,11,13,23;90:10,11,13,25;91:6,16;93:24;94:9;97:6,12;103:5,10;105:16,24;107:1,23;109:13;110:12,14;113:6,17;115:8;116:22,25
**rights (1)**
25:17
**road (6)**
14:1,3;27:10,11,13;60:13
**Robert (2)**
4:15;106:13
**Rock (1)**
81:23
**role (9)**
22:3,5,16,18;38:4,10,12;50:19;84:4
**Roughly (2)**
12:6;33:6
**round (1)**
53:14
**routine (1)**
38:25
**rules (1)**
4:25
**running (1)**
18:2

**S**

**safe (2)**
21:9;27:10
**safety (9)**
16:19;17:5;21:6,7,12;39:8;40:23;41:16,19
**Safeway (5)**
13:2,3,5,7,11
**salary (1)**
52:19
**same (16)**
8:12,15,18;12:23;18:15;23:7;31:23;44:3;74:12;76:9;77:3;88:20,21,23;112:1,2
**San (2)**
19:14;22:12
**sat (2)**
46:23;54:23
**saw (2)**
55:25;98:4
**saying (3)**
61:5;64:13;85:25
**scan (3)**
8:9;25:2;60:17
**scanning (10)**
8:7;50:16;56:1,7,11;60:18;95:21;97:17,19,23
**scans (5)**
65:17;66:7,11,15,22
**schedule (2)**
80:9;107:20
**school (5)**
11:19,22,24;12:2,7
**schools (1)**
8:6
**science (2)**
12:20,22
**scolded (1)**
25:15
**score (1)**
25:24
**scored (1)**
24:24
**scratch (2)**
82:15,24
**screen (3)**
6:8;8:2;11:15
**screens (1)**
7:11
**se (1)**
40:13
**Seattle (1)**
75:19
**second (12)**
12:7;52:20;57:25;65:20;75:5,8;76:11;87:21;89:23;92:11;111:24;112:11
**security (18)**
50:19,23;55:12;57:10;65:12;74:22;78:7;82:3;95:5,17,23;96:8,10;99:11;110:4,6;113:11;117:1
**seeing (3)**
6:12;15:17;67:22
**seem (2)**
13:18;21:10
**seems (1)**
73:8
**send (4)**
11:8;80:4;81:9,15
**sending (2)**
9:4;111:22
**Senior (1)**
11:22
**sense (2)**
5:11;51:15
**sent (11)**
7:2;11:2;74:5;75:6;76:12;84:15;85:20,23;89:2;111:10;116:4
**separate (1)**
44:9
**September (12)**
37:17;38:3;65:16;67:22,23;71:11;92:12;96:17;98:10;100:1,20;101:20
**seriously (1)**
58:3
**service (10)**
23:4,6;28:11;65:17;66:7,23;68:12;71:20;87:24;110:19
**services (1)**
107:20
**session (1)**
69:18
**sessions (1)**
46:5
**set (5)**

16:15;40:7,15;49:4;101:22
sets (2) 50:4;52:17
setting (1) 40:4
seven (2) 27:16;33:6
Several (2) 39:11;57:24
shakes (1) 5:15
share (6) 6:8;7:11;8:11;23:6;102:14;113:24
shares (1) 47:14
sharing (3) 7:10;8:11;69:24
sheet (2) 14:10;20:18
sheeted (1) 92:13
sheets (1) 14:8
shift (1) 25:25
shipping (2) 20:3;35:25
shirt (1) 14:19
shock (1) 46:11
short (1) 97:7
shortly (3) 63:6,7,9
show (9) 6:9;34:7;65:3,16;68:19;88:17;92:8;97:6;112:25
showed (2) 73:13;77:5
showing (3) 68:23;78:2;92:6
side (7) 50:25;51:5;101:18;102:4;103:8,11;104:15
significant (2) 104:2;115:17
similar (2) 42:10;82:13
simple (1) 52:19
simpler (1) 21:24
Simply (1) 55:2
single (5) 80:5,12;81:20;83:25;85:19
sit (3) 49:22;54:20;58:4
sit-down (1) 43:23
six (5) 15:21;25:8;33:6;43:10;94:14
skip (1) 86:14
slate (2) 27:24;33:10
slated (3) 51:11;95:18;116:8
small (4) 29:6,20;30:4;31:1
snow (1) 60:13
somebody (1) 53:19
someone (18) 35:18,20;36:23;45:17;47:19;50:8,9;52:4,6;59:17;60:2;82:6;87:12;90:2,13;93:19;100:16;108:21
someone's (1) 78:22
sometimes (2) 5:21;9:16
Somewhat (1) 26:4
somewhere (1) 108:8
soon (1) 49:17
Sorry (6) 48:17;55:6;59:1;66:19;94:25;106:12
sort (7) 23:18,19;30:5,19,19;38:18;96:1
sounds (3) 31:7;79:24;82:7
South (18) 29:6,20;30:2,24;37:3,4;38:13,15;39:16,17,25;45:12;62:1;63:7;65:20;71:9;84:5;107:4
Southern (7) 4:22;12:9,10,13,19;22:14;31:17
spacing (1) 16:19
speak (9) 6:21;18:11;48:25;86:6;97:5;102:6,8,12;103:18
specific (6) 44:12,15;52:23;63:3;71:8;72:13
specifically (5) 21:11;22:15;35:6;66:5;95:25
speculative (1) 114:24
speed (1) 37:2
spell (1) 4:13
spoke (1) 106:25
spoken (1) 111:18
spring (1) 12:11
Springs (1) 81:23
stage (1) 60:7
stands (2) 17:20;93:23
start (8) 22:4;43:17;45:7,8,14;82:15;83:24;93:11
started (5) 20:11;23:19;81:23,24;116:6
starting (1) 23:12
state (7) 4:13;22:25;38:17;54:24;101:18;103:8,25
stated (20) 68:6;69:9;81:4;83:15;90:10,13;95:19;97:16;98:4;100:25;101:16;102:17;103:4,7,24;104:12;109:19;110:10;112:19;116:18
statement (3) 84:13;92:23;96:16
statements (2) 64:19;109:15
states (4) 8:2;66:5;90:15,16
stating (1) 84:22
stay (4) 18:9;32:24;33:4;44:3
stayed (1) 22:8
STEGELMEIER (36) 4:9,11;6:12;8:22;21:16,22;26:5;28:23;34:25;45:2,12;49:2;56:2,17;57:23;58:10,18;61:4;65:6;68:22;69:11;77:12,18,22;79:20;85:18;88:12;89:17;95:16;104:1;105:2,19;106:3;114:18;117:18,21
step (2) 23:24;43:17
stepped (1) 87:14
Steve (5) 71:1;75:22;106:18,24;108:17
stick (1) 82:11
still (20) 10:13,14;11:2,3,4,4;17:9;37:12;41:18;48:1;63:20;66:23;68:4;71:1;79:4,8,15;88:7,17;98:18
stint (2) 29:22;30:25
stock (2) 44:16;47:15
stop (4) 7:10;8:10;69:24;116:5
store (3) 8:6;17:1;94:12
storing (1) 99:20
story (6) 101:18;102:4,14;103:9,11;104:15
street (1) 31:21
Strickland (2) 90:7,17
strictly (1) 103:16
strike (1) 116:21
study (4) 15:8,14;16:7,8
stuff (14) 17:21;24:18;40:20;43:7;61:17,19,23;62:6;76:19;80:1;85:10;92:9;102:24;103:5
subject (3) 45:24;96:4;115:13
submitted (1) 88:14
subordinates (2) 61:18;62:1
subsequent (1) 73:20
subsequently (1) 74:9
substantiated (1) 82:3
sufficient (5) 76:15,24;81:1;116:9,17
suit (1) 54:19
sum (1) 15:14
summary (3) 65:9;81:22;88:10
sup (2) 83:13,17
supervisor (17) 15:4,8;16:4,13,15;17:13;18:13,17;41:21;52:25;55:12;61:11;83:6;84:10;89:24;90:6;96:10
supervisors (8) 27:16;33:10,23;60:23;79:14;92:14;114:5;115:5
support (5) 19:16,23;22:4,23;86:10
supposed (5) 7:25;9:17;27:24;39:3;51:3
sure (30) 4:25;7:12,21;8:12,25;11:13;14:5;16:17,25;17:24;18:5;20:24;21:3;22:6;27:7,12;34:23;39:2;48:15,18;58:9,10;65:4;86:19;97:22;100:9,17;103:5;115:7;117:12
surgery (1) 12:15
surprise (5) 73:3,5,7;101:8,11
surprised (1) 101:14
switch (1) 12:12
sworn (1) 4:5
system (2) 22:8;35:8
systems (5) 20:3,23,24,25;56:11

T

talk (8) 5:18;46:6;64:15;85:5;95:24;102:16;113:21;116:1
talked (9) 56:3;64:3;69:15;75:12;85:5;86:11;100:17,18;112:21
tapes (1) 9:25
target (1) 53:9
tattle (1) 93:12
taught (1) 82:12
teams (1) 102:25
technicians (1) 20:2
Technology (6) 19:16,21,21,23;22:4;

27:23
**tecum (2)** 6:13;9:17
**telephone (4)** 63:12;96:18;97:22;103:2
**telling (4)** 60:21,24;61:11,17
**ten (3)** 18:23;41:17;105:13
**tendency (1)** 5:18
**term (2)** 52:23;58:5
**terminate (17)** 41:25;46:17;68:13;69:13;73:2;75:25;81:1;85:8;86:9;87:12;100:5,8,16;102:2;103:13;108:23;116:10
**terminated (21)** 42:19;46:19;57:14;64:3;68:24;77:8,14;85:3,6,11;89:21;98:7;100:20,21,22;103:21;106:19;108:12;115:17,18;117:16
**terminating (5)** 47:4;103:11;107:1;110:11,15
**termination (17)** 4:21;10:1,4,7,20,24;11:9;44:19;55:22;59:18;76:25;79:5,9;87:16;88:14;100:13;116:17
**terms (3)** 48:25;99:20,21
**test (2)** 14:1,3
**testified (2)** 4:6;79:14
**testimony (11)** 58:19;64:22;67:17;68:7;69:10;77:6;100:2;102:10;103:20,24;105:21
**texts (1)** 57:11
**That'd (1)** 66:13
**That'll (1)** 12:18
**theater (1)** 20:13
**therapy (1)** 10:18
**thereafter (1)** 63:6
**there'll (1)** 43:22
**though (11)** 46:14;50:14;52:11;59:10,18;67:15;69:16;76:25;79:21;86:25;116:17
**thought (5)** 31:5;58:20;74:6;79:4;105:20
**three (10)** 27:14,15;44:5,12,13;68:3;82:4;92:12;100:6,15
**throughout (1)** 15:12
**timeframe (4)** 47:16;88:20,21,23
**timeline (1)** 100:7
**times (8)** 18:12;45:3;52:18;72:11;83:19;110:2,17;112:12
**timing (4)** 49:1;77:1;89:19;114:2
**title (2)** 22:21;26:24
**today (3)** 5:24;7:8;109:15
**today's (1)** 107:14
**Todd (4)** 101:23;102:15;108:10,14
**told (12)** 36:12,24;42:18,20;44:10,16;46:23;64:10;87:22;101:24;102:10,15
**tomorrow (1)** 46:11
**tons (1)** 60:18
**took (4)** 94:19;97:11;98:9;100:15
**tools (1)** 44:20
**top (4)** 8:14;24:3,6;27:1
**tore (1)** 12:15
**touch (1)** 55:15
**towards (3)** 26:1;37:4;55:21
**track (3)** 14:6;19:6;47:1
**tracked (1)** 35:5
**tractor-trailer (1)** 30:7
**train (1)** 114:5
**trained (7)** 90:1,2,6,9,11,13,17
**training (13)** 13:24;16:19;17:4,5,7;22:23;33:9,16,18;80:10;82:25;83:17;115:4
**trainings (1)** 41:20
**transfer (2)** 26:21;29:9
**transferred (4)** 30:1;31:3;82:13;83:6
**transportation (2)** 38:6,8
**trial (1)** 117:20
**trip (2)** 71:9,10
**triples (1)** 30:9
**trophy (4)** 25:10,11,13,18
**trouble (5)** 25:15;28:17,20;35:14;86:2
**Troy (4)** 4:3,15;58:9;109:14
**truck (2)** 93:4,5
**trucks (2)** 13:18;37:25
**true (5)** 29:14;78:4,6;94:15;105:5
**try (6)** 18:15;34:13;35:8;41:9;45:14;108:19
**trying (2)** 19:5;69:19
**turned (1)** 56:4
**twelve (1)** 43:11
**twice (2)** 76:5;110:20
**two (20)** 13:8;16:5,22,23;30:25;32:12;35:22;44:12,13;49:3;61:18;68:3;73:21;74:16;82:4;100:5,6;109:6;115:16;116:21
**two-day (1)** 14:17
**two-month (3)** 93:25;116:9,16
**type (2)** 40:25;80:21
**types (1)** 81:16
**typical (1)** 99:22
**Typically (12)** 39:12;40:15;41:3,12;43:22;44:12;50:6,15;53:24;60:17;70:24;82:22

## U

**ultimately (6)** 34:7;75:23;81:14;86:12;112:10;114:4
**unacceptable (1)** 111:21
**unaware (1)** 90:5
**uncommon (2)** 21:23;82:8
**under (12)** 5:3;21:14;23:9;49:7;72:2,4,5,5;79:8;88:7;107:12;116:2
**underperforming (1)** 41:2
**understands (1)** 58:9
**understood (3)** 7:22;9:1;76:6
**unit (1)** 52:25
**University (2)** 12:2,9
**unloaded (2)** 17:1;30:16
**unreasonable (1)** 84:9
**up (24)** 12:15;17:2;21:3;27:12;30:8;33:15;37:3;42:13,15;43:18,23;53:2;60:18;66:2;73:13;74:22;80:17;84:19;87:20,21;96:24;101:22;108:3;109:16
**UPS (41)** 4:12;11:2,3,4;13:14,15;18:7;20:25;23:13;29:12,14;30:10;32:1;35:25;36:10;43:4,16;45:6,11,23;47:14;54:14;57:25;58:2,8;59:9,13,15;62:9,18;78:3;82:7;87:8;94:12;96:12;102:2,22,23;103:16;105:3;106:4
**upset (1)** 61:16
**UPS-issued (1)** 62:12
**UPS's (2)** 34:20,22
**use (10)** 7:22,25,25;9:16;47:14;52:19;66:6;75:8;116:13,19
**used (2)** 8:1;10:11
**using (5)** 15:13;66:10,15;68:12;90:20
**usually (11)** 18:9,15;34:3;42:25;43:9;44:13;46:14;48:7;72:14;86:16;117:22

## V

**vacation (1)** 71:19
**Vacek (1)** 108:20
**validating (1)** 39:9
**Valley (1)** 6:3
**value (3)** 78:2,16,23
**vary (1)** 39:23
**vent (1)** 10:17
**verify (1)** 94:17
**versus (2)** 35:12;45:17
**via (2)** 6:18;98:14
**view (1)** 56:5
**viewpoint (1)** 56:18
**visibility (1)** 16:19
**visible (1)** 28:8
**volume (6)** 17:2;27:8,12;66:16,23;67:8
**voluntarily (1)** 68:24

## W

**wait (3)** 5:20;14:4;16:24
**waited (2)** 49:18;100:5
**waiting (1)** 49:3
**walk (1)** 28:10
**warn (1)** 48:7
**warranted (1)** 49:18
**Washington (1)** 37:23

**watch (1)**
39:5
**way (16)**
49:10;50:9;51:13;60:3,21;61:12;64:21;67:2,7;72:7;78:18;82:7,12;83:5;100:23;101:14
**ways (2)**
51:19;60:12
**weather (8)**
34:10,12,21;35:7,7,22;60:16;61:6
**week (7)**
16:22,23;25:4,4,5;39:5,12
**weekly (1)**
66:11
**weeks (2)**
25:9;49:3
**week's (1)**
25:6
**weren't (4)**
29:15;55:8;78:15;114:10
**whatnot (1)**
15:18
**what's (18)**
7:24;23:11,11,13,14;30:3;36:15;47:16;54:16;63:1,18,25;67:2,7;74:20;86:20;93:21;100:23
**whole (1)**
52:10
**Who's (6)**
24:6;50:13;60:8,8;106:11;115:7
**who've (1)**
48:3
**wife (1)**
6:5
**wiggle-wagons (1)**
30:8
**willful (2)**
78:25;79:4
**willfully (6)**
66:6;68:11;69:6;79:21;90:24;115:17
**William (1)**
77:23
**winner (2)**
25:6,9
**winter (1)**
8:6
**wiring (1)**
20:7
**withheld (1)**
52:3
**within (4)**
26:14,17,19;52:24
**without (3)**
46:9;63:23;111:22
**witness (20)**
4:4;21:18,21;26:4;28:20;34:18;44:25;45:10;48:25;55:25;61:2;69:9;77:10,17;79:18;85:17;89:15;95:15;103:24;105:1
**word (2)**
9:15;94:19
**words (2)**
9:16;91:1
**work (16)**
5:22;10:18;17:24;19:6;25:20;41:3,9;46:22;47:1;70:15;71:12,14;77:1;101:2;105:14;108:1
**worked (4)**
21:14;44:3;70:18,22
**working (4)**
13:1;16:7;72:16;108:2
**works (2)**
54:22;114:12
**world (1)**
107:14
**world's (1)**
67:10
**WorldShip (1)**
20:4
**worries (1)**
96:23
**worse (2)**
44:4;60:23
**write (1)**
93:6
**writing (1)**
46:25
**written (3)**
10:6;79:11;84:19
**wrong (6)**
40:24;60:22;77:20;90:5;93:4,5
**wrongful (1)**
4:21
**wrote (1)**
79:13
**Wyoming (2)**
37:24;38:22

**Y**

**yard (1)**
30:21
**year (20)**
17:14;24:22;27:21;29:4;31:15;32:25;44:21,22;45:17;47:12;48:23;53:3,5;68:8;73:6;85:15;99:14;100:23;112:1,2
**yearly (1)**
47:17
**years (10)**
13:8;18:23;20:21;29:23;30:25;32:12;82:4;84:12;85:14;109:6
**yell (1)**
77:20
**Yep (2)**
39:1;101:12

**Z**

**zero (1)**
65:17
**zone (23)**
38:13,16;39:16,17,20,22,25;40:3,4;42:1;45:12;49:6,14;62:1;63:7;65:21;69:25;71:9;75:7;107:4,9;108:25;116:2
**Zoom (4)**
4:23;5:17,21;7:14

**1**

**1 (9)**
6:9,11;9:14;94:9,10;95:3,3;116:24,25
**10 (1)**
109:25
**10:14 (1)**
58:16
**10:24 (1)**
58:17
**11:25 (1)**
105:17
**11:35 (1)**
105:18
**11:50 (1)**
118:1
**13 (1)**
101:20
**13,000 (1)**
110:1
**13:51 (1)**
96:17
**14:24 (1)**
96:19
**1463 (1)**
89:1
**16 (2)**
85:14;92:12
**18 (2)**
26:8;29:23
**1981 (1)**
11:20
**1987 (3)**
13:12;14:7;20:24
**1991 (2)**
19:19;20:10
**1992 (1)**
19:19

**2**

**2 (5)**
8:20,21;29:23;47:25;65:16
**2,000 (2)**
69:5;89:11
**2,486 (3)**
65:17;68:10;109:19
**20 (1)**
16:16
**2000s (3)**
19:10,11;20:12
**2010 (1)**
31:3
**2013 (2)**
32:13,22
**2016 (5)**
37:6,6,7,15,16
**2017 (2)**
37:17;38:3
**2019 (1)**
71:11
**2020 (1)**
7:16
**2021 (30)**
7:6;9:9;10:12,14,15;38:10,12,13,24;40:9,12;62:22;63:2;65:16;67:22,22,23,23,24;70:25;72:10,19,22;73:8,18;92:12;98:10;100:1,2;110:23
**2022 (5)**
37:12,15;63:12;68:3,24
**21 (1)**
65:16
**22 (3)**
13:23;14:11;15:1
**23,000 (2)**
114:23;116:7
**2482 (1)**
89:12
**25 (2)**
16:16;65:16
**26 (2)**
67:23;80:19
**27 (1)**
67:23
**28 (4)**
24:11;67:23;96:17;98:10
**29 (1)**
67:22

**3**

**3 (3)**
65:4,5;109:18
**30 (3)**
44:5;47:23;68:24
**30-minute (1)**
97:3
**31 (1)**
47:19

**4**

**4 (7)**
7:17;68:20,21;85:20;94:1,6;116:22
**4:30 (2)**
39:12,14
**40 (6)**
88:25;89:4;93:25;94:5;116:8,16

**5**

**5 (2)**
77:19,21
**5:00 (2)**
39:13,14
**50 (2)**
53:5,9
**55 (1)**
23:15
**572 (1)**
89:1

**6**

**6 (2)**
88:9,11
**60 (1)**
44:11

**7**

**7 (2)**
106:1,2

**8**

**82 (1)**
12:11
**86 (1)**
12:11

**9**

**9:01 (1)**
4:1
**90 (1)**
44:11