UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HEIDI H. PECK, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED PARCEL SERVICE, INC., an Ohio corporation,<br><br>          Defendant. | Case No. 4:22-cv-00381-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff Heidi H. Peck was employed by Defendant United Parcel Service, Inc. ("UPS") from August 18, 2004, to December 13, 2021, at which time UPS terminated her employment. In her complaint, Peck alleges four claims arising out of her employment and termination: gender discrimination in violation of Title VII of the 1964 Civil Rights Act and state law claims for unpaid wages, breach of contract, and breach of the covenant of good faith and fair dealing.

Now pending before the Court are (1) Peck's Motion for Partial Summary Judgment (Dkt. 36) and (2) UPS's Motion for Summary Judgment (Dkt. 37). UPS seeks dismissal of all Peck's claims. Peck seeks an order finding the following: (1) UPS violated Title VII by terminating Peck's employment because she is a woman; (2) UPS violated the Idaho Wage Claims Act and breached its contract with Peck by failing to pay her a performance bonus; and (3) UPS breached its contract with Peck by refusing to engage in mediation as part of UPS's employee dispute program.

The Court finds that the decisional process would not be aided by oral argument. Dist. Idaho L. Rule 7.1(d). After reviewing the record and the arguments of the parties, the Court will deny Peck's motion for partial summary judgment and grant UPS's motion for summary judgment.

## I.    BACKGROUND

### A.    Peck's Employment at UPS

Peck began her employment with UPS in August 2004 as a pre-loader but was consistently promoted. (Dkt. 36-3 at ¶¶ 2-4). In 2019, Peck was promoted to Business Manager. (*Id.* at ¶ 4). In this role, Peck's duties included overseeing UPS operations in Idaho Falls, Rexburg, Salmon, and Challis and supervising all on-road supervisors at those center locations. (*Id.* at ¶ 6).  From the time Peck was hired in August 2004 until her termination December 2021, Peck was never disciplined, never received a negative review, and never placed on an improvement plan. (*Id.* at ¶ 3). Immediately prior to her termination in 2021, however, two centers she managed—Rexburg and Idaho Falls—were investigated for misreporting "service failures," as detailed below.

### B.    Service Failures

A key statistic UPS corporate management reviews is the number of "service failures" in a given service region. (Dkt. 37-9 at p. 14). A "service failure" is the term used to describe when a driver does not make a scheduled delivery because of a UPS failure, as opposed to missed deliveries caused by weather or other events outside UPS's control. (*Id.*). For example, a service failure includes when a loader places a package on the wrong UPS delivery truck, and the intended recipient does not timely get the package. (*Id.*). This example counts as a service failure because UPS's error caused the delivery failure. (*Id.*). Another example includes when a truck breaks down, and the driver is unable to make his or her deliveries because of the breakdown. (*Id.* at p. 13).

Again, in this example, UPS's error in not properly maintaining its trucks caused the missed delivery. (*Id.*).

The Service Exceptions and Analysis ("SEAS") database allows UPS to track packages through a network, including service failures in a particular area. UPS tracks these failures because a center struggling with service failures signals to leadership that the center is not running well for some reason. (*Id.* at p. 14). If these service failures are not being reported, leadership cannot properly ascertain whether UPS's customers are receiving the best service. (*Id.*). Service failures damage UPS's reputation among shippers relying on UPS to deliver packages to their customers, as well as members of the public relying on their service. (Dkt. 37-10 at ¶ 9). A secondary issue related to service failures is that customers may receive a Guaranteed Service Refund if UPS fails to timely deliver a package, but a customer is not eligible for a refund if customer error or an act of nature causes the missed or late delivery. (Dkt. 37-9 at p. 14).

Drivers report the delivery or failure to deliver every package that is loaded on their vehicles through the use of a handheld computer system called a Delivery Information Acquisition Device, known as a DIAD. (Dkt. 37-10 at ¶ 9). The system automatically notifies the customer of the delay and delivery failure. (Dkt. 37-9 at p. 7). An act of nature or something else outside of UPS's control that prevents a delivery is an exception, not a service failure. (*Id.* at p. 18).

Misreporting a service failure as an exception improperly hides the service failure from both management and the customers. Employees are therefore trained on proper reporting and the difference between service failures and exceptions through a training course at the beginning of their employment. (*Id.* at p. 18). Employees then receive annual certification trainings. (*Id.*) A business manager who has a significant number of service failures at one of her centers will have to explain to leadership why such failures continue to occur at those centers. (*Id.* at p. 21). If service

failures consistently occur, the business manager will be held accountable, put on action plans, and potentially terminated. (*Id.*). In 2021, UPS Security was engaged in a company-wide effort of investigating and eliminating the falsification of delivery records to hide service failures. (Dkt. 37-3 ¶ 23).

## C.    Security Investigations

### 1.    Rexburg Investigation

In May 2021, UPS Security initiated an internal investigation into the Rexburg Center, which Peck managed, after UPS received an anonymous report made through UPS's 1-800 reporting Helpline that claimed drivers' failure to deliver packages were being hidden at the center. (Dkt. 37-12 at p. 4). Security Investigator William Joiner conducted the investigation. (*Id.* at p. 7) Joiner analyzed the SEAS database and determined that employees at the Rexburg Center were frequently using a rare "misflow" exception. (*Id.*). After interviewing personnel at the facility, Joiner determined that "claims were substantiated" and drivers and on-road supervisors had been trained to use exceptions instead of marking a "missed-on-road" delivery as a service failure. (*Id.* at p. 6).

On May 28, 2021, Joiner interviewed Peck. The Idaho Division Manager, an HR representative, and two security personnel participated in the interview. Peck admitted to knowing that service failures in Rexburg were a big issue and that an on-road supervisor had told her misloads were an issue. (*Id.* at p. 8). When asked how many service failures Rexburg had, Peck responded she "wasn't sure." (*Id.*). Johns noted only two deliveries had been identified as missed for the entire year through May. (*Id.*). When asked why Peck had not questioned the misreporting in light of her training and UPS's integrity polices, Peck maintained she has not read the last "few

things" she was sent, i.e., the annual certification for proper reporting of service and nonservice failures; rather, she said she just signed them and sent them back. (*Id.*).

Johns explained the proper process for reporting and directed Peck to put a stop to the practice. Peck was not disciplined. Additionally, on June 4, 2021, Peck's manager, Troy Emerson, sent an email to all business managers under his authority, including Peck, advising them that misrepresenting service failures as exceptions was unacceptable and "must cease immediately." Peck responded to the email: "Got it." (Dkt. 37-13 at p. 3). After being directed to stop the misreporting practice, Peck spoke with her employees and reiterated the importance of correctly reporting missed packages. (Dkt. 36-3 at ¶¶ 14, 16-17). In addition, she sent multiple text messages from her UPS cell phone informing her employees that they needed to correctly report missed packages. (*Id.*).

### 2. Idaho Falls Investigation

A month after Peck's manager sent the email about misrepresenting service failures, in July 2021, UPS Security initiated a second investigation into the Idaho Falls Center, which Peck also managed. (Dkt. 37-14 at p. 2).  Security initiated this investigation after a part-time supervisor at the Idaho Falls Center came to Security Supervisor Clay Holloway and advised him that delivery drivers were hiding service failures in the same manner as the Rexburg Center. (*Id.*).

Like Joiner in the Rexburg investigation, Holloway analyzed the SEAS database and determined that the center had thousands of exceptions based on emergency conditions (weather) and almost no service failures. Holloway interviewed multiple supervisors and obtained witness statements from them that they were actively scanning service failures as exceptions and had trained employees to do the same. (*Id.* at pp. 4-8). Employee Mason Woolf stated Peck had directed the practice, along with the local sort and on-road supervisors. (*Id.* at p. 6). Local supervisor Scott

Richardson also stated Peck instructed to use weather exceptions instead of reporting service failures. (*Id.* at p. 5).

On September 28, 2021, Holloway interviewed Peck. (*Id.* at p. 7). According to Holloway, security supervisor Nicolas Luper also participated in the interview. (*Id.*). Peck denied knowledge of the practice of misreporting service failures as exceptions. (*Id.*). Holloway reported that this interview lasted thirty minutes (*id.*), but according to Peck it only lasted five minutes.

Clyde Fitzmaurice, the district security director overseeing Wyoming, Montana, and Idaho, reviewed both the May 2021 investigation conducted by Joiner and a second August 2021 investigation conducted by Holloway. (Dkt. 37-10 at ¶¶ 1, 3, 5). After reviewing the investigations, Fitzmaurice determined both investigations "substantiated a practice of misreporting service failures," which was regularly occurring at the two facilities. (*Id.* at ¶¶ 4, 6). Fitzmaurice further determined the misreporting practice at the Idaho Falls facility "was occurring with Peck's active direction or passive consent." (*Id.* at ¶ 6).

## D.    Termination

According to UPS, based on this investigation and the Rexburg investigation, Troy Emerson, Package Operations Manager, made the decision to terminate Peck's employment for dishonesty based on the two investigations. (Dkt. 37-15 ¶ 9). On December 13, 2021, Emerson and HR Business Partner, Alecia Todd, met with Peck. (Dkt. 36-3 ¶¶ 28-29). Emerson told Peck she was being terminated. (*Id.* at ¶ 30).

As a Business Manager, Peck had been eligible to participate in the Manager Incentive Program (MIP), a year-end bonus program. Such bonuses are awarded at the end of the calendar year and paid out in March of the following year. (Dkt. 36-4 at pp. 25-26, 28, 32). Peck did not receive her MIP bonus after her termination.

E.    **Employee Dispute Resolution Process**

After UPS fired Peck, she applied for the voluntary Employee Dispute Resolution ("EDR") process to review her termination. The EDR process is a nonbinding dispute resolution process. (Dkt. 37-17 at p. 11). Neither UPS nor the employee are bound to follow the recommendations of the EDR panel or even participate in any portion of the program. (*Id.* at p. 9). The EDR Peer Review Panel, which reviews the dispute, consists of three UPS employees, two members chosen by the employee and one member chosen by the company. (*Id.* at p. 10). The panel, after reviewing documents and listening to both the employee and the company representative during an informal hearing, makes a recommendation. The recommendation "is not a decision, instruction, or an order. (*Id.* at p. 11). Once the nonbinding recommendation is made, the employee and UPS have ten business days to either accept or reject the Peer Review Panel's recommendation. (*Id.*).

In Peck's case, the EDR panel recommended Peck be reinstated as a business manager at a different location. (Dkt. 36-3 ¶ 40(a)-(b)). UPS did not offer Peck reinstatement as a business manager but instead offered her reinstatement with demotion to on-road supervisor. (*Id.* ¶ 42). Peck declined the offer and proceeded to litigation after UPS cancelled a scheduled mediation. (*Id.* ¶¶ 43, 47).

## II.    LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted).

In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the respondent need only present evidence on which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted). When the parties submit cross-motions for summary judgment, as in this case, the district court must consider each motion on its own merits. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Even if both parties assert there are no disputed factual issues, the court must determine whether disputed issues of material fact preclude summary judgment.

### III.    ANALYSIS

### A.    Gender Discrimination under Title VII and the IHRA

In Peck's first claim, which states a violation of Title VII, Peck alleges she is a member of a protected class, i.e., a woman, and UPS intentionally discriminated against her "on the basis of her sex when it terminated her without warning for alleged conduct that UPS did not terminate other male Business Managers for engaging in." (Dkt. 1 at ¶ 39).

Title VII outlaws sex discrimination in the workplace. 42 U.S.C. § 2000e-2(a)(1); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 650 (2020). "Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). A person suffers disparate treatment in her employment when she is singled out and treated less favorably than others similarly situated on account of sex. *C.f., Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

The Court analyzes Peck's sex discrimination claims under the framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this framework, Peck must first establish a prima facie case of employment discrimination. *See Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). To establish a prima facie case, Peck "must offer evidence that 'give[s] rise to an inference of unlawful discrimination." *Id.* at 1156 (citations and internal quotation marks omitted); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Peck may establish a prima facie case based on circumstantial evidence by showing: (1) she is a member of a protected class; (2) she was qualified for her position and performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) "similarly situated men were treated more favorably, or her position was filled by a man." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002); *Hawn*, 615 F.3d at 1156.

"Establishing a prima facie case under *McDonnell Douglas* creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's [gender]." *Cornwell*, 439 F.3d at 1028. To rebut this presumption, the defendant must submit evidence showing it undertook the challenged action for a "legitimate, nondiscriminatory reason." *Id.* If the defendant meets its burden, "the presumption of discrimination drops out of the picture." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)) (internal quotation marks omitted). The plaintiff must then show that the proffered reason is a pretext for discrimination. *Id.* "The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).

Here, Peck argues she has established UPS terminated her because of her sex as a matter of law. By contrast, UPS argues Peck fails to establish even a prima facie case of discrimination because she cannot show that (1) she performed her job satisfactorily, or (2) similarly situated men were treated more favorably. Alternatively, UPS argues it terminated Peck for legitimate, nondiscriminatory reasons. Although the Court is not entirely convinced Peck has established a prima facie case of discrimination,[1] the Court need not resolve that question definitively. *See Villiarimo*, 281 F.3d at 1062. Even if Peck made out her prima facie case, she has not demonstrated that UPS's explanation for her termination is pretextual.

### 1. UPS's Nondiscriminatory Reason

UPS has met the low bar of introducing evidence, taken as true, of a legitimate, nondiscriminatory reason for Peck's termination. Emerson testified he terminated Peck's employment, in consultation with HR, "[b]ased on two investigations indicating a pattern of dishonest reporting at Peck's centers, and Peck's prior pledge to stop the dishonest practice." (Dkt. 37-15 at ¶ 9). Because UPS has met its burden of showing a legitimate, nondiscriminatory reason for terminating Peck, the burden shifts to Peck to show such reason is pretextual. *Cornwell*, 439 F.3d at 1028.

---

[1]     Peck argues she established the fourth prong of her prima facie case by showing she was replaced by Rob Hall, a male. UPS argues in response that Peck offers no evidence that she was actually replaced by Hall or that Hall is a man. But neither has UPS—which would have access to the relevant records—provided evidence that Peck was not replaced by Hall or that Hall is not a man. For purposes of summary judgment, the Court assumes Peck was replaced by a man.

2.      **Pretext**

Peck can prove pretext through either direct or circumstantial evidence. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998)). Peck does not offer any direct evidence of gender discrimination. As a result, she "must produce specific, substantial evidence of pretext." *Id. But see Cornwell*, 439 F.3d at 1029-31 (questioning the continued viability of *Godwin* after *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)). That standard is "tempered" by our observation that a plaintiff's burden to raise a triable issue of pretext is "hardly an onerous one." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007) (quoting *Payne v. Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997)). A showing that UPS treated similarly situated employees outside Peck's protected class more favorably would be probative of pretext. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004).

To show pretext, Peck identifies two male business managers as "comparators," who she argues were similarly situated to her but who were treated more favorably than she was. The first comparator Peck identifies is Floyd Reinhardt, the business manager for Cheyenne, Wyoming. The Cheyenne center was investigated by Security Supervisor Holloway, who found the center improperly used "Emergency Condition" exceptions to hide service failures. None of the employees at the center directly tied Reinhardt to the practice, but Reinhardt "willfully acknowledged" misreporting service failures, stating "he was not trying to be dishonest or hide this use of exception scans." (Dkt. 37-19 at pp. 3, 4). Troy Emerson, Reinhardt's supervisor, testified he would have terminated Reinhardt's employment, but Reinhardt took "disability" leave

and then retired while on leave. (Dkt. 37-20 at pp. 18-20, 31). UPS does not discipline employees while on leave. (Dkt. 37-3 at ¶¶ 33-34).[2]

The second comparator Peck identifies is Bradley Tolson, who was the business manager for Butte, Montana. Holloway also investigated the Butte center for misreporting service failures and found drivers were improperly using exception scans to hide service failures. An on-road supervisor directly implicated in the deceptive practice—who initially lied about his participation, including telling a subordinate to "play dumb" in his interview about the center's use of the practice—was fired for dishonesty after the investigation. But Tolson—who provided proof he had instructed his employees to properly report service failures—was not. (Dkt. 37-18 at pp. 2, 3).

UPS argues that neither Reinhardt nor Tolson was similarly situated to Peck and that they are not valid comparators. The Court agrees. To establish similarity under the *McDonnell Douglas* framework, the individuals being compared "need not be identical; they must only be similar 'in all material respects.'" *Hawn*, 615 F.3d at 1157 (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)); *see Wall v. Nat'l R.R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983). "Materiality will depend on context and the facts of the case." *Hawn*, 615 F.3d at 1157. As a general matter, the Ninth Circuit has determined that "individuals are similarly situated when they have similar jobs and display similar conduct." *Id.* at 1157 (quoting *Vasquez*, 349 F.3d at 641).

---

[2] Peck moves to strike the entirety of Alecia Todd's declaration, in which she testified UPS does not discipline or terminate its employees when they are on leave. In seeking to strike Todd's declaration, Peck argues Todd's declaration contradicts her deposition testimony, during which she testified she had no knowledge of the investigation of Floyd Reinhardt. Todd, however, did not testify in her deposition regarding UPS's policy generally as applied to employees on disability leave. Thus, Todd's declaration testimony that UPS does not discipline employees while they are on leave does not contradict her deposition testimony. Accordingly, the Court denies Peck's motion to strike the declaration.

In *Hawn*, for example, the Ninth Circuit found the plaintiffs, all of whom were male pilots who were terminated for alleged sexual harassment, were not similarly situated to female flight attendants, who allegedly engaged in similar conduct but were not terminated, because only the pilots' conduct gave rise to a complaint of sexual harassment while the female flight attendants' alleged conduct did not. 615 F.3d at 1160. Similarly, in *Vasquez*, the Ninth Circuit found that employees were not similarly situated when the type and severity of an alleged offense was dissimilar. 349 F.3d at 641. Finally, in *Wall*, the Ninth Circuit found the three white employees who were not discharged for conduct similar to the conduct for which the plaintiff was discharged had no disciplinary records while the plaintiff had "a poor disciplinary record." 718 F.2d at 909.

Likewise, in this case, neither Reinhardt nor Tolson was similarly situated to Peck. Although both Reinhardt and Tolson held the same business manager position as Peck and both their centers were investigated for misreporting service failures, Reinhardt and Tolson were each involved in only one investigation while Peck was involved in two substantiated investigations of misreporting. Like Reinhardt and Tolson, Peck was not fired after the first investigation into the Rexburg center she managed. Instead, Peck was directed to stop the practice by the Idaho division manager and Troy Emerson, her director supervisor. Emerson only terminated Peck after the second investigation into her Idaho Falls center revealed more misreporting of service failures. "When warranted by the circumstances, an employer may discipline repeat offenders more severely than first-time offenders." *Id.*

Further, Emerson testified that he would have terminated Reinhardt after only one substantiated investigation of misreporting at his center but that Reinhardt took leave and then

retired without ever returning to work, preventing Emerson from firing him.[3] Thus, the evidence does not show that Reinhardt was treated more favorably. As for Tolson, not only was he involved in only one investigation, but he also provided proof he told his employees how to properly code service failures. (Dkt. 37-18 at p. 2). By contrast, two employees at the Idaho Falls center reported Peck had directed the practice of misreporting service failures to some extent. In other words, the evidence shows Tolson did not engage in "problematic conduct of comparable seriousness," therefore warranting the differential treatment between Tolson and Peck. *C.f. Vasquez*, 349 F.3d at 641 (noting that alleged comparator was "not involved in the same type of offense" as plaintiff and did not "engage in problematic conduct of comparable seriousness").

To show pretext, Peck also argues Holloway allegedly "falsified" the second investigation into the Idaho Falls center, and therefore UPS's proffered reason for terminating her employment is "unworthy of credence." This argument is unpersuasive. As evidence that Holloway falsified the second investigation, Peck claims she only spoke to Holloway for five minutes while Holloway noted they spoke for over thirty minutes. To cast further doubt on the legitimacy of Holloway's

---

[3]    Contrary to Peck's argument, UPS has submitted admissible evidence through Emerson's deposition testimony that he would have terminated Reinhardt's employment but that Reinhardt's taking leave and then retiring while on leave prevented him from doing so. Moreover, while the Court agrees many of Alecia Todd's answers in her deposition appeared evasive, the Court declines to strike her declaration testimony relating to Reinhardt's disability leave. Peck argues, because Todd testified in her deposition that it was not her role to keep records and that she was not involved in the investigation of Reinhardt, her declaration testimony regarding Reinhardt's disability leave should be struck under the sham affidavit rule. (Dkt. 38 at pp. 4-5). But "the 'custodian or other qualified witness' who must authenticate business records need not be the person who prepared or maintained the records, or even an employee of the recordkeeping entity, as long as the witness understands the system used to prepare the records." *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 391 (Fed. Cir. 1996). In her declaration, Todd states that she is familiar with the manner in which UPS's records are created and maintained and that the records relating to Reinhardt's disability leave are authentic and kept in the regular course of business. (Dkt. 37-3 at ¶¶ 2-3). Her declaration testimony in this regard does not contradict her deposition testimony and therefore will not be stricken.

MEMORANDUM DECISION AND ORDER - 14

investigation, Peck claims Holloway was disciplined for dishonesty related to another investigation which occurred seven months after Peck's termination. (Dkt. 36-4 at pp. 90-91). Because Peck claims Holloway lied about the length of her interview with him and was later disciplined for dishonesty in an unrelated investigation, she argues UPS's reliance on Holloway's investigation as "their 'legitimate' reason for terminating Ms. Peck's employment is unworthy of credence." (Dkt. 38 at p. 14).

Even if Holloway falsified the second investigation, however, Peck's attacks on that investigation are unavailing. *See Villiarimo*, 281 F.3d at 1063. In judging whether UPS's proffered justifications were "false," "it is not important whether they were *objectively* false," e.g., whether Peck actually directed subordinates to hide service failures at the Idaho Falls center. *Id*. Rather, "[a]n employer is required only to offer its honest reasons for its action, even if the reason is foolish, trivial, or baseless." *Mihailescu v. Maryville Nursing Home*, 339 F. App'x 717, 719 (9th Cir. 2009) (citing *Villiarimo*, 281 F.3d at 1063 and *Reeves*, 530 U.S. at 148). Peck presents no evidence that UPS did not honestly believe its proffered reasons. To the contrary, UPS even conducted "a second quality control review of Holloway's prior investigations, including the second August 2021 investigation into Peck" and found it was a "thorough investigation," with "signed witness statements verifying the interviews" and "no irregularities." (Dkt. 37-10 at ¶ 8).

In summary, the circumstances surrounding Peck's termination do not raise any plausible basis for concluding UPS's reason was pretextual and Peck's termination was actually motivated by her gender. Peck has offered no direct evidence suggesting UPS was motivated by discriminatory intent. Nor has Peck shown that UPS's explanation is not believable for some other reason. It is well-established that "purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars" are not enough to prevent summary judgment. *Forsberg v. Pac.*

*Northwest Bell. Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988); *see also Kaiser v. Trace, Inc.*, 72 F. Supp. 3d 1126, 1134 (D. Idaho 2014) (citing *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 265 (9th Cir. 1991). Therefore, even assuming Peck established a prima facie case of gender discrimination, UPS is entitled to summary judgment on that claim.

**B.    MIP Bonus**

**1.    Idaho Wage Claim Act**

Peck next alleges that UPS violated the Idaho Wage Claim Act ("IWCA" or "Wage Claim Act") by not paying her the MIP bonus, which she contends she earned in 2021. "When an employee separates from his employer, the Wage Claim Act requires the employer to pay 'all wages then due the employee' on the next scheduled payday or within ten days, whichever is sooner." *Smith v. Kount, Inc.*, 497 P.3d 534, 537 (Idaho 2021) (quoting I.C. § 45-606(1)). An employee who prevails in a suit under the IWCA is entitled to attorney fees and treble damages of the wages found "due and owing." I.C. § 45-615. "Wages" under the IWCA may include annual bonuses earned and "due" at the time of termination. *See Savage v. Scandit Inc.*, 417 P.3d 234, 239 (Idaho 2018) ("Bonuses fall under the definition of wages and are subject to the mandatory trebling statute if they are not paid when they are due.").

Here, UPS does not dispute the MIP Bonus would constitute wages under the IWCA. Instead, UPS contends Peck did not "earn" the MIP bonus, and therefore such bonus was not "due and owing." In determining whether wages are "due" to an employee and, thus, required to be paid under the IWCA, the Idaho Supreme Court directs courts to determine "whether the employee is entitled to the wages for services rendered or whether there is more they must do in order to be entitled to the wages." *Smith*, 497 P.3d at 537 (quoting *Savage*, 417 P.3d at 238). If an employee

was entitled to the bonus at the time she brought suit, it would fall under the IWCA. *Id.* at 537-38. If an employee had to do more to earn the bonus, it would not. *Id.*

Peck contends she had "earned" the MIP bonus at the time of her termination because (1) she "was employed by UPS for the vast majority of 2021, including through the busiest portion of the holiday season," (2) she "was not subject to any form of discipline during 2021," (3) she "was never informed that she was not eligible to receive the MIP bonus in 2021," and (4) Emerson made the decision to terminate her employment prior to October 27, 2021, but then waited until December 13 to terminate her employment. (Dkt. 36-2 at pp. 8-9). Peck insists that she needed to do nothing else to earn her bonus by December 13, when she was fired, but that "UPS waited until the end of the December to terminate [her] employment in an effort to deprive her of her bonus while still exploiting her leadership during the holiday season." (*Id.* at p. 9). These facts are not enough to establish the MIP bonus was due and owing.

The MIP is a program designed "to align incentive pay with annual performance." (Dkt. 36-4 at p. 24). To qualify for a MIP bonus, a manager or supervisor must demonstrate exceptional performance the entire calendar year and receive their manager's recommendation, as well as the approval of the "UPS Salary Committee." (Dkt. 39-14 at ¶ 11; Dkt. 36-4 at pp. 25, 31-32). In addition, the employee must still be employed by UPS as of "the last full business day" of the calendar year. (Dkt. 36-4 at pp. 25-26, 32) (explaining the salary committee at the end of each "Plan Year" calculates the performance award for each "Eligible Employee" who is "employed on the MIP Eligibility Date," defined as the "last full business day of the Plan Year"). Once the employee meets this criteria, UPS evaluates the bonuses and pays them out "no later than March 15" of the following calendar year. (*Id.* at p. 28).

**MEMORANDUM DECISION AND ORDER - 17**

Peck's manager testified he would not and did not recommend Peck for the MIP bonus in 2021 because of her involvement in two substantiated investigations for dishonest reporting practices. (Dkt. 39-14 at ¶ 11). Further, that Peck was not employed with UPS at the end of 2021 is undisputed. The evidence conclusively shows Peck did not qualify for the MIP Bonus. (*Id.*).

Other than her blanket assertion declaring she was eligible to receive an MIP bonus in 2021 (Dkt. 36-3 at ¶¶ 8, 27), Peck offers no evidence indicating the MIP bonus was "due" at the time of her termination. Peck's subjective belief that she had "earned" the MIP bonus in 2021 does not refute her manager's testimony that he did not recommend her for the bonus because of her unsatisfactory performance. Regardless, even if Peck had "earned" the bonus, as she contends, she fails to establish the bonus was "due" at the time of her termination: MIP policy unambiguously required Peck remain employed at UPS through the "last full business day of the Plan Year" to qualify for the bonus. Peck, however, was not employed on this date. Because she failed to satisfy this condition, the bonus was not due to Peck at the time of her termination. *Smith*, 497 P.3d at 540-41 (explaining that unambiguous contract provision required plaintiff to remain "employee in good standing on the payment date" to receive commissions and that commissions were not "due" at the time of his separation from employment because employee resigned before contractual payment date).

As the Idaho Supreme Court made clear in *Smith*, "the proper focus under the Wage Claim Act is whether wages were 'due,' not whether they were earned." *Id.* at 539 With no evidence showing the bonus was "due" at the time of her termination, Peck's wage claim necessarily fails and must be dismissed. *Id.* at 540-41 (dismissing plaintiff's wage claim where plaintiff failed to show the disputed commissions were "due" at the time he resigned even if the plaintiff had "earned" the wages prior to his resignation).

**MEMORANDUM DECISION AND ORDER - 18**

### 2.    Breach of Contract

For similar reasons, Peck's claim that UPS breached its contract with her by terminating her employment "two weeks before she would have been paid her MIP bonus" also fails. A breach of contract claim requires (1) existence of a contract, (2) breach of the contract, (3) causation, and (4) damages. *O'Dell v. Basabe*, 810 P.2d 1082, 1099 (Idaho 1991). "An employee handbook can be an element of an employment contract in an at-will employment relationship." *Knudsen v. J.R. Simplot Co.*, 483 P.3d 313, 327 (Idaho 2021). Peck maintains the first element—the existence of a contract—"is established by the existence of UPS's MIP policy," which policy "was used to incentivize hard work and loyalty among the UPS managers." (Dkt. 36-2 at p. 10). Yet, other than establishing the mere existence of the policy, Peck points to no language in the policy restricting UPS's ability to fire Peck before she became eligible for the MIP bonus.

In Idaho, a presumption exists that an employee hired for an indefinite period of time is an at-will employee who may be terminated at any time for any reason. *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 387 (Idaho 2005). While the employer's right to terminate the contract at will may be limited through an implied-in-fact agreement, *id.*, Peck offers no evidence to suggest UPS abandoned the right to terminate Peck at-will, *id.* Because Peck was an at-will employee, and nothing in the MIP policy restricts UPS's ability to terminate her at any time, she has failed to state a claim for breach of contract. *Id.*; *see also Lawson v. Heartland Payment Sys., LLC*, 548 F. Supp. 3d 1085, 1096 (D. Colo. 2020) (finding plaintiff who alleged that her employer fired her to avoid paying commissions allegedly earned failed to state breach-of-contract claim because plaintiff was at-will employee).

C.    **Employee Dispute Program**

Peck next alleges UPS breached its contract with her by refusing "to comply with the EDR process" governed by UPS's EDR Program Manual (Manual). Peck argues that "because UPS failed to follow the recommendation of the peer review group and refused to participate in mediation," UPS breached the EDR contract. (Dkt. 36-2 at p. 11). This claim fails at the outset because Peck failed to establish the Manual constituted a contract.

As noted above, an employer's policies and statements may be part of an employment contract. *Knudsen*, 483 P.3d at 327. "Whether an employee manual constitutes an element of an employment contract is generally a question of fact unless the handbook 'specifically negates any intention on the part of the employer to have it become a part of the employment contract.'" *Nix v. Elmore Cnty.*, 346 P.3d 1045, 1052 (Idaho 2015) (quoting *Mitchell v. Zilog, Inc.*, 874 P.2d 520, 523-24 (Idaho 1994)). Under *Zilog*, this Court must examine the Manual, the EDR Request Form Peck signed, and any other written and oral statements made to Peck, "to determine first, whether they specifically negate any intention of contract formation." *Id.* (quoting *Zilog*, 874 P.2d at 524). If not, the Court must then determine if a question of fact exists whether the parties intended the Manual to express a term of the employment contract. *Id.*

First, and most importantly, the Manual states on its first page that it is not a contract:

> Note: The UPS Employee Dispute Resolution (EDR) Program establishes a procedure for resolving workplace disputes, but does not establish any of the terms of your employment. The UPS EDR Program creates a mechanism for the investigation and resolution of employment related concerns. Although that mechanism may change from time to time to improve its efficiency, it is intended to be a process upon which you and the company will rely. At the same time, however, *nothing in the EDR process or this program booklet creates a contract of employment, express or implied, for any period of time. The UPS EDR Program does not alter UPS's at-will employment policy.*

(Dkt. 37-17 at p. 3) (emphasis added).

Second, the Manual informs UPS employees the EDR Peer Review Panel's recommendation is nonbinding. The Peer Review Panel consists of three UPS employees, two members chosen by the employee and one member chosen by the company, who review evidence and listen to informal testimony from the employee, company representative, and witnesses, and make a recommendation on whether to uphold discipline or modify it. In a bold typeface page entitled "Non-Binding Nature of the Peer Review Recommendation," the Manual further clarifies neither UPS nor the employee are bound to follow the recommendations of the EDR panel, underscoring the nonbinding nature of the Manual. (*Id.*).

When the Manual is read as a whole, it does not create enforceable contract rights. *Nix*, 346 P.3d at 1052 (explaining language in policy expressly disclaiming any intent to having its provision become part of employment and language informing employees that policy terms were discretionary made clear policy "did not create enforceable contract rights"). Instead, the Manual's provisions are more aptly characterized as guidelines and expectations. *Id.* An employer may provide guidelines, which are necessary conditions for continued employment, without having them read as a contract or a guarantee for a specific term of employment. *Id.* (citing *Jenkins*, 108 P.3d at 389).

Peck does not point to a signed contract or any other evidence to indicate the Manual created enforceable contract rights obligating UPS to follow the Peer Review Panel's recommendation or to participate in mediation. Contrary to Peck's assertion, the EDR Request Form she signed did not create such an obligation. Rather, the request form merely contains a signed acknowledgment stating that Peck was subject to the EDR process and must comply with the EDR guidelines and that she received, reviewed, and understood the guidelines, which expressly state the EDR process is nonbinding. (Dkt. 36-4 at p. 107). The acknowledgement further

states that Peck acknowledged and agreed "the Arbitration step of the EDR process is optional" for UPS and that she had no right to compel UPS to arbitrate the dispute covered by the request. (*Id.*). It did not state *only* the arbitration step of the EDR process was optional. In fact, the EDR guidelines, which Peck acknowledged she reviewed and understood, expressly state the meditation step is "optional." (Dkt. 37-17 at pp. 8, 12). Likewise, as noted, the guidelines also make clear the Peer Review Panel's recommendation is nonbinding. (*Id.* at p. 10).

In short, Peck has failed to present a genuine issue of material fact that the EDR Program Manual or the EDR Request Form created an enforceable contract obligating UPS to follow the Peer Review Panel's recommendation or to engage in mediation. In the absence of a contract, Peck's claim for breach of contract relating to the EDR process fails.

### D.    Breach of the Covenant of Good Faith and Fair Dealing

Finally, Peck argues that UPS breached the implied covenant of good faith and fair dealing when it refused to pay Peck her MIP bonus and allegedly failed to comply with the EDR process. "Idaho law recognizes that a covenant of good faith and fair dealing is found in all employment agreements, including employment-at-will relationships." *Howell v. Portneuf Med.* Ctr., LLC, 2018 WL 11469964, at *6 (D. Idaho Aug. 6, 2018) (citing *Zilog*, 874 P.2d at 526); *see also Knudsen*, 483 P.3d at 327 (Idaho 2021) (quoting *Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 992 (2009)) ("A covenant of good faith and fair dealing is implied in all employment agreements—including at-will employment relationships."). "The covenant requires the parties to perform, in good faith, the obligations contained in their agreement, and a violation occurs when either party violates, qualifies, or significantly impairs any benefit or right of the other party under the contract—whether express or implied." *Van*, 212 P.3d at 992.

Because a good faith and fair dealing claim cannot be used to add additional terms to a contract, *Knudsen*, 483 P.3d at 328, Peck must demonstrate the existence of a question of fact as to whether UPS breached an express or implied term of her employment contract to establish a good faith and fair dealing claim. Even construing all reasonable inferences and facts in Peck's favor, the Court finds Peck fails to identify any term or condition of the employment agreement that UPS breached. As discussed above, UPS's refusal to pay Peck an MIP bonus in 2021 did not breach the MIP policy; thus, UPS did not "violate, qualify, or significantly impair" any of Peck's benefits or rights when it did not pay her that bonus. Further, the Manual and the EDR Request Form did not create any binding contractual rights for Peck or otherwise obligate UPS to follow the peer review group's recommendation or to participate in mediation.

"The implied covenant of good faith does not create new duties that are not inherent in the employment relationship, nor does it alter an employer's right to fire an at-will employee by creating a for cause requirement." *Nix*, 346 P.3d at 1055 (internal quotation marks omitted). Peck presents no argument, nor are there facts in the record to suggest, that UPS failed to perform in good faith obligations under an employment agreement. Accordingly, Peck's good faith and fair dealing claim is dismissed.

### IV. ORDER

**IT IS ORDERED that:**

1. Peck's Motion for Partial Summary Judgment (Dkt. 36) is **DENIED.**

2. UPS's Motion for Summary Judgment (Dkt. 37) is **GRANTED.**

DATED: December 10, 2024

Amanda K. Brailsford
U.S. District Court Judge